Page 1

1  IN THE UNITED STATES DISTRICT COURT
2  FOR THE NORTHERN DISTRICT OF OHIO
3  EASTERN DIVISION
4        - - -
5  MELISSA YATSKO and DARIAN )
6  ALLEN, Co-Admrs. of the  )
7  Estate of Thomas Yatsko,  )
8      Plaintiffs,    ) Case No.
9    -vs-          ) 1:18-cv-00814
10 SERGEANT DEAN GRAZIOLLI, ) Judge Dan A.
11 et al.,          ) Polster
12                )
13    Defendants.   )
14      - - - o0o - - -
15    Videotaped deposition of SERGEANT DEAN
16 GRAZIOLLI, a Defendant herein, being called
17 by the Plaintiffs as if upon cross-
18 examination under the statute, and taken
19 before Angelika P. Shane, a Notary Public
20 within and for the State of Ohio, pursuant
21 to agreement of counsel, on Wednesday, the
22 30th day of January, 2019, at 1:00 p.m., at
23 the offices of Spangenberg, Shibley & Liber,
24 LLP, 1001 Lakeside Avenue, Cleveland, Ohio.
25      - - - o0o - - -

Page 2

1  APPEARANCES:
2
3    ON BEHALF OF THE PLAINTIFFS:
4
5    Spangenberg Shibley & Liber LLP
6    Nicholas A. DiCello, Esq.
7    Jeremy A. Tor, Esq.
8    Kevin C. Hulick, Esq.
9    1001 Lakeside Avenue East  Suite 1700
10   Cleveland, Ohio  44114
11   216-696-3232
12   ndicello@spanglaw.com
13   jtor@spanglaw.com
14   khulick@spanglaw.com
15
16
17   ON BEHALF OF THE DEFENDANT
18   SERGEANT DEAN GRAZIOLLI:
19
20   David M. Leneghan, Esq.
21   200 Treeworth Blvd.  Suite 200
22   Broadview Heights, Ohio  44147
23   440-838-4260
24   leneghanlaw@yahoo.com
25

Page 3

1  ON BEHALF OF THE DEFENDANTS
2  CORNER ALLEY FOURTH LIMITED
3  PARTNERSHIP, CORNER ALLEY UPTOWN, LLC,
4  CORNER ALLEY, LLC, MRN DEVELOPMENT
5  CORPORATION, MRN ENTERPRISES, LLC AND
6  MRN INVESTMENT GROUP, LLC:
7
8  Collins, Roche, Utley & Garner, LLC
9  Patrick M. Roche, Esq.
10 800 Westpoint Pkwy.  Suite 1100
11 Westlake, Ohio  44145
12 216-916-7730
13 pmroche@cruglaw.com
14
15
16 ON BEHALF OF THE DEFENDANT
17 CITY OF CLEVELAND:
18
19 City of Cleveland Law Department
20 Michael J. Pike, Esq.
21 601 Lakeside Ave.  Room 106
22 Cleveland, Ohio  44114
23 216-664-2775 (Direct)
24 mpike@city.cleveland.oh.us
25

Page 4

1  ON BEHALF OF SAFECO INSURANCE COMPANY
2  OF INDIANA:
3
4  Frost Brown Todd, LLC
5  Frank S. Carson, Esq.
6  10 West Broad Street
7  One Columbus  Suite 2300
8  Columbus, Ohio  43215
9  614-464-1211
10 fcarson@fbtlaw.com
11
12
13 VIDEOGRAPHER:  George Tackla
14
15      - - -
16
17
18
19
20
21
22
23
24
25

Deposition of Sergeant Dean Graziolli                                      Melissa Yatsko and Darian Allen vs. Sergeant Dean Graziolli, et al.,

| | Page 5 |
| --- | --- |

## OBJECTION INDEX

| BY | PAGE/LINE |
| --- | --- |
| Mr. Roche | 36-9 |
| Mr. Roche | 37-12 |
| Mr. Roche | 38-7 |
| Mr. Pike | 41-3 |
| Mr. Pike | 41-9 |
| Mr. Pike | 45-11 |
| Mr. Pike | 46-7 |
| Mr. Pike | 46-17 |
| Mr. Pike | 50-11 |
| Mr. Pike | 58-9 |
| Mr. Pike | 59-19 |
| Mr. Pike | 70-13 |
| Mr. Leneghan | 144-22 |
| Mr. Pike | 145-1 |
| Mr. Pike | 145-13 |
| Mr. Roche | 154-4 |
| Mr. Pike | 156-16 |
| Mr. Roche | 160-1 |
| Mr. Roche | 168-21 |
| Mr. Leneghan | 204-13 |
| Mr. Pike | 205-20 |
| Mr. Roche | 205-22 |
| Mr. Pike | 207-20 |

| | Page 6 |
| --- | --- |

| BY | PAGE/LINE |
| --- | --- |
| Mr. Pike | 213-15 |
| Mr. Pike | 214-19 |
| Mr. Roche | 222-22 |
| Mr. Pike | 248-6 |

- - -

| | Page 7 |
| --- | --- |

VIDEOGRAPHER:  We're on the
record.  Will you please swear in
the witness.

- - -

SERGEANT DEAN GRAZIOLLI, of
lawful age, a Defendant herein, having been
first duly sworn, as hereinafter certified,
deposes and says as follows:

- - -

CROSS-EXAMINATION OF SERGEANT DEAN GRAZIOLLI
BY MR. TOR:

Q   Good afternoon, sir.
A   Good afternoon.
Q   State your full name for the record,
please.
A   Dean Victor Graziolli.
Q   And your date of birth?
A
Q   What is your home address?
A

Q   How long have you lived there?
A   Almost 20 years.
Q   Who lives there with you?
A   No one, just myself.

| | Page 8 |
| --- | --- |

Q   Was that your home address as of
January 13th, 2018?
A   Did you say 2018?
Q   Correct.
A   Yes, it is.
Q   Was anyone living with you at that
address at that time?
A   No.
Q   What is your work address?
A   881 East 152nd Street.
Q   And what is that?
A   It's the Cleveland Division of Police,
District Five.
Q   Are you married, sir?
A   I am not.
Q   Have you ever been married?
A   Yes.
Q   How many times?
A   Two times.
Q   And you've been divorced two times?
A   I have.
Q   To whom was your first marriage?
A   Kristine Wagner.
Q   And what year did you marry her?
A   1996.

Page 9

1  Q   What year did you divorce?
2  A   2000.
3  Q   And your second marriage?
4  A   Lanett Ventura.
5  Q   What year did you get married?
6  A   2013 to last year, 2018.
7  Q   Are you still a Cleveland police
8  officer?
9  A   Yes.
10 Q   What's your current rank?
11 A   Sergeant of Police.
12 Q   All right, sir, you understand you're
13 here to have your deposition taken in this
14 civil lawsuit brought on behalf of Thomas
15 Yatsko's parents?
16 A   I do.
17 Q   You understand you're named as a
18 defendant in this case?
19 A   I do.
20 Q   And you understand that in addition to
21 yourself, the City of Cleveland and Corner
22 Alley Uptown, LLC are named defendants in
23 this case?
24 A   Yes.
25 Q   Have you ever had your deposition taken

Page 10

1  before?
2  A   Concerning this?
3  Q   Ever in any case.
4  A   I think once in an accident, accident
5  case.
6  Q   Like a personal injury case?
7  A   It was a -- it was just a car accident
8  that I think we did the paperwork on.
9  Q   Were you injured in that ccar --
10 A   I was not, no.
11 Q   Were you the responsible driver in that
12 case?
13 A   No.
14 Q   Okay.  Well, Just tell me a little bit
15 about the case.
16 A   Just was the investigating officer on
17 it.
18 Q   I see.
19 A   Did the crash report.
20 Q   So you were essentially a witness in
21 that case?
22 A   No.
23 Q   Doesn't matter.  When was that
24 deposition?
25 A   I don't recall when it was.

Page 11

1  Q   Okay.  So other than that one time
2  having had your deposition taken, can you
3  think of any other times you've had your
4  deposition taken?
5  A   No.
6  Q   Have you ever testified in court?
7  A   I have.
8  Q   In a civil case?
9  A   No, I don't recall.
10 Q   But in criminal cases?
11 A   Yes.
12 Q   All right.  I'm sure your lawyer
13 explained the ground rules.  You are
14 represented by a lawyer here today?
15 A   I am, yes.
16 Q   Who's your lawyer?
17 A   David Leneghan.
18 Q   Okay.  I'm going to go over the ground
19 rules with you.
20 A   Okay.
21 Q   This is a deposition.  I'll be asking
22 questions and you'll be providing the
23 answers, okay?
24 A   Okay.
25 Q   It's important that you answer verbally

Page 12

1  because we have a court reporter here.
2  Understood?
3  A   Mm-hmm, yes.
4  Q   Okay.  Wait for me to finish my
5  questions before you answer, okay?
6  A   Yes.
7  Q   And I'll try to do the same, I'll try
8  not to cut you off, okay?
9  A   Yes.
10 Q   If you don't understand my question,
11 you need to tell me that, okay?
12 A   Okay.
13 Q   I'm going to rely on you to tell me you
14 don't understand the question, not any of
15 the lawyers around the table, okay?
16 A   Okay.
17 Q   All right.  You understand you're under
18 oath right now?
19 A   I do.
20 Q   And this is the same oath that you
21 would take at trial in this case?
22 A   I do.
23 Q   Okay.  Is this an important oath you
24 think?
25 A   Very important.

Page 13

1  Q    Okay.  Tell me why it's important.
2  A    It's about the truth.
3  Q    As a police officer, are you aware of
4  the penalties for lying under oath?
5  A    I am.
6  Q    What are the penalties?
7  A    You can face criminal -- criminal time,
8  criminal repercussions.
9  Q    Perjury?
10 A    Yes.
11 Q    Sir, do you have any vision problems?
12 A    I do not.
13 Q    Do you wear prescription glasses or
14 prescription contacts?
15 A    I do not.
16 Q    Have you ever?
17 A    I wear reading glasses.  That's about
18 it.
19 Q    Okay.  Are those prescription reading
20 glasses or --
21 A    Yeah.
22 Q    They are.  Okay.  Do you use glasses
23 for any other purpose other than reading?
24 A    No.
25 Q    Okay.  Do you have any hearing

Page 14

1  problems?
2  A    No.
3  Q    Have you ever had any hearing
4  problems?
5  A    No.
6  Q    Are you currently on any medication
7  that you think might affect your memory?
8  A    No, I don't believe so.
9  Q    Are you on any medication that you
10 think might affect your ability to testify
11 truthfully and accurately?
12 A    No.
13 Q    Okay.  All right, sir, will you please
14 tell me everything that you did to prepare
15 for this deposition.
16 A    I didn't do anything.
17 Q    Did you meet with your lawyer?
18 A    I met with my attorney, yes.
19 Q    Okay.  And when did you meet with your
20 lawyer?
21 A    Today.
22 Q    Any other times?
23 A    No.
24 Q    Was anyone else present during your
25 meeting with your lawyer?

Page 15

1  A    No.
2  Q    You attended the deposition of Deleon
3  McDuffie; is that correct?
4  A    I did.
5  Q    Did you take any notes during his
6  deposition?
7  A    I did not.
8  Q    Did you take any notes after the
9  deposition?
10 A    I did not.
11 Q    Did you talk with anybody about his
12 deposition testimony?
13 A    No.
14 Q    Have you reviewed the deposition
15 transcript of Breann Steele?  That was the
16 blond woman who was on the patio at the time
17 of your interaction with Thomas Yatsko.
18 A    No.
19 Q    Have you read her deposition?
20 A    I have not.
21 Q    Has anyone told you what her testimony
22 is?
23 A    No.
24 Q    Have you reviewed any documents related
25 to this case in preparation for your

Page 16

1  deposition?
2  A    No, I have not.
3  Q    Were you interviewed at any point by
4  the Cuyahoga County Sheriff's Office related
5  to the incident that occurred on January
6  13th, 2018?
7  A    No.
8  Q    You were not interviewed?
9  A    I was not.
10 Q    Were you asked to be interviewed by
11 that office?
12 A    Yes.
13 Q    And what was your response?
14 A    By the advice of counsel, I declined.
15 Q    And how did you communicate to them
16 that you declined?  Was this over the phone,
17 e-mail or some other format?
18 A    I'm not sure how the attorney
19 responded.
20 Q    So you relied on your attorney to
21 communicate to the sheriff's office?
22 A    That's correct.
23 Q    I understand.  And what was the basis
24 for declining to be interviewed by the
25 sheriff's office?

Page 17

1  A    Because of the ongoing investigation.
2  Q    The ongoing criminal investigation?
3  A    Correct.
4  Q    When was it that they reached out to
5  you or your attorney to ask to interview
6  you?
7  A    It was last year. I would say -- I
8  would say the springtime.
9  Q    I'll press you a little bit. Could you
10 be more precise in terms of giving me a
11 month that you think that the sheriff's
12 office reached out to you?
13 A    No, I'm sorry, I cannot.
14 Q    And how did they contact you?
15 A    Through the attorney.
16 Q    Mr. Leneghan?
17 A    No.
18 Q    Which attorney was it?
19 A    Bob Phillips.
20 Q    Was Bob Phillips an attorney provided
21 to you through the FOP?
22 A    He is the FOP attorney.
23 Q    He is the FOP attorney?
24 A    Right.
25 Q    What does that mean? Does that mean

Page 18

1  anytime a police officer might need an
2  attorney, that would be the attorney
3  representing them?
4  A    It could be him.
5  Q    Okay. When did Bob Phillips become
6  your attorney with respect to this matter?
7  A    I would say probably 2002 when I became
8  a sergeant.
9  Q    Okay. Let me ask the question a little
10 bit better.
11     When did Bob Phillips become your
12 attorney with respect to the criminal and/or
13 civil liability arising out of the incident
14 on January 13th, 2018?
15 A    When the sheriff's department contacted
16 him through the union.
17 Q    In the springtime?
18 A    Yes.
19 Q    Okay. So you did not have an
20 attorney-client relationship with him with
21 respect to the incident on January 13th,
22 2018 before that point?
23 A    Correct.
24 Q    Was that the one and only time, as far
25 as you're aware, that the sheriff's office

Page 19

1  reached out to interview you with respect to
2  the criminal investigation?
3  A    As far as I'm aware, yes.
4  Q    Okay. Have you been provided any
5  documents related to that criminal
6  investigation?
7  A    I have not.
8  Q    Do you have any idea what has happened
9  with respect to that criminal
10 investigation?
11 A    Yes.
12 Q    What is your understanding?
13 A    That the investigation is now with the
14 Franklin County prosecutor's office.
15 Q    And are you aware of any action that
16 the Franklin County prosecutor's office has
17 taken with respect to the case?
18 A    I am not.
19 Q    Have you been contacted by them?
20 A    Again, through the attorney.
21 Q    Your attorney has been contacted by the
22 prosecutor's office?
23 A    Correct.
24 Q    Same attorney?
25 A    Yes.

Page 20

1  Q    When was that? When did they reach out
2  to your attorney?
3  A    I would say it was the first week of
4  this year.
5  Q    And what was your attorney's response?
6  A    I believe his response was to them that
7  I was not going to provide them with a
8  statement.
9  Q    Do you know if they were asking for a
10 written statement from you or whether they
11 were asking to interview you or take your
12 testimony under oath? Do you have any idea
13 what they wanted?
14 A    I remember reading a voluntary
15 statement. They asked me if I wanted to
16 give a voluntary statement.
17 Q    And was it your understanding that that
18 would be provided in writing, that you would
19 write out your statement or that you would
20 give it verbally in a setting like this?
21 A    I think either/or.
22 Q    So you didn't get into the details of
23 it, they just asked for a voluntary
24 statement and your attorney declined?
25 A    Right, yes.

Page 21

1  Q    And that's what you wanted, I presume?
2  A    Yes.
3  Q    Have you at any point watched the
4  surveillance video from The Corner Alley
5  from the night of the incident?
6  A    I have not.
7  Q    Has anybody told you what the video
8  shows?
9  A    No.
10  Q    Have you been curious to know what the
11  video shows?
12  A    I don't have an answer for that.  I
13  don't -- I've never thought about that.
14  Q    You don't have an interest in seeing
15  what's on the video?
16  A    No.
17  Q    All right.  You provided some written
18  discovery answers in this case through your
19  attorney, correct?
20  A    I did.
21  Q    Okay.  Those were interrogatories that
22  my office sent to you through your attorney,
23  correct?
24  A    Correct.
25  Q    All right.  And you provided answers to

Page 22

1  those interrogatories related to this case,
2  correct?
3  A    Yes.
4  Q    Okay.  So I want to follow up on some
5  of the answers you provided.  So one of the
6  interrogatories we asked was for you to
7  identify people you've spoken to about the
8  incident, and when I say "incident," you
9  understand what I'm talking about, right?
10  A    Yes.
11  Q    Okay.  The incident that happened at
12  The Corner Alley, January 13th, 2018, right?
13  A    Right.
14  Q    Involving you and Thomas Yatsko, right?
15  A    Yeah.
16  Q    I just want to make sure we're on the
17  same page.  You told me in your discovery
18  answer that you've spoken with CPD Internal
19  Affairs investigators, so that's the
20  Cleveland Police Internal Affairs
21  investigators?
22  A    Yes.
23  Q    All right.  Can you recall the names of
24  the investigators that you spoke to?
25  A    It's Lieutenant Rob Tucker.

Page 23

1  Q    Rob Tucker?
2  A    Rob Tucker.  Sergeant Jason -- I can't
3  recall his last name, and then there's a
4  third sergeant.  I can't recall the third
5  sergeant's name.
6  Q    Anyone else from the Internal Affairs
7  Division that you spoke to about this case?
8  A    No.
9  Q    When did you speak with these
10  individuals about the incident?
11  A    It was only a few days after the
12  incident.
13  Q    Where was it that you spoke with them?
14  A    It was at the Justice Center, in their
15  offices.
16  Q    What did they ask you?
17  A    They asked me specific questions.
18  Q    And did you answer those questions?
19  A    Yes.
20  Q    Do you know if your conversation with
21  these individuals, these investigators, was
22  recorded either by video or audio or by
23  stenographic means like a court reporter?
24  A    I believe by video and audio.
25  Q    Were you under oath at the time of this

Page 24

1  interview?
2  A    No, I don't believe so.
3  Q    Did you have an attorney present with
4  you?
5  A    I did.
6  Q    Who was the attorney?
7  A    Bob Phillips.
8  Q    Okay.  Have you ever reviewed the video
9  or audio of your interview?
10  A    I have not.
11  Q    How long did this interview last?
12  A    I don't recall.
13  Q    I'm going to press you a little bit on
14  that.  Do you think it was longer than an
15  hour?
16  A    Yes, I believe so.
17  Q    Do you think it was longer than three
18  hours?
19  A    I don't know.
20  Q    Okay.  But certainly longer than an
21  hour?
22  A    I believe so, yes.
23  Q    So presumably they asked you a number
24  of specific questions about the incident; is
25  that fair?

Deposition of Sergeant Dean Graziolli                    Melissa Yatsko and Darian Allen vs. Sergeant Dean Graziolli, et al.,

Page 25

1  A    Yes.
2  Q    Did you prepare a written statement
3  before this interview?
4  A    I did not.
5  Q    Have you ever prepared a written
6  statement about the incident?
7  A    No.
8  Q    So other than yourself, Bob Phillips,
9  these three investigators, who else was
10 present during the interview?
11 A    The FOP president, Brian Bentley,
12 Captain Brian Bentley, and the FOP first
13 vice president, Lieutenant Jerry Zarlenga.
14 Q    Anyone else?
15 A    No, I don't believe so.
16 Q    Have you had a conversation with anyone
17 about your interview after it happened?
18 A    No.
19 Q    Did you sit for any other interview
20 with anyone in any setting related to the
21 incident other than that one that you just
22 told me?
23 A    No.
24 Q    Okay.  Some other individuals you
25 identified in your interrogatory responses

Page 26

1  that you spoke with about the incident
2  includes your FOP attorney, Bob Phillips,
3  FOP president, Captain Brian Bentley.  Did
4  you speak with Mr. Bentley outside of the
5  setting of that interview you just told me
6  about?
7  A    No.
8  Q    That was the one and only circumstance
9  in which you had a conversation with him at
10 that point?
11 A    Yes.
12 Q    Did you talk with him before the
13 interview happened?
14 A    No.
15 Q    Did you talk with him after?
16 A    No.
17 Q    What about FOP first vice president,
18 Lieutenant Gerald Zarlenga, he was also
19 present at the interview?
20 A    He was.
21 Q    Did you talk with him before the
22 interview?
23 A    No.
24 Q    After?
25 A    No.

Page 27

1  Q    And the other person you identified is
2  the City of Cleveland stress consultant, Dr.
3  Franklin.  Is this somebody you are seeing
4  related to this incident?
5  A    Initially I saw her.  I see someone
6  else now.
7  Q    And what was the purpose of seeing Dr.
8  Franklin?
9  A    Deal with the aftermaths of the
10 incident.
11 Q    Can you recall how many different times
12 you met with Dr. Franklin?
13 A    Couldn't give you a number, but it's
14 numerous times.
15 Q    When did you stop seeing Dr. Franklin?
16 A    When I started seeing an outside --
17 outside doctor.
18 Q    Can you give me a time frame?
19 A    I'm sorry, I cannot.
20 Q    It was sometime last year that you
21 switched from Dr. Franklin to an outside
22 provider?
23 A    Yes.
24 Q    Do you think it was in the springtime,
25 in the summertime?

Page 28

1  A    If I could give you a specific time, I
2  would give it to you.  I don't know it.
3  Q    Okay.  Who is the outside provider that
4  you now see?
5  A    Dr. Eddie Myers.
6  Q    And where does he practice?
7  A    He has an office over on Rocky River
8  Drive.
9  Q    And is that where you see him?
10 A    Yes.
11 Q    Are you still seeing him?
12 A    Yes.
13 Q    How often?
14 A    It varies.
15 Q    From what to what?
16 A    Usually once every week or once every
17 couple of weeks to more than one time, you
18 know, in those time frames.
19 Q    So as frequently as once a week?
20 A    Yeah.
21 Q    Have you been given a diagnosis, mental
22 health diagnosis, related to this incident?
23 A    He has not given me a specific
24 diagnosis.
25 Q    Has any mental health provider given

Page 29

1 you any specific diagnosis?
2 A   No.
3 Q   Are you obligated to see a stress
4 consultant or is this something you've
5 chosen to do on your own?
6 A   I've chosen to do it on my own.
7 Q   From the beginning, it was your choice
8 or was it at the beginning something you --
9 A   No, it's always been my choice.
10 Q   Before the incident, had you ever seen
11 any kind of mental health provider for
12 anything?
13 A   No.
14 Q   Other than the individuals we talked
15 about, have you spoken with anyone else at
16 the Cleveland Police Department about the
17 incident?
18 A   No, I have not.
19 Q   Were you interviewed by anybody at the
20 scene of the incident?
21 A   I was not.
22 Q   Were you interviewed by anybody at the
23 hospital where you went from the scene?
24 A   No.
25 Q   Am I correct in understanding that from

Page 30

1 the scene, you went to the University
2 Hospitals?
3 A   Yes.
4 Q   Did you go anywhere in between?
5 A   No.
6 Q   And how did you get to the hospital?
7 A   EMS transported me.
8 Q   Were you accompanied by any officer?
9 A   I was.
10 Q   How many?
11 A   I think two.
12 Q   Do you recall their names?
13 A   I do not recall their names, no.
14 Q   Did they stay with you at the hospital?
15 A   Yes.
16 Q   What was your understanding of the
17 purpose of them staying with you at the
18 hospital?
19 A   Something a policeman would do for
20 another policeman.
21 Q   So you weren't under the impression
22 that you were a suspect in any crime?
23 A   Absolutely not, no.
24 Q   You weren't in their custody, so to
25 speak?

Page 31

1 A   No, I was not.
2 Q   They were just trying to I guess
3 provide some support for you; is that fair?
4 A   I can't speak for them, but...
5 Q   That was your impression?
6 A   Yes.
7 Q   Did you know these officers?
8 A   In passing.
9 Q   But you can't recall who they were as
10 we sit here?
11 A   I cannot, no.
12 Q   All right.  You told me in response to
13 another interrogatory your e-mail address,
14 which is dgraziolli@gmail.com?
15 A   Yes.
16 Q   Have you sent or received any e-mails
17 related in any way to this incident?
18 A   From my attorney, yes.
19 Q   Other than from or to your attorney?
20 A   No.
21 Q   Did you do anything to look in your
22 e-mail inbox or outbox to see whether you
23 have any e-mails related to the incident?
24 A   I don't really understand.
25 Q   Yeah.  You just told me that the only

Page 32

1 e-mails you believe you have related to this
2 incident are either to or from your
3 attorney.
4 A   Okay.
5 Q   My question is what did you do, what
6 steps did you take to verify that you don't
7 have any other e-mails related to this
8 incident?
9 A   I didn't take any other steps.
10 Q   Okay.  You know within gmail, you can
11 perform a search, right?
12 A   The e-mails on the phone, it's not
13 something I'm, you know, a hundred percent
14 versed on.
15 Q   Okay.  Well, something I need to know
16 is if you have any documents, any e-mails,
17 not between you and your attorney, but that
18 are related to this incident, okay?  That's
19 something I need to know, okay?
20 A   Okay.
21 Q   So I'll follow up with your attorney
22 and you and he can undertake efforts to
23 check your e-mail to make sure that you
24 don't have any documents, okay?
25 A   Okay.

Deposition of Sergeant Dean Graziolli      Melissa Yatsko and Darian Allen vs. Sergeant Dean Graziolli, et al.,

Page 33

1   Q   All right. At the time of this
2 incident, you had one cell phone on you; is
3 that right?
4   A   Yes.
5   Q   It was your personal cell phone?
6   A   Yes.
7   Q   And that was the cell phone ending in
8 7901?
9   A   Correct.
10   Q   And your provider was Sprint?
11   A   Yes.
12   Q   And that a Samsung 8S phone?
13   A   Yes.
14   Q   Do you still have that phone?
15   A   Yes.
16   Q   Okay. Did you send or receive any text
17 messages on January 13th, 2018?
18   A   In general?
19   Q   In general, yes.
20   A   I don't recall if I did or not.
21   Q   Have you done anything to see if you've
22 sent or received text messages on that day?
23   A   No, I have not.
24   Q   So as you sit here today, you don't
25 know if you sent or received any text

Page 34

1 messages on that day related to this
2 incident, correct?
3   A   Correct.
4   Q   What about the following day, January
5 14, 2018, any text messages about the
6 incident?
7   A   No.
8   Q   Okay. So that's another thing I'm
9 going to need you and your attorney to do is
10 to look at your text messages from the 13th
11 and the 14th and see if you have any text
12 messages related to this incident, okay?
13   A   Okay.
14   Q   And if you do, produce them, okay.
15   A   (Nodding).
16   Q   All right, sir, are you good to keep
17 going?
18   A   I'm fine.
19   Q   Okay. If you want to take a break at
20 any point, you tell me so, okay?
21   A   Yes.
22   Q   So you understand that The Corner Alley
23 is one of the named defendants in this case?
24   A   Yes.
25   Q   Okay. And one of the reasons that

Page 35

1 they're named in this case is depending on
2 what the court rules and what the jury
3 finds, there may be circumstances under
4 which The Corner Alley might be legally
5 responsible if there's a judgment entered
6 against you, okay?
7   A   Okay.
8   Q   All right. So is it fair to say that
9 on January 13th, 2018, you were working for
10 The Corner Alley?
11   A   Yes.
12   Q   Okay. What was your job title?
13   A   I guess security.
14   Q   You say you guess security. Why do you
15 have doubts or uncertainty about what your
16 job title was?
17   A   As a policeman, you're viewed as
18 security. As a policeman, I'm viewed as a
19 policeman to myself, but to others, we are
20 viewed as security.
21   Q   Did Corner Alley tell you that your job
22 title is security?
23   A   No, they did not.
24   Q   Did you ever have a conversation with
25 Corner Alley about what exactly your job

Page 36

1 title was?
2   A   No.
3   Q   You just had some general sense that it
4 was to provide security at The Corner Alley?
5   A   Yes.
6   Q   And when you interacted with Thomas
7 Yatsko in front of The Corner Alley, you
8 were still on the job, correct?
9      MR. ROCHE:   Objection.
10   Go ahead.
11   A   Could you be more specific?
12   Q   Yeah. You were still working security
13 for Corner Alley at that time?
14   A   Yes.
15   Q   I mean, you didn't notify anybody at
16 Corner Alley that you were going to be off
17 the clock in terms of providing security for
18 Corner Alley at the time that you interacted
19 with Thomas Yatsko, correct?
20   A   I didn't interact with anyone about
21 any topic at Corner Alley.
22   Q   Yeah, no. I apologize if my question
23 was not clear.
24      When you interacted with Thomas Yatsko
25 outside of Corner Alley, okay, did you tell

Page 37

1 anybody at Corner Alley that, "I'm going to
2 be off the clock for a moment, I need to
3 interact with this young man"?  Did you say
4 anything to that effect?
5 A   I did not, no.
6 Q   Okay.  Now, The Corner Alley premises
7 includes the inside where there's the
8 bowling alley and the bar, correct?
9 A   Yes.
10 Q   And The Corner Alley included the patio
11 area in front, correct?
12        MR. ROCHE:      Objection.
13 A   Yes.
14 Q   All right.  And even though it was cold
15 outside on this particular date, you did see
16 that there were some customers using the
17 patio such as to smoke or to make a phone
18 call, correct?
19 A   I don't recall anybody being outside.
20 Q   Okay.  Well, you certainly saw Thomas
21 Yatsko in front of the patio, right?
22 A   Yes.
23 Q   And you saw the blond woman, Breann
24 Steele?  She was in the patio, you saw her?
25 A   I did not see her.

Page 38

1 Q   Okay.
2 A   No.
3 Q   All right.  Your job was to provide
4 security both inside The Corner Alley and in
5 the outside vicinity, including the patio,
6 if necessary?
7        MR. ROCHE:      Objection.
8 A   I guess, yes.
9 Q   Okay.  And when you interacted with
10 Thomas Yatsko at the edge of The Corner
11 Alley patio, were you partly motivated to
12 keep Thomas Yatsko out of The Corner Alley
13 to make sure he doesn't go back inside?
14 A   I don't understand the "partly
15 motivated" part of your question.
16 Q   Right.
17 A   I don't understand that.
18 Q   Fair enough.  And I appreciate you
19 telling me if you don't understand my
20 question.
21     Was one of your objectives in
22 interacting with Thomas Yatsko outside of
23 The Corner Alley is to make sure he didn't
24 go back inside The Corner Alley?
25 A   Yes.

Page 39

1 Q   And did you believe that that was part
2 of your job responsibilities as security for
3 The Corner Alley, to make sure Thomas didn't
4 go back inside the bar?
5 A   Yes.
6 Q   Is it fair to say, sir, that if you
7 weren't working security for the Corner
8 Alley, you likely would not have been at
9 that Corner Alley location that night?
10 A   That's correct.
11 Q   And, therefore, you likely would not
12 have interacted with Thomas Yatsko,
13 correct?
14 A   That's correct.
15 Q   And you likely would not have been
16 carrying your gun on these premises,
17 correct?
18 A   If I wasn't there and if I didn't
19 interact with him, would I have a gun on me?
20 Is that the question?
21 Q   Correct.
22 A   If I was anywhere else other than
23 there?
24 Q   Sure, yeah.
25 A   Not necessarily, no.

Page 40

1 Q   Okay.  All right.  Even though you were
2 working for Corner Alley on January 13th,
3 2018, am I correct in understanding that the
4 Cleveland Police Department did have to
5 approve your secondary employment?
6 A   Yes, that is correct.
7 Q   All right.  And what did you have to
8 do?  What steps did you have to take in
9 order to get approval for this secondary
10 employment?
11 A   There's a form -- a format, I should
12 say, you fill out on a computer.  It has the
13 names, the places, you have to fill that
14 out.  You have to submit a coverage letter
15 for, like, either your own Workers' Comp or
16 for Workers' Comp for the, you know,
17 specific place, and then you have to address
18 any sick time that you personally have used
19 and then it's forwarded through a chain of
20 command.
21 Q   Up to the police chief?
22 A   Not sure if it goes to the chief
23 anymore or if it goes to a designee of his.
24 I'm not sure.
25 Q   Am I correct in understanding that the

Page 41

1  police chief has to approve your secondary
2  employment?
3         MR. PIKE:        Objection.
4  Form.
5  A   That's my understanding.
6  Q   And the Director of Public Safety, does
7  he also have to approve secondary employment
8  for Cleveland police officers?
9         MR. PIKE:        Objection.
10  Form, foundation.
11  A   I'm not sure.
12  Q   Was it your understanding that this
13  permission to work secondary employment
14  could be revoked at any time?
15  A   Yes.
16  Q   And did you have to get permission
17  every year that you work secondary
18  employment?
19  A   Yes.
20  Q   Did you have your permission to work
21  secondary employment at The Corner Alley
22  revoked at any point before January 13th,
23  2018?
24  A   No.
25  Q   When Cleveland police officers are

Page 42

1  engaged in secondary employment, are they
2  authorized to wear their police uniform?
3  A   Yes.
4  Q   Are you wearing your police uniform
5  now?
6  A   I am.
7  Q   Is this the same uniform you wear when
8  you're on duty?
9  A   Yes.
10  Q   And is it the same uniform you wear
11  when you're working secondary employment?
12  A   Yes.
13  Q   Okay.  And can you just describe for me
14  all the different badges and the insignia
15  you have on your shirt?
16  A   Well, the badge would identify my rank,
17  Cleveland Police Sergeant.  Obviously the
18  patches say "Cleveland Police" on them.  The
19  sergeant's patch, the three stripes, is, you
20  know, synonymous with a sergeant's rank, and
21  these would be for every five years of
22  service.
23  Q   So we know from those patches you've
24  been on the force at least 25 years?
25  A   Correct.

Page 43

1  Q   Anything else on your shirt that is
2  relevant?
3  A   No.
4  Q   Okay.  Is this what you were wearing
5  on January 13th, 2018 when you were working
6  secondary employment for The Corner Alley?
7  A   Yes.
8  Q   Are Cleveland police officers required
9  to carry their Cleveland Police Department
10  issued firearms when they're working
11  secondary employment?
12  A   Yes.
13  Q   And were you doing so on the date of
14  the incident?
15  A   Yes.
16  Q   What type of weapon is it?
17  A   It's a Glock model 17.
18  Q   What about the magazines for that gun,
19  are those also issued by the police
20  department?
21  A   Yes.
22  Q   And the bullets inside those magazines?
23  A   Yes.
24  Q   What else are Cleveland police officers
25  required to carry on them while working

Page 44

1  secondary employment?
2  A   A Taser, pepper spray, ASP baton.
3  That's pretty much it.
4  Q   What about handcuffs?
5  A   Oh, handcuffs, yeah.  I'm sorry.
6  Handcuffs.
7  Q   Did you have those items on you while
8  you were working secondary employment for
9  The Corner Alley on January 13, 2018?
10  A   I did not.
11  Q   Why not?
12  A   I worked it before and never as so much
13  had an alter -- a verbal altercation with
14  anybody, so I was lax by not carrying those
15  things, lax in my mind.
16  Q   Are you telling me that you have only
17  ever had a verbal altercation while working
18  secondary employment at The Corner Alley or
19  in your entire career working secondary
20  employment?
21  A   Working there specific, there was no
22  problems whatsoever.
23  Q   Where were these items?  Were they at
24  home, in your car, at the district?
25  A   I don't recall where they were.

Page 45

1  Q    When did you start working for The
2  Corner Alley?
3  A    I think it would have been September of
4  the previous year.
5  Q    2017?
6  A    I believe so.
7  Q    While working secondary employment, are
8  you still required to fulfill certain
9  official responsibilities as a police
10 officer as the circumstances may require?
11         MR. PIKE:      Objection.
12     Form.
13 A    I guess I don't really understand.  If
14 you could be more specific.  I don't really
15 understand.
16 Q    Sure.  Do you still have an obligation
17 to preserve the peace if you observe, say,
18 criminal activity while working secondary
19 employment?
20 A    Yes.
21 Q    If you observe a crime being committed
22 while working secondary employment, do you
23 still have an official responsibility to
24 address that crime?
25 A    Yes.

Page 46

1  Q    And to, if necessary, arrest the person
2  committing the crime?
3  A    Yes.
4  Q    So this is true regardless of whether
5  you're technically on duty or off duty, you
6  still have those official responsibilities?
7         MR. PIKE:      Objection.
8     Form.
9  A    I'm not specifically sure about the
10 "off duty" portion of your question.
11 Q    Sure.  Well, we don't have to use the
12 phrase "off duty," but regardless of whether
13 you're on duty as a police officer or you're
14 working secondary employment, you still have
15 to fulfill those official responsibilities
16 we just talked about?
17         MR. PIKE:      Objection.
18     Form.
19 BY MR. TOR:
20 Q    Is that fair?
21 A    The ones that you spoke about and I
22 answered, yes.
23 Q    Are there any other official
24 responsibilities you have to fulfill as a
25 Cleveland police officer even when you're

Page 47

1  working secondary employment?
2  A    I would say I don't know because it
3  would be specific to whatever I am faced
4  with or observe.
5  Q    There might be other responsibilities,
6  you just can't call any specific ones to
7  mind; is that fair?
8  A    That's fair.
9  Q    Did the Cleveland Police Department
10 ever provide you training regarding
11 secondary employment?
12 A    No.
13 Q    Did the Cleveland Police Department
14 ever provide you training on the rules and
15 regulations you must comply with while
16 working secondary employment?
17 A    Yes.
18 Q    Okay.  And do you recall when you
19 received that training?
20 A    Not specifically, no.
21 Q    Did you receive that training once or
22 multiple times on a regular basis?  Give me
23 an idea.
24 A    It's hard -- it's a hard question to
25 answer.

Page 48

1  Q    Okay.  That's fair.  What format was
2  this training?
3     So let me ask it this way:  The
4  training on the rules and regulations that
5  govern your work while on secondary
6  employment, did you get this training in a
7  classroom setting, did you get it in some
8  kind of live interactive format?  Do you
9  recall the setting or the format?
10 A    I do not.
11 Q    You are aware that there are specific
12 Cleveland Police policies related to
13 secondary employment?
14 A    I am.
15 Q    Okay.  And you're familiar with those
16 policies?
17 A    I am.
18 Q    And you were responsible for following
19 those policies while on secondary
20 employment, correct?
21 A    Yes.
22 Q    In addition, while working secondary
23 employment, you are required to follow the
24 Cleveland Police use of force policies,
25 correct?

Page 49

1 A    Correct.
2 Q    All right.  We talked about some of the
3 attire you had on at the time of the
4 incident, but I want to make sure we cover
5 all the different Cleveland issued equipment
6 and attire you had on at the time.
7      So the pants you wore that night, were
8 those Cleveland Police Department issued
9 uniform pants?
10 A    Yes.
11 Q    What about your shirt?  You were
12 wearing a long sleeve shirt I understand?
13 A    Yes.
14 Q    Underneath your outer shirt here; is
15 that right, or is that what you mean by long
16 sleeve?
17 A    Long sleeve uniform shirt.
18 Q    Got it.  Were you wearing anything else
19 that the Cleveland Police Department had
20 issued to you other than your pants, your
21 shirt, the badges?
22 A    I had an outer coat on.
23 Q    That was a Cleveland Police issued
24 coat?
25 A    Yes.

Page 50

1 Q    Did it say "police" or give any -- have
2 any police markings on it?
3 A    It's exactly like this shirt, except
4 it's a jacket, a heavy jacket.  I believe
5 it's called a cruiser jacket.
6 Q    Was it your understanding you had
7 permission from the Cleveland Police
8 Department to wear all of this attire while
9 working at The Corner Alley?
10 A    Yes.
11      MR. PIKE:    Objection.
12   Form.
13 BY MR. TOR:
14 Q    You mentioned a Taser.  Are you
15 qualified to carry and use a Taser as a
16 Cleveland police officer?
17 A    Yes.
18 Q    And I take it you're qualified and
19 trained to use pepper spray?
20 A    It's been so long ago that we were
21 certified to carry that, I don't know if a
22 certification is an ongoing thing or if it's
23 time-specific.  I don't know the answer to
24 that.
25 Q    Let me ask it this way:  Would you feel

Page 51

1 comfortable using pepper spray?  In other
2 words, do you know how to use pepper spray
3 as a police officer?
4 A    I would say yes.
5 Q    When you're on duty, do you have pepper
6 spray on your duty belt?
7 A    No, I do not.
8 Q    Okay.  When you're on duty, do you have
9 a Taser on your belt?
10 A    It's not on the belt.
11 Q    Where is it?
12 A    It's carried -- I would carry mine in a
13 pocket.
14 Q    But it would be on your person?
15 A    It would be, yes.
16 Q    What about the baton, do you carry that
17 when you're on duty?
18 A    I do not, no.
19 Q    Do you know how to use the baton?
20 A    Yes.
21 Q    Are all those items, the pepper spray,
22 the baton, the Taser, are those all
23 Cleveland Police issued?
24 A    Yes.
25 Q    So let me kind of circle back to an

Page 52

1 earlier question.  While you're on duty,
2 tell me all the weapons that you do carry
3 with you.  Obviously your gun, right?
4 A    It would be the ones that I mentioned.
5 Q    The gun, the Taser?
6 A    Taser.
7 Q    What else?
8 A    The ASP baton and the pepper spray and
9 the handcuffs.
10 Q    Okay.  So you do carry that when you're
11 on duty?
12 A    I carry it with me, yes.
13 Q    And again, you're comfortable using all
14 those different weapons?
15 A    Yes.
16 Q    Have you ever used a Taser on an
17 individual?
18 A    I have not.
19 Q    What about when you were trained on
20 using the Taser, did you ever deploy it on
21 any individual?
22 A    No.
23 Q    Okay.  Have you ever used a baton on
24 any individual?
25 A    Not that I can recall, no.

Deposition of Sergeant Dean Graziolli      Melissa Yatsko and Darian Allen vs. Sergeant Dean Graziolli, et al.,

Page 53

1   Q   Pepper spray?

2   A   Pepper spray, yes.

3   Q   How often have you used pepper spray as

4   a police officer?

5   A   I would say only a few times.

6   Q   You told me earlier that on the night

7   of the incident, you were only carrying a

8   gun, you weren't carrying any of your

9   intermediate weapons, right?

10   A   That's correct.

11   Q   And you told me that the reason you

12   didn't carry these intermediate weapons is

13   because you got a little bit lax because you

14   didn't have any issues at The Corner Alley;

15   is that correct?

16   A   That's correct.

17   Q   Why then did you feel the need to carry

18   a gun?

19   A   I've always carried a gun no matter

20   what the job.

21   Q   Did you think you'd ever have to use

22   the gun?

23   A   No, absolutely not.

24   Q   So you carried the gun as a matter of

25   habit; fair to say?

Page 54

1   A   It's not -- it's not because of habit.

2   It's like you wearing a suit, putting a tie

3   on.

4   Q   Part of your uniform?

5   A   Right.

6   Q   Part of declaring to the public, "I'm a

7   Cleveland police officer"?

8   A   Yeah, I guess, yeah.  I think the

9   uniform says that more, but...

10   Q   Okay.  Part of your job as a police

11   officer involved dealing with citizens who

12   might be noncompliant; is that true?

13   A   That's true.

14   Q   Who might be drunk or unruly, true?

15   A   Mm-hmm, yes.

16   Q   Who might be disobedient or

17   noncompliant, correct?

18   A   Yes.

19   Q   And I take it in your 27-year career,

20   is it 27 years?

21   A   Yes.

22   Q   I take it in those 27 years, you've

23   dealt with such individuals; is that fair?

24   A   That's fair.

25   Q   Okay.  And you're expected to deal with

Page 55

1   these individuals in a professional and

2   reasonable manner, right?

3   A   Yes.

4   Q   And you are expected and presumably

5   trained on conflict management; is that

6   fair?

7   A   I don't know if we've been trained with

8   that specific title.

9   Q   Have you been trained on de-escalation

10   techniques?

11   A   Yes.

12   Q   How often do you receive training on

13   de-escalation?

14   A   That's relatively new to the

15   department.

16   Q   How new is it?

17   A   I would say within the last -- last

18   year or so.  I couldn't give you a date

19   specific.

20   Q   It appears from your personnel file

21   that you received de-escalation training in

22   the fall of 2017; is that correct?

23   A   Okay.  I mean, I don't recall the

24   specific training.

25   Q   Let me ask the question this way:  At

Page 56

1   some point prior to the incident, you had

2   received de-escalation training; is that

3   fair?

4   A   If it's in the personnel file, then we

5   probably received it.

6   Q   As you sit here today, can you recall

7   that training?

8   A   I cannot, no.

9   Q   So you don't know whether it was quick

10   training or long training, correct?

11   A   I don't know.

12   Q   You don't know whether it took 30

13   minutes or several days, correct?

14   A   I do not know.

15   Q   And you can't recall any of the

16   specifics of what you were taught during

17   this training; is that fair?

18   A   That's fair.

19   Q   Can you recall the instructor?

20   A   No.

21   Q   Were you given any written material

22   during this training?

23   A   Again, I don't know.

24   Q   Well, we've talked about

25   de-escalation.  What does that term mean to

Page 57

1  you as a police officer?
2  A   It's got so many -- so many different,
3  I think, steps to it and they are, I feel,
4  specific to whatever you are dealing with.
5      So to answer it in the way you're
6  asking me, I couldn't give you a specific
7  answer.
8  Q   Sure.  I'll ask specific questions
9  then, okay?
10 A   That's fine.
11 Q   All right.  One of the objectives in
12 using de-escalation techniques is to reduce
13 or eliminate the need to resort to force,
14 correct?
15 A   Okay.
16 Q   Were you ever trained about that by the
17 Cleveland Police Department?
18 A   Again, I don't recall the specifics of
19 the training.
20 Q   Were you trained by the police
21 department that de-escalation techniques are
22 important in order to slow down a situation?
23 A   See, the thing I'm having a hard time
24 with is it's hard to answer your question
25 because of, again, I refer back to something

Page 58

1  specific happening and a response to it.  I
2  don't understand how to -- I don't know how
3  to answer that to you.
4  Q   Okay.  Were you trained by the
5  Cleveland Police Department that police
6  officers must take all reasonable steps to
7  de-escalate an incident and reduce the
8  likelihood of having to use force?
9          MR. PIKE:     Objection.
10     Form, foundation.
11 A   I would say if we are given an
12 opportunity to do that, yes.
13 Q   Okay.  Is it your responsibility as a
14 police officer to be proactive in reducing
15 the severity of an encounter with a citizen
16 so as to reduce the need to resort to force?
17 A   If I was given an opportunity to reduce
18 that, then I would, yes.
19 Q   Okay.  Were you trained that an officer
20 should avoid using aggressive body language
21 towards a citizen?
22 A   I don't recall that.
23 Q   Were you ever trained that an officer
24 should avoid getting unnecessarily close to
25 a suspect?

Page 59

1  A   It's more of a personal thing about
2  getting close to somebody than being trained
3  that way.
4  Q   What do you mean?
5  A   Like I wouldn't -- me, personally, I
6  wouldn't get close to somebody.  It's just,
7  I guess -- it's just the way that I'm made
8  up.  It's not necessarily I've been trained
9  that way.
10 Q   You're just not comfortable getting
11 close to another person; is that what you're
12 saying?
13 A   Right.
14 Q   Okay.  Well, were you trained by the
15 Cleveland Police Department that as an
16 officer, you should avoid using a harsh
17 level of voice or tone while interacting
18 with an individual?
19         MR. PIKE:     Objection.
20     Form, foundation.
21 A   I don't recall being specifically
22 trained not to do that or to do it.
23 Q   Were you ever trained by the Cleveland
24 Police Department to avoid using swear or
25 curse words towards an individual?

Page 60

1  A   Again, I don't recall being trained or
2  not trained.
3  Q   Were you trained that as an officer,
4  you should take steps to calm and cool down
5  a situation when interacting with an
6  individual?
7  A   If I'm given the opportunity to, yes.
8  Q   Okay.  But my specific question is
9  whether you were trained by the police
10 department to do that.
11 A   Again, I don't recall, you know,
12 specific black and white in front of me.
13 Q   Okay.
14 A   I don't recall that.
15 Q   Were you trained by the police
16 department that you should as an officer
17 minimize the level of force that you have to
18 use against a suspect?
19 A   Yes.
20 Q   Okay.  I'm going to go through some
21 de-escalation techniques.  I want you to
22 tell me if you've ever been trained by the
23 police department on how to use them, okay?
24 A   Okay.
25 Q   Verbal persuasion?

Page 61

1  A   I don't recall.
2  Q   Advisements, giving advisements or
3  warnings to a suspect?
4  A   Yes.  Okay, yes.
5  Q   When were you trained on that?
6  A   I would say through the course of my
7  career.
8  Q   Were you trained on slowing down the
9  pace of an incident as one of the possible
10  de-escalation techniques?
11  A   I don't recall.
12  Q   Proactively creating a distance between
13  yourself and the suspect?
14  A   I would say yes to that.  Yes.
15  Q   Placing barriers between yourself and
16  the suspect or the subject?
17         VIDEOGRAPHER:  Three
18         minutes of tape.
19  A   Specifically, I don't recall that.
20  Q   Moving yourself to a safer place or
21  safer position?
22  A   Yeah.  Yes, I would say so, yes.
23  Q   Taking steps to avoid having a physical
24  confrontation with the individual?
25  A   I don't recall that one specifically.

Page 62

1  Q   Were you trained to talk to individuals
2  in a calm manner, in a normal tone of voice?
3  A   Not that I can recall.
4  Q   Were you trained that when trying to
5  de-escalate a situation, an officer should
6  ask questions rather than issue orders or
7  commands?
8  A   Not that I can recall.
9         VIDEOGRAPHER:  We're off the
10         record.
11         - - -
12  (Short recess to change tapes.)
13         - - -
14         VIDEOGRAPHER:  We're back on
15         the record.  Tape two.
16  BY MR. TOR:
17  Q   Okay.  Let's talk about the use of
18  force, okay?
19  A   Okay.
20  Q   Have you received training by the
21  police department on use of force?
22  A   Yes.
23  Q   How often do you undergo use of force
24  training?
25  A   I'd say once a year.

Page 63

1  Q   What is the format of this training?
2  A   It's given down at the outdoor range
3  before you would qualify with your weapon,
4  which you do on a yearly basis.
5  Q   A shooting range?
6  A   Correct.
7  Q   Okay.  Other than practicing using your
8  gun at the shooting range, what training do
9  you receive on a yearly basis regarding the
10  use of force?
11  A   They give you a test, multiple choice
12  answer test related to the general police
13  order.
14  Q   Do they give you any kind of refresher
15  course or they just give you the multiple
16  choice exam and see how you do?
17  A   They go over the general police order
18  before the testing procedure.
19  Q   How much time do they spend going over
20  the police order?
21  A   I would say it varies.  It varies
22  because some years we're down at the range
23  for more than one day, other times we're
24  there for one day and that's that.
25  Q   Is this in a classroom setting where

Page 64

1  they go over the police orders?
2  A   Yes.
3  Q   Are you given any written material
4  during this course?
5  A   It's available to you if you want to
6  look at it.
7  Q   Do you consider yourself knowledgeable
8  about the use of force policies that the
9  Cleveland Police Department has issued?
10  A   Yes.
11  Q   If a patrol officer had a question
12  about the use of force policies, would you
13  feel that you would be comfortable answering
14  those questions?
15  A   Depends on the question.
16  Q   Okay.  Were you trained by the police
17  department that officers must identify
18  themselves as police officers when
19  interacting with the public?
20  A   Yes.
21  Q   And must advise individuals of their
22  intent to detain or arrest them before using
23  any force?
24  A   I would have to say no to that.
25  Q   Were you trained that force may only be

Deposition of Sergeant Dean Grazioli

Melissa Yatsko and Darian Allen vs. Sergeant Dean Grazioli, et al.,

Page 65

1  used by you as a police officer in order to
2  achieve a lawful objective?
3  A  Yes.
4  Q  Such as to effect a lawful arrest, to
5  make a lawful arrest, correct?
6  A  That's one of the things, yes.
7  Q  Another might be to gain control of a
8  noncompliant individual?
9  A  Yes.
10  Q  To prevent or terminate the commission
11  of a crime?
12  A  Yes.
13  Q  And you have been trained, I presume,
14  on types of force that an officer can use
15  that is less than deadly force?
16  A  Yes.
17  Q  Okay.  What are some examples?
18  A  The use of the Taser or the pepper
19  spray or the ASP baton.
20  Q  Any others you can think of off the top
21  of your head?
22  A  I guess, you know, like, you know,
23  hand-to-hand stuff.  Hands-on I should say.
24  Hands-on.
25  Q  Have you received hands-on training of

Page 66

1  the sort you're describing?
2  A  Yes.
3  Q  What about leg sweeps, is that a
4  technique you could use short of using
5  deadly force?
6  A  If you have the opportunity, yes.
7  Q  Or a take-down technique like tackling
8  --
9  A  Again, if the opportunity promotes
10  itself, yes.
11  Q  Using pressure point control?
12  A  Yes.
13  Q  Issuing verbal commands?
14  A  Yeah, yeah.
15  Q  Have you used any of these techniques
16  in your 27-year career?
17  A  I would say, yes; yes, I have.
18  Q  And I think you told me you've been
19  trained on these various techniques, right?
20  A  Yes.
21  Q  So you as a sergeant feel comfortable
22  deploying these techniques?
23  A  The reason why I hesitate is when I
24  was younger, in better shape, I would agree
25  that I could -- I would say yes, that I

Page 67

1  would feel comfortable deploying these
2  things.
3  Q  But now you don't feel as comfortable?
4  A  If I was given the opportunity to use a
5  technique like that, I would probably still
6  do it.  I just don't know the outcome.
7  Q  Well, what is it that you do to stay in
8  shape now?
9  A  I go to the gym.
10  Q  How often do you do that?
11  A  I try three -- between three and five
12  times a week.
13  Q  And what do you do?  Do you just lift
14  weights or do you do any aerobic activities?
15  A  It's aerobic, cardio stuff.
16  Q  What specifically do you do?
17  A  I walk on a treadmill, elliptical.  I
18  try to lift some weights, but the age is
19  hitting me.
20  Q  How much time do you spend in the gym?
21  A  It varies, you know, from like an hour
22  to maybe two hours.
23  Q  Do you have a workout buddy or someone
24  you work out with?
25  A  No.

Page 68

1  Q  Which gym do you use?
2  A  LifeWorks.
3  Q  Where's that located?
4  A  Middleburg Heights.
5  Q  What time of day typically do you go to
6  the gym?
7  A  I would say, you know, in the
8  afternoon.
9  Q  All right.  Let's return to the topic
10  of use of force, okay?
11  A  Okay.
12  Q  Have you been trained that an officer
13  has to consider his surroundings before he
14  unholsters his gun?
15  A  I don't remember anything specific
16  about surroundings.
17  Q  Okay.  Have you been trained that you
18  as an officer have to consider your
19  surroundings before discharging your
20  firearm?
21  A  Yeah, yes.  Yes.  Yes, yes.
22  Q  Okay.  And what were you told or
23  trained about that?
24  A  I don't recall specifics about it.
25  Q  How many times in your 27 years have

Page 69

1  you discharged your firearm aside from at
2  the shooting range?
3  A   Once.
4  Q   During this incident that occurred at
5  The Corner Alley?
6  A   That's correct.
7  Q   Were you trained that deadly force may
8  only be used when necessary?
9  A   Yes.
10 Q   Were you trained that deadly force may
11 be used only if the subject poses an
12 imminent threat of serious physical harm to
13 you or another person?
14 A   Yes.
15 Q   Were you trained that deadly force is
16 not permitted unless there are no other
17 force options, techniques, tactics or
18 choices available to you?
19 A   Could you be more specific?  I don't --
20 I don't understand because I think the
21 question -- the question doesn't address the
22 incident.
23 Q   Sure.  We're talking in general.  If
24 the circumstances permit other options, in
25 terms of techniques, in terms of tactics, in

Page 70

1  terms of your choices as a police officer,
2  is deadly force still permitted?
3  A   The problem I'm having is that the
4  question you're asking me is more of a broad
5  -- broad thing instead of specific to the
6  time that the deadly force is deployed.
7  Q   Okay.  Let me ask this question:  Have
8  you ever been trained about this general
9  rule by the Cleveland Police Department?
10 A   I don't -- I don't recall.
11 Q   As you sit here, you don't recall any
12 such training?
13        MR. PIKE:       Objection.
14    Form.
15 A   That specific, no, I don't recall
16 that.
17 Q   Have you ever been trained that the use
18 of deadly force in response to a non-deadly
19 aggression is unlawful?
20        MR. LENEGHAN:  Objection to
21    the form of that question.
22 A   I don't know.  I don't know that I've
23 been trained about that.
24 Q   As you sit here, you can't recall any
25 such training?

Page 71

1  A   I cannot, no.
2  Q   Were you trained that an officer is not
3  allowed to crate a deadly encounter and then
4  shoot his way out of it?
5  A   I don't recall ever hearing that
6  before.
7  Q   Were you ever trained that retaliatory
8  force is not allowed?
9  A   Yes.
10 Q   Were you trained that force may not be
11 used to punish an individual for
12 disrespecting a police officer?
13 A   I don't remember that ever being
14 something I read.
15 Q   Nothing you read.  Anything anyone told
16 you at the police department?
17 A   Not that I can recall, no.
18 Q   Were you trained that before
19 displaying or using a firearm, a police
20 officer has to allow the individual an
21 opportunity to comply?
22 A   I do not recall reading that or that
23 being told to me.
24 Q   When you are working secondary
25 employment, you are required to follow the

Page 72

1  use of force policies issued by the police
2  department, right?
3  A   Yes.
4  Q   Okay.  Have you undergone any kind of
5  tactical training as a police officer?
6  A   Could you be more specific?
7  Q   Like scenario-based training?
8  A   Yes.
9  Q   How often do you undergo scenario-based
10 training?
11 A   Generally that, anything along those
12 lines would be done during in-service
13 training, which is usually once a year.
14 Q   And how long does the in-service
15 training last?
16 A   That -- that varies.  It could last a
17 whole week, it could last a day.  It could
18 last hours.  It all depends on their -- when
19 I say "their," I mean the curriculum of the,
20 you know, in-service training.
21 Q   Have you ever undergone scenario-based
22 training involving a noncompliant or
23 disorderly individual?
24 A   Yes.
25 Q   All right.  And what techniques or

Page 73

1  tactics did you use during that scenario to
2  diffuse the situation?
3  A    Officer presence.
4  Q    What else?
5  A    The verbal commands and then it would
6  -- it could escalate or it could not,
7  depending on, you know, the specific
8  scenario.
9  Q    And if it were to escalate, you could
10  use, say, one of your intermediate weapons?
11  A    You could.
12  Q    Okay.  Were you -- have you ever been
13  provided self-defense training?
14  A    No, not that I can recall.
15  Q    Whether by the police department or
16  outside?
17  A    No.
18  Q    Have you ever done any martial arts?
19  A    I have not.
20  Q    Have you ever undergone hand-to-hand
21  skills training through the police
22  department?
23  A    If I did, it would have been in the
24  police academy and that's a long time ago
25  and I don't recall anything specific about

Page 74

1  it, no.
2  Q    As a Cleveland police officer, are you
3  trained in rendering first aid?
4  A    Yes.
5  Q    Do you receive ongoing training for
6  first aid?
7  A    I wouldn't say ongoing.
8  Q    Have you undergone first aid training
9  more than once as a police officer?
10  A    Yes.
11  Q    About how many times have you undergone
12  that training?
13  A    Two or three times.
14  Q    In your 27-year career?
15  A    Correct.
16  Q    Do you recall the last time you
17  underwent that training?
18  A    I believe 2017.
19  Q    Have you ever been trained in rendering
20  CPR or performing CPR?
21  A    Yes.
22  Q    How many different times have you been
23  trained on CPR?
24  A    It's two or three times there as well.
25  Q    Would it be in the same training --

Page 75

1  A    Yes.
2  Q    -- course?
3  A    Yes.
4  Q    Are you CPR certified?
5  A    I don't believe I am.  I don't believe
6  I am, no.
7  Q    Do you think you've ever been CPR
8  certified?
9  A    During those training periods, yes, but
10  I believe it's time-specific.
11  Q    So you'd undergo CPR training and you'd
12  get the certification and then it would
13  expire at a certain point?
14  A    I believe.  Please don't quote me on
15  that, but I believe so.
16  Q    Okay.  And then first aid
17  certification, did you likewise obtain that?
18  A    It would be the same -- same type of
19  training.
20  Q    Same situation.  So you don't know as
21  you sit here today whether you still qualify
22  as being first aid certified?
23  A    Whether it's active or expired, I have
24  no idea.
25  Q    Okay.  Is that a requirement as a

Page 76

1  Cleveland police officer, that you have
2  active first aid certification?
3  A    I don't know because of the word
4  "active."  I don't know if a card that says
5  it's good for one year is active or it's
6  expired, I don't know if that means, you
7  know, I don't do it no more.
8  Q    Okay.  My question is do you know if
9  the police department requires that you have
10  an active first aid certification, whether
11  you do have that or not?
12  A    I do not know if they require it.
13  Q    Okay.  And the same question for CPR,
14  any idea whether you're required to have an
15  active --
16  A    I do not know, believe me.  I do not
17  know.
18  Q    All right.  Have you ever been involved
19  in a physical fight with anyone prior to
20  January 13th, 2018?
21  A    With anyone?
22  Q    Yeah.
23  A    Yes.
24  Q    How many different times?
25  A    I would say one other time.

Page 77

1  Q   Tell me about that one.
2  A   1992, I believe, and a bouncer at a
3  nightclub assaulted me.
4  Q   Okay.  Did you press charges?
5  A   I did.
6  Q   What happened with the criminal
7  matter?
8  A   I believe he pled to an assault.
9  Q   What happened in terms of the fight?
10 Did you guys exchange punches?
11 A   I did not exchange any punches with
12 him.  It was him punching me.
13 Q   That was 1992.  Any other times you had
14 been in a fight?
15 A   Not that I can recall, no.
16 Q   Not with a neighbor or family member or
17 fellow officer?
18 A   No.
19 Q   Have you ever been violent with a
20 family member?
21 A   Have not.
22 Q   Have you ever been violent around a
23 family member?
24 A   No.
25 Q   Ever been violent towards anyone in

Page 78

1  your neighborhood?
2  A   No.
3  Q   Ever been violent towards a colleague?
4  A   No.
5  Q   Have you ever threatened a colleague
6  before?
7  A   No.
8  Q   Ever threatened a family member?
9  A   No.
10 Q   Or a neighbor?
11 A   No.
12 Q   In this 1992 incident with the bouncer,
13 were you on duty as a police officer?
14 A   I was not.
15 Q   Were you working secondary employment?
16 A   I was not.
17 Q   By the way, we talked about your
18 uniform.  Are you carrying any weapons on
19 you right now?
20 A   I am.
21 Q   Can you stand up and show me what
22 weapons you're carrying?
23 A   Sidearm.
24 Q   Okay.
25 A   That's it.  That's all I have.

Page 79

1  Q   And why is it that you're wearing this
2  uniform during this deposition?
3  A   No specific reason.
4  Q   Are you on duty right now?
5  A   I am not.
6  Q   Did you get clearance from the police
7  department to wear your uniform and your gun
8  during this deposition?
9  A   I did not.
10 Q   Did you check whether this building is
11 a no-firearm building?
12 A   I did not check it, no.
13 Q   Okay.  And where do you keep your gun
14 when it's not on you physically and you're
15 not at home?
16 A   It would be at home.
17 Q   Okay.  Do you have anyplace in your car
18 that you could put it securely?
19 A   No.
20 Q   Do you have bullets in that gun right
21 now?
22 A   I do.
23 Q   Okay.  Let's talk a little bit more
24 about your career as a Cleveland police
25 officer.  Do you remember your date of

Page 80

1  hire?
2  A   January 6, 1992.
3  Q   And before being hired, did you go
4  through OPOTA training?
5  A   Not before, no.
6  Q   Okay.  But you did undergo -- you did
7  go through the police academy?
8  A   I did.
9  Q   When you were hired as a patrol
10 officer?
11 A   I was hired as a recruit.
12 Q   Okay.  And when you started, what was
13 your rank?
14 A   When I started on January 6th, 1992?
15 Recruit, police recruit.
16 Q   Okay.  And for how long were you a
17 police recruit?
18 A   Six months.
19 Q   And then what did you become?
20 A   Patrolman.
21 Q   Did you ever undergo any mental fitness
22 or psychological testing at any point in
23 your 27-year career?
24 A   In the police academy, physical
25 testing.

Page 81

1  Q   Physical testing.  Any mental health
2  testing?
3  A   I don't believe so, not in the police
4  academy, no.  No.
5  Q   Any mental health testing after you got
6  out of the police academy?
7  A   No, nothing -- no.
8  Q   Do you have to undergo physical testing
9  on a regular basis as a Cleveland police
10  officer?
11  A   No.
12  Q   Is that something you have ever
13  undergone outside of the academy, have you
14  ever undergone physical testing by the
15  Cleveland Police Department?
16  A   I have -- no, I have not.
17  Q   Did you ever receive a promotion?
18  A   I did.
19  Q   When did you receive your first
20  promotion?
21  A   December -- I believe it's the 9th,
22  December 9th of 2002.
23  Q   And what did you have to do to attain
24  the promotion to sergeant?
25  A   A written and verbal exam.

Page 82

1  Q   Did you pass the written and verbal
2  exams the first time you took them?
3  A   I did.
4  Q   Did you ever receive any kind of
5  demotion?
6  A   I did.
7  Q   When did that occur?
8  A   2013, I believe.
9  Q   And what were the circumstances of the
10  demotion?
11  A   An investigation by an investigative
12  reporter, Carl Monday.
13  Q   And what did his investigation reveal?
14  A   I was at home with the police car.
15  Q   And did this lead to any kind of
16  criminal investigation?
17  A   Yes.
18  Q   Did the police department itself
19  conduct its own investigation?
20  A   I'm sure they did.
21  Q   What was the outcome of the criminal
22  matter?
23  A   I pled guilty to a misdemeanor
24  falsification.
25  Q   What were you falsifying?

Page 83

1  A   It was specific to, like, time cards.
2  Yeah, time cards.
3  Q   Am I correct in understanding that you
4  were falsifying time cards to indicate you
5  were on duty when, in fact, you were at
6  home?
7  A   No, that's not it.
8  Q   Well, what is it?
9  A   It didn't have -- I had permission to
10  be at home, but it wasn't reflected on my
11  time cards duty report.
12  Q   Were you paid for the time you were at
13  home?
14  A   Yes.
15  Q   Is that where the falsification stems
16  from, that you were paid for time when you
17  were at home when you were not supposed to
18  be?
19  A   You know, I'm not really sure of the,
20  you know, the specifics of that.  I'm not
21  really sure.
22  Q   But you did plead guilty to
23  falsification?
24  A   I did.
25  Q   And what were you pleading guilty to

Page 84

1  falsifying?
2  A   Again, it was a part of falsification
3  that dealt specifically with report,
4  writings, things of that nature.
5  Q   And specifically what was false about
6  it?
7  A   That it wasn't reflected on a duty
8  report that I was at my house.
9  Q   I see.  So you would fill out duty
10  reports, but you wouldn't indicate that you
11  were at home for a certain time period?
12  A   Yes.
13  Q   And what was the outcome of the
14  Cleveland Police Department investigation?
15  Did they find that you had committed certain
16  violations of rules or regulations?
17  A   Yes, but I don't know which ones
18  specifically.
19  Q   Do you recall how many different
20  criminal charges were asserted against you
21  in the criminal matter?
22  A   I do not.
23  Q   Okay.  And you were represented by a
24  criminal defense lawyer in that proceeding?
25  A   Yes.

Page 85

1  Q    What was the time period at issue here
2  with respect to the false duty reports or
3  time cards?
4  A    What was the time frame?
5  Q    Yeah.  When did this occur?
6  A    In 2012 I believe is when it
7  occurred.
8  Q    And do you know how it was discovered
9  that you were at home when you were supposed
10 to be on duty?
11 A    Through the TV reporter's
12 investigation.
13 Q    My understanding is that the following
14 criminal charges were asserted against you.
15 Tell me if this is also your understanding.
16 Theft in office; does that sound right?
17 A    Yes.
18 Q    Aggravated theft?
19 A    I don't recall that.
20 Q    Falsification?
21 A    Yes.
22 Q    Seven counts of tampering with
23 records?
24 A    For some reas -- yeah, okay.  Yes,
25 yes.

Page 86

1  Q    Dereliction of duty?
2  A    I don't recall the dereliction of
3  duty.
4  Q    So I take it you didn't come forward to
5  the police and tell them about this activity
6  before you were discovered by Carl Monday?
7  A    That's correct.
8  Q    And so as a result of your activities
9  for which you were criminally charged and
10 ultimately pleaded guilty, you say you were
11 demoted from sergeant?
12 A    Yes.
13 Q    From sergeant back to patrol officer?
14 A    Yes.
15 Q    What other punishments did you sustain
16 as a result of this incident through the
17 police department?
18 A    I was suspended for 30 days.
19 Q    With or without pay?
20 A    Without.
21 Q    And in terms of the criminal matter,
22 what was your sentence?
23 A    It was six months and a thousand dollar
24 fine.
25 Q    Can we agree that you pleaded guilty to

Page 87

1  a crime of dishonesty?
2  A    Given what is not on paper with the
3  court and what I was there doing, I would
4  say I wasn't being dishonest, no.
5  Q    You don't believe you were being
6  dishonest?
7  A    I don't believe I was, no.
8  Q    Okay.  And so why did you plead guilty
9  to falsification of records?
10 A    Because, I mean, I had to.  I had to
11 plead to it.  I couldn't just walk away from
12 it.  I had to take responsibility and I
13 did.
14 Q    Okay.  And what were you taking
15 responsibility for is what I'm trying to
16 understand?
17 A    I was taking responsibility for the way
18 it looked.
19 Q    And how do you think it looked?
20 A    Bad, terrible.
21 Q    But not dishonest?
22 A    No.
23 Q    Did you ever retain -- not retain.  Did
24 you ever have your sergeant status renewed?
25 A    Yes.

Page 88

1  Q    When did that occur?
2  A    I believe it was July of 2014.
3  Q    And how were you able to get back your
4  rank of sergeant after this incident?
5  A    I don't understand the question.
6  Q    Did you have to take the written and
7  verbal test again?
8  A    No.
9  Q    Did you have to do anything to get your
10 promotion back or did it come back
11 automatically?
12 A    It just -- it came back automatically.
13 Q    And whose decision was that, as far as
14 you're aware?
15 A    I believe the Director of Public
16 Safety.
17 Q    In your position as a police sergeant,
18 are you considered a supervisor?
19 A    Yes.
20 Q    Over how many officers would you
21 consider yourself to be a supervisor?
22 A    I would say 20 plus.  I don't know the
23 specific number.
24 Q    Are they all within your same district?
25 A    Same district and same shift.

Page 89

1  Q    You work in the Fifth District?
2  A    That's correct.
3  Q    How many districts does the Cleveland
4  Police Department --
5  A    Five.
6  Q    When did you start working in the Fifth
7  District?
8  A    It would have been -- I want to say it
9  was June of 2013.
10 Q    Shortly after the incident involving
11 the time cards?
12 A    Yes.
13 Q    What district were you working in at
14 that time, the Fourth District?
15 A    Yes.
16 Q    When did you first start working in the
17 Fourth District?
18 A    When I was first promoted.
19 Q    In 2002?
20 A    Yes.
21 Q    Okay.  And then before that point in
22 time, which district did you work in?
23 A    The Third District.
24 Q    Did you work in any other district
25 other than the Third District?

Page 90

1  A    No.  No.
2  Q    Who determines what district an officer
3  is assigned to?
4  A    Chief of police.
5  Q    So the chief of police is the one who
6  determined that you would be assigned to the
7  Fifth District in June of 2013?
8  A    Yes.
9  Q    And do you have an understanding why
10 the chief assigned you to that district at
11 that time?
12 A    I do not, no.
13 Q    What are your duties as a police
14 sergeant?
15 A    Basically you make sure that the patrol
16 officers are answering the radio, responding
17 to the assignments, and if there's reports
18 to be generated, make sure that they're
19 generating the reports.
20      You review those reports and then you
21 would forward them to any -- if there's an
22 investigative unit that needs to follow up
23 on them or, you know, whatever the case is.
24 Q    On average, how many hours are you on
25 duty per week?

Page 91

1  A    48.
2  Q    And where do you spend the majority of
3  your time, at the district office or --
4  A    Both.  It varies, but in the building
5  and then, of course, on the road as well.
6  Q    And what -- under what circumstances
7  would you be on the road, if one of your
8  patrol officers has an issue or regular
9  patrol?
10 A    Both.
11 Q    Okay.
12 A    Both.
13 Q    And do you have a schedule that
14 dictates when you're going to be on patrol
15 versus when you're going to be in the
16 office?
17 A    No.
18 Q    And when you're on patrol, are you in
19 effect supervising another patrol officer?
20 A    Not specifically, no.
21 Q    So you might be on patrol by yourself,
22 not necessarily with another officer?
23 A    I wouldn't be with a partner.  I would
24 be by myself.
25 Q    Okay.  And so can you give me a better

Page 92

1  sense of how many hours during a given week
2  you are on patrol?
3  A    I couldn't nail it down from one day to
4  the next.
5  Q    And do you have -- can you help me
6  understand what would determine whether
7  you'd be on patrol on any given day?
8  A    Mostly if you were needed somewhere in
9  a supervisory capacity.
10 Q    Okay.  So it's kind of on an as-needed
11 basis; is that fair to say?
12 A    That's fair, yeah.
13 Q    As a sergeant, do you have the
14 responsibility to evaluate the performance
15 of other officers from time to time?
16 A    Yes.
17 Q    And I take it you've received training
18 on how to effectively evaluate other
19 officers?
20 A    I haven't received any training.
21 Q    Okay.  So how did you learn how to
22 evaluate other officers?
23 A    Could you be more specific on what type
24 of evaluation you mean?
25 Q    Sure.  Well, let me ask you.  Do you

Page 93

1 ever provide formal written evaluations for
2 any patrol officers you supervise?
3 A  You do, yes.
4 Q  Okay.  And so have you received any
5 formal training in order to --
6 A  To do that, no.
7 Q  And so how have you learned to do that,
8 just on the job?
9 A  Yes.
10 Q  Maybe talking with other officers,
11 other sergeants, if necessary?
12 A  Yes.
13 Q  Have you yourself ever provided
14 training to other officers?
15 A  I have not, no.
16 Q  All right.  You told us about the Carl
17 Monday incident, the falsification of
18 records.  Have you ever been disciplined at
19 any other time during your 27-year career?
20 A  Yes.
21 Q  On how many different occasions have
22 you been disciplined?
23 A  I couldn't tell you a specific time or
24 date or times.
25 Q  Okay.  I did receive some documentation

Page 94

1 from the City of Cleveland and I'll go
2 through what documents I have or what
3 information I have and you tell me if this
4 sounds accurate, okay?
5 A  Fair.
6 Q  So my understanding is that in 2014,
7 you were demoted to patrol officer and
8 suspended for 30 days for falsifying daily
9 duty reports.  Does that sound about right?
10 A  Yes.
11 Q  In 2012, you were given a written
12 warning for failing to investigate a use of
13 force incident involving another officer; is
14 that right?
15 A  Yes.
16 Q  And then in 2011, you were disciplined
17 for failing to appear in court for a case
18 which resulted in the case being dismissed.
19 Does that sound right?
20 A  I do not recall being disciplined for
21 anything like that.
22 Q  Okay.  Does that particular incident
23 ring a bell?
24 A  Appearing -- not appearing in court?
25 Q  Yeah, not appearing in court for a

Page 95

1 case.
2 A  No, not at all.
3 Q  Okay.  It looks like you received a
4 written warning for working secondary
5 employment without approval from the police
6 department.  This is in 2011.
7 A  I sure don't remember that.
8 Q  Okay.  In 2008, it appears you were
9 given a written reprimand after engaging in
10 improper procedures while investigating the
11 use of non-deadly force by members under
12 your command.  Do you recall that?
13 A  Yeah, I believe that was regarding the
14 investigation over the timeliness of it.
15 Q  And my understanding from your
16 personnel file is that you admitted to some
17 rule violations?
18 A  Yes.
19 Q  One of which was neglect of duty?
20 A  Right, yes.
21 Q  And incompetency or inefficiency in
22 performance of duties.  Does that sound
23 right?
24 A  Again, I, you know -- that's what year
25 again?

Page 96

1 Q  2011 you were given a written
2 reprimand.
3 A  I don't remember the specifics of
4 it.
5 Q  Okay.  Do you have any reason to doubt
6 that that was the outcome of that
7 discipline?
8 A  I don't have any reason to doubt it,
9 but I also don't remember it.
10 Q  My understanding is that in 2006, you
11 were given a verbal warning for being
12 involved in an off-duty physical altercation
13 with another member of the police force in a
14 public place.
15 A  Yes.
16 Q  Okay.  Earlier I asked you if you'd
17 been in any fights before, but you didn't
18 mention this one.  Would this be considered
19 a fight?
20 A  On his part probably.
21 Q  Okay.  Well, tell me what happened.
22 A  He assaulted me.
23 Q  And did you throw any punches?
24 A  I did not.
25 Q  How many times did he attack you or

Page 97

1  punch you?
2  A    I do not remember the time -- the
3  number of times because I was knocked
4  unconscious.
5  Q    Did you instigate the fight?
6  A    No.
7  Q    Why was he attacking you?
8  A    You'd have to ask him.  I don't know.
9  Q    Did you press charges?
10  A    I did not.
11  Q    Why were you disciplined if he was the
12  one that attacked you?
13  A    It's what the department does.
14  Q    So if you're an innocent victim of an
15  attack, you're going to be disciplined?
16  A    I -- you know, I mean, I can't go about
17  -- I don't know how to answer that because
18  it's just the way that you're treated as a
19  policeman.
20  Q    Is it your position that you were the
21  innocent victim of an assault?
22  A    Yes.
23  Q    Okay.  And did you explain to your
24  supervisors that you were the innocent
25  victim and that you should receive no

Page 98

1  discipline for this incident?
2  A    I don't remember specifics back to
3  2006.
4  Q    Did you receive any medical attention
5  related to that incident?
6  A    Yes, I believe I did, yes.
7  Q    What kind of medical attention did you
8  get?
9  A    I want to say that I was just treated
10  -- treated and released for maybe some --
11  for stitches.  I think I got stitches.
12  Q    Do you remember where you were
13  treated?
14  A    Metro, I believe.  Metro.
15  Q    What was the name of the officer that
16  you claim assaulted you?
17  A    Thomas Barnes.
18  Q    Is he still with the Cleveland Police
19  Department?
20  A    Yes, I believe he is.
21  Q    Do you know what his rank is?
22  A    I do not.
23  Q    Does he work in your district?
24  A    He does not.
25  Q    Do you know what district he works in?

Page 99

1  A    I do not.
2  Q    Do you know how old he is,
3  approximately?
4  A    No.
5  Q    Where did this altercation take place?
6  A    It was at a bar on Memphis and Fulton
7  area.
8  Q    Do you know the name of the bar?
9  A    It's no longer there.
10  Q    Were you drinking that night?
11  A    I don't believe I was when this
12  happened, no.
13  Q    How long had you been at the bar before
14  the attack occurred?
15  A    I don't recall.
16  Q    Was anybody with you?
17  A    No.
18  Q    So it was just you and Thomas Barnes
19  at the bar or were there other patrons
20  there?
21  A    There might have been others there.  I
22  don't recall how many people or name
23  specific.
24  Q    Did you exchange words with Thomas
25  before he attacked you?

Page 100

1  A    Just discussion, not words.
2  Q    What was the discussion about?
3  A    I don't recall.  It's so long ago, I
4  don't recall it.
5  Q    Did you make any documentation related
6  to the incident?
7  A    I don't believe so, no.
8  Q    Did you report it to anyone at the
9  police department?
10  A    I didn't report it specifically, but it
11  was reported.
12  Q    Do you know by whom?
13  A    I do not know by whom, no.
14  Q    Do you know if Thomas Barnes reported
15  it?
16  A    I don't know.
17  Q    Was a hearing ever conducted by the
18  police department about the matter?
19  A    I don't remember attending one.
20  Q    Okay.  Were you represented by a
21  lawyer?
22  A    No, I don't believe so.
23  Q    Or a member of the FOP?
24  A    Again, I don't remember being
25  represented or being at anything.

Page 101

Q   After you were issued a verbal warning for this incident, did you file a grievance through the union?

A   No.

Q   Did you do anything to contest the discipline you received for this incident?

A   No.

MR. TOR:      How much longer do we have on the tape?

VIDEOGRAPHER:   15 minutes.

BY MR. TOR:

Q   I understand you've been involved in a number of different lawsuits over the years; fair to say?

A   I don't know.

Q   Okay.  We'll go through some of these. I see four different divorce proceedings.

A   Four?

Q   Yeah.  It may look like four, but the divorce proceeding filed in 1999 with your first wife, Kristine, and you told me earlier you were divorced from her as of 2000?

A   Yes.

Q   Okay.  It looks like maybe you filed a

Page 102

divorce proceeding and she also filed a divorce proceeding at the same time?

A   I don't know.

Q   Do you know if she made any claims against you in any way violent or abusive towards her?

A   I don't believe she did.  I don't remember.

Q   Okay.  Have you ever given her a reason -- did you ever give her a reason --

A   No.

Q   -- to think that you were a violent person?

A   No.

Q   All right.  And then you told me you were divorced from your second wife, Lanett, sometime in 2018; does that sound right?

A   Yes.

Q   When did this divorce occur relative to the incident we're here to talk about on January 13, 2018?

A   It was a dissolutionment finalized on Valentine's Day of last year.

Q   And do you remember when you first received notice of the filing of a divorce

Page 103

proceeding?  Was it before or after the incident?

A   It was before, I believe.

Q   Like a few days before?

A   Oh, no.  I don't know.  I would say months before.

Q   Okay.  Did you give your second wife any reason to think you were a violent --

A   No.

Q   -- individual?

A   No.

Q   Do you know if she asserted any claims against you that you were abusive or violent?

A   No.

Q   I see there's some civil matters in which you were a named party.  There's a 1994 case where the other side was Shark Club?

A   That's the bouncer.

Q   So you sued the bouncer related to that incident?

A   Sued the club I thought.

Q   You sued the club.  Okay.  So you sued the club because of the incident related to

Page 104

the bouncer?

A   Correct.

Q   What was the outcome of that lawsuit?

A   There was money awarded.

Q   To you?

A   Yes.  The amount, I can't recall the amount.

Q   Okay.  How far along in the case did you all get before there was a resolution?

A   I believe that it went -- it was in court, ready for trial.

Q   Did you have your deposition taken?

A   I don't believe so.  I don't recall being -- being -- having it taken.

Q   Do you recall who represented you, what lawyer represented you in that lawsuit?

A   No.

Q   I see there's a lawsuit filed on your behalf in 2000 against the RTA.

A   RTA?  Oh, I was hit by a bus while I was working.

Q   Oh, okay.  Where did this occur?

A   On Superior.  Superior and almost like how Huron and Superior, even though they don't technically meet, they meet.  Over in

Page 105

that area.

Q   And what were your injuries?

A   Back injury is all I can really remember.

Q   How bad was the injury?

A   You know, hospitalized, but then treated and released.  Nothing -- nothing, you know, long-term.

Q   And you filed a lawsuit against RTA. Did you recover any money?

A   I believe there was some money recovered, yes.  Yes, there was, yes.

Q   Did you make a Workers' Compensation claim?

A   I believe so, yes.

Q   And then I see you filed a civil lawsuit in 1996 against your employer, the City of Cleveland.  What was that case about?

A   I don't recall ever filing anything against the city.

Q   Another lawsuit, civil lawsuit filed by you in 1997, also against the City of Cleveland.  Does that ring a bell?

A   Hmm-mm, not at all.

Page 106

Q   There's some cases filed by the Ohio Department of Taxation.

A   Yeah, I owed taxes.

Q   Back taxes?

A   Yeah.  They've since been paid, the taxes have been.

Q   Was it that you were not reporting all your income?

A   No.

Q   What were the circumstances?

A   Just owing more than I could pay at the end of the year, so you get involved with attorneys like you gentlemen, you have to pay, pay monthly down until it's gone.

Q   Have you ever failed to fully report all of your income for any tax year?

A   No.

Q   2013, looks like you were a defendant in a civil lawsuit in which Ocwen Loan Servicing was the plaintiff?

A   That's -- that's got to be with the house when I -- I think they were -- they are or they were a mortgage type thing and I re --

Q   Financed?

Page 107

A   It's not a refinance.  It would be -- what's the term?  Oh, boy.  It was sold from them to another mortgage company, but I don't know what the exact term of the deal was.

Q   And do you have any recollection of why you were sued?

A   No, I do not.

Q   What happened with that case?

A   I don't remember it and, I mean, I still have the house, so I don't know the outcome.

Q   Do you own any other real estate property?

A   I do not.

Q   Now, you told me about the Workers' Comp claim you believe you filed with respect to the bus incident.  Prior to the incident that occurred at The Corner Alley, had you ever filed a Workers' Comp claim?

A   Yes.

Q   How many different times?

A   Not many, but specific number, I couldn't tell you a number.

Q   More than three?

Page 108

A   Been pretty fortunate to where I haven't really been injured a lot, so I would say I don't know.  I don't -- I honestly don't know the number.  I could say three, it might be six.  I don't know that. I can't remember right now.  I don't think it's six, but I don't know if it's three.

Q   Okay.  So let's talk in terms of injuries that you sustained while on the job.  So the bus incident --

A   Right.

Q   -- involving the RTA.  You made a Workers' Comp claim for this incident that occurred at The Corner Alley, right?

A   Yes.

Q   Tell me about other incidents where you believe you were injured on the job.

A   I had the tendons in one of my fingers -- I don't know what the word would be. Obviously, they can't be broken I don't think.

Q   How did that happen?

A   It happened after a vehicle pursuit when myself and a large number of officers were fighting with the suspect, I believe,

Page 109

after a foot chase, but I don't know what year that happened or anything about that, you know, and --

Q   Do you recall getting any medical treatment?

A   I believe, I believe so.  I went to -- probably would have went to Charity Hospital at that time because that's where -- I was in the Third District at that time I believe.

Q   Did you have to take time off of work for your injury?

A   I don't think so.

Q   Were you involved in the struggle or the scuffle with this individual?

A   No, the other officers were.  I remember it being icy and -- like ice-covered area where we were at and I remember falling, injuring my hand.

Q   I see.  So you fell and that's how you injured your hand?

A   Right.

Q   Okay.  Tell me about the other incidents where you believe you were injured on the job.

Page 110

A   I want to say a car accident, I think, where we were hit from behind, like, you know, with whiplash.

Q   Do you remember what year that happened in?

A   No.  This is -- these incidents would be in the '90s, the early '90s, you know.

Q   You said "we."  Was somebody else in the car with you?

A   Again, back then, I worked with a partner, but who it was, I have no idea.

Q   How many different partners have you had over the years?

A   Oh, boy.  Do you want a number?

Q   Yeah.

A   20, 25 guys, girls.

Q   Okay.  All right.  Any other incidents where you were injured on the job?

A   Not that I can recall, no.

Q   So you've told me about three that you do remember in addition to the one that happened at The Corner Alley, right?

A   Yeah.

Q   So at least four Workers' Comp claims?

A   Okay.

Page 111

Q   Do you think there may have been more?

A   Again, not really sure.

Q   Is there any way you could find out if you had other Workers' Comp claims?

A   I wouldn't know where to start.

Q   Okay.  When you had the Workers' Comp claims, did you have a lawyer representing you?

A   Yes.

Q   Who was the lawyer or lawyers?

A   George Mineff, I believe.

Q   George?

A   Mineff.  He's represented me on those.

Q   Were you ever denied a Workers' Comp claim?

A   No.

Q   Did you ever have any type of personal injury other than what we've already talked about?

A   Not that I can recall, no.

Q   Has anyone ever filed a restraining order against you?

A   Not that I can recall, no.

Q   Or a protective order?

A   No.

Page 112

VIDEOGRAPHER:  Three minutes of tape.

MR. TOR:     All right.  Let's take a break.

VIDEOGRAPHER:  We're off the record.

- - -

(Short recess to change tapes.)

- - -

VIDEOGRAPHER:  Tape three.  We are back on the record.

BY MR. TOR:

Q   All right, sir, we're going to continue.

As of the date of the incident, January 13th, 2018, did you have any medical conditions for which you were being actively treated by a doctor?

A   No.

Q   Were you on any prescription medication?

A   Yes.  I take high blood pressure and cholesterol medication.

Q   Other than high blood pressure and high cholesterol, did you have any other

Deposition of Sergeant Dean Graziolli     Melissa Yatsko and Darian Allen vs. Sergeant Dean Graziolli, et al.,

Page 113

1 medical conditions or issues at the time of
2 the incident?
3 A  No.
4 Q  Had you ever had any surgeries before?
5 A  Yes.
6 Q  How many different surgeries?
7 A  One.
8 Q  And what was it?
9 A  To repair a herniated disc in January
10 of 2017.
11 Q  Do you know what caused the herniated
12 disc?
13 A  I believe the doctor told me just old
14 age.
15 Q  Did you make a Workers' Compensation
16 claim?
17 A  No.
18 Q  Did you file any lawsuit related to
19 that?
20 A  No.
21 Q  Have you ever filed for disability?
22 A  I have not, no.
23 Q  When did this surgery take place?
24 A  January of 2017.
25 Q  Okay.  I saw in your medical records

Page 114

1 reference to a traumatic subarachnoid
2 hemorrhage in 2013.  Do you know what that's
3 about?
4 A  I was in a car accident.
5 Q  Is that the car accident you were
6 telling me about before where you were
7 rear-ended?
8 A  No.  I was -- no.
9 Q  You were not working at that time?
10 A  I was not working, no.
11 Q  Okay.  Well, when did this car crash
12 take place?
13 A  I want to say it was October of '13.
14 Q  Where did it take place?
15 A  Memphis, West 58th, I think, somewhere
16 in that area, right around there, 57th,
17 58th.
18 Q  Tell me about the crash.  What
19 happened?
20 A  Lost control of my vehicle and hit a
21 tree.
22 Q  No other cars were involved?
23 A  No.
24 Q  What time of day was this?
25 A  Say night.

Page 115

1 Q  Were you coming off work?
2 A  Yes.  Yes.
3 Q  Were you on duty -- were you coming off
4 work for the police department or were you
5 coming off some kind of secondary
6 employment?
7 A  It wouldn't have been for the city.  It
8 had to have been secondary employment, but
9 where I was coming from, I don't recall.
10 Q  Did you have any alcohol in your
11 system?
12 A  No.
13 Q  Any drugs in your system?
14 A  No.
15 Q  Were you taken to a hospital from the
16 scene?
17 A  Yes.
18 Q  Do you know what hospital it was?
19 A  Metro I believe.
20 Q  Were you treated and released?
21 A  I was kept overnight.
22 Q  And how did the doctors treat your
23 injury?
24 A  I don't think they did anything
25 specific to me.  The only thing that I

Page 116

1 remember being treated for is a broken
2 wrist; fractured wrist I should say.
3 Q  Your left wrist?
4 A  I think so, yeah.
5 Q  What kind of fracture was it?  Did they
6 tell you?
7 A  No idea.
8 Q  Did you have to miss any work?
9 A  I don't recall missing any work, no.
10 Q  Can you just show me where on your
11 wrist the fracture occurred?
12 A  I mean, it was cast.  I think it was
13 cast, you know, in the hand and wrist area,
14 maybe a little bit past it.
15 Q  How long did you wear the cast for?
16 A  I don't know.  Six to eight weeks.  I
17 don't know how long -- however long you have
18 to wear it.
19 Q  Were you able to perform your regular
20 duties as a police officer during the time
21 you were wearing --
22 A  Yes.
23 Q  Were you on any restricted duties?
24 A  I don't believe so, no.
25 Q  Did you undergo any surgery for the

Page 117

1 fracture?
2 A   No.
3 Q   Was anyone in the car with you at the
4 time?
5 A   No.
6 Q   Who is your family physician or primary
7 care physician?
8 A   I had one, but his license has been
9 revoked, so now I go to Metro.
10 Q   Who do you see there?  Any doctor in
11 particular?
12 A   Dr. D'Onofrio I think her name is.  I
13 only saw her one time.
14 Q   Was it before or after this incident?
15 A   After.
16 Q   Who was prescribing you the blood
17 pressure and cholesterol medication as of
18 the time --
19 A   That would have been Dr. Kavlich who
20 had his license suspended, revoked, I don't
21 know which it is.
22 Q   I see.  So Dr. Kavlich was your primary
23 care physician until he had his license
24 taken away?
25 A   He was, yes.

Page 118

1 Q   Do you know how soon before the
2 incident you last saw him, Dr. Kavlich?
3 A   No.
4 Q   Where did he practice?
5 A   Berea; Berea, Ohio.
6 Q   Was he affiliated with any hospital
7 that you're aware of?
8 A   Not that I'm aware of, no.
9 Q   Was he the last doctor you saw before
10 the incident?
11 A   Before which incident?
12 Q   The Corner Alley incident.
13 A   Yes.
14 Q   So you told me as of the date of that
15 incident, you had blood pressure medication
16 and cholesterol medication.  Did you take
17 any over-the-counter drugs that day?
18 A   Not that I recall taking, no.
19 Q   And did you consume any alcohol that
20 day, January 13th --
21 A   I did not.
22 Q   Did you consume any other drugs other
23 than the two --
24 A   No.
25 Q   -- prescribed drugs?

Page 119

1 A   No.
2 Q   And when was the last time you drank
3 alcohol before the incident?
4 A   I'm not that big a drinker.  I couldn't
5 even tell you when.
6 Q   I do have a few follow-up questions
7 based on some of the topics we covered
8 before.
9    The altercation at the bar that
10 involved Thomas Barnes, the other officer,
11 were you or was he in police uniform at the
12 time of the incident?
13 A   No.
14 Q   Did you or he have a firearm on you at
15 the time?
16 A   I know I didn't.
17 Q   Did anybody -- did either of you draw a
18 firearm during the altercation?
19 A   I know I didn't.
20 Q   Did he?
21 A   Not that I recall.
22 Q   Going back to this Carl Monday
23 investigative reporting incident, you told
24 me, I think, that you had permission to be
25 at home?

Page 120

1 A   I did.
2 Q   Okay.  Who gave you that permission?
3 A   It would have been my lieutenant.
4 Q   Lieutenant -- what's his or her name?
5 A   Anthony George.
6 Q   Did Lieutenant George defend you, stand
7 up for you in this case, either the criminal
8 case or the police investigation, and say
9 actually he had permission to be at home?
10 A   No, he did not.
11 Q   Okay.  And did you feel betrayed by
12 that?
13 A   Not at all.
14 Q   Okay.  Well, wouldn't you expect him to
15 tell the truth if you had permission to be
16 at home so that you wouldn't be accused of
17 something you don't think you did?
18 A   If he was able to, he would have.
19 Q   Well why do you think he was not able
20 to?
21 A   He's dead.
22 Q   Okay.  When did he die?
23 A   I was still in the Fourth District.
24 It's got to be -- it's got to be 2012.
25 Q   Before or after your activities were

Deposition of Sergeant Dean Graziolli          Melissa Yatsko and Darian Allen vs. Sergeant Dean Graziolli, et al.,

Page 121

1  uncovered by Carl Monday?
2  A  He died I want to say after, after I
3  think.  I think.  I couldn't give you
4  specific dates.
5  Q  Is there anyone else that can
6  corroborate --
7  A  Not to my knowledge, no.
8  Q  -- your claim that Lieutenant George
9  gave you permission?
10 A  Not to my knowledge, no.
11 Q  So just you and Lieutenant George, who
12 is deceased, those are the only two people?
13 A  Yes.
14 Q  Now, why were you given permission by
15 Lieutenant George to go home?
16 A  I explained to him why I had to go
17 there and he gave me permission to go there.
18 Q  What was your explanation?
19 A  I was taking care of my father.
20 Q  And what was your father's condition
21 that required that you provide care?
22 A  My father has anxiety and depression
23 issues.
24 Q  Did you request leave, family leave, in
25 order to take care of your father?

Page 122

1  A  I did not.
2  Q  Why not?
3  A  I don't know.  I didn't think -- just
4  didn't -- never occurred to me to even think
5  about that.
6  Q  Okay.  So instead, you asked permission
7  from Lieutenant George to take care of your
8  father at home?
9  A  Yes.
10 Q  And how often did you go home to take
11 care of your father while you were still on
12 duty?
13 A  Usually once during my shift.
14 Q  For how long?
15 A  Varied.
16 Q  As little as half an hour?
17 A  Less than that.
18 Q  Up to?
19 A  Make sure he's getting something to
20 eat, something to drink, and then I would
21 leave.
22 Q  Okay.  Would you stay longer than an
23 hour?
24 A  At times I believe I did, yes.
25 Q  And is your father still alive?

Page 123

1  A  He is.
2  Q  What's his name?
3  A  Herman Graziolli.
4  Q  Where does he live?
5  A  He lives in Brook Park.
6  Q  And did he ever live with you?
7  A  No.
8  Q  So why did you have to go home to check
9  on your father if he didn't live with you?
10 A  Because he was at my house.
11 Q  So he was at your house, but not living
12 at your house?
13 A  Correct.
14 Q  He would go to your house during the
15 day?
16 A  Correct.
17 Q  How did he get to your house?
18 A  He would walk.
19 Q  How close did he live to you?
20 A  I would say at the time, five or six
21 blocks away.
22 Q  And he was able to walk by himself to
23 your house?
24 A  Yes.
25 Q  And so it was anxiety and depression

Page 124

1  you say your father had that required you to
2  check on him and provide care for him?
3  A  Right.
4  Q  And did he ever file a claim through
5  Social Security or any other agency?
6  A  No, I don't believe so.
7  Q  And how old is your father?
8  A  75.
9  Q  Is he seeing any doctors or healthcare
10 providers to treat these conditions?
11 A  To my knowledge, no.
12 Q  Has he ever?
13 A  I don't know.
14 Q  I mean, it sounds like you were
15 providing some care to him.  Is that
16 something you think you'd know if he was
17 actually going to see a healthcare provider?
18 A  Not necessarily.
19 Q  And how much time would he spend at
20 your house every day?
21 A  That would vary as well.  Could be
22 there for moments to, you know, the entire
23 day.
24 Q  And did you document any of this
25 information when you were --

Page 125

1 A I did not.
2 Q Did you explain any of this to the
3 committee or the group at the police
4 department that investigated the matter?
5 A No.
6 Q So this is the first time you're
7 telling anybody about this?
8 A Yeah.
9 Q And how long did this go on for? How
10 long were you going home to check on your
11 father while you were on duty?
12 A A week or so, maybe a little bit longer
13 than a week.
14 Q And why just the week?
15 A Because he was feeling better and
16 wasn't coming by anymore.
17 Q So he was just feeling bad for a week,
18 you checked on him and you happened to get
19 --
20 A I don't know that he was -- I'm not
21 him. I can't say that he was just feeling
22 bad for a week. I'm talking about when he
23 was at my house.
24 Q So he was only at your house for just a
25 one week period of time?

Page 126

1 A Well, give or take days. You know, I'm
2 not saying it was seven days, seven days,
3 that's it.
4 Q So give or take a week is --
5 A Right.
6 Q And it was during that time period that
7 you would come home to check on him?
8 A Correct, yes.
9 Q And you just happened to be caught by
10 Carl Monday as an investigative reporter?
11 A Yes.
12 Q Okay. All right. Let's talk about
13 your secondary employment, okay?
14 A Okay.
15 Q You answered an interrogatory that I
16 had sent to your lawyer and in response, you
17 told me that you've worked hundreds of
18 special duty assignments. Does that sound
19 right to you?
20 A (Nodding).
21 Q Yeah?
22 A A lot of them, yes.
23 Q And this has been over the past 27
24 years?
25 A Yes.

Page 127

1 Q Do you recall when you first started
2 working secondary employment?
3 A As soon as I could.
4 Q Do you remember what year that was?
5 A Probably 1992.
6 Q And have you always worked secondary
7 employment since then?
8 A Yes.
9 Q And why is it that you work secondary
10 employment?
11 A The money.
12 Q What percentage of your income in a
13 given year is derived from secondary
14 employment?
15 A I couldn't break it down that way. I
16 never -- never, you know, looked at it that
17 way.
18 Q Where are some of the establishments or
19 companies for which you have worked
20 secondary employment?
21 A I mean, I worked over between the Q and
22 the Progressive Field, I worked Tower City,
23 I worked all kinds of construction jobs,
24 standing over a hole, directing traffic. I
25 worked just about anything.

Page 128

1 Q At any given week, how many hours would
2 you say you're working secondary
3 employment?
4 A I would say upwards of 28, somewhere
5 around that time frame.
6 Q Around 28 hours per week?
7 A Yeah, somewhere around there, give or
8 take.
9 Q And this is in addition to the 48 hours
10 you work regular duty?
11 A Yes.
12 Q Let me just talk a little bit about
13 your shift or your work schedule as a police
14 officer. Have you had a regular schedule
15 over the years as a police officer?
16 A It's not regular. It's -- from 1992 to
17 '94, we rotated shifts, so every 30 days,
18 they would switch.
19 Q And then going forward after 1994?
20 A They were specific to day shift,
21 afternoon shift or night shift, and I've
22 been on all of them.
23 Q And so as of, say, January of 2018,
24 about a year ago, what was your --
25 A Day shift.

Page 129

Q   Day shift.  And what are the hours?
A   Again, it would vary.  They start either at 6:00 a.m., 7:00 a.m. or 8:00 a.m. and go for eight hours, but could extend, of course, as well to overtime.
Q   And how many days a week?
A   Generally six days a week.
Q   Is that the norm for the Cleveland Police Department or that --
A   Your days off rotate.  There's -- like one week you would be off Monday and Tuesday, the following week, you would be off Tuesday and Wednesday.  That's my shift.
Q   And on average, it's six days a week?
A   Yes.
Q   Okay.  All right.  Let go back to your secondary employment.  Who typically pays you for the secondary employment assignments, the private employer?
A   Yes, yes, yes.
Q   Does it go through the city in any way?
A   Does not.
Q   How are you typically paid?  Cash, check, direct deposit, what?

Page 130

A   Both, all of those.
Q   All of those.  It depends?
A   Depends.
Q   And have you ever been issued a 1099?
A   Yes.
Q   Okay.  A W-2?
A   Yes.
Q   Okay.  Did The Corner Alley issue a W-2 or a 1099?
A   No, neither.
Q   Neither.  And how did The Corner Alley pay you?
A   Cash.
Q   Did you report your income from the secondary employment jobs to the taxing authorities?
A   Yes.
Q   All the time?
A   Yes.
Q   And on your tax returns, do you declare yourself an employee when you work secondary employment or independent contractor?
A   I'm not sure how the tax guy, you know, approaches that.
Q   Who's your tax guy?

Page 131

A   I go to -- I've had family friends do it, and I think that's the last few years I've had somebody just with some tax experience -- well, I don't know if it's tax experience, but...
Q   Someone to help you with your tax returns?
A   Yeah.
Q   You filed tax returns for 2017 I take it?
A   I did, yes.
Q   Did you have anybody help you?
A   I had it done, yes.
Q   Who did it for you?
A   Ta-Check.  Ta-Check.
Q   Can you spell that for me?
A   T-A Check, C-H-E-C-K.
Q   And that's a company?
A   Yes.
Q   Where are they located?
A   Pearl Road in Parma, I believe.
Q   Is there a person or an individual there that you worked with?
A   Yes.  Don Lambo.
Q   Don Lambo, L-A-M-B-O?

Page 132

A   Yes.
Q   He prepared your 2017 tax return?
A   Yes.
Q   And did he -- what about the year before, 2016?
A   I believe so, yes.  I believe so.
Q   The year before that, 2015?
A   Yes, I think so, yes.
Q   Okay.  How far back do you think he helped you with your tax returns?
A   Not much past that, I don't think so.
Q   Okay.  With the cash jobs, how do you report your income?
A   I would just tell him how much I made and then he would put it on the forms, however it's put on there.  I don't know.
Q   And did you keep any documentation when you got cash payment about how much you received and the hours you worked?
A   No.
Q   How would you know how much to report to Don Lambo?
A   Just in my mind, I would keep track of it.
Q   You would just keep a memory of how

Page 133

1  much --
2  A    It wasn't -- it wasn't like, you know,
3  a great number.
4  Q    Did the Cleveland Police Department
5  ever provide you training on being a private
6  security guard?
7  A    No, not that I can recall, no.
8  Q    Have you ever gotten formal training on
9  being a private security guard?
10  A    No.
11  Q    Have you ever read any materials to
12  educate yourself on being a private security
13  guard?
14  A    No.
15  Q    In your interrogatory answers, you
16  used the phrase "special duty" to talk about
17  your secondary employment.  For example,
18  you've had hundreds of special duty
19  assignments.  Is that a terminology that you
20  use when describing secondary employment?
21  A    We call it part-time.
22  Q    Part-time.  Does the phrase "special
23  duty" have any meaning to you as a police
24  officer?
25  A    Ours is part-time.  That's the word we

Page 134

1  use for it, part-time.
2  Q    Part-time.  Do you know what
3  terminology the police department uses?
4  A    I don't believe they use any, other
5  than secondary employment.  That's what they
6  would use, sorry.
7  Q    Secondary employment.
8  A    That's what they would use.
9  Q    How do you typically find out about the
10  secondary employment job opportunities?
11  A    That could vary.  Word of mouth, could
12  be posted.
13  Q    Posted where?
14  A    In the buildings.
15  Q    The police buildings?
16  A    Yes.
17  Q    Where would it be posted, on a bulletin
18  board?
19  A    Could be anywhere.
20  Q    So it could be posted on a bulletin
21  board?
22  A    Could be, could be anywhere.  Could be
23  in a roll call room, could be in a roll call
24  folder.  It could be anywhere, honestly.
25  Q    Electronically, do you ever see any

Page 135

1  electronic --
2  A    No, I've never seen it electronically.
3  Q    So any postings would be somewhere
4  inside of the police district headquarters?
5  A    That would be where most of it is or
6  it's word of mouth.
7  Q    What about The Corner Alley job, how
8  did you find out about that?
9  A    From Lieutenant Zarlenga.
10  Q    Zarlenga?
11  A    Yeah.
12  Q    Was there a job posting about The
13  Corner Alley job?
14  A    No.
15  Q    Did Lieutenant Zarlenga ever work
16  secondary employment for The Corner Alley?
17  A    I don't know.  I have no idea.
18  Q    You don't know how he found out about
19  the job, he just told you about it?
20  A    Right.
21  Q    And what did he explain the job
22  involved?
23  A    It's part-time.
24  Q    Anything more than that?
25  A    No.

Page 136

1  Q    Okay.  Let talk a little bit more
2  specifically about your employment
3  arrangement with The Corner Alley.  You told
4  me how you found out about the job is
5  through this lieutenant.
6       Did you have to submit any kind of
7  written application to The Corner Alley to
8  apply for the job?
9  A    No.
10  Q    How did you apply for the job?
11  A    I didn't apply for it.  I was given the
12  opportunity from the lieutenant to work it
13  and I worked it.
14  Q    So he was your point person for The
15  Corner Alley?
16  A    He told me about it, yeah.
17  Q    Okay.  So he told you about it and then
18  did you reach out to The Corner Alley?
19  A    No.
20  Q    They reached out to you?
21  A    No.
22  Q    How'd you get the job?
23  A    Through the lieutenant.
24  Q    I don't understand that.  Was he an
25  employee of Corner Alley?

Page 137

1  A   I don't know his arrangement with them
2  at all.
3  Q   Okay.
4  A   He said, "I got this part-time, you
5  interested in working it?"
6     I said, "I'm available on these dates
7  and times."
8     "There you go."
9  Q   I see.  And so he told you what -- he
10 told you when to show up?
11 A   Yes.
12 Q   Did you ever deal with any employee of
13 The Corner Alley in terms of scheduling?
14 A   No.
15 Q   And who paid you, the lieutenant?
16 A   The lieutenant.
17 Q   How often would he pay you?  Daily,
18 weekly, monthly?
19 A   It varied.  Whenever I would see him.
20 Q   How would he know how many hours you
21 worked?
22 A   Based off of the days that he gave you
23 -- gave me.
24 Q   I see.  And how often would he give you
25 the work schedule?

Page 138

1  A   I did the schedule for that -- for the
2  east side location.
3  Q   Okay.  You created the work schedule?
4  A   I did, yes.  I had officers.
5  Q   You what?
6  A   I had officers working it.
7  Q   You had officers working what?
8  A   Corner Alley.
9  Q   Okay.  What other officers worked at
10 that Corner Alley location?
11 A   Let me think who worked it for me.
12 They were newer guys.  I don't really -- I
13 don't really remember.
14    You got to understand, it's you walk up
15 to somebody, say, "I got some part-time, you
16 want to work it," and that's how it's
17 filled.
18 Q   Very informal it sounds like?
19 A   Exactly.
20 Q   But how would you know what days and
21 what hours you would be reporting to The
22 Corner Alley?
23 A   It was only two days, it was Thursdays
24 and Saturdays.
25 Q   I see.  From when you started there at

Page 139

1  Corner Alley, it was always Thursdays and
2  Saturdays?
3  A   I want to say that when we started,
4  when I started, when we started, it was only
5  Thursdays.  I believe Saturdays were added.
6  Q   Was it always just one officer working
7  at this Corner Alley location at one time?
8  A   On Thursdays, there would be two.
9  Saturdays, when Saturdays became part of it,
10 it was one.
11 Q   One officer.  And I take it you did
12 work some Thursdays at The Corner Alley?
13 A   I only worked there Thursdays.
14 Q   You did work there on Thursdays?
15 A   On Thursdays.
16 Q   Who did you work there with?
17 A   That would vary again.
18 Q   Okay.
19 A   There would be times when somebody
20 couldn't do it, I'd have to just do it
21 myself.
22 Q   So at no point did you work with The
23 Corner Alley employees to arrange your
24 schedule, you did all this through the
25 lieutenant?

Page 140

1  A   Right.
2  Q   And in collaboration with these patrol
3  officers that you would work with as well,
4  right?
5  A   Right, yeah.
6  Q   And who paid the patrol officers, you
7  or the lieutenant?
8  A   He would give me the money and then I
9  would give it to...
10 Q   And who would pay this lieutenant?
11 A   I have no idea.
12 Q   What did you tell me his name is?
13 A   Zarlenga.
14 Q   What is it?
15 A   Zarlenga.
16 Q   Zarlenga.  And which district is he in?
17 A   He's not.  He's the FOP vice president.
18 Q   Oh, that's right.  You told me about
19 him already.
20    You don't know who he received the
21 money from?
22 A   I do not, no.
23 Q   Do you know if he was taking a cut of
24 your pay?
25 A   I do not know that.

Page 141

1  Q   Is that typically how these secondary
2  jobs work, that a lieutenant would be
3  responsible --
4  A   No, any -- there's -- I mean, rank is
5  nothing.  Could be anybody.
6  Q   But would it be an officer that would
7  pay the other officers working the part-time
8  employment?
9  A   Not necessarily.  A lot of times you
10 could get paid directly, too.
11 Q   And on those occasions when you would
12 be responsible for paying the other
13 officers, did you take a cut of their pay?
14 A   No.
15 Q   And how did you keep track of the money
16 to make sure to document that the amount of
17 money you're receiving is the same amount of
18 money you were giving to the patrol
19 officers?
20 A   Well, I would know that --- what I was
21 supposed to pay them and what I received and
22 that's what I would pay them because I would
23 be receive -- I would be receiving that
24 specific amount.
25 Q   From the lieutenant?

Page 142

1  A   Yes.
2  Q   And then you would dole out as
3  appropriate to the different officers?
4  A   Right.
5  Q   But you didn't make any documentation
6  about who you paid and how much?
7  A   No.
8  Q   And what were your duties and
9  responsibilities while working security at
10 The Corner Alley?
11 A   I wasn't given any specifically.
12 Q   Did you ask?
13 A   No.
14 Q   Did you ask The Corner Alley or any of
15 its employees, "What do you want me to do
16 here?"
17 A   No.
18 Q   Were you given any limitations on what
19 you were allowed to do?
20 A   I wasn't -- no, I wasn't given
21 anything.
22 Q   You worked at The Corner Alley Uptown.
23 Did you ever work at the other Corner Alley
24 location?
25 A   No, I don't believe I ever worked down

Page 143

1  there.
2  Q   Have you ever worked at a bowling alley
3  before?
4  A   No.
5  Q   What about a bowling alley with a bar
6  inside?
7  A   No.
8  Q   What about a bowling alley with a bar
9  and an arcade?
10 A   No.
11 Q   So who determined what your duties and
12 responsibilities were at The Corner Alley,
13 just you?
14 A   Yes.
15 Q   Okay.  And what in your mind were your
16 duties and responsibilities?
17 A   Presence.
18 Q   Did you have any responsibilities to
19 patrol the area, patrol the premises?
20 A   I didn't.
21 Q   Just to be a physical presence?
22 A   Right.
23 Q   And beyond that, you didn't have any
24 other responsibilities?
25 A   Right.

Page 144

1  Q   Did anyone at Corner Alley ever talk to
2  you about why they wanted to hire a police
3  officer?
4  A   No.
5  Q   Did you ever ask them?
6  A   No.
7  Q   Did you ever interact with any Corner
8  Alley employee?
9  A   Just in, you know, hello, how are you,
10 the weather, order some food.  I ordered
11 food.
12 Q   Can you recall any Corner Alley
13 employees' names?
14 A   No.
15 Q   Did you ever know their names?
16 A   No.
17 Q   I think you did tell me that you got
18 written permission to work this second job?
19 A   I did, yes.
20 Q   And did the police department know the
21 manner in which you were being paid?
22        MR. PIKE:      Objection.
23    Form.
24 A   I don't know.
25 Q   Is that something that you told them?

Page 145

1      MR. PIKE:    Same
2  objection.
3  A   No.
4  Q   Did they ever ask?
5  A   No.
6  Q   Is that something that you have to
7  report to them, the manner in which you're
8  being paid at that secondary employment?
9  A   No.
10 Q   And you were approved by the police
11 department to carry your firearm while
12 working this job?
13     MR. PIKE:    Objection.
14  Form.
15 A   Yes.
16 Q   And to wear your police uniform, right?
17 You had permission to do that?
18 A   Yes.
19 Q   And you had permission to carry your
20 intermediate weapons that we talked about
21 before?
22 A   Yes.
23 Q   Did the police department impose any
24 restrictions on what you could do at The
25 Corner Alley that you're aware of?

Page 146

1  A   No.
2  Q   Did they restrict your work with
3  respect to the bar area at The Corner
4  Alley?
5  A   No.
6  Q   Was there a written agreement or
7  contract between you and The Corner Alley?
8  A   No.
9  Q   Did you ever get any training documents
10 from The Corner Alley?
11 A   No.
12 Q   Any handbooks?
13 A   No.
14 Q   Guidelines?
15 A   No.
16 Q   Memos?
17 A   No.
18 Q   Pamphlets?
19 A   No.
20 Q   Policies?
21 A   No.
22 Q   Employee manual?
23 A   No.
24 Q   Do you know if any such documents
25 existed at The Corner Alley?

Page 147

1  A   I don't know.
2  Q   Did you ever ask to see them?
3  A   No.
4  Q   Were you ever given a layout, a
5  document showing the layout of The Corner
6  Alley premises?
7  A   No.
8  Q   Can you tell me what the capacity was
9  at The Corner Alley Uptown?
10 A   I cannot, I couldn't tell you at all.
11 Q   You were never told that information by
12 The Corner Alley?
13 A   Right.
14 Q   You didn't ask it either?
15 A   No.
16 Q   Were you ever told what the alcohol
17 sales were on Saturdays?
18 A   Sales?  What do you mean?
19 Q   Alcohol sales, the amount of beverages,
20 alcoholic beverages that were sold at The
21 Corner Alley.
22 A   Like dollar-wise?
23 Q   Dollar-wise or --
24 A   No, no, no.
25 Q   You never were provided that

Page 148

1  information?
2  A   No.
3  Q   On Thursdays or Saturdays?
4  A   No dates.
5  Q   Okay.  Well, was more or less alcohol
6  sold on Saturdays compared with Thursdays?
7  A   I have no idea.
8  Q   What about the number of patrons,
9  Thursdays compared with Saturdays?
10 A   Again, no idea.
11 Q   Were you aware if there had been any
12 fights ever at The Corner Alley?
13 A   To my knowledge, I'm not aware of any,
14 no.
15 Q   Any medical incidents at The --
16 A   Again, not aware of any.
17 Q   Okay.  Any disturbance at The Corner
18 Alley that resulted in the police being
19 called?
20 A   To my knowledge, I don't know.
21 Q   Did you have any responsibility to
22 check IDs of people coming into the bar?
23 A   I did not.
24 Q   Did anybody that you were aware of, did
25 anybody check IDs at The Corner Alley?

Page 149

1  A   I didn't, I don't -- I didn't, no.
2  Q   But you didn't see anybody else doing
3  that?
4  A   No.
5  Q   Was there ever a bouncer at the front
6  door?
7  A   No.
8  Q   Did you ever see anybody get kicked out
9  of The Corner Alley before the incident on
10 January 13th, 2018?
11 A   No.
12 Q   Did you observe any fights?
13 A   No.
14 Q   Did The Corner Alley ask you to carry
15 your firearm while working?
16 A   No.
17 Q   Presumably you were -- because you were
18 a presence there, it was clear to the
19 patrons that you were carrying a firearm; is
20 that fair to say?
21 A   I can't -- I can't say what they would
22 interpret.
23 Q   Sure.  Let me ask it this way:  Were
24 you concealing the fact that you were
25 carrying a firearm while working at The

Page 150

1  Corner Alley?
2  A   No.
3  Q   So it was visible?
4  A   My coat would have been -- probably
5  would have been covering it.
6  Q   Okay.  Did you wear your coat the
7  entire time working at The Corner Alley when
8  you were inside?
9  A   That night?
10 Q   Just in general.
11 A   Depended on the weather.
12 Q   Okay.  And you did carry your weapon
13 every time you worked at The Corner Alley?
14 A   Yes.
15 Q   Did The Corner Alley employees ever
16 object to you having a firearm?
17 A   No.
18 Q   Were you aware that this was a
19 no-firearm establishment?
20 A   No.
21 Q   Okay.  You didn't see that big sticker
22 on the front door?
23 A   I did not.
24 Q   Did you ever see anybody else carrying
25 a firearm inside The Corner Alley?

Page 151

1  A   I did not.
2  Q   Did you ever discuss with The Corner
3  Alley the circumstances under which you
4  would use your gun if necessary?
5  A   No.
6  Q   Were you given -- were you provided any
7  restrictions on when or how you could use
8  your firearm while working at The Corner
9  Alley?
10 A   No.
11 Q   If I'm understanding correctly, you
12 never underwent any kind of interview
13 process --
14 A   Correct.
15 Q   -- to get the job at The Corner Alley?
16 A   That's correct.
17 Q   You didn't submit any documentation to
18 The Corner Alley?
19 A   No.
20 Q   You didn't submit your personnel file?
21 A   No.
22 Q   Do you know if they performed a
23 background check on you?
24 A   I do not know.
25 Q   Did anybody at The Corner Alley tell

Page 152

1  you that they were going to do a background
2  check?
3  A   No.
4  Q   How soon after you learned about the
5  job from the lieutenant did you work your
6  first shift at The Corner Alley?
7  A   It would have been relatively soon.
8  Q   Like the same day or within days?
9  A   Within days I would say.
10 Q   Okay.  If you were sick and couldn't
11 work The Corner Alley, who would you
12 notify?
13 A   The lieutenant.
14 Q   Lieutenant.  And you don't know who he
15 would in turn notify?
16 A   No, exactly.
17 Q   Do you know the total number of hours
18 you worked at The Corner Alley in 2017?
19 A   I do not.
20 Q   You never made any documentation?
21 A   No.
22 Q   Was that something you typically did as
23 -- when you worked secondary employment, you
24 would make documentation of the hours
25 worked?

Page 153

1  A   No.
2  Q   Not something you kept track of?
3  A   No.
4  Q   You were not issued a W-2 or a 1099 by
5  The Corner Alley?
6  A   I was not.
7  Q   When you got to The Corner Alley, did
8  you have to report to somebody, say, "I'm
9  here"?
10  A   No.
11  Q   What was your typical Thursday shift?
12  A   I believe 9:00 p.m. to 1:00, 1:00 a.m.
13  Q   And was that when the establishment
14  closed, 1:00 a.m.?
15  A   I don't know if they closed or not that
16  early.
17  Q   And what about Saturdays, the same,
18  9:00 to 1:00; your shift I mean?
19  A   Yes; I think so, yes.
20  Q   Did those hours ever change or was your
21  shift always 9:00 to 1:00?
22  A   I think it was 9:00 to 1:00.
23  Q   And when was the last date you were
24  working secondary employment at The Corner
25  Alley, January 13th, 2018?

Page 154

1  A   That's the last day.
2  Q   Okay.  And why was that your last day?
3  Were you fired by The Corner Alley?
4        MR. ROCHE:  Objection.  Go
5        ahead.
6  A   No, not to my knowledge.
7  Q   So how did you know that you were not
8  going to be working there anymore?
9  A   Since the incident, I'm on restricted
10  duty.
11  Q   Even to this day, you're still on
12  restricted duty?
13  A   I am.
14  Q   And that's the reason you no longer
15  worked at The Corner Alley, because you were
16  on restricted duty?
17  A   Yes.
18  Q   You were not told by The Corner Alley
19  that we didn't want you to come back?
20  A   I was not.
21  Q   Did you have a conversation with this
22  Lieutenant Zarlenga that you wouldn't be
23  working at The Corner Alley anymore?
24  A   No.
25  Q   You just assumed that he would find out

Page 155

1  and report it back to The Corner Alley that
2  you were not available to work anymore?
3  A   I can't -- I don't know what he -- what
4  he would do or what he has done.
5  Q   Okay.  So you don't know one way or the
6  other and you didn't do anything to notify
7  The Corner Alley?
8  A   Right.
9  Q   You just -- okay.  All right.  Tell me
10  about this restricted duty.  Why are you on
11  restricted duty?
12  A   Because of the ongoing investigation.
13  Q   And what are you allowed to do while
14  you're on restricted duty?
15  A   Administrative duties.
16  Q   And what does that mean?  What are you
17  doing on a day-to-day basis?
18  A   It varies.  Whatever my lieutenant
19  would give me administratively, that's what
20  I do.
21  Q   Who is your lieutenant?
22  A   James Plent.
23  Q   Plent?
24  A   Plent, yes.
25  Q   Despite being on restricted duty, do

Page 156

1  you still maintain your normal hours?
2  A   Yes.
3  Q   About 48 hours a week?
4  A   I'm on Monday through Friday now, so 40
5  hours a week.
6  Q   And you're paid?
7  A   I am.
8  Q   And you've been paid consistently since
9  this incident?
10  A   Yes.
11  Q   Have you worked any secondary
12  employment since the incident?
13  A   I have not.
14  Q   Do you know when you're going to be --
15  return back to normal duties?
16        MR. PIKE:     Objection.
17        Form.
18  A   I do not know.
19  Q   Have you received any documentation
20  related to your restricted duty?
21  A   No.
22  Q   So how did you find out you were on
23  restricted duty?
24  A   I was told.
25  Q   By your lieutenant or by somebody

Page 157

1 else?
2 A   Oh, boy.  I'm trying to think here.  I
3 want to say I was told by the homicide unit.
4 Q   Who in the homicide unit?
5 A   It would have been Lieutenant Pillow.
6 Q   Lieutenant Pillow?
7 A   Pillow, yeah.
8 Q   How do you spell it?  How do you spell
9 Pillow?
10 A   P-I-L-L-O-W, Pillow.  I believe that's
11 who told me, but somebody in that -- in that
12 chain right there.
13 Q   Have you had a conversation with this
14 lieutenant about the incident?
15 A   I have not.
16 Q   Are you normally working in the
17 homicide unit?
18 A   No.  He's the officer in charge of it.
19 Q   Okay.  Is there a unit that you're
20 assigned to?
21 A   I'm assigned to District Five.
22 Q   Just District Five?
23 A   Oh, you know, I apologize.  I'm
24 assigned to the employees assistance unit.
25 Q   And what is that?

Page 158

1 A   That's the unit that helps officers
2 involved in critical incidents.
3 Q   Give me an example of what a critical
4 incident might be.
5 A   Use of deadly force incident.
6 Q   So any time there's an officer involved
7 in the use of deadly force, it's your unit
8 that goes to the scene, somebody from your
9 unit?
10 A   I don't know their protocol, if they
11 respond to the scene.  I know that they
12 address the officer afterwards.
13 Q   And what is your role within that
14 unit?
15 A   That's just where I'm assigned.
16 Q   Okay.  Is it just a title or does it
17 actually mean anything?
18 A   It's just where I'm assigned while the
19 investigation is going -- ongoing.
20 Q   Oh, I understand.  While you're on
21 restricted duty, that's the unit you're
22 assigned to?
23 A   Right.
24 Q   I see.  Before you were on restricted
25 duty, before the incident, were you assigned

Page 159

1 to any particular unit?
2 A   Just District Five.
3 Q   I understand.  All right.  Let's turn
4 back to The Corner Alley.  Were you aware of
5 the layout of The Corner Alley when you were
6 working there?
7 A   Yes.
8 Q   Okay.  Can you describe the second
9 floor for me?
10 A   Only thing that I know about the second
11 floor is there's a bathroom up there.
12 Q   Did you ever go up to the second floor
13 while working there?
14 A   No.
15 Q   You always just stayed on the first
16 floor?
17 A   Yes.
18 Q   And were you responsible for monitoring
19 either the front or the back entrance?
20 A   Was I assigned to monitor the front or
21 back entrance, that's the question?
22 Q   Correct.
23 A   No.
24 Q   Who was monitoring the front and the
25 back entrance while you were working there?

Page 160

1        MR. ROCHE:       Objection.
2 A   I don't believe anyone.
3 Q   Were both the front and the back opened
4 while you were working there?  I mean,
5 unlocked, opened while you were working
6 there on Thursdays?
7 A   Yes.
8 Q   And Saturdays?
9 A   Yes.
10 Q   Were you aware of where the
11 surveillance cameras were located throughout
12 the establishment?
13 A   Not at all, no.
14 Q   Were you ever told by The Corner Alley
15 or anybody working for The Corner Alley
16 where the different cameras were located?
17 A   No.
18 Q   Did you ever ask?
19 A   No.
20 Q   Did you know where the room was where
21 the monitors for the surveillance videos
22 were located?
23 A   No.
24 Q   Did you know if it was on the first
25 floor or the second floor?

Page 161

1  A   No, no idea.
2  Q   Did you know where the manager's office
3  was located at this --
4  A   No.
5  Q   Okay.  Do you know what square footage
6  of The Corner Alley establishment was?
7  A   No, not at all.
8  Q   Do you know how many bars were inside
9  the premises?
10  A   No.
11  Q   This was an establishment open to
12  adults and children?
13  A   I don't know.
14  Q   Okay.  Do you recall seeing children
15  there ever?
16  A   Not that I can remember, no.
17  Q   Did you pay attention to that one way
18  or the other, whether there were children at
19  the establishment?
20  A   I never specifically looked for kids or
21  did not look for them.
22  Q   Okay.  Not something that was within
23  your purview providing security at The
24  Corner Alley?
25  A   It's not something that I did.

Page 162

1  Q   The night of the incident, January
2  13th, 2018, how many employees were working
3  at The Corner Alley?
4  A   I have no idea.
5  Q   Who was part of the security team at
6  The Corner Alley that night?
7  A   I guess it would just be me.
8  Q   And what was the security plan that
9  night?
10  A   Presence.
11  Q   Anything else?
12  A   No.
13  Q   Did you have a meeting with anyone else
14  to discuss the security plan?
15  A   No.
16  Q   Did Corner Alley ever hire a security
17  company to assist you at this job site?
18  A   I never talked with any security
19  company.
20  Q   Did you ever check for weapons while
21  working security at The Corner Alley?
22  A   Check?
23  Q   Check patrons for weapons?
24  A   No.
25  Q   Did you see anybody checking for

Page 163

1  weapons?
2  A   No.
3  Q   At any point?
4  A   I did not, no.
5  Q   On any day that you worked?
6  A   I did not, no.
7  Q   Was any Corner Alley staff trained in
8  first aid?
9  A   I have no idea.
10  Q   You have no idea.  Did anybody tell you
11  whether they were one way or the other?
12  A   No.
13  Q   Do you know if The Corner Alley had
14  first aid supplies on hand?
15  A   I have no idea.
16  Q   And so who was responsible at The
17  Corner Alley for determining when the first
18  aid kit would be used?
19  A   I have no idea.
20  Q   Did The Corner Alley have an emergency
21  plan in place the night of the shooting?
22  A   I have no idea.
23  Q   Evacuation plan?
24  A   Again, no idea.
25  Q   Did The Corner Alley ever issue you a

Page 164

1  handheld radio?
2  A   No.
3  Q   Were you carrying a radio?
4  A   I was not.
5  Q   Did you have a plan to stay in one
6  location while you were working at The
7  Corner Alley or you just moved around
8  throughout the night?
9  A   I don't recall moving around too much,
10  but I also don't -- saying I'm going to stay
11  here, right here.  You move around.  It's
12  just, you know...
13  Q   You didn't have a plan one way or the
14  other?
15  A   No.
16  Q   When was the last time you were working
17  on duty as a police officer prior to coming
18  to The Corner Alley that night?
19  A   I believe it was that day, during the
20  day.
21  Q   What were your hours that day?
22  A   I believe they were 6:00 to 2:00, 6:00
23  a.m. to 2:00 p.m.
24  Q   And where did you spend most of that
25  day at work?  Were you at the district

Page 165

1  headquarters or were you on patrol?
2  A   I don't recall.
3  Q   Is that something that would be
4  documented?
5  A   It would be on my duty report.
6  Q   And what about earlier in the week, did
7  you work a full week?
8  A   I believe so, yeah.
9  Q   Did you work Monday through Saturday?
10 A   I don't know what dates -- what days I
11 would have worked, what days I would have
12 been off.
13 Q   But if we got your duty reports from
14 that week, it would reflect your hours?
15 A   It would reflect the dates and times I
16 worked, yes.
17 Q   Got it.  Did you work that Thursday
18 before the incident at Corner Alley?
19 A   Again, I don't remember if I was off on
20 those days.  Could have been working
21 overtime.  I can't really specifically
22 remember and I haven't looked at anything to
23 say I was working that day.
24 Q   Were you working any other secondary
25 employment anywhere else during this time

Page 166

1  frame?
2  A   No.
3  Q   So in January of 2018, Corner Alley was
4  your only other secondary job?
5  A   Yes.
6  Q   So you got off duty around 2:00 p.m.
7  that Saturday and where did you go?  Where
8  was the first place you went after work?
9  A   I would have went home.
10 Q   And when you got home, what'd you do?
11 A   I remember, you know, sleeping at some
12 point.
13 Q   What time did you get up?
14 A   Have no idea.
15 Q   What'd you do once you got up?
16 A   Probably took a shower and get ready to
17 go back to work.
18 Q   At The Corner Alley?
19 A   Right.
20 Q   Did you have anything to eat?
21 A   I don't remember.
22 Q   Was anybody with you at your house?
23 A   No.
24 Q   Did you see anybody in between
25 finishing your work at the police department

Page 167

1  and starting your job that night at The
2  Corner Alley?
3  A   No, because I would have been home.
4  Nobody's there.
5  Q   Did you consume any alcohol that day?
6  A   No.
7  Q   At any point during that day?
8  A   Absolutely no.
9  Q   When you got to The Corner Alley, did
10 you report to anybody?
11 A   Did not.
12 Q   Did anybody report to you?
13 A   No.
14 Q   Was anybody supervising you?
15 A   No.
16 Q   Did you supervise anyone?
17 A   No.
18 Q   You told me your shift started around
19 9:00 p.m. that night.  Do you know what time
20 you actually arrived there?
21 A   I want to say it was quarter, quarter
22 after, 20 after, something like that.
23 Q   How did you get there, by car?
24 A   Yes.
25 Q   Was it a police car you drove in?

Page 168

1  A   No.
2  Q   Where'd you park?
3  A   The rear of the building.
4  Q   What was the weather like that night,
5  pretty cold?
6  A   Terrible.  Terrible outside.
7  Q   Below freezing?
8  A   I don't know.
9  Q   But a typical terrible --
10 A   It was cold.
11 Q   -- Cleveland winter?
12 A   It was cold.
13 Q   Okay.  Snow on the ground?
14 A   A lot of snow and ice.
15 Q   So since you didn't report to anybody,
16 was there any way for The Corner Alley to
17 know when you got there?
18 A   They would see me.
19 Q   The other employees would see you?
20 A   Yeah.
21           MR. ROCHE:     Objection.
22    Pardon me.  I'm going to put on one
23    continuing objection, too, just
24    acknowledging the fact that there's
25    a legal issue regarding his status,

Deposition of Sergeant Dean Graziolli          Melissa Yatsko and Darian Allen vs. Sergeant Dean Graziolli, et al.,

Page 169

1  his employment relationship.  With
2  that, go ahead please.
3       Oh, also while we're taking a
4  moment, we should have a
5  conversation about any time
6  constraints today.  We're after four
7  o'clock.  You guys can certainly go
8  as long as you need to, but
9  everybody else has some questions.
10  I don't know if the officer has any
11  time restrictions.  We should at
12  least talk about it and we can do
13  that off the record, whatever you
14  guys want.
15       MR. TOR:      Sure.
16  What was my last question?
17            - - -
18       (Record read.)
19            - - -
20       MR. ROCHE:      Pardon me,
21  Jeremy.  I had a question about any
22  time issues.
23       MR. TOR:      Yeah, no.  We
24  can maybe discuss it during a break.
25       MR. ROCHE:      Sure,

Page 170

1  absolutely.
2  BY MR. TOR:
3  Q   Do you know how many other -- how many
4  Corner Alley employees there were at this --
5  A   I do not.
6  Q   Do you know who the manager was on
7  duty?
8  A   I do not.
9  Q   Do you know what the employees' job
10  responsibilities were, one way or the other?
11  A   No.
12  Q   All right.  So tell me everything you
13  remember that you did before the first
14  incident which happened inside The Corner
15  Alley between Thomas and his friend.  You
16  get there a little after 9:15.  What do you
17  do?
18  A   Got something to drink.  I remember
19  asking if there was any ice and they said
20  there was no ice in the soda dispenser where
21  I was getting soda.  I got Mountain Dew.
22  Then I walked to the front, close to the
23  alleys and I ordered some food with one of
24  the waitresses.
25  Q   Do you remember what you ordered?

Page 171

1  A   I do not.  I want to say it was a -- it
2  was a -- maybe a chicken salad.
3  Q   And were you able to finish it?
4  A   I did eat, yes.
5  Q   And so other than getting a Mountain
6  Dew, eating your dinner, what else did you
7  do before the first incident inside The
8  Corner Alley?
9  A   Nothing.  I was staying in there.
10  Q   Did you go upstairs at any point?
11  A   Hmm-mm.
12  Q   No?
13  A   Before the incident?
14  Q   Correct.
15  A   I did not, no.
16  Q   All right.  Do you recall about what
17  time the incident occurred inside the
18  establishment?
19  A   I do not, no.
20  Q   How did you learn about it?
21  A   One of the employees informed me about
22  it.
23  Q   What'd they tell you?
24  A   Said there was a fight.
25  Q   Did you witness the fight yourself?

Page 172

1  A   I did not.
2  Q   By the time you got to the location of
3  the fight, did you see anybody fighting?
4  A   I did not.
5  Q   What did you -- what did you see when
6  you got there?
7  A   Saw the first kid getting walked out,
8  saw from going back to where the second kid
9  was, going upstairs because I think there
10  was personal belongings up there.
11      I went upstairs with them.  There was
12  some conversation back and forth between the
13  employees and the individual and he I think
14  got a coat, I think it was, and they went
15  around him, walked down the stairs and
16  walked out the front door.
17  Q   Did you hear what was said during the
18  conversation between this individual and the
19  employees?
20  A   I do not recall what was said at all.
21  Q   And this individual, was that Thomas
22  Yatsko?
23  A   Upstairs?
24  Q   Yeah.
25  A   Yes.

Case: 1:18-cv-00814-DAP  Doc #: 71  Filed: 01/17/20  44 of 83.  PageID #: 1113

Deposition of Sergeant Dean Graziolli      Melissa Yatsko and Darian Allen vs. Sergeant Dean Graziolli, et al.,

Page 173

1 Q   Okay.  And the other individual who was
2 first walked out of the establishment, that
3 was his friend Deleon?
4 A   Yes.
5 Q   Okay.  Did you have a conversation with
6 Thomas at any point during this time period
7 when he's going upstairs to get his jacket?
8 A   No, I did not.
9 Q   Did you ever have a conversation with
10 Thomas inside the bar?
11 A   I did not.
12 Q   Did you have a conversation inside the
13 establishment with his friend, Deleon?
14 A   I did not.
15 Q   So an employee called you over because
16 there had been a fight.  What did you
17 understand your responsibilities to be?  Why
18 were you being summoned?
19 A   Because I'm the policeman working the
20 place.
21 Q   And did you say or do anything?
22 A   No.
23 Q   You just followed the employee?
24 A   I did.
25 Q   Did you put your hands on Thomas at any

Page 174

1 point?
2 A   No.
3 Q   Did you know exactly what had happened
4 between Thomas and his friend?
5 A   Not one clue.
6 Q   You had no idea who threw a punch?
7 A   No.
8 Q   Didn't know any punches had been
9 thrown?
10 A   Nothing.
11 Q   So you didn't know if Thomas was an
12 innocent victim, whether he threw any
13 punches, you just have no idea one way or
14 the other, right?
15 A   I haven't a clue as to what happened
16 with any of them.
17 Q   How close did you get to Thomas?
18 A   I wasn't close at all to him.
19 Q   Do you know whose idea it was to eject
20 these two individuals from the
21 establishment?
22 A   I do not.
23 Q   It wasn't your decision?
24 A   I was not consulted about it, no.
25 Q   Do you know if anybody called 911?

Page 175

1 A   I do not know.
2 Q   Was that discussed?
3 A   No.
4 Q   Did you offer it?  Did you say, "Do you
5 guys want to call 911"?
6 A   Nope.
7 Q   Did you ask anybody if they wanted to
8 report any crime?
9 A   I didn't speak to anyone.
10 Q   Did you have any reason to think a
11 crime had occurred inside the establishment?
12 A   I didn't have reason to think anything
13 other than an altercation or fight occurred.
14 Q   Was that a basis for you to think that
15 any crime had occurred?
16 A   I guess -- I guess it depends.
17 Q   I mean, as you're walking out with
18 Thomas, in your mind, are you thinking that
19 criminal activity has just occurred in this
20 establishment?
21 A   I don't know.  At that point, I don't
22 know because all I'm told is there was a
23 fight, so I know that from the employee,
24 there's a fight.  That's all I know.
25 Q   Beyond that, you didn't know anything

Page 176

1 else?
2 A   Right.
3 Q   Didn't draw any other conclusions?
4 A   Right.
5 Q   Well, did Thomas appear to be compliant
6 when he was being escorted out of the
7 establishment?
8 A   He was walking.  Compliant?  I don't
9 know.  Walking, he was walking.
10 Q   He went out of the establishment
11 voluntarily, right?
12 A   He had a large group around him.  It
13 wasn't voluntarily.
14 Q   Nobody had to physically remove him
15 from the establishment?
16 A   Nobody put hands on him, no.
17 Q   Right.  Did it appear that he was
18 giving anybody a hard time about being
19 ejected from the establishment?
20 A   He was speaking his piece.
21 Q   And what was he saying?
22 A   I have no idea.  I don't recall what he
23 was saying because I was behind the group.
24 Q   What do you mean "he was speaking his
25 piece"?

Page 177

1  A    To whatever the circumstances of the
2  fight, he was saying something, I'm
3  assuming, towards that, because they were
4  all nodding their heads in agreement as
5  they're walking.
6  Q    Did you --
7         VIDEOGRAPHER:    Three minutes
8     of tape.
9         MR. TOR:      What's that?
10        VIDEOGRAPHER:    Three
11    minutes.
12        MR. TOR:      Three
13    minutes.
14 BY MR. TOR:
15 Q    Did you hear Thomas objecting verbally
16 or protesting being ejected from the
17 establishment?
18 A    I don't recall what he said at all.
19 Q    Right.  So you didn't hear him
20 protesting?
21 A    Like I said, I can't speak what he was
22 saying because I didn't hear it.
23 Q    Okay.  Did he fight with you as he was
24 being escorted out?
25 A    With me?

Page 178

1  Q    Yes.
2  A    No.
3  Q    Did he fight with any of the employees
4  while being escorted out?
5  A    No.
6  Q    Was this the first time you had ever
7  seen this individual, Thomas Yatsko?
8  A    I never seen him before.
9  Q    Did you feel threatened by him as he
10 was leaving?
11 A    No.
12 Q    Did you feel threatened by his friend?
13 A    No.
14 Q    Did any of The Corner Alley employees
15 express to you their concern about these two
16 individuals?
17 A    They did not.
18 Q    And once Thomas got outside, did you
19 also go outside?
20 A    I followed them out, yes.
21 Q    How far out did you follow them?
22 A    Six or eight feet.
23 Q    You were still with inside the patio by
24 the time you returned to come back inside?
25 A    It would have been -- it would have

Page 179

1  been real close to the sidewalk, the common
2  sidewalk.
3         VIDEOGRAPHER:    We're off the
4     record.
5             - - -
6     (Short recess to change tapes.)
7             - - -
8         VIDEOGRAPHER:    We're back on
9     the record.
10 BY MR. TOR:
11 Q    How much were you paid at The Corner
12 Alley?
13 A    It was $100 a night.
14 Q    For the 9:00 p.m. to 1:00 a.m. shift?
15 A    Yes.
16 Q    What about the patrol officers, did
17 they get --
18 A    Same.
19 Q    Did that lieutenant ever work at The
20 Corner Alley, to your knowledge?
21 A    Not to my knowledge.
22 Q    All right.  So we were talking about
23 how you walked along with the employee to
24 escort Thomas out of the establishment.
25    Did you have authority to remove a

Page 180

1  patron from The Corner Alley?
2  A    Yes.
3  Q    And who gave you that authority?
4  A    The state of Ohio.
5  Q    Okay.  So that was authority you
6  believed you had as a licensed police
7  officer?
8  A    Yes.
9  Q    So you got outside and did you have a
10 conversation with Thomas at that point?
11 A    No con -- well, yeah, I did, yes.
12 Q    What'd you say, what did he say?
13 A    He and Delano?
14 Q    Deleon.
15 A    Deleon.  Excuse me.  Were talking with
16 each other like they were friends and I
17 remember asking them, "Are you guys
18 friends," and Deleon saying, "I thought he
19 were," and I said, "It's a funny way to
20 treat your friends."
21 Q    What did you mean by that?
22 A    Fight with your friends, the fighting
23 with your friends, engaged in a fight with
24 your friends.  That's what I meant.
25 Q    But I thought you told me you didn't

Page 181

1 know what had happened?
2 A   Well, I was told a fight occurred.
3 Q   And you didn't know the circumstances
4 of the fight?
5 A   Correct.
6 Q   You didn't know who threw -- whether
7 one or both ever them punched or shoved or
8 threw any objects at the other?
9 A   Right.
10 Q   Was anything else said during this
11 conversation?
12 A   The only thing that I said to them was,
13 "You cannot come back inside."
14 Q   Okay.  And was a Corner Alley employee
15 with you at the time that you said that to
16 them?
17 A   I do not recall any of them being
18 there.
19 Q   Did a Corner Alley employee also tell
20 them that they couldn't come back into the
21 establishment?
22 A   I don't know.  I don't know.
23 Q   Why did you tell them they couldn't
24 come back in?
25 A   Because of what I was told, the fight.

Page 182

1 Q   The fight.  Did a Corner Alley employee
2 say to you, "Please tell them that they
3 can't come back into the establishment"?
4 A   No.
5 Q   This was a decision you made on your
6 own to tell them that they couldn't come
7 back in?
8 A   Yes.
9 Q   Had you ever removed anybody from The
10 Corner Alley prior to this incident?
11 A   No.
12 Q   And then you went back into The Corner
13 Alley?
14 A   I did.
15 Q   And what's the next thing that you
16 remember happening once you got inside?
17 A   I sat down at the edge of the bar.
18 Q   Near the window, facing --
19 A   The whole front is windows.  Would have
20 been I guess on the part by the
21 entrance/exit door.
22 Q   And what were you doing there?
23 A   Just sitting there.
24 Q   Were you watching what was happening on
25 the public sidewalk or out on the street?

Page 183

1 A   I was not.
2 Q   Where were you facing, facing inward?
3 A   I was on a stool, so this way, that
4 way, turn.  You know, just kind of looking
5 around.
6 Q   Looking around.  Not looking at
7 anything in particular?
8 A   Right.
9 Q   But you were not observing what was
10 happening outside?
11 A   I was not, no.
12 Q   And what's the next thing you remember
13 happening?
14 A   A lady coming up to me saying that they
15 were fighting in the middle of Euclid
16 Avenue, middle of the street I believe she
17 said.
18 Q   Did you witness the fight from inside
19 The Corner Alley?
20 A   No.
21 Q   And when you heard this, what did you
22 do?
23 A   I went outside.
24 Q   Did you have your jacket on at the
25 time?

Page 184

1 A   Yes.
2 Q   And what was your purpose in going
3 outside?
4 A   To see if what the citizen told me was,
5 in fact, going on.
6 Q   And if it proved to be correct, what
7 was your plan?  What were you going to do?
8 A   Was going to intervene, going to take
9 steps to stop the fight.
10 Q   And is that what you ended up doing?
11 Did you intervene to stop the fight?
12 A   I did intervene, yes.
13 Q   Did you observe any of the fight?
14 A   Yes.
15 Q   What did you observe?
16 A   I observed Thomas putting the boots to
17 Deleon on the ground, punching him, head and
18 face, body, kicking his body.
19 Q   And what was Deleon doing?
20 A   He was defenseless.  He wasn't doing
21 anything.
22 Q   And did you see any weapon either in
23 Deleon's hand or Thomas's hand?
24 A   Other than his fists, no.
25 Q   And so what did you do to intervene?

Page 185

1  A    Put my hand on his shoulder.
2  Q    Whose?
3  A    Thomas.
4  Q    You put your hand on his shoulder.  Was
5  it his left or his right shoulder?
6  A    I don't know.
7  Q    You put your hand on his shoulder.
8  Then did you pull him away?
9  A    Just to get him off of the kid, yes.
10 Q    Did you have to use much effort to do
11 that?
12 A    Yes.
13 Q    Did you use one hand or two hands?
14 A    One hand.
15 Q    You were able to get him off with one
16 hand?
17 A    Yes.
18 Q    And what'd you say to him?
19 A    I didn't say anything to him.
20 Q    Did you say anything to Deleon?
21 A    No.
22 Q    Okay.  So what happens next?
23 A    Thomas turns to me, faces me and with
24 the closed fists is getting ready to punch
25 me with the closed fists.

Page 186

1  Q    Thomas is getting ready to punch you
2  with the closed fist?
3  A    Right.
4  Q    And what do you say or do?
5  A    I tell him, I said, "Look who you're
6  going to punch."
7  Q    Did you identify yourself as a police
8  officer?
9  A    I did.
10 Q    All right.  So when you were observing
11 Thomas, quote, "putting the boots to
12 Deleon," did you have your weapon on you,
13 your gun?
14 A    Yes.
15 Q    And did you take your gun out of your
16 holster?
17 A    I did not.
18 Q    Why not?
19 A    Didn't.  I didn't -- I just didn't.
20 Q    Wasn't necessary?
21 A    Wasn't necessary.
22 Q    And did you -- were you planning to
23 arrest either Deleon or Thomas at that
24 point?
25 A    I didn't have a plan at that point.

Page 187

1  Q    Deleon testified, and you know because
2  you were there, that you threatened to
3  arrest him.  Do you recall saying that?
4  A    I do not recall saying that to him.
5  Q    Do you deny that you said that?
6  A    I don't deny it.
7  Q    Do you recall seeing Deleon walk away
8  after you intervened to break up the fight?
9  A    No.
10 Q    Deleon testified that after you
11 intervened to break up the fight, Thomas did
12 not say anything to you.  Is that correct?
13 A    I don't recall him saying anything to
14 me.
15 Q    Deleon also testified that Thomas never
16 made any gestures towards you.  Do you
17 dispute that testimony?
18 A    I do, yes.
19 Q    Deleon testified that Thomas never
20 threatened you.  Do you dispute that
21 testimony?
22 A    I do.
23 Q    Deleon said that you were being nasty
24 to him, to Deleon.  Do you have any reason
25 to dispute that?

Page 188

1  A    I wasn't being nasty to him.
2  Q    You do dispute Deleon's testimony on
3  that point?
4  A    Yeah, I wasn't nasty to the kid.
5  Q    Deleon testified that you cursed at
6  him.  Did you curse at him?
7  A    Not at him, no.
8  Q    Well, he recalls you saying something
9  to the effect of "Fuck your phone."  Did you
10 say that to Deleon?
11 A    I did say that.
12 Q    And why did you say that?
13 A    Because my purpose was not to look for
14 his phone, my purpose was to get him out of
15 an active street that had cars driving up
16 and down on it, on snowy and ice conditions,
17 so I did say, "Forget your fucking phone,
18 we'll get your phone.  Don't worry about
19 your phone.  Your phone is not the thing we
20 have to worry about at this time."
21 Q    And did you help Deleon get out of the
22 street?
23 A    I did.
24 Q    Did you pick him up?
25 A    I helped him to his feet, yes.

Deposition of Sergeant Dean Graziolli | Melissa Yatsko and Darian Allen vs. Sergeant Dean Graziolli, et al.,

Page 189

1  Q    Okay.  Was this before or after Thomas
2  tried to punch you?
3  A    It would have been after.
4  Q    Okay.  So the sequence of events,
5  according to you, is you break up the fight
6  and Thomas goes to punch you?
7  A    Correct.
8  Q    You identify yourself as a police
9  officer and he doesn't punch you?
10  A    No.
11  Q    And then Deleon says something in
12  response, you say, "Fuck your phone," and
13  then you help him out of the street?
14  A    Yes.
15  Q    Okay.  And what is Thomas doing at this
16  point?
17  A    He is gone.  I have no idea where he
18  went.  He ran off.
19  Q    Did you witness any crime occurring
20  when you came out of the Corner Alley and
21  saw Thomas and Deleon?
22  A    Yes.
23  Q    What crime did you witness?
24  A    Assault, possibly a felonious assault,
25  depending on the outcome of his injuries.

Page 190

1  Q    And who had committed the assault,
2  possible felonious assault?
3  A    Thomas.
4  Q    Did you report it?  Did you call 911 to
5  report the incident?
6  A    Did not.
7  Q    Did you report it to anybody inside The
8  Corner Alley?
9  A    I did not.
10  Q    Did you arrest Thomas at that point
11  after you observed him --
12  A    Did not.
13  Q    -- after you observed the felonious
14  assault?
15  A    I did not.
16  Q    Why not?
17  A    I didn't have an opportunity to do any
18  of those stages that you just doled out.  I
19  didn't have an opportunity to do any of
20  that.
21  Q    Did you tell Thomas that "I'm going to
22  arrest you for committing an assault"?
23  A    I did not tell him that.
24  Q    All right.  What's the next thing that
25  you do after this episode happens and after

Page 191

1  you have apparently helped Deleon out of the
2  street?
3  A    I walked with him down -- would have
4  been almost to, like, the edge of The Corner
5  Alley's building.
6  Q    And what was your purpose in walking
7  with Deleon and escorting him?
8  A    Wanted to put some distance between him
9  and Thomas.
10  Q    Did you say anything to Deleon?
11  A    Yes.  I told him that I wanted him to
12  stay down there and that I was going to go
13  and get an ambulance and a police car for
14  him.
15  Q    Your plan was to get a police car and
16  get an ambulance for him?
17  A    Correct, because I could see he was
18  bleeding from his mouth.
19  Q    And did you call anybody to get an
20  ambulance or a police car?
21  A    I never got the opportunity to.
22  Q    And so you told Deleon to stay where he
23  was?
24  A    Yes.
25  Q    And were you telling him that as a

Page 192

1  police officer, that you were ordering him
2  to stay in place, stay put?
3  A    I was telling him that I needed to go
4  get medical attention for him and a police
5  car; so, yes.  Yes, I guess as a policeman.
6  Q    You were ordering him to stay there?
7  A    I wasn't ordering him.  I was telling
8  him to stay there.  He's not under arrest,
9  I'm not detaining him, so I didn't give him
10  an order to stay there.
11  Q    Did you tell him, "I'm going to try to
12  help you and get you" --
13  A    Absolutely, yes.
14  Q    Okay.  So what's the very next thing
15  you do after you tell Deleon to stay put?
16  A    I started walking back towards the
17  front of the building.
18  Q    Then what happens?
19  A    That's where I'm met with Thomas.
20  Q    At any point did you help somebody park
21  along Euclid Avenue?
22  A    No.
23  Q    And where did you encounter Thomas?
24  A    Right on that sidewalk entrance/exit to
25  the fenced in area.

Page 193

1 Q   And did you say anything to him?
2 A   I don't recall saying anything to him.
3 Q   Do you recall telling him that you were
4 placing him under arrest?
5 A   No.
6 Q   Did you tell him that you're going to
7 call a police unit to have him arrested?
8 A   Did not.
9 Q   But that was your plan?
10 A   No.  My plan was to get Deleon medical
11 attention.
12 Q   I see.  And so then why did you engage
13 with Thomas?  Why did you have a
14 conversation with Thomas?
15 A   He was right there.  There was no
16 passing, or anything of that nature.  He
17 engaged me.
18 Q   Did you have a cell phone on you?
19 A   Yes.
20 Q   Why did you have to walk back in order
21 to use your cell phone to call for an
22 ambulance?
23 A   Because it was January 13th, it was
24 cold outside.  I wanted to get inside where
25 I knew I was safe and I could make the

Page 194

1 proper notifications to get this kid some
2 medical attention.
3 Q   I see.  So your plan was to go back
4 inside where it was warmer and then place a
5 call to get medical attention for Deleon?
6 A   That's correct.
7 Q   And is it your testimony that Thomas
8 blocked you or prevented you from going back
9 inside?
10 A   He was right there.
11 Q   So was he blocking you?
12 A   I don't remember if it was blocking or
13 what the circumstance was.  He was right
14 there, though.  I could not egress any
15 further.
16 Q   So Thomas was the one that -- or was
17 the reason, his presence was the reason you
18 couldn't go back inside The Corner Alley?
19 A   Yes.
20 Q   I see.  And did you tell him that, say
21 "You need to move out of the way because I
22 need to get help for your friend"?
23 A   I don't recall telling him anything.
24 Q   And how long did you interact with
25 Thomas before --

Page 195

1 A   Very briefly.
2 Q   Did he say anything to you during this
3 interaction before the altercation began?
4 A   I don't recall.
5 Q   You don't recall what, if anything, you
6 said to him and you don't recall what, if
7 anything, he said to you?
8 A   Correct.
9 Q   Do you recall anything that Breann
10 Steele, the young woman who was in the
11 patio, the blond woman, do you recall her
12 saying anything to you or to Thomas?
13 A   No.
14 Q   When you came back to the patio and you
15 interacted with Thomas, did you observe him
16 threatening anybody?
17 A   Anybody in general?
18 Q   Anyone at all.
19 A   No.
20 Q   Did you see him being aggressive or
21 violent towards anybody?
22 A   No.
23 Q   Did he have a weapon on him?
24 A   Not to my knowledge.
25 Q   In either hand did he have a weapon?

Page 196

1 A   Not to my knowledge.
2 Q   That whole night, you had never seen
3 Thomas with a weapon in his hand, correct?
4 A   I never seen him before.
5 Q   With a weapon in his hand ever?
6 A   I never saw him, no, with a weapon.
7 Q   And do you recall what Breann Steele
8 was doing when you confronted Thomas?
9 A   I do not.
10 Q   So when you were turned to the patio
11 area and you confronted Thomas, your plan
12 wasn't to interact with Thomas, your plan
13 was just to go back inside; is that correct?
14 A   Yes.
15 Q   And when you confronted Thomas at the
16 edge of the patio, do you recall what he was
17 doing?
18 A   I want to say smoking.
19 Q   Smoking a cigarette?
20 A   I didn't see what it was.
21 Q   And at that point, he was standing on
22 the sidewalk?
23 A   Right in that area.
24 Q   Sidewalk right by the patio?
25 A   By the entrance/exit to the patio.

Page 197

1 Q   And did you notice that his coat was
2 slung over the patio wall?
3 A   I don't recall.
4 Q   Was Thomas being rude to you during
5 this interaction?
6 A   I don't recall what he said to me or if
7 he was rude or not.  I don't recall.
8 Q   Do you recall whether he was being
9 disrespectful to you?
10 A   At that moment, no, I don't recall
11 anything.
12 Q   You told me that you never at any point
13 saw Thomas with a weapon on him.  My
14 question is did you see any weapon near
15 Thomas at this moment when you're
16 interacting with him?
17 A   Nothing that I can think of, no.
18 Q   Nothing that he could possibly grab and
19 use as a weapon?
20 A   Not that I can think of.
21 Q   When you interacted with Thomas, did
22 you smell alcohol on his breath?
23 A   I didn't smell anything.
24 Q   Did he appear to be slurring his
25 speech?

Page 198

1 A   Again, I don't recall.
2 Q   Was he stumbling?
3 A   I don't recall.
4 Q   Are you aware of the postmortem
5 toxicology test results which reveal --
6 A   I am not.
7 Q   Okay.  Well, they revealed that Thomas
8 did not have any alcohol in his system.  My
9 question to you is did you have any reason
10 to think Thomas was under the influence of
11 drugs or alcohol?
12 A   No.  I mean, no, nothing led me to
13 believe either way, yes or no.
14 Q   When you re-contacted Thomas at the
15 edge of the patio, did you conduct a threat
16 assessment of him?
17 A   No.
18 Q   At some point, you do have an
19 altercation with Thomas, correct?
20 A   Yeah.
21 Q   Okay.  Tell me everything you remember
22 about the altercation.
23 A   This is where I'm going to have to
24 stop you because of the ongoing criminal
25 investigation and advice of my counsel that

Page 199

1 I won't be able to answer that question at
2 this time.
3 Q   Okay.  So you're invoking your Fifth
4 Amendment?  Is that what you're doing?
5 A   If that's what you'd like to call it,
6 yes.
7 Q   Okay.  All right.  So what is the
8 basis for your refusal, what is the legal
9 basis for your refusal to answer my
10 question, which was tell me about the
11 altercation?
12 A   Because of the ongoing investigation,
13 criminal investigation into the matter.
14 Q   What is the legal right that you're
15 asserting?
16 A   On advice of my counsel and I guess
17 since you said it already for me, the Fifth
18 Amendment.
19 Q   Okay.  All right.  I still have to ask
20 you questions, okay?
21 A   I do understand that, sir.
22 Q   Okay.  You were in attendance at the
23 case management conference for this case
24 before Judge Polster, correct?
25 A   Mm-hmm.

Page 200

1 Q   Yes?
2 A   Yes, I was, yes.  Sorry.
3 Q   And you recall at that conference,
4 Judge Polster asked you what happened,
5 correct?
6 A   I do.
7 Q   And you recall telling him your
8 recollection of what happened, correct?
9 A   I do.
10 Q   And at that point, you did not invoke
11 your Fifth Amendment and refuse to answer
12 the Court's questions, correct?
13 A   I did not, no.
14 Q   You answered the judge's questions
15 about what happened during the altercation,
16 correct?
17 A   To the best that I can remember, yes.
18 Q   And he asked you follow-up questions,
19 correct?
20 A   I don't remember if he did or not.
21 Q   Okay.  But there was no question that
22 the Court asked that you refused to answer;
23 is that fair?
24 A   I don't remember refusing, no.
25 Q   Okay.  But you're now invoking your

Page 201

1  Fifth Amendment right and refusing to answer
2  these questions?
3  A    That's correct, yes, sir.
4  Q    And for the record, your lawyer was
5  present during the conference with the Court
6  when you were asked questions about the
7  incident, correct?
8  A    Yes.
9  Q    And your lawyer didn't object on your
10  behalf, correct?
11  A    I don't believe so, no.
12  Q    Okay.  And all the other lawyers were
13  present at the conference?
14  A    There was a lot of people there.
15  Q    Right.
16        MR. TOR:      All right.
17  So, David, my position is that your
18  client has waived his Fifth
19  Amendment right regarding this
20  incident, based both on the fact
21  that he voluntarily answered the
22  Court's questions about the incident
23  and also based on the fact that he
24  has answered a number of questions
25  in this deposition related to that

Page 202

1  night and what happened in the
2  events leading up to the
3  altercation, and also because he has
4  voluntarily answered discovery
5  questions propounded to him in this
6  litigation, and so my proposal is
7  that we get the Court on the phone,
8  see if he's available to address
9  this issue.
10        MR. LENEGHAN:   Whatever
11  manner you want to try to
12  accomplish, whatever you want to try
13  to do.  We can certainly do that
14  either by telephone or written
15  motions, or whatever the case may
16  be.
17        MR. TOR:      Well, why
18  don't we try by telephone and we'll
19  see what -- yeah, we can go off the
20  video, but stay on the record with
21  the court reporter.
22            - - -
23        (At this time, Mr. Tor is
24  making a phone call to Judge Polster.)
25            - - -

Page 203

1  (THE FOLLOWING IS NOT ON THE VIDEO RECORD)
2            - - -
3        VOICEMAIL GREETING:   You
4  have reached the chambers of the
5  Honorable Dan A. Polster.  We are
6  either on the phone or away from our
7  desks.  Please leave a detailed
8  message, including your name and
9  phone number, and we'll get back to
10  you as soon as we can.  Thank you.
11        "Record your message at the
12  tone.  When you are finished, hang
13  up or hit # for more options."
14        MR. TOR:      Good
15  afternoon.  This is Jeremy Tor
16  calling regarding the matter of
17  Yatsko versus Graziolli, Case Number
18  18-cv-814.  We are in the middle of
19  the deposition of Sergeant Dean
20  Graziolli.  We've been going for
21  almost four hours and so far, the
22  officer has answered questions, but
23  when I began asking questions about
24  the altercation at issue in this
25  lawsuit, he invoked his Fifth

Page 204

1  Amendment and refused to answer the
2  question.
3        Plaintiff's position is that
4  he has waived his Fifth Amendment
5  right.  I am in the conference room
6  with all the lawyers present, along
7  with the court reporter, who's
8  transcribing this, and the witness
9  himself.
10        If anybody from the defense
11  side wants to speak up and say
12  anything on this message.
13        MR. LENEGHAN:   This is David
14  Leneghan.  We object to your
15  position and we vehemently oppose it
16  and disagree with it.  There has
17  been no waiver.  He's properly
18  invoked his constitutional rights as
19  he's now being questioned under oath
20  and believe he fully has the right
21  to do so, particularly since we've
22  been informed that the criminal
23  investigation is still ongoing at
24  this time and the officer even
25  testified to that earlier in his

Page 205

1  deposition, some two or three hours
2  ago.
3          MR. TOR:     We should be
4  at this number for the next couple
5  of hours.  It's 216-696-3232 if the
6  Court would become available.  Thank
7  you.
8          Anybody else want to add
9  anything?
10         MR. ROCHE:     No, thank
11 you.
12             - - -
13         VIDEOGRAPHER:  We're back on
14 the record.
15 BY MR. TOR:
16 Q   Were you using your position as a
17 Cleveland police officer to compel or coerce
18 Thomas Yatsko into leaving the area when you
19 confronted him at the edge of the patio?
20         MR. PIKE:     Objection.
21 Form.
22         MR. ROCHE:     Objection.
23 A  No.
24 Q   Have you read the deposition transcript
25 of Breann Steele?

Page 206

1  A  I have not.
2  Q   Okay.  Are you aware what her testimony
3  is?
4  A  No.
5  Q   She testified that after you approached
6  Thomas near the edge of the patio, you told
7  him, "It's time to go, you need to get the
8  fuck on."  Did you say that to him?
9  A  No.
10 Q   You dispute her testimony?
11 A  Yes.
12 Q   In your police training, were you
13 trained to use the phrase, "Get the fuck on"
14 as part of a de-escalation technique?
15 A  No.
16 Q   Is it a proper de-escalation technique?
17 A  No.
18 Q   Did you tell Thomas that he needs to
19 leave?
20 A  I don't recall.
21 Q   Would that have been an appropriate
22 thing to say?
23 A  The only thing I remember telling him
24 is, "You can't come back in the bar."
25 Q   And when did you tell him this?

Page 207

1  A  After the fight inside the bar.
2  Q   Did you tell that to him, or something
3  to that effect, again when you recontacted
4  him at the edge of the patio?
5  A  I don't recall saying that to him, no.
6  Q   Was Thomas committing a crime standing
7  on the sidewalk, smoking a cigarette?
8  A  No.
9  Q   Did you have reason to think Thomas had
10 committed any crime up to that point?
11 A  Yes.
12 Q   So why didn't you arrest him?
13 A  He wasn't my main concern.
14 Q   You told me earlier that a police
15 officer, even when he's working secondary
16 employment, has a responsibility to arrest
17 an individual he witnesses committing a
18 crime.  You claim to have witnessed him
19 committing a crime, correct?
20         MR. PIKE:     Objection.
21 Form.
22 A  I did witness.
23 Q   But you did not arrest him?
24 A  Right.
25 Q   Did you call for backup to have

Page 208

1  somebody arrest Thomas?
2  A  Never got the opportunity to do that.
3  Q   Was that going to be your plan?
4  A  That was what I was going to do.
5  Q   Ms. Steele testified that Thomas
6  explained to you that he didn't have a ride
7  home.  Do you recall hearing that?
8  A  I don't remember anything like that.
9  Q   Ms. Steele testified that you said to
10 Thomas, quote, "I've given you plenty of
11 chances tonight."  What did you mean by
12 that?
13 A  I don't recall saying that to him.
14 Q   Do you deny saying that?
15 A  Yeah, because I don't remember saying
16 -- interacting with him at all other than
17 what I told you after the first fight,
18 that's it.
19 Q   Did Thomas ask for you to call a unit
20 for a right home?
21 A  No.
22 Q   Were you aware that Thomas was looking
23 for a ride home?
24 A  No.
25 Q   Did you do anything to help him get a

Page 209

1  ride home?
2  A    No.
3  Q    Did you say to him, "You can walk for
4  all I care"?
5  A    No.
6  Q    Did you say, "You need to get the fuck
7  out of here"?
8  A    No.
9  Q    That was Breann Steele's testimony.  Do
10 you dispute her testimony?
11 A    Yes.
12 Q    Were you annoyed with Thomas?
13 A    No.
14 Q    Were you fed up with him?
15 A    No.
16 Q    Were you scared by him?
17 A    No.
18 Q    Did you feel threatened by him?
19 A    No.
20 Q    Did you feel he was disrespecting you?
21 A    No.
22 Q    You told me that it was terrible
23 outside and it was very cold.  Did you
24 expect that Thomas would just start walking
25 home?

Page 210

1  A    I didn't know what he was going to do.
2  Q    Was there any urgency that required
3  Thomas to leave the area, from your point of
4  view?
5  A    No.
6  Q    Did he make any attempts that you could
7  see to go back inside The Corner Alley?
8  A    No.
9  Q    Did Breann say -- Breann Steele say,
10 "We can call him an Uber"?
11 A    I don't recall her saying anything.
12 Q    Okay.  Do you recall her saying, "If
13 you're going to make him walk, at least let
14 him get his coat"?
15 A    No.
16 Q    Do you remember Thomas grabbing his
17 coat?
18 A    No, I don't recall that at all.
19 Q    Did you hand him his coat?
20 A    I don't know.
21 Q    You don't know?
22 A    I don't know.
23 Q    Breann Steele testified that you told
24 Thomas, quote, "I don't like your body
25 language."  Do you recall saying that to

Page 211

1  Thomas?
2  A    No.
3  Q    Do you dispute that?
4  A    Yes.
5  Q    Ms. Steele said that you went
6  toe-to-toe with Thomas.  Do you dispute
7  that?
8  A    Yes.
9  Q    She testified that both you and Thomas
10 threw punches at one another.  Do you
11 dispute that?
12 A    Yes.
13 Q    Did Thomas throw any punches at you?
14 A    Yes.
15 Q    Did Thomas shove you?
16 A    I don't know.
17 Q    How many times did Thomas punch you?
18 A    Multiple times.
19 Q    Where did he punch you?
20 A    In the face and head.
21 Q    Did you punch him?
22 A    No.
23 Q    Did you shove him?
24 A    No.
25 Q    Did you touch him at all?

Page 212

1  A    I don't recall touching him, no.
2  Q    Do you recall pulling your gun?
3  A    Yes.
4  Q    Why did you pull your gun?
5  A    To back him off of me.
6  Q    Did you tell Thomas you were going to
7  pull your gun before you did so?
8  A    No.
9  Q    Breann Steele's testimony is that you
10 and Thomas threw an even number of punches.
11 I take it you dispute that testimony?
12 A    Yes.
13 Q    She testified that you approached
14 Thomas aggressively.  Do you dispute that?
15 A    Yes.
16 Q    She testified that you initiated the
17 aggression.  Do you dispute that?
18 A    Yes.
19 Q    She testified that you provoked Thomas
20 to fight.  Do you dispute that?
21 A    Yes.
22 Q    At any point during the altercation
23 with Thomas did you tell him he was under
24 arrest?
25 A    No.

Page 213

1  Q   Do you recall shooting Thomas?
2  A   I do not.
3  Q   Did you warn Thomas before shooting
4  him?
5  A   I don't recall any of the incident.
6  Q   Is any of your -- is your memory -- let
7  me start that question over.
8     Do you have a memory of the entire
9  altercation with Thomas?
10  A   No.
11  Q   Are there parts that you don't
12  remember?
13  A   Yes.
14  Q   Which parts don't you remember?
15          MR. PIKE:      Objection.
16     Form.
17  A   It's hard to say from where it starts
18  and where it ends.
19  Q   You do have a memory of pulling your
20  gun?
21  A   I do.
22  Q   You don't have a memory of pulling the
23  trigger?
24  A   I do not.
25  Q   What is your next memory after pulling

Page 214

1  the trigger?
2  A   I hear somebody -- somebody yelling
3  something about a gun.
4  Q   And did you see a gun in your hand?
5  A   Yes.
6  Q   And what did you do once you saw that
7  you had a gun in your hand?
8  A   I believe I put it away.
9  Q   And why did you put it away?
10  A   Just, you know, like instinct, I
11  guess.  I don't know.  I don't have an
12  answer as to why I put it away right away.
13  I don't -- I don't have an answer.
14  Q   Was there any reason for you to keep it
15  out?
16  A   I don't know.
17  Q   Do you believe that your police
18  training kicked in during this incident?
19          MR. PIKE:      Objection.
20     Form, foundation.
21  A   I believe -- I believe survival kicked
22  in on this instance.
23  Q   What do you mean by that?
24  A   Survival.  I mean, I don't -- I'm not
25  going to say that the police training, or

Page 215

1  anything of that nature, was what -- like a
2  light switch, nothing like that.
3     It's just survive, you're trying to
4  survive, I was trying to survive being
5  maliciously attacked.  That's what I
6  remember.
7  Q   So Thomas weighed at the time about 149
8  pounds.  How much did you weigh at the time
9  of the incident?
10  A   I have no idea.  Probably about 245
11  maybe.
12  Q   And how tall are you?
13  A   Five seven I am.
14  Q   Do you recall whether Thomas was taller
15  or shorter than you?
16  A   I would say the same height.
17  Q   Did he appear to be smaller than you in
18  terms of stature and weight?
19  A   He appeared to be muscular.
20  Q   And I think you told me earlier you
21  were able to remove him from Deleon with
22  just one hand; is that right?
23  A   Yeah.
24  Q   Do you recall Thomas saying anything
25  to you during the altercation?

Page 216

1  A   I remember two things.  I can remember
2  him -- I can remember him shouting that I
3  was going to have to kill him and I can
4  remember him shouting that he was going to
5  kill me.
6  Q   Your testimony is that Thomas
7  threatened to kill you?
8  A   Yes.
9  Q   And when did he do this?  When did he
10  make this threat to you?
11  A   As he was attacking me.
12  Q   Was that before or after you drew your
13  weapon?
14  A   He was attacking me before I drew my
15  weapon.
16  Q   For how long before you drew your
17  weapon?
18  A   I don't know.
19  Q   Seconds, minutes?
20  A   I have no idea.
21  Q   Do you remember how many punches he
22  landed on you before you drew your weapon?
23  A   I do not.  It was multiple times I was
24  hit.
25  Q   You were hit multiple times before you

Page 217

1 drew your weapon?
2 A  Yes; to my recollection, yes.
3 Q  And this whole time, you're telling me
4 you didn't put a hand on Thomas?
5 A  Did not.
6 Q  Did Thomas shout, "You'll have to kill
7 me" before or after you drew your weapon?
8 A  Before.
9 Q  So Thomas shouted, "You'll have to kill
10 me," and then shortly thereafter, you drew
11 your weapon?
12 A  I didn't draw my weapon until after I
13 was being attacked.
14 Q  Which was after he had made this
15 comment, "You'll have to kill me"?
16 A  Yeah.
17 Q  And was it your intention in drawing
18 your weapon to kill Thomas?
19 A  Absolutely not.
20 Q  What was your intention in drawing your
21 weapon?
22 A  To get this kid off of me.
23 Q  And did it work when you drew your
24 weapon?
25 A  No.  It came right threw it.

Page 218

1 Q  And so did you reholster your gun since
2 that technique didn't --
3 A  No, I did not.
4 Q  Did you pull the trigger as a survival
5 instinct?
6 A  I have no idea.
7 Q  You have no idea why you pulled --
8 A  I have no idea.  I don't remember it.
9 Q  When Thomas was shouting, "You'll have
10 to kill me," and then threatened to kill
11 you, when Thomas threatened to kill you,
12 what was your understanding about how he was
13 going to kill you?
14 A  I have no idea.
15 Q  Did you think he was going to beat you
16 to death with his fists?
17 A  I have no idea what he was going to do
18 to me.
19 Q  And did you try to run away?
20 A  I did not try to run away.  I was
21 backing away from him.
22 Q  Did you try to get help?
23 A  I was not given a chance to get help
24 from anybody.
25 Q  Did you cry out for help?

Page 219

1 A  No.  I was not given a chance to cry
2 out, to shout, to do nothing.
3 Q  You couldn't have turned back into the
4 bar and walked back inside?
5 A  No, I could not have done that, no.
6 Q  And why not?
7 A  Because Thomas was on me like no
8 tomorrow.  I don't know how to describe it
9 to you, but he was on me.  There was no
10 getting this kid off of me.  None.
11 Q  If you had had, say, your Taser on you,
12 would you have been able to use it?
13 A  No.
14 Q  What about a baton?
15 A  No.
16 Q  Pepper spray?
17 A  No.
18 Q  And so no intermediate weapon would
19 have been --
20 A  No.
21 Q  If you had an intermediate weapon on
22 you, you don't think you would have been
23 able to use it?
24 A  No.
25 Q  Why not?

Page 220

1 A  Because I was being viciously attacked
2 by this kid.  I didn't have a chance to do
3 any of that, to get to anything.  I'm lucky
4 that I was able to get to my firearm.
5 Q  So you felt your only option was to
6 pull your firearm and shoot Thomas?
7 A  That wasn't my -- see, my only option
8 was to survive the attack that I was being
9 placed on by your client.  That's the only
10 thing I was able to do was get to my firearm
11 and save my life.  That's it.
12      MR. TOR:      All right.
13 Why don't we take a five minute
14 break.
15      VIDEOGRAPHER:  We're off on
16 the record.
17           - - -
18      (Short recess taken)
19           - - -
20      VIDEOGRAPHER:  We are back
21 on the record.
22 BY MR. TOR:
23 Q  All right, sir, I have up on the screen
24 video footage.  This is from a surveillance
25 video camera from The Corner Alley that we

Deposition of Sergeant Dean Graziolli                    Melissa Yatsko and Darian Allen vs. Sergeant Dean Graziolli, et al.,

Page 221

1  received from The Corner Alley's lawyers.
2  I'm not going to play this video for you.
3  All I'm going to do is ask you to identify
4  yourself at various points, okay?
5  A    (Nodding.)
6  Q    Can you look up at the screen?  Okay.
7  The time stamp is 22:44:17 seconds, right?
8  It's on the top right?
9  A    Yeah.
10  Q    Okay.  So what we're looking at, sir,
11  is the patio outside The Corner Alley in the
12  front, correct?
13  A    Yeah.
14  Q    And I've got a cursor here, so I'll use
15  it.  This is you, right, with the dark boots
16  and the dark pants?
17  A    I don't -- I don't know.
18  Q    Okay.  All right.  I'll have to show
19  you a couple clips so we can establish that
20  that's you.  So is that you right there at
21  22:45:47 where I have my cursor?
22  A    Again, I see -- I see the bottom half
23  of a torso.  I can't tell if that's me.
24  Q    Okay.  Fair enough.  Let me show you
25  another still image here.  Is that you, sir?

Page 222

1  A    Right there?  That's me, yes.
2  Q    At 22:47:03, and that's your gun in
3  your right hand?
4  A    I can't really see the gun.
5  Q    Yeah, I'll play it for just a few
6  seconds so you can see, okay, so keep your
7  eye on the screen.
8  A    Okay.
9  Q    Is that your gun in your right hand?
10  A    I see the gun now, yes.
11  Q    All right.  So that is you; is that
12  correct?
13  A    That's me, yes.
14  Q    And that's Thomas Yatsko on the ground,
15  correct?
16  A    Yeah.
17  Q    He's wearing tan boots?
18  A    Yeah.
19  Q    Yeah.  So what we're looking at is the
20  area where the altercation took place
21  between you and Thomas, right?
22          MR. ROCHE:    Objection.
23  BY MR. TOR:
24  Q    You were telling us earlier about the
25  altercation.  I just want to confirm, we're

Page 223

1  looking at roughly the location where that
2  took place?
3  A    Yeah.  Yeah, that's my blood right
4  there on the ground.
5  Q    That's your blood on the ground?
6  A    Right, those multiple spots, that's my
7  blood, yes.
8  Q    I'm going to go back in time a little
9  bit, and this area where my cursor is,
10  that's the edge of the patio, right?
11  A    It looks like -- it looks like where
12  the boots are at is on the other side of the
13  patio, which is the common sidewalk --
14  Q    The common --
15  A    -- that I remember, the common
16  sidewalk.  Runs along, you know, Euclid
17  Avenue.
18  Q    Okay.  So where these tan boots are
19  standing is the common sidewalk area?
20  A    Right.
21  Q    And is this the area where you first
22  had contact with Thomas?
23  A    That's where -- when I walked up,
24  that's where he was -- he was standing
25  there.  That's what I remember, yes.

Page 224

1  Q    Okay.  That's all I'm going to show
2  you, sir, of the video.
3      You do recall seeing Thomas on the
4  ground after he had been shot, correct?
5  A    Yes.
6  Q    And you could tell that he was
7  bleeding?
8  A    I remember -- what I remember is a
9  large group around him, so I couldn't see
10  him specifically, I saw the group.  I saw
11  the group.
12  Q    Did you do anything to assess whether
13  Thomas had been injured?
14  A    Could you be more specific?  I don't --
15  Q    Did you look to see if Thomas had been
16  injured?
17  A    I couldn't see, I couldn't see him,
18  though, I couldn't see because there was a
19  crowd of folks around him.  I couldn't see.
20  I could not see.
21  Q    Were you aware that he had been shot?
22  A    At that point, I'm not aware of
23  anything, not -- no, I'm not aware of
24  anything, no.
25  Q    You're not aware that you had shot him

Page 225

twice at that point?

A   I'm not aware -- I'm not aware of that.  I told you when you asked me about the gun, the thing that shakes me up is the gun.  I hear the voice about the gun, the gun.  That's kind of what shakes me out of it, so I don't know what happened in between there.

Q   Okay.  Well, let's talk about what happened afterwards, okay?

A   All right.

Q   So after you were shaken out of it, what do you remember?

A   I remember the people and a lot of, like, chaotic behavior, a lot of shouting.  You know, a lot of -- a lot of people running in and out, I remember that.  That's all I remember.

Q   Did you provide any first aid to Thomas?

A   I remember yelling for someone, not somebody specific, for someone to call 911.  That's all I remember doing.

Q   And why did you think somebody needed to call 911?

Page 226

A   Well, there was a group of folks around somebody's down, I could see their boots.  I'm bleeding profusely from my face and head.  I don't know where I'm bleeding from.

   I'm spitting globs, if that's even a word, I don't know if that's even a word, you know, huge amounts of blood, I'm spitting that out, so 911 needs to be called.  The med -- somebody with medical training needs to come there.

Q   So you're not really sure what had happened, you just knew that 911 needed to be called?

A   Absolutely.

Q   And are you aware of whether any of the people that were around Thomas were medical professionals or capable of providing first aid?

A   I'm not aware of that.

Q   Okay.  Did you yourself call 911?

A   I did not.

Q   And why not?

A   I didn't know the extent of my injuries and I was trying to focus on keeping it

Page 227

together, trying to get it together to where I could understand what was unfolding, what had happened.  I didn't know -- I don't know -- I don't know how to answer it.

Q   You wanted somebody to call 911, but you weren't going to call 911?

A   I was shouting for someone to call 911, yes.

Q   And did you tell anybody to let them know that a Cleveland police officer had been involved in some type of situation?

A   I don't recall saying that.

Q   Do you recall saying anything else to anybody other than call 911?

A   No.

Q   What's the next thing you remember?

A   The chao -- the scene, the scene right there, the chaotic scene becoming even more chaotic as police and fire, EMS, as those folks all arrive.  So it just, you know, became a larger, more involved chaotic scene.

Q   Do you remember seeing Cleveland police officers or any other type of police officers arrive on the scene?

Page 228

A   I don't remember seeing Cleveland guys.  I remember seeing uniforms.  I don't know which department they were with.

Q   And were you placed in handcuffs and placed under arrest?

A   No.

Q   Were you escorted from the scene by a police officer?

A   No.

Q   How were you removed from the scene?

A   EMS came up to me and saw the extent of my injuries and walked me to the side of an ambulance and then I walked inside of it.

Q   And you got into the ambulance and they took you to University Hospitals?

A   Right.

Q   Were you transported by stretcher?

A   No.

Q   And did any other officer ride with you in the ambulance?

A   Yeah.  I think I said earlier that I believe there was two of them.

Q   Do you know which ambulance company it was?

A   It was Cleveland EMS.

Page 229

1  Q    Did you tell anybody in the ambulance
2  what had happened?
3  A    No.
4  Q    How soon after the incident with Thomas
5  were you taken from the scene by ambulance?
6  A    It was moments.  I don't know how long,
7  how much time elapsed.
8  Q    And what happened to your gun?  Was it
9  taken from you or did you keep it on you
10 that night?
11 A    No, it was taken.
12 Q    By whom?
13 A    It was initially taken by I want to say
14 Sergeant Todd.
15 Q    Is he with the Cleveland Police
16 Department?
17 A    He is, yes.
18 Q    Did you know him before this incident?
19 A    Yes.
20 Q    And what did he do with the gun?
21 A    Protocol is to turn it over to
22 homicide.
23 Q    When did he take the gun from you?
24 A    I think when we were in the ambulance.
25 I think.

Page 230

1  Q    So you think he rode with you in the
2  ambulance?
3  A    I'm not sure.  I think there was two
4  guys, but there might have been only one
5  and he came in and left.  I'm not really
6  sure.
7  Q    What did Sergeant Todd do to preserve
8  the gun as evidence?
9  A    I have no idea.
10 Q    To make sure that fingerprints didn't
11 get on it?  Anything?
12 A    To my knowledge, I have no idea what he
13 did with it.
14 Q    Did you hand him your gun or did he
15 take it from you?
16 A    No, I handed it to him.
17 Q    And have you gotten that gun back?
18 A    No.
19 Q    Do you know where it's being held?
20 A    I would say probably homicide or the
21 coroner's office or maybe our property
22 room.  I don't -- I don't know.  I don't
23 know what they --
24 Q    So you've been issued a different gun
25 now?

Page 231

1  A    Yes.
2  Q    That's the one you're carrying?  Did
3  you ever complete a use of force report for
4  this incident?
5  A    I did not.
6  Q    And why not?
7  A    I was never instructed to do so.
8  Q    Isn't there a regulation requiring
9  officers to complete use of force reports
10 any time force is used?
11 A    For the -- the -- for -- it's called
12 less lethal, I guess you would call it, less
13 lethal force, there's forms that are done.
14     For this incident, use of deadly force,
15 I don't know protocol.  I believe that
16 homicide handles it all.
17 Q    So you're not sure what the protocol is
18 in terms of reporting the use of lethal
19 force?
20 A    Right, other than what I stated about
21 homicide.
22 Q    Do you claim that Thomas committed any
23 crime against you?
24 A    Yes.
25 Q    What crime?

Page 232

1  A    Felonious assault.
2  Q    Did you document that anywhere?
3  A    I did not, no.
4  Q    Did you at any point claim that Thomas
5  attempted to kill you, attempted homicide?
6  A    Did I -- can you explain how you --
7  what do you mean by "claim"?  I don't
8  understand.
9  Q    Right.  Well, you claim that Thomas
10 committed a felonious assault against you.
11 Have you ever claimed that Thomas committed
12 an attempted homicide against you?
13 A    I've never been interviewed by anybody
14 to make that claim, if that makes sense to
15 you.
16 Q    So to whom did you claim the felonious
17 assault, to anybody?
18 A    No.
19 Q    Okay.  But you're not claiming that he
20 committed an attempted homicide against you,
21 are you?
22 A    I don't know how it would be
23 interpreted.
24 Q    Okay.  Well, I asked you what --
25 A    You're asking me how I would interpret

Page 233

it?

Q   Yeah.

A   I don't know how I would interpret it versus how it is truly interpreted by, like, you know, the courts or who makes that determination.  I don't have -- I don't know how to answer the question.

Q   Sure.  I asked you what crimes Thomas had committed against you.  The only crime you told me is felonious assault, correct?

A   Felonious assault.  I mean, it could be attempt murder, I guess.  I mean, it's all in what -- not so much what I say or what you say, but what the evidence says, and I don't know the answer to the question because I don't know what the evidence says.

Q   Well, you're a police officer of 27 years, so I presume you have a good understanding of the criminal code in Ohio, fair?

A   That's fair, but you got to understand, we only respond -- in basic patrol, we respond to the initial stuff and then everything else investigative is done by somebody else, so what I might say don't

Page 234

mean nothing.  It's all what they present.  That's why I'm having a hard time answering your question.

Q   Okay.  Well, you didn't have a hard time telling me it was a felonious assault.

A   Based on my thinking, it's at least a felonious assault, yes.

Q   And did you make any documentation?

A   I did not, no.

Q   And when you were interviewed by the internal affairs people last year, did you tell them that you believed Thomas committed a felonious assault?

A   I don't recall them asking me any questions on what I thought.

Q   Are you aware of whether the Cleveland Police Department conducted an investigation into this incident?

A   I don't believe they did.  I think that the sheriffs did.

Q   Were you ever debriefed about this incident by anybody at the Cleveland Police Department?

A   No.

Q   Have you ever been provided any

Page 235

documentation or written materials about this incident by anybody from the Cleveland Police Department?

A   No, I have not.

Q   You told me earlier that you're on restricted duty.  Does that entail any kind of medical restrictions on your ability to do work?

A   No.

Q   So you don't have any medical restrictions?

A   No.

Q   So if it weren't for the ongoing criminal investigation, your understanding is that you'd be able to return to regular duty?

A   No, not necessarily because I'm still under -- when you said medical, it kind of triggered in my mind.  I'm still under concussion protocol and being seen for that, for the concussion, so I guess then there would be medical restrictions until I was cleared of that.

Q   Speaking of concussion, have you filed a Workers' Comp claim related to this

Page 236

incident?

A   Yes.

Q   And what is the status of that claim?

A   I believe it is on hold.

Q   Do you know how long it's on hold for or why it's on hold?

A   I don't know the reason why and I don't know how long it's on hold for.

Q   Do you have an attorney representing you in that matter?

A   George Mineff.

Q   George Mineff.  Same guy who represented you in your previous Workers' Comp claims?

A   Right, right.

Q   Under whose Workers' Comp coverage have you filed the claim, the City of Cleveland or Corner Alley?

A   No, I believe it was filed under The Corner Alley.

Q   And as a requirement in order to get approved for secondary employment at Corner Alley, did you have to provide the City of Cleveland proof of Corner Alley's Workers' Comp coverage?

Page 237

1  A   Yes.
2  Q   And to your knowledge, has The Corner
3  Alley disputed the Workers' Comp claim?
4  A   I -- I don't know.
5  Q   When was this Workers' Comp claim
6  filed?
7  A   It's got to be sometime last year,
8  relatively I would say in the wintertime or
9  spring.  I don't know the dates, so...
10  Q   What are you claiming, what injuries
11  are you claiming?
12  A   I think the concussion's listed on
13  there, the neck sprain, and I think the
14  issue with the amount of stitches, stitches
15  I had in and outside of my mouth.
16  Q   Are you still suffering from the
17  stitches?
18  A   As a matter of fact, I am.
19  Q   What is the problem, the ongoing
20  problem related to the stitches?
21  A   On the inside of my lower lip, I can
22  show it to you.  I don't know if you can see
23  it or not.
24  Q   Go ahead.
25  A   Can you see it, right in here?  There's

Page 238

1  a -- I don't know if you can see it.  It's
2  kind of like a -- it's not -- like if you
3  ran your tongue around the inside of your
4  mouth, it would be I guess -- there would be
5  no bump in the road per se, if that makes
6  sense.
7  Q   So now you feel a bump?
8  A   There is -- I don't feel it, there is
9  one there.
10  Q   There's a bump there.
11  A   Every time that I eat, I bite down on
12  it, so I am still, yes, suffering from it.
13  Q   Okay.  You suffer when you bite down on
14  it?
15  A   Whenever I eat and it's, you know, a
16  few times a day, I'll catch it and I
17  (indicating).  It catches me, I should say.
18  Q   And are you being provided any medical
19  treatment for that?
20  A   I don't know what could be done for
21  it.  Something you got to live with.
22  Q   Right.  Does it impair your ability to
23  do your job in any way?
24  A   I don't believe so.
25  Q   This neck sprain, do you still suffer

Page 239

1  from it?
2  A   Yes.
3  Q   What are your symptoms?
4  A   The neck is real stiff, don't have much
5  mobility to the right or to the left, and
6  constant pain.
7  Q   Where is the pain?  Can you point to
8  it?
9  A   I would say it's on the sides of the
10  neck and then up in the middle.  It's kind
11  of like the entire back of the neck going up
12  into my head and then going down into my
13  neck, shoulder area, like the top of your --
14  like, top where your coat would be.
15  Q   And on a scale from 1 to 10, how severe
16  is the pain right now?
17  A   Right now, it's probably about 6.  It
18  gets as high as, like, 9, 10.  I take
19  medication for it, prescribed.
20  Q   What medication?
21  A   I believe it's a muscle relaxer.
22  Q   Are you on a muscle relaxer right now?
23  A   I am not, no.
24  Q   How often do you take a muscle
25  relaxer?

Page 240

1  A   As needed.
2  Q   And how often does that -- how often is
3  that?
4  A   Depends.  You know, a lot of times I
5  get it from sitting or laying a certain way,
6  I'll wake up with it.  Other times I'm just
7  -- I'm not doing anything and all of a
8  sudden I can't turn my neck all the way to
9  the left, so it varies.
10  Q   Are you under the care of a doctor for
11  this?
12  A   I am.
13  Q   Okay.  Well, who's your doctor that's
14  treating for your neck sprain?
15  A   That would be -- same one for the
16  concussion.  It's Dr. Rainey, Heather
17  Rainey.  She's at Metro.
18  Q   Other than the muscle relaxers, has she
19  prescribed any other treatment for your neck
20  sprain?
21  A   She's -- not for the neck, not for the
22  neck.  Well, she's given me a pain
23  medication for my head and neck and she's
24  also prescribed me migraine medication
25  because I get migraines as well.

Deposition of Sergeant Dean Graziolli     Melissa Yatsko and Darian Allen vs. Sergeant Dean Graziolli, et al.,

Page 241

1 Q Has she -- we're over a year now since
2 the incident. Has she told you whether you
3 should expect to have any improvement with
4 respect to your neck sprain?
5 A She hasn't and the -- there's a holdup
6 with the Workers' Comp, so I can't get
7 physical therapy approved.
8 Q Well, have you tried to -- have you
9 undergone the physical therapy anyway even
10 though it's not being covered by Workers'
11 Comp?
12 A I have not, no.
13 Q Is that something you think you need,
14 physical therapy?
15 A I would like to do it, but, again, it's
16 not being provided at this time.
17 Q Okay. Do you have health insurance?
18 A Through the city, yes.
19 Q And have you tried to go through that
20 health insurance coverage for physical
21 therapy?
22 A I have not, no.
23 Q What about your concussion, do you
24 still suffer the effects of the concussion?
25 A Most definitely.

Page 242

1 Q Okay. Tell me about that.
2 A My memory is bad. I don't do well with
3 times, dates, places.
4 I'll give you one specific. One of my
5 administrative duties at the district was to
6 inventory the riot gear that the city issued
7 us during the Republican National Convention
8 and I was charged with going through and
9 making sure that everybody still had that
10 equipment, and I was speaking to an
11 individual about his equipment and he showed
12 it to me, and I've worked with this guy
13 since I've been in the Fifth District, which
14 is, you know, five years, give or take, and
15 I said to him, I said, "You're going to have
16 to excuse me," I said, "I apologize," I
17 said, "but on this list, can you find your
18 name for me," and he thought, of course,
19 that I'm joking around.
20 He goes, "Come on, really?"
21 You know, I could not remember his name
22 and I've worked with this guy closely.
23 Q Who is this?
24 A His name is -- he's a detective. Mike
25 -- oh, what is his last name? Oh, boy.

Page 243

1 See, this is what I mean.
2 Q When did this incident occur?
3 A This is back in -- back probably like
4 September or so when I was doing that
5 equipment.
6 Q Have you had any other incidents like
7 this where your memory's failed you?
8 A Yeah, a lot of incidents, you know,
9 with family and friends and it could be --
10 it could be the smallest thing as
11 remembering a song that you hear that you
12 know and there's no recollection of who
13 sings the song or if it has any meaning to
14 you, or anything like that. I don't have
15 that -- I don't have that memory to pull
16 from.
17 Q And has your doctor, Dr. Rainey, given
18 you an idea about what your future outlook
19 is with respect to the concussion?
20 A I'm supposed to go to this thing. I
21 know I'm going to butcher the name. It's
22 some sort of psychotherapy where it's an
23 extensive -- like eight hour thing where
24 they give you -- I don't know if it's
25 testing or it's questions, something along

Page 244

1 those lines, and from that, you are supposed
2 to -- they're supposed to be able to tell
3 you what's next, what you can expect, what
4 the future holds, and I haven't gone to that
5 yet.
6 Q Do you have an expectation when you
7 will go to that --
8 A I go to it, because I spoke to the
9 doctor only a day or two ago, I go to it on
10 the 6th of February.
11 Q And where is that?
12 A That's at Metro as well.
13 Q Okay. All right. Let's jump back to
14 University Hospitals after the incident.
15 You're treated at the hospital there?
16 A In the emergency room, yes.
17 Q And then you were released after a few
18 hours?
19 A Yeah.
20 Q And these two police officers, are they
21 with you the whole time?
22 A There were so many people in and out of
23 the room. I don't remember them being in
24 there beyond the initial.
25 Q And how did you get home that night?

Page 245

1  A   I was driven home by the FOP president,
2  Captain Bentley.
3  Q   And how did you get your car?
4  A   I believe they -- two policemen brought
5  it to the house.
6  Q   And were you able to drive the next
7  day?
8  A   I did not drive the next day.
9  Q   What about the day after that?
10  A   No, I don't believe I -- I believe I
11  was in the house for probably a week or so.
12  Q   When did you return to work?
13  A   I want to say it might have been the
14  following Monday.  The following Monday, you
15  know, give or take because I was on
16  administrative days, which is, you know,
17  it's kind of rule of thumb.
18  Q   When you say the following Monday, do
19  you mean -- so the incident happened on a
20  Saturday.  Do you mean two days later or --
21  A   No.
22  Q   -- a week and two days?
23  A   Yeah, like that, around that time
24  frame.
25  Q   So the week you were in your house, how

Page 246

1  were you able to get food for yourself to
2  eat?
3  A   I had my father staying with me.
4  Q   Okay.  And your father, was he able to
5  go out and get food for you?
6  A   Yeah.
7  Q   And did you leave the house at all that
8  week?
9  A   Not that I can recall, no.
10  Q   All right.  Back at the hospital, do
11  you remember what you told the doctors that
12  happened?
13  A   No, I don't remember talking anything
14  with them.
15  Q   By the time you're at the hospital, did
16  you feel nauseous?
17  A   No.
18  Q   Do you know whether you had vomited?
19  A   I don't remember throwing up.
20  Q   Did you have blurry vision?
21  A   I don't know.  My head was bothering me
22  a lot, my face.  Everything was bothering
23  me.  I don't remember specifics about was
24  this -- was I blurry or clear view, I don't
25  remember.

Page 247

1  Q   Well, do you remember having a
2  headache?
3  A   Had a real bad headache.
4  Q   Real bad headache.  Like on a scale
5  from 1 to 10?
6  A   10, 10 plus.
7  Q   10 plus.  Did you feel dizzy?
8  A   I don't recall.  I was sitting on the
9  bed.
10  Q   Were any of your teeth knocked out or
11  loose?
12  A   Not that I can recall, no.
13  Q   Do you recall whether any tests or
14  scans were performed at the hospital on you?
15  A   I believe a CAT scan.
16  Q   And by the time you were done at the
17  hospital, do you recall what the doctors
18  gave you as a diagnosis?
19  A   Well, paperwork, follow up with your --
20  with your primary care physician, Tylenol
21  for pain, that kind of thing.
22  Q   Right, but did they give you any kind
23  of medical diagnosis?
24  A   No, I don't remember any of that, no,
25  I'm sorry.  I'm sorry.  I thought that's

Page 248

1  what you meant.
2  Q   Is it your understanding that the
3  Cleveland -- that the City of Cleveland is
4  refusing to defend you and indemnify you in
5  this lawsuit?
6         MR. PIKE:     Objection.
7     Form, foundation.
8  A   Yeah, that's my understanding.
9  Q   Have you tried to contest this?
10  A   No.
11  Q   Did you file a grievance to contest
12  this?
13  A   No.
14  Q   Do you intend to at any point?
15  A   I can't answer that, sir.  I don't
16  know.
17  Q   Okay.
18         MR. PIKE:     Jeremy, I
19     can't hear testimony that's going
20     on.
21         MR. TOR:     You know, I
22     think Nick has gone to address it,
23     so I'll wait until he comes back.
24  BY MR. TOR:
25  Q   Do you have -- did you ever obtain

Deposition of Sergeant Dean Graziolli    Melissa Yatsko and Darian Allen vs. Sergeant Dean Graziolli, et al.,

Page 249

1  insurance coverage specifically for your
2  work as a security guard at any of these
3  private establishments?
4  A    No.
5  Q    Okay.  Are you aware of whether such
6  insurance exists?
7  A    Not specifically, no.
8  Q    Are you a member of the FOP?
9  A    Yes.
10 Q    How long have you been a member?
11 A    Since I was promoted back in 2002.
12      MR. TOR:      All right.
13 Give me a couple minutes.  I just
14 want to review my notes, see if I
15 have any follow-up questions.  Yeah,
16 I guess I can pass the witness for
17 now if anybody wants to ask
18 questions.
19      MR. PIKE:      It's 10 to
20 6:00.
21      MR. DiCELLO:   Want to go
22 off the record and figure out what
23 everybody wants to do?
24      VIDEOGRAPHER:  We're off the
25 record.

Page 250

1           - - -
2      (Discussion had off the record.)
3           - - -
4      VIDEOGRAPHER:   We're back on
5  the record.
6      MR. TOR:      Sir, I don't
7  have any more questions at the
8  moment.  The understanding among the
9  lawyers in the room is we'll adjourn
10 for now, leaving open the deposition
11 to be continued at a later date.
12      Anyone want to put anything
13 else on the record?
14      MR. ROCHE:    No.
15      MR. PIKE:    No.
16      MR. LENEGHAN:  No, that's
17 fine.  We're adjourning for now.
18 You guys are completed and if
19 cross-examination by the other
20 parties commence, we can coordinate
21 that and see where we go from
22 there.
23      MR. ROCHE:    Agree.
24      MR. PIKE:    Agree.
25      VIDEOGRAPHER:  We're off the

Page 251

1  record.
2           - - -
3      (Signature not waived)
4      (Deposition adjourned at 5:48 p.m.)
5           - - -

Page 252

1      CERTIFICATE
2
3  THE STATE OF OHIO,    )
4              ) SS:
5  COUNTY OF CUYAHOGA.   )
6
7      I, Angelika P. Shane, a Notary Public
8  within and for the state of Ohio, duly
9  commissioned and qualified, do hereby
10 certify that the within-named witness,
11 SERGEANT DEAN GRAZIOLLI, was by me first
12 duly sworn to testify to the truth, the
13 whole truth and nothing but the truth in the
14 cause aforesaid; that the testimony then
15 given by the above-referenced witness was by
16 me reduced to stenotype in the presence of
17 said witness; afterwards transcribed, and
18 that the foregoing is a true and correct
19 transcription of the testimony so given by
20 the above referenced witness.
21      I do further certify that this
22 deposition was taken at the time and place
23 in the foregoing caption specified and was
24 completed without adjournment.

Deposition of Sergeant Dean Graziolli                    Melissa Yatsko and Darian Allen vs. Sergeant Dean Graziolli, et al.,

Page 253

1      I do further certify that I am not a
2  relative, counsel or attorney for either
3  party, or otherwise interested in the
4  event of this action.
5      IN WITNESS WHEREOF, I have hereunto set
6  my hand and affixed my seal of office at
7  Cleveland, Ohio, this 7th day of March,
8  2019.
9
10
11      _____
12  Angelika P. Shane, Notary Public
13  Within and for the State of Ohio
14  My commission expires 6/21/20
15
16      - - - o0o - - -
17
18
19
20
21
22
23
24
25

Case: 1:18-cv-00814-DAP  Doc #: 71  Filed: 01/17/20  65 of 83.  PageID #: 1134

Deposition of Sergeant Dean Graziolli

Melissa Yatsko and Darian Allen vs. Sergeant Dean Graziolli, et al.,

## WORD INDEX

**< • >**
• 253:*18, 19, 20*

**< $ >**
**$100** 179:*13*

**< 1 >**
**1** 239:*15* 247:*5*
**1:00** 1:*22* 153:*12, 12, 14, 18, 21, 22* 179:*14*
**1:18-cv-00814** 1:*9*
**10** 4:*6* 239:*15, 18* 247:*5, 6, 6, 7* 249:*19*
**1001** 1:*24* 2:*9*
**106** 3:*21*
**1099** 130:*4, 9* 153:*4*
**1100** 3:*10*
**13** 44:*9* 102:*21* 114:*13*
**13th** 8:*2* 16:*6* 18:*14, 21* 22:*12* 33:*17* 34:*10* 35:*9* 40:*2* 41:*22* 43:*5* 76:*20* 112:*16* 118:*20* 149:*10* 153:*25* 162:*2* 193:*23*
**14** 34:*5*
**144-22** 5:*15*
**145-1** 5:*16*
**145-13** 5:*17*
**149** 215:*7*
**14th** 34:*11*
**15** 101:*10*
**152nd** 8:*10*
**154-4** 5:*18*
**156-16** 5:*19*
**160-1** 5:*20*
**168-21** 5:*21*
**17** 43:*17*
**1700** 2:*9*
**18-cv-814** 203:*18*
**1966** 7:*18*
**1992** 77:*2, 13* 78:*12* 80:*2, 14* 127:*5* 128:*16*
**1994** 103:*18* 128:*19*
**1996** 8:*25* 105:*17*
**1997** 105:*23*
**1999** 101:*20*

**< 2 >**
**2:00** 164:*22, 23* 166:*6*
**20** 7:*23* 88:*22* 110:*16* 167:*22* 253:*14*
**200** 2:*21, 21*
**2000** 9:*2* 101:*23* 104:*19*
**2002** 18:*7* 81:*22* 89:*19* 249:*11*
**2006** 96:*10* 98:*3*
**2008** 95:*8*
**2011** 94:*16* 95:*6* 96:*1*
**2012** 85:*6* 94:*11* 120:*24*

**2013** 9:*6* 82:*8* 89:*9* 90:*7* 106:*18* 114:*2*
**2014** 88:*2* 94:*6*
**2015** 132:*7*
**2016** 132:*5*
**2017** 45:*5* 55:*22* 74:*18* 113:*10, 24* 131:*9* 132:*2* 152:*18*
**2018** 8:*2, 3* 9:*6* 16:*6* 18:*14, 22* 22:*12* 33:*17* 34:*5* 35:*9* 40:*3* 41:*23* 43:*5* 44:*9* 76:*20* 102:*17, 21* 112:*16* 128:*23* 149:*10* 153:*25* 162:*2* 166:*3*
**2019** 1:*22* 253:*8*
**204-13** 5:*22*
**205-20** 5:*23*
**205-22** 5:*24*
**207-20** 5:*25*
**21** 253:*14*
**213-15** 6:*2*
**214-19** 6:*3*
**216-664-2775** 3:*23*
**216-696-3232** 2:*11* 205:*5*
**216-916-7730** 3:*12*
**222-22** 6:*4*
**2300** 4:*7*
**245** 215:*10*
**248-6** 6:*5*
**25** 42:*24* 110:*16*
**27** 54:*20, 22* 68:*25* 126:*23* 233:*17*
**27-year** 54:*19* 66:*16* 74:*14* 80:*23* 93:*19*
**28** 128:*4, 6*

**< 3 >**
**30** 56:*12* 86:*18* 94:*8* 128:*17*
**30th** 1:*22*
**36-9** 5:*3*
**37-12** 5:*4*
**38-7** 5:*5*

**< 4 >**
**40** 156:*4*
**41-3** 5:*6*
**41-9** 5:*7*
**43215** 4:*8*
**440-838-4260** 2:*23*
**44114** 2:*10* 3:*22*
**44144** 7:*21*
**44145** 3:*11*
**44147** 2:*22*
**45-11** 5:*8*
**46-17** 5:*10*
**46-7** 5:*9*
**48** 91:*1* 128:*9* 156:*3*

**< 5 >**
**5:48** 251:*4*
**50-11** 5:*11*
**5317** 7:*20*
**57th** 114:*16*
**58-9** 5:*12*
**58th** 114:*15, 17*
**59-19** 5:*13*

**< 6 >**
**6** 80:*2* 239:*17* 253:*14*
**6:00** 129:*3* 164:*22, 22* 249:*20*
**601** 3:*21*
**614-464-1211** 4:*9*
**6th** 80:*14* 244:*10*

**< 7 >**
**7:00** 129:*3*
**70-13** 5:*14*
**75** 124:*8*
**7901** 33:*8*
**7th** 253:*7*

**< 8 >**
**8:00** 129:*3*
**800** 3:*10*
**881** 8:*10*
**8S** 33:*12*

**< 9 >**
**9** 239:*18*
**9:00** 153:*12, 18, 21, 22* 167:*19* 179:*14*
**9:15** 170:*16*
**90s** 110:*7, 7*
**911** 174:*25* 175:*5* 190:*4* 225:*22, 25* 226:*9, 13, 21* 227:*5, 6, 7, 14*
**94** 128:*17*
**9th** 7:*18* 81:*21, 22*

**< A >**
**a.m** 129:*3, 3, 3* 153:*12* 164:*23* 179:*14*
**a.m.** 153:*14*
**ability** 14:*10* 235:*7* 238:*22*
**able** 88:*3* 116:*19* 120:*18, 19* 123:*22* 171:*3* 185:*15* 199:*1* 215:*21* 219:*12, 23* 220:*4, 10* 235:*15* 244:*2* 245:*6* 246:*1, 4*
**above-referenced** 252:*15*
**Absolutely** 30:*23* 53:*23* 167:*8* 170:*1* 192:*13* 217:*19* 226:*15*
**abusive** 102:*6* 103:*13*
**academy** 73:*24* 80:*7, 24* 81:*4, 6, 13*

**accident** 10:*4, 4, 7* 110:*1* 114:*4, 5*
**accompanied** 30:*8*
**accomplish** 202:*12*
**accurate** 94:*4*
**accurately** 14:*11*
**accused** 120:*16*
**achieve** 65:*2*
**acknowledging** 168:*24*
**action** 19:*15* 253:*4*
**active** 75:*23* 76:*2, 4, 5, 10, 15* 188:*15*
**actively** 112:*17*
**activities** 67:*14* 86:*8* 120:*25*
**activity** 45:*18* 86:*5* 175:*19*
**add** 205:*8*
**added** 139:*5*
**addition** 9:*20* 48:*22* 110:*21* 128:*9*
**address** 7:*19* 8:*1, 7, 9* 31:*13* 40:*17* 45:*24* 69:*21* 158:*12* 202:*8* 248:*22*
**adjourn** 250:*9*
**adjourned** 251:*4*
**adjourning** 250:*17*
**adjournment** 252:*24*
**Administrative** 155:*15* 242:*5* 245:*16*
**administratively** 155:*19*
**admitted** 95:*16*
**adults** 161:*12*
**advice** 16:*14* 198:*25* 199:*16*
**advise** 64:*21*
**Advisements** 61:*2, 2*
**aerobic** 67:*14, 15*
**Affairs** 22:*19, 20* 23:*6* 234:*11*
**affect** 14:*7, 10*
**affiliated** 118:*6*
**affixed** 253:*6*
**aforesaid** 252:*14*
**aftermaths** 27:*9*
**afternoon** 7:*12, 13* 68:*8* 128:*21* 203:*15*
**age** 7:*6* 67:*18* 113:*14*
**agency** 124:*5*
**Aggravated** 85:*18*
**aggression** 70:*19* 212:*17*
**aggressive** 58:*20* 195:*20*
**aggressively** 212:*14*
**ago** 50:*20* 73:*24* 100:*3* 128:*24* 205:*2* 244:*9*
**agree** 66:*24* 86:*25* 250:*23, 24*
**agreement** 1:*21* 146:*6* 177:*4*

Case: 1:18-cv-00814-DAP  Doc #: 71  Filed: 01/17/20  66 of 83.  PageID #: 1135

Deposition of Sergeant Dean Grazioli                              Melissa Yatsko and Darian Allen vs. Sergeant Dean Grazioli, et al.,

ahead 36:10 154:5 169:2
237:24
aid 74:3, 6, 8 75:16, 22
76:2, 10 163:8, 14, 18
225:19 226:19
al 1:11
alcohol 115:10 118:19
119:3 147:16, 19 148:5
167:5 197:22 198:8, 11
alcoholic 147:20
alive 122:25
ALLEN 1:6
ALLEY 3:2, 3, 4 9:22
21:4 22:12 34:22 35:4,
10, 21, 25 36:4, 7, 13, 16,
18, 21, 25 37:1, 6, 8, 10
38:4, 11, 12, 23, 24 39:3, 8,
9 40:2 41:21 43:6 44:9,
18 45:2 50:9 53:14 69:5
107:19 108:14 110:22
118:12 130:8, 11 135:7,
13, 16 136:3, 7, 15, 18, 25
137:13 138:8, 10, 22
139:1, 7, 12, 23 142:10, 14,
22, 23 143:2, 5, 8, 12
144:1, 8, 12 145:25 146:4,
7, 10, 25 147:6, 9, 12, 21
148:12, 18, 25 149:9, 14
150:1, 7, 13, 15, 25 151:3,
9, 15, 18, 25 152:6, 11, 18
153:5, 7, 25 154:3, 15, 18,
23 155:1, 7 159:4, 5
160:14, 15 161:6, 24
162:3, 6, 16, 21 163:7, 13,
17, 20, 25 164:7, 18
165:18 166:3, 18 167:2, 9
168:16 170:4, 15 171:8
178:14 179:12, 20 180:1
181:14, 19 182:1, 10, 13
183:19 189:20 190:8
194:18 210:7 220:25
221:11 236:18, 20, 23
237:3
alleys 170:23
Alley's 191:5 221:1
236:24
allow 71:20
allowed 71:3, 8 142:19
155:13
alter 44:13
altercation 44:13, 17
96:12 99:5 119:9, 18
175:13 195:3 198:19, 22
199:11 200:15 202:3
203:24 212:22 213:9
215:25 222:20, 25
ambulance 191:13, 16, 20
193:22 228:13, 14, 20, 23
229:1, 5, 24 230:2

Amendment 199:4, 18
200:11 201:1, 19 204:1, 4
amount 104:6, 7 141:16,
17, 24 147:19 237:14
amounts 226:8
Angelika 1:19 252:7
253:12
annoyed 209:12
answer 11:25 12:5 21:12
22:18 23:18 47:25 50:23
57:5, 7, 24 58:3 63:12
97:17 199:1, 9 200:11, 22
201:1 204:1 214:12, 13
227:4 233:7, 15 248:15
answered 46:22 126:15
200:14 201:21, 24 202:4
203:22
answering 64:13 90:16
234:2
answers 11:23 21:18, 25
22:5 133:15
Anthony 120:5
anxiety 121:22 123:25
anybody 15:11 21:7
29:19, 22 36:15 37:1, 19
44:14 99:16 119:17
125:7 131:12 141:5
148:24, 25 149:2, 8
150:24 151:25 160:15
162:25 163:10 166:22, 24
167:10, 12, 14 168:15
172:3 174:25 175:7
176:18 182:9 190:7
191:19 195:16, 17, 21
204:10 205:8 218:24
227:9, 14 229:1 232:13,
17 234:22 235:2 249:17
anymore 40:23 125:16
154:8, 23 155:2
anyplace 79:17
anytime 18:1
anyway 241:9
apologize 36:22 157:23
apologize, 242:16
apparently 191:1
appear 94:17 176:5, 17
197:24 215:17
APPEARANCES 2:1
appeared 215:19
appearing 94:24, 24, 25
appears 55:20 95:8
application 136:7
apply 136:8, 10, 11
appreciate 38:18
approached 206:5 212:13
approaches 130:24
appropriate 142:3 206:21
approval 40:9 95:5
approve 40:5 41:1, 7

approved 145:10 236:22
241:7
approximately 99:3
April 7:18
arcade 143:9
area 37:11 99:7 105:1
109:18 114:16 116:13
143:19 146:3 192:25
196:11, 23 205:18 210:3
222:20 223:9, 19, 21
239:13
arising 18:13
arrange 139:23
arrangement 136:3 137:1
arrest 46:1 64:22 65:4, 5
186:23 187:3 190:10, 22
192:8 193:4 207:12, 16,
23 208:1 212:24 228:5
arrested 193:7
arrive 227:20, 25
arrived 167:20
arts 73:18
aside 69:7
asked 16:10 20:15, 23
22:6 23:17 24:23 96:16
122:6 200:4, 18, 22 201:6
225:3 232:24 233:8
asking 11:21 20:9, 11
57:6 70:4 170:19 180:17
203:23 232:25 234:14
as-needed 92:10
ASP 44:2 52:8 65:19
assault 77:8 97:21
189:24, 24 190:1, 2, 14, 22
232:1, 10, 17 233:10, 11
234:5, 7, 13
assaulted 77:3 96:22
98:16
asserted 84:20 85:14
103:12
asserting 199:15
assess 224:12
assessment 198:16
assigned 90:3, 6, 10
157:20, 21, 24 158:15, 18,
22, 25 159:20
assignments 90:17 126:18
129:20 133:19
assist 162:17
assistance 157:24
assumed 154:25
assuming 177:3
attack 96:25 97:15 99:14
220:8
attacked 97:12 99:25
215:5 217:13 220:1
attacking 97:7 216:11, 14
attain 81:23
attempt 233:12

attempted 232:5, 5, 12, 20
attempts 210:6
attendance 199:22
attended 15:2
attending 100:19
attention 98:4, 7 161:17
192:4 193:11 194:2, 5
attire 49:3, 6 50:8
attorney 14:18 16:18, 20
17:5, 15, 18, 20, 22, 23
18:2, 2, 6, 12 19:20, 21, 24
20:2, 24 21:19, 22 24:3, 6
26:2 31:18, 19 32:3, 17,
21 34:9 236:9 253:2
attorney-client 18:20
attorneys 106:13
attorney's 20:5
audio 23:22, 24 24:9
authorities 130:16
authority 179:25 180:3, 5
authorized 42:2
automatically 88:11, 12
available 64:5 69:18
137:6 155:2 202:8 205:6
Ave 3:21
Avenue 1:24 2:9 7:20
183:16 192:21 223:17
average 90:24 129:15
avoid 58:20, 24 59:16, 24
61:23
awarded 104:4
aware 13:3 18:25 19:3,
15 48:11 88:14 118:7, 8
145:25 148:11, 13, 16, 24
150:18 159:4 160:10
198:4 206:2 208:22
224:21, 22, 23, 25 225:2, 2
226:16, 20 234:16 249:5

< B >
back 38:13, 24 39:4
51:25 57:25 62:14 86:13
88:3, 10, 10, 12 98:2
105:3 106:4 110:10
112:11 119:22 129:17
132:9 154:19 155:1
156:15 159:4, 19, 21, 25
160:3 166:17 172:8, 12
178:24 179:8 181:13, 20,
24 182:3, 7, 12 192:16
193:20 194:3, 8, 18
195:14 196:13 203:9
205:13 206:24 210:7
212:5 219:3, 4 220:20
223:8 230:17 239:11
243:3, 3 244:13 246:10
248:23 249:11 250:4
background 151:23 152:1
backing 218:21
backup 207:25

**Bad** 87:20 105:5 125:17, 22 242:2 247:3, 4
**badge** 42:16
**badges** 42:14 49:21
**bar** 37:8 39:4 99:6, 8, 13, 19 119:9 143:5, 8 146:3 148:22 173:10 182:17 206:24 207:1 219:4
**Barnes** 98:17 99:18 100:14 119:10
**barriers** 61:15
**bars** 161:8
**based** 119:7 137:22 201:20, 23 234:6
**basic** 233:22
**Basically** 90:15
**basis** 16:23 47:22 63:4, 9 81:9 92:11 155:17 175:14 199:8, 9
**bathroom** 159:11
**baton** 44:2 51:16, 19, 22 52:8, 23 65:19 219:14
**beat** 218:15
**becoming** 227:18
**bed** 247:9
**began** 195:3 203:23
**beginning** 29:7, 8
**BEHALF** 2:3, 17 3:1, 16 4:1 9:14 104:19 201:10
**behavior** 225:15
**believe** 14:8 20:6 23:24 24:2, 16, 22 25:15 32:1 39:1 45:6 50:4 74:18 75:5, 5, 10, 14, 15 76:16 77:2, 8 81:3, 21 82:8 85:6 87:5, 7 88:2, 15 95:13 98:6, 14, 20 99:11 100:7, 22 102:7 103:3 104:10, 13 105:11, 15 107:17 108:17, 25 109:6, 6, 10, 24 111:11 113:13 115:19 116:24 122:24 124:6 131:21 132:6, 6 134:4 139:5 142:25 153:12 157:10 160:2 164:19, 22 165:8 183:16 198:13 201:11 204:20 214:8, 17, 21, 21 228:22 231:15 234:19 236:4, 19 238:24 239:21 245:4, 10, 10 247:15
**believed** 180:6 234:12
**bell** 94:23 105:24
**belongings** 172:10
**belt** 51:6, 9, 10
**Bentley** 25:11, 12 26:3, 4 245:2
**Berea** 118:5, 5
**best** 200:17
**betrayed** 120:11

**better** 18:10 66:24 91:25 125:15
**beverages** 147:19, 20
**beyond** 143:23 175:25 244:24
**big** 119:4 150:21
**birth** 7:17
**bit** 10:14 17:9 18:10 24:13 53:13 79:23 116:14 125:12 128:12 136:1 223:9
**bite** 238:11, 13
**black** 60:12
**bleeding** 191:18 224:7 226:3, 4
**blocked** 194:8
**blocking** 194:11, 12
**blocks** 123:21
**blond** 15:16 37:23 195:11
**blood** 112:22, 24 117:16 118:15 223:3, 5, 7 226:8
**blurry** 246:20, 24
**Blvd** 2:21
**board** 134:18, 21
**Bob** 17:19, 20 18:5, 11 24:7 25:8 26:2
**body** 58:20 184:18, 18 210:24
**boots** 184:16 186:11 221:15 222:17 223:12, 18 226:2
**bothering** 246:21, 22
**bottom** 221:22
**bouncer** 77:2 78:12 103:20, 21 104:1 149:5
**bowling** 37:8 143:2, 5, 8
**boy** 107:2 110:14 157:2 242:25
**break** 34:19 112:4 127:15 169:24 187:8, 11 189:5 220:14
**Breann** 15:15 37:23 195:9 196:7 205:25 209:9 210:9, 9, 23 212:9
**breath** 197:22
**Brian** 25:11, 12 26:3
**briefly** 195:1
**Broad** 4:6 70:4, 5
**Broadview** 2:22
**broken** 108:20 116:1
**Brook** 123:5
**brought** 9:14 245:4
**Brown** 4:4
**buddy** 67:23
**building** 79:10, 11 91:4 168:3 191:5 192:17
**buildings** 134:14, 15
**bulletin** 134:17, 20
**bullets** 43:22 79:20

**bump** 238:5, 7, 10
**bus** 104:20 107:18 108:10
**butcher** 243:21

**< C >**
**call** 37:18 47:6 133:21 134:23, 23 175:5 190:4 191:19 193:7, 21 194:5 199:5 202:24 207:25 208:19 210:10 225:22, 25 226:21 227:5, 6, 7, 14 231:12
**called** 1:16 50:5 148:19 173:15 174:25 226:10, 14 231:11
**calling** 203:16
**calm** 60:4 62:2
**camera** 220:25
**cameras** 160:11, 16
**capable** 226:18
**capacity** 92:9 147:8
**Captain** 25:12 26:3 245:2
**caption** 252:23
**car** 10:7 44:24 79:17 82:14 110:1, 9 114:4, 5, 11 117:3 167:23, 25 191:13, 15, 20 192:5 245:3
**card** 76:4
**cardio** 67:15
**cards** 83:1, 2, 4, 11 85:3 89:11
**care** 117:7, 23 121:19, 21, 25 122:7, 11 124:2, 15 209:4 240:10 247:20
**career** 44:19 54:19 61:7 66:16 74:14 79:24 80:23 93:19
**Carl** 82:12 86:6 93:16 119:22 121:1 126:10
**carried** 51:12 53:19, 24
**carry** 43:9, 25 50:15, 21 51:12, 16 52:2, 10, 12 53:12, 17 145:11, 19 149:14 150:12
**carrying** 39:16 44:14 53:7, 8 78:18, 22 149:19, 25 150:24 164:3 231:2
**cars** 114:22 188:15
**Carson** 4:5
**Case** 1:9 9:18, 23 10:3, 5, 6, 12, 15, 21 11:8 12:21 15:25 19:17 21:18 22:1 23:7 34:23 35:1 90:23 94:17, 18 95:1 103:18 104:8 105:18 107:9 120:7, 8 199:23, 23 202:15 203:17
**cases** 11:10 106:1
**Cash** 129:24 130:13

**132:12, 18**
**cast** 116:12, 13, 15
**CAT** 247:15
**catch** 238:16
**catches** 238:17
**caught** 126:9
**cause** 252:14
**caused** 113:11
**ccar** 10:9
**cell** 33:2, 5, 7 193:18, 21
**Center** 23:14
**certain** 45:8 75:13 84:11, 15 240:5
**certainly** 24:20 37:20 169:7 202:13
**CERTIFICATE** 252:1
**certification** 50:22 75:12, 17 76:2, 10
**certified** 7:7 50:21 75:4, 8, 22
**certify** 252:10, 21 253:1
**chain** 40:19 157:12
**chambers** 203:4
**chance** 218:23 219:1 220:2
**chances** 208:11
**change** 62:12 112:8 153:20 179:6
**chao** 227:17
**chaotic** 225:15 227:18, 19, 21
**charge** 157:18
**charged** 86:9 242:8
**charges** 77:4 84:20 85:14 97:9
**Charity** 109:7
**chase** 109:1
**check** 32:23 79:10, 12 123:8 124:2 125:10 126:7 129:25 131:17 148:22, 25 151:23 152:2 162:20, 22, 23
**C-H-E-C-K** 131:17
**checked** 125:18
**checking** 162:25
**chicken** 171:2
**chief** 40:21, 22 41:1 90:4, 5, 10
**children** 161:12, 14, 18
**choice** 29:7, 9 63:11, 16
**choices** 69:18 70:1
**cholesterol** 112:23, 25 117:17 118:16
**chosen** 29:5, 6
**cigarette** 196:19 207:7
**circle** 51:25
**circumstance** 26:8 194:13
**circumstances** 35:3 45:10 69:24 82:9 91:6 106:10

Case: 1:18-cv-00814-DAP Doc #: 71 Filed: 01/17/20 68 of 83. PageID #: 1137

Deposition of Sergeant Dean Graziolli     Melissa Yatsko and Darian Allen vs. Sergeant Dean Graziolli, et al.,

151:*3* 177:*1* 181:*3*
**citizen** 58:*15*, 21 184:*4*
**citizens** 54:*11*
**CITY** 3:*17, 19* 9:*21* 27:*2*
94:*1* 105:*18, 21, 23* 115:*7*
127:*22* 129:*22* 236:*17, 23*
241:*18* 242:*6* 248:*3*
**civil** 9:*14* 11:*8* 18:*13*
103:*16* 105:*16, 22* 106:*19*
**claim** 98:*16* 105:*14*
107:*17, 20* 108:*13* 111:*15*
113:*16* 121:*8* 124:*4*
207:*18* 231:*22* 232:*4, 7, 9,
14, 16* 235:*25* 236:*3, 17*
237:*3, 5*
**claimed** 232:*11*
**claiming** 232:*19* 237:*10,
11*
**claims** 102:*4* 103:*12*
110:*24* 111:*4, 7* 236:*14*
**classroom** 48:*7* 63:*25*
**clear** 36:*23* 149:*18*
246:*24*
**clearance** 79:*6*
**cleared** 235:*23*
**Cleveland** 1:*24* 2:*10*
3:*17, 19, 22* 7:*20* 8:*12*
9:*7, 21* 22:*20* 27:*2* 29:*16*
40:*4* 41:*8, 25* 42:*17, 18*
43:*8, 9, 24* 46:*25* 47:*9, 13*
48:*12, 24* 49:*5, 8, 19, 23*
50:*7, 16* 51:*23* 54:*7*
57:*17* 58:*5* 59:*15, 23*
64:*9* 70:*9* 74:*2* 76:*1*
79:*24* 81:*9, 15* 84:*14*
89:*3* 94:*1* 98:*18* 105:*18,
24* 129:*8* 133:*4* 168:*11*
205:*17* 227:*10, 23* 228:*1,
25* 229:*15* 234:*16, 22*
235:*2* 236:*17, 24* 248:*3, 3*
253:*7*
**client** 201:*18* 220:*9*
**clips** 221:*19*
**clock** 36:*17* 37:*2*
**close** 58:*24* 59:*2, 6, 11*
123:*19* 170:*22* 174:*17, 18*
179:*1*
**closed** 153:*14, 15* 185:*24,
25* 186:*2*
**closely** 242:*22*
**Club** 103:*19, 23, 24, 25*
**clue** 174:*5, 16*
**Co-Admrs** 1:*6*
**coat** 49:*22, 24* 150:*4, 6*
172:*14* 197:*1* 210:*14, 17,
19* 239:*14*
**code** 233:*19*
**coerce** 205:*17*
**cold** 37:*14* 168:*5, 10, 12*

193:*24* 209:*23*
**collaboration** 140:*2*
**colleague** 78:*3, 5*
**Collins** 3:*8*
**Columbus** 4:*7, 8*
**come** 86:*4* 88:*10* 126:*7*
154:*19* 178:*24* 181:*13, 20,
24* 182:*3, 6* 206:*24*
226:*11* 242:*20*
**comes** 248:*23*
**comfortable** 51:*1* 52:*13*
59:*10* 64:*13* 66:*21* 67:*1,
3*
**coming** 115:*1, 3, 5, 9*
125:*16* 148:*22* 164:*17*
183:*14*
**command** 40:*20* 95:*12*
**commands** 62:*7* 66:*13*
73:*5*
**commence** 250:*20*
**comment** 217:*15*
**commission** 65:*10* 253:*14*
**commissioned** 252:*9*
**committed** 45:*21* 84:*15*
190:*1* 207:*10* 231:*22*
232:*10, 11, 20* 233:*9*
234:*12*
**committee** 125:*3*
**committing** 46:*2* 190:*22*
207:*6, 17, 19*
**common** 179:*1* 223:*13, 14,
15, 19*
**communicate** 16:*15, 21*
**Comp** 40:*15, 16* 107:*17,
20* 108:*13* 110:*24* 111:*4,
6, 14* 235:*25* 236:*14, 16,
25* 237:*3, 5* 241:*6, 11*
**companies** 127:*19*
**COMPANY** 4:*1* 107:*3*
131:*18* 162:*17, 19* 228:*23*
**compared** 148:*6, 9*
**compel** 205:*17*
**Compensation** 105:*13*
113:*15*
**complete** 231:*3, 9*
**completed** 250:*18* 252:*24*
**compliant** 176:*5, 8*
**comply** 47:*15* 71:*21*
**computer** 40:*12*
**con** 180:*11*
**concealing** 149:*24*
**concern** 178:*15* 207:*13*
**Concerning** 1:*6*
**conclusions** 176:*3*
**concussion** 235:*20, 21, 24*
240:*16* 241:*23, 24* 243:*19*
**concussion's** 237:*12*
**condition** 121:*20*
**conditions** 112:*17* 113:*1*

124:*10* 188:*16*
**conduct** 82:*19* 198:*15*
**conducted** 100:*17* 234:*17*
**conference** 199:*23* 200:*3*
201:*5, 13* 204:*5*
**confirm** 222:*25*
**conflict** 55:*5*
**confrontation** 61:*24*
**confronted** 196:*8, 11, 15*
205:*19*
**consider** 64:*7* 68:*13, 18*
88:*21*
**considered** 88:*18* 96:*18*
**consistently** 156:*8*
**constant** 239:*6*
**constitutional** 204:*18*
**constraints** 169:*6*
**construction** 127:*23*
**consultant** 27:*2* 29:*4*
**consulted** 174:*24*
**consume** 118:*19, 22* 167:*5*
**contact** 17:*14* 223:*22*
**contacted** 18:*15* 19:*19, 21*
**contacts** 13:*14*
**contest** 101:*5* 248:*9, 11*
**continue** 112:*14*
**continued** 250:*11*
**continuing** 168:*23*
**contract** 146:*7*
**contractor** 130:*22*
**control** 65:*7* 66:*11*
114:*20*
**Convention** 242:*7*
**conversation** 23:*20* 25:*16*
26:*9* 35:*24* 154:*21*
157:*13* 169:*5* 172:*12, 18*
173:*5, 9, 12* 180:*10*
181:*11* 193:*14*
**cool** 60:*4*
**coordinate** 250:*20*
**CORNER** 3:*2, 3, 4* 9:*21*
21:*4* 22:*12* 34:*22* 35:*4,
10, 21, 25* 36:*4, 7, 13, 16,
18, 21, 25* 37:*1, 6, 10* 38:*4,
10, 12, 23, 24* 39:*3, 7, 9*
40:*2* 41:*21* 43:*6* 44:*9, 18*
45:*2* 50:*9* 53:*14* 69:*5*
107:*19* 108:*14* 110:*22*
118:*12* 130:*8, 11* 135:*7,
13, 16* 136:*3, 7, 15, 18, 25*
137:*13* 138:*8, 10, 22*
139:*1, 7, 12, 23* 142:*10, 14,
22, 23* 143:*12* 144:*1, 7, 12*
145:*25* 146:*3, 7, 10, 25*
147:*5, 9, 12, 21* 148:*12, 17,
25* 149:*9, 14* 150:*1, 7, 13,
15, 25* 151:*2, 8, 15, 18, 25*
152:*6, 11, 18* 153:*5, 7, 24*
154:*3, 15, 18, 23* 155:*1, 7*
159:*4, 5* 160:*14, 15* 161:*6,*

24* 162:*3, 6, 16, 21* 163:*7,
13, 17, 20, 25* 164:*7, 18*
165:*18* 166:*3, 18* 167:*2, 9*
168:*16* 170:*4, 14* 171:*8*
178:*14* 179:*11, 20* 180:*1*
181:*14, 19* 182:*1, 10, 12*
183:*19* 189:*20* 190:*8*
191:*4* 194:*18* 210:*7*
220:*25* 221:*1, 11* 236:*18,
20, 22, 24* 237:*2*
**coroner's** 230:*21*
**CORPORATION** 3:*5*
**Correct** 8:*4* 15:*3* 16:*22*
17:*3* 18:*23* 19:*23* 21:*19,
23, 24* 22:*2* 29:*25* 33:*9*
34:*2, 3* 36:*8, 19* 37:*8, 11,
18* 39:*10, 13, 14, 17, 21*
40:*3, 6, 25* 42:*25* 48:*20,
25* 49:*1* 53:*10, 15, 16*
54:*17* 55:*22* 56:*10, 13*
57:*14* 63:*6* 65:*5* 69:*6*
74:*15* 83:*3* 86:*7* 89:*2*
104:*2* 123:*13, 16* 126:*8*
151:*14, 16* 159:*22* 171:*14*
181:*5* 184:*6* 187:*12*
189:*7* 191:*17* 194:*6*
195:*8* 196:*3, 13* 198:*19*
199:*24* 200:*5, 8, 12, 16, 19*
201:*3, 7, 10* 207:*19*
221:*12* 222:*12, 15* 224:*4*
233:*10* 252:*18*
**correctly** 151:*11*
**corroborate** 121:*6*
**counsel** 1:*21* 16:*14*
198:*25* 199:*16* 253:*2*
**counts** 85:*22*
**County** 16:*4* 19:*14, 16*
252:*5*
**couple** 28:*17* 205:*4*
221:*19* 249:*13*
**course** 61:*6* 63:*15* 64:*4*
75:*2* 91:*5* 129:*5* 242:*18*
**COURT** 1:*1* 11:*6* 12:*1*
23:*23* 35:*2* 87:*3* 94:*17,
24, 25* 104:*11* 200:*22*
201:*5* 202:*7, 21* 204:*7*
205:*6*
**courts** 233:*5*
**Court's** 200:*12* 201:*22*
**cover** 49:*4*
**coverage** 40:*14* 236:*16, 25*
241:*20* 249:*1*
**covered** 119:*7* 241:*10*
**covering** 150:*5*
**CPD** 22:*18*
**CPR** 74:*20, 20, 23* 75:*4, 7,
11* 76:*13*
**crash** 10:*19* 114:*11, 18*
**crate** 71:*3*

Case: 1:18-cv-00814-DAP  Doc #: 71  Filed:  01/17/20  69 of 83.  PageID #: 1138

Deposition of Sergeant Dean Grazioli                    Melissa Yatsko and Darian Allen vs. Sergeant Dean Grazioli, et al.,

**created** 138:3
**creating** 61:12
**crime** 30:22 45:21, 24
  46:2 65:11 87:1 175:8,
  11, 15 189:19, 23 207:6,
  10, 18, 19 231:23, 25 233:9
**crimes** 233:8
**criminal** 11:10 13:7, 7, 8
  17:2 18:12 19:2, 5, 9
  45:18 77:6 82:16, 21
  84:20, 21, 24 85:14 86:21
  120:7 175:19 198:24
  199:13 204:22 233:19
  235:14
**criminally** 86:9
**critical** 158:2, 3
**cross** 1:17
**CROSS-EXAMINATION**
  7:10 250:19
**crowd** 224:19
**cruiser** 50:5
**cry** 218:25 219:1
**curious** 21:10
**current** 9:10
**currently** 14:6
**curriculum** 72:19
**curse** 59:25 188:6
**cursed** 188:5
**cursor** 221:14, 21 223:9
**custody** 30:24
**customers** 37:16
**cut** 12:8 140:23 141:13
**Cuyahoga** 16:4 252:5

**< D >**
**daily** 94:8 137:17
**Dan** 1:10 203:5
**DARIAN** 1:5
**dark** 221:15, 16
**date** 7:17 37:15 43:13
  55:18 79:25 93:24
  112:15 118:14 153:23
  250:11
**dates** 121:4 137:6 148:4
  165:10, 15 237:9 242:3
**David** 2:20 11:17 201:17
  204:13
**day** 1:22 33:22 34:1, 4
  63:23, 24 68:5 72:17
  92:3, 7 102:23 114:24
  118:17, 20 123:15 124:20,
  23 128:20, 25 129:1
  152:8 154:1, 2, 11 163:5
  164:19, 20, 21, 25 165:23
  167:5, 7 238:16 244:9
  245:7, 8, 9 253:7
**days** 23:11 56:13 86:18
  94:8 103:4 126:1, 2, 2
  128:17 129:6, 7, 10, 15
  137:22 138:20, 23 152:8,

**9** 165:10, 11, 20 245:16,
  20, 22
**day-to-day** 155:17
**dead** 120:21
**deadly** 65:15 66:5 69:7,
  10, 15 70:2, 6, 18 71:3
  158:5, 7 231:14
**Deal** 27:9 54:25 107:4
  137:12
**dealing** 54:11 57:4
**dealt** 54:23 84:3
**DEAN** 1:10, 15 2:18 7:5,
  10, 16 203:19 252:11
**death** 218:16
**debriefed** 234:21
**deceased** 121:12
**December** 81:21, 22
**decision** 88:13 174:23
  182:5
**declare** 130:20
**declaring** 54:6
**declined** 16:14, 16 20:24
**declining** 16:24
**de-escalate** 58:7 62:5
**de-escalation** 55:9, 13, 21
  56:2, 25 57:12, 21 60:21
  61:10 206:14, 16
**defend** 120:6 248:4
**Defendant** 1:16 2:17
  3:16 7:6 9:18 106:18
**Defendants** 1:13 3:1
  9:22 34:23
**defense** 84:24 204:10
**defenseless** 184:20
**definitely** 241:25
**Delano** 180:13
**Deleon** 15:2 173:3, 13
  180:14, 15, 18 184:17, 19
  185:20 186:23 187:1, 7,
  10, 15, 19, 23, 24 188:5, 10,
  21 189:11, 21 191:1, 7, 10,
  22 192:15 193:10 194:5
  215:21
**Deleon,** 186:12
**Deleon's** 184:23 188:2
**demoted** 86:11 94:7
**demotion** 82:5, 10
**denied** 111:14
**deny** 187:5, 6 208:14
**Department** 3:19 18:15
  29:16 40:4 43:9, 20 47:9,
  13 49:8, 19 50:8 55:15
  57:17, 21 58:5 59:15, 24
  60:10, 16, 23 62:21 64:9,
  17 70:9 71:16 72:2
  73:15, 22 76:9 79:7
  81:15 82:18 84:14 86:17
  89:4 95:6 97:13 98:19
  100:9, 18 106:2 115:4
  125:4 129:9 133:4 134:3

**144:**20 145:11, 23 166:25
  228:3 229:16 234:17, 23
  235:3
**Depended** 150:11
**depending** 35:1 73:7
  189:25
**Depends** 64:15 72:18
  130:2, 3 175:16 240:4
**deploy** 52:20
**deployed** 70:6
**deploying** 66:22 67:1
**deposes** 7:8
**deposit** 129:25
**deposition** 1:15 9:13, 25
  10:24 11:2, 4, 21 14:15
  15:2, 6, 9, 12, 14, 19 16:1
  79:2, 8 104:12 201:25
  203:19 205:1, 24 250:10
  251:4 252:22
**depression** 121:22 123:25
**Dereliction** 86:1, 2
**derived** 127:13
**describe** 42:13 159:8
  219:8
**describing** 66:1 133:20
**designee** 40:23
**desks** 203:7
**Despite** 155:25
**detailed** 203:7
**details** 20:22
**detain** 64:22
**detaining** 192:9
**detective** 242:24
**determination** 233:6
**determine** 92:6
**determined** 90:6 143:11
**determines** 90:2
**determining** 163:17
**DEVELOPMENT** 3:4
**Dew** 170:21 171:6
**dgrazioli@gmail.com**
  31:14
**diagnosis** 28:21, 22, 24
  29:1 247:18, 23
**DiCello** 2:6 249:21
**dictates** 91:14
**die** 120:22
**died** 121:2
**different** 27:11 42:14
  49:5 52:14 57:2 74:22
  76:24 84:19 93:21
  101:13, 17 107:22 110:12
  113:6 142:3 160:16
  230:24
**diffuse** 73:2
**dinner** 171:6
**Direct** 3:23 129:25
**directing** 127:24
**directly** 141:10

**Director** 41:6 88:15
**disability** 113:21
**disagree** 204:16
**disc** 113:9, 12
**discharged** 69:1
**discharging** 68:19
**discipline** 96:7 98:1
  101:6
**disciplined** 93:18, 22
  94:16, 20 97:11, 15
**discovered** 85:8 86:6
**discovery** 21:18 22:17
  202:4
**discuss** 151:2 162:14
  169:24
**discussed** 175:2
**discussion** 100:1, 2 250:2
**dishonest** 87:4, 6, 21
**dishonesty** 87:1
**dismissed** 94:18
**disobedient** 54:16
**disorderly** 72:23
**dispenser** 170:20
**displaying** 71:19
**dispute** 187:17, 20, 25
  188:2 206:10 209:10
  211:3, 6, 11 212:11, 14, 17,
  20
**disputed** 237:3
**disrespectful** 197:9
**disrespecting** 71:12
  209:20
**dissolutionment** 102:22
**distance** 61:12 191:8
**DISTRICT** 1:1, 2 8:13
  44:24 88:24, 25 89:1, 7,
  13, 14, 17, 22, 23, 24, 25
  90:2, 7, 10 91:3 98:23, 25
  109:9 120:23 135:4
  140:16 157:21, 22 159:2
  164:25 242:5, 13
**districts** 89:3
**disturbance** 148:17
**DIVISION** 1:3 8:12 23:7
**divorce** 9:1 101:17, 20
  102:1, 2, 19, 25
**divorced** 8:20 101:22
  102:16
**dizzy** 247:7
**doctor** 27:17 112:18
  113:13 117:10 118:9
  240:10, 13 243:17 244:9
**doctors** 115:22 124:9
  246:11 247:17
**document** 124:24 141:16
  147:5 232:2
**documentation** 93:25
  100:5 132:17 142:5
  151:17 152:20, 24 156:19

Case: 1:18-cv-00814-DAP  Doc #: 71  Filed:  01/17/20  70 of 83.  PageID #: 1139

Deposition of Sergeant Dean Graziolli          Melissa Yatsko and Darian Allen vs. Sergeant Dean Graziolli, et al.,

234:8  235:1
**documented**  165:4
**documents**  15:24  19:5
32:16, 24  94:2  146:9, 24
**doing**  43:13  87:3  149:2
155:17  182:22  184:10, 19,
20  189:15  196:8, 17
199:4  225:23  240:7
243:4
**dole**  142:2
**doled**  190:18
**dollar**  86:23
**dollar-wise**  147:22, 23
**Don**  131:24, 25  132:22
**D'Onofrio**  117:12
**door**  149:6  150:22
172:16  182:21
**doubt**  96:5, 8
**doubts**  35:15
**Dr**  27:2, 7, 12, 15, 21  28:5
117:12, 19, 22  118:2
240:16  243:17
**drank**  119:2
**draw**  119:17  176:3
217:12
**drawing**  217:17, 20
**drew**  216:12, 14, 16, 22
217:1, 7, 10, 23
**drink**  122:20  170:18
**drinker**  119:4
**drinking**  99:10
**Drive**  28:8  245:6, 8
**driven**  245:1
**driver**  10:11
**driving**  188:15
**drove**  167:25
**drugs**  115:13  118:17, 22,
25  198:11
**drunk**  54:14
**duly**  7:7  252:8, 12
**duties**  90:13  95:22
116:20, 23  142:8  143:11,
16  155:15  156:15  242:5
**duty**  42:8  46:5, 5, 10, 13
51:5, 6, 8, 17  52:1, 11
78:13  79:4  83:5, 11  84:7,
9  85:2, 10  86:1, 3  90:25
94:9  95:19  115:3  122:12
125:11  126:18  128:10
133:16, 18, 23  154:10, 12,
16  155:10, 11, 14, 25
156:20, 23  158:21, 25
164:17  165:5, 13  166:6
170:7  235:6, 16
**duty,**  46:12

**< E >**
**earlier**  52:1  53:6  96:16
101:22  165:6  204:25

207:14  215:20  222:24
228:21  235:5
**early**  110:7  153:16
**East**  2:9  8:10  138:2
**EASTERN**  1:3
**eat**  122:20  166:20  171:4
238:11, 15  246:2
**eating**  171:6
**Eddie**  28:5
**edge**  38:10  182:17  191:4
196:16  198:15  205:19
206:6  207:4  223:10
**educate**  133:12
**effect**  37:4  65:4  91:19
188:9  207:3
**effectively**  92:18
**effects**  241:24
**effort**  185:10
**efforts**  32:22
**egress**  194:14
**eight**  116:16  129:4
178:22  243:23
**either**  20:21  23:22  32:2
40:15  119:17  120:7
129:3  147:14  159:19
184:22  186:23  195:25
198:13  202:14  203:6
253:2
**eject**  174:19
**ejected**  176:19  177:16
**elapsed**  229:7
**electronic**  135:1
**Electronically**  134:25
135:2
**eliminate**  57:13
**elliptical**  67:17
**e-mail**  16:17  31:13, 22
32:23
**e-mails**  31:16, 23  32:1, 7,
12, 16
**emergency**  163:20  244:16
**employee**  130:21  136:25
137:12  144:8  146:22
173:15, 23  175:23  179:23
181:14, 19  182:1
**employees**  139:23  142:15
144:13  150:15  157:24
162:2  168:19  170:4, 9
171:21  172:13, 19  178:3,
14
**employer**  105:17  129:20
**employment**  40:5, 10  41:2,
7, 13, 18, 21  42:1, 11  43:6,
11  44:1, 8, 18, 20  45:7, 19,
22  46:14  47:1, 11, 16
48:6, 13, 20, 23  71:25
78:15  95:5  115:6, 8
126:13  127:2, 7, 10, 14, 20
128:3  129:18, 19  130:15,
22  133:17, 20  134:5, 7, 10

135:16  136:2  141:8
145:8  152:23  153:24
156:12  165:25  169:1
207:16  236:22
**EMS**  30:7  227:19  228:11,
25
**encounter**  58:15  71:3
192:23
**ended**  184:10
**ends**  213:18
**engage**  193:12
**engaged**  42:1  180:23
193:17
**engaging**  95:9
**entail**  235:6
**entered**  35:5
**ENTERPRISES**  3:5
**entire**  44:19  124:22
150:7  213:8  239:11
**entrance**  159:19, 21, 25
182:21  192:24  196:25
**episode**  190:25
**equipment**  49:5  242:10,
11  243:5
**escalate**  73:6, 9
**escort**  179:24
**escorted**  176:6  177:24
178:4  228:7
**escorting**  191:7
**Esq**  2:6, 7, 8, 20  3:9, 20
4:5
**essentially**  10:20
**establish**  221:19
**establishment**  150:19
153:13  160:12  161:6, 11,
19  171:18  173:2, 13
174:21  175:11, 20  176:7,
10, 15, 19  177:17  179:24
181:21  182:3
**establishments**  127:18
249:3
**Estate**  1:7  107:13
**et**  1:11
**Euclid**  183:15  192:21
223:16
**Evacuation**  163:23
**evaluate**  92:14, 18, 22
**evaluation**  92:24
**evaluations**  93:1
**event**  253:4
**events**  189:4  202:2
**everybody**  169:9  242:9
249:23
**evidence**  230:8  233:14, 16
**exact**  107:4
**exactly**  35:25  50:3
138:19  152:16  174:3
**exam**  63:16  81:25
**examination**  1:18

135:16  136:2  141:8
**example**  133:17  158:3
**examples**  65:17
**exams**  82:2
**exchange**  77:10, 11  99:24
**Excuse**  180:15  242:16
**existed**  146:25
**exists**  249:6
**exit**  182:21  192:24
196:25
**expect**  120:14  209:24
241:3  244:3
**expectation**  244:6
**expected**  54:25  55:4
**experience**  131:4, 5
**expire**  75:13
**expired**  75:23  76:6
**expires**  253:14
**explain**  97:23  125:2
135:21  232:6
**explained**  11:13  121:16
208:6
**explanation**  121:18
**express**  178:15
**extend**  129:4
**extensive**  243:23
**extent**  226:24  228:11
**eye**  222:7

**< F >**
**face**  13:7  184:18  211:20
226:3  246:22
**faced**  47:3
**faces**  185:23
**facing**  182:18  183:2, 2
184:5  201:20, 23  237:18
**failed**  106:15  243:7
**failing**  94:12, 17
**fair**  24:25  31:3  35:8
38:18  39:6  46:20  47:7, 8
48:1  53:25  54:23, 24
55:6  56:3, 17, 18  92:11,
12  94:5  101:14  149:20
200:23  221:24  233:20, 21
**fall**  55:22
**falling**  109:19
**false**  84:5  85:2
**falsification**  82:24  83:15,
23  84:2  85:20  87:9
93:17
**falsifying**  82:25  83:4
84:1  94:8
**familiar**  48:15
**family**  77:16, 20, 23  78:8
117:6  121:24  131:1
243:9
**far**  18:24  19:3  88:13
104:8  132:9  178:21
203:21

Deposition of Sergeant Dean Graziolli                    Melissa Yatsko and Darian Allen vs. Sergeant Dean Graziolli, et al.,

**father**  121:*19, 22, 25*
    122:*8, 11, 25*  123:*9*  124:*1,*
    *7*  125:*11*  246:*3, 4*
**father's**  121:*20*
**fcarson@fbtlaw.com**  4:*10*
**February**  244:*10*
**fed**  209:*14*
**feel**  50:*25*  53:*17*  57:*3*
    64:*13*  66:*21*  67:*1, 3*
    120:*11*  178:*9, 12*  209:*18,*
    *20*  238:*7, 8*  246:*16*  247:*7*
**feeling**  125:*15, 17, 21*
**feet**  178:*22*  188:*25*
**fell**  109:*20*
**fellow**  77:*17*
**felonious**  189:*24*  190:*2,*
    *13*  232:*1, 10, 16*  233:*10,*
    *11*  234:*5, 7, 13*
**felt**  220:*5*
**fenced**  192:*25*
**Field**  127:*22*
**Fifth**  89:*1, 6*  90:*7*  199:*3,*
    *17*  200:*11*  201:*1, 18*
    203:*25*  204:*4*  242:*13*
**fight**  76:*19*  77:*9, 14*
    96:*19*  97:*5*  171:*24, 25*
    172:*3*  173:*16*  175:*13, 23,*
    *24*  177:*2, 23*  178:*3*
    180:*22, 23*  181:*2, 4, 25*
    182:*1*  183:*18*  184:*9, 11,*
    *13*  187:*8, 11*  189:*5*  207:*1*
    208:*17*  212:*20*
**fighting**  108:*25*  172:*3*
    180:*22*  183:*15*
**fights**  96:*17*  148:*12*
    149:*12*
**figure**  249:*22*
**file**  55:*20*  56:*4*  95:*16*
    101:*2*  113:*18*  124:*4*
    151:*20*  248:*11*
**filed**  101:*20, 25*  102:*1*
    104:*18*  105:*9, 16, 22*
    106:*1*  107:*17, 20*  111:*21*
    113:*21*  131:*9*  235:*24*
    236:*17, 19*  237:*6*
**filing**  102:*25*  105:*20*
**fill**  40:*12, 13*  84:*9*
**filled**  138:*17*
**finalized**  102:*22*
**Financed**  106:*25*
**find**  84:*15*  111:*3*  134:*9*
    135:*8*  154:*25*  156:*22*
    242:*17*
**finds**  35:*3*
**fine**  34:*18*  57:*10*  86:*24*
    250:*17*
**fingerprints**  230:*10*
**fingers**  108:*18*
**finish**  12:*4*  171:*3*

**finished**  203:*12*
**finishing**  166:*25*
**fire**  227:*19*
**firearm**  68:*20*  69:*1*
    71:*19*  119:*14, 18*  145:*11*
    149:*15, 19, 25*  150:*16, 25*
    151:*8*  220:*4, 6, 10*
**firearms**  43:*10*
**fired**  154:*3*
**first**  7:*7*  8:*22*  20:*3*
    25:*12*  26:*17*  74:*3, 6, 8*
    75:*16, 22*  76:*2, 10*  81:*19*
    82:*3*  89:*16, 18*  101:*21*
    102:*24*  125:*6*  127:*1*
    152:*6*  159:*15*  160:*24*
    163:*8, 14, 17*  166:*8*
    170:*13*  171:*7*  172:*7*
    173:*2*  178:*6*  208:*17*
    223:*21*  225:*19*  226:*18*
    252:*11*
**fist**  186:*2*
**fists**  184:*24*  185:*24, 25*
    218:*16*
**fitness**  80:*21*
**Five**  8:*13*  42:*21*  67:*11*
    89:*5*  123:*20*  157:*21, 22*
    159:*2*  215:*13*  220:*13*
    242:*14*
**floor**  159:*9, 11, 12, 16*
    160:*25, 25*
**focus**  226:*25*
**folder**  134:*24*
**folks**  224:*19*  226:*1*
    227:*20*
**follow**  22:*4*  32:*21*  48:*23*
    71:*25*  90:*22*  178:*21*
    247:*19*
**followed**  173:*23*  178:*20*
**following**  34:*4*  48:*18*
    85:*13*  129:*12*  203:*1*
    245:*14, 14, 18*
**follows**  7:*8*
**follow-up**  119:*6*  200:*18*
    249:*15*
**food**  144:*10, 11*  170:*23*
    246:*1, 5*
**foot**  109:*1*
**footage**  161:*5*  220:*24*
**FOP**  17:*21, 22, 23*  25:*11,*
    *12*  26:*2, 3, 17*  100:*23*
    140:*17*  245:*1*  249:*8*
**force**  42:*24*  48:*24*  57:*13*
    58:*8, 16*  60:*17*  62:*18, 21,*
    *23*  63:*10*  64:*8, 12, 23, 25*
    65:*14, 15*  66:*5*  68:*10*
    69:*7, 10, 15, 17*  70:*2, 6, 18*
    71:*8, 10*  72:*1*  94:*13*
    95:*11*  96:*13*  158:*5, 7*
    231:*3, 9, 10, 13, 14, 19*

**foregoing**  252:*18, 23*
**Forget**  188:*17*
**form**  40:*11*  41:*4, 10*
    45:*12*  46:*8, 18*  50:*12*
    58:*10*  59:*20*  70:*14, 21*
    144:*23*  145:*14*  156:*17*
    205:*21*  207:*21*  213:*16*
    214:*20*  248:*7*
**formal**  93:*1, 5*  133:*8*
**format**  16:*17*  40:*11*  48:*1,*
    *8, 9*  63:*1*
**forms**  132:*15*  231:*13*
**forth**  172:*12*
**fortunate**  108:*1*
**forward**  86:*4*  90:*21*
    128:*19*
**forwarded**  40:*19*
**found**  135:*18*  136:*4*
**foundation**  41:*10*  58:*10*
    59:*20*  214:*20*  248:*7*
**four**  101:*17, 18, 19*
    110:*24*  169:*6*  203:*21*
**FOURTH**  3:*2*  89:*14, 17*
    120:*23*
**fracture**  116:*5, 11*  117:*1*
**fractured**  116:*2*
**frame**  27:*18*  85:*4*  128:*5*
    166:*1*  245:*24*
**frames**  28:*18*
**Frank**  4:*5*
**Franklin**  19:*14, 16*  27:*3, 8,*
    *12, 15, 21*
**freezing**  168:*7*
**frequently**  28:*19*
**Friday**  156:*4*
**friend**  170:*15*  173:*3, 13*
    174:*4*  178:*12*  194:*22*
**friends**  131:*1*  180:*16, 20,*
    *22, 23, 24*  243:*9*
**friends,**  180:*18*
**front**  36:*7*  37:*11, 21*
    60:*12*  149:*5*  150:*22*
    159:*19, 20, 24*  160:*3*
    170:*22*  172:*16*  182:*19*
    192:*17*  221:*12*
**Frost**  4:*4*
**Fuck**  188:*9*  189:*12*  206:*8,*
    *13*  209:*6*
**fucking**  188:*17*
**fulfill**  45:*8*  46:*15, 24*
**full**  7:*14*  165:*7*
**fully**  106:*15*  204:*20*
**Fulton**  99:*6*
**funny**  180:*19*
**further**  194:*15*  252:*21*
    253:*1*
**future**  243:*18*  244:*4*

**< G >**

**gain**  65:*7*
**Garner**  3:*8*
**gear**  242:*6*
**general**  33:*18, 19*  36:*3*
    63:*12, 17*  69:*23*  70:*8*
    150:*10*  195:*17*
**Generally**  72:*11*  129:*7*
**generated**  90:*18*
**generating**  90:*19*
**gentlemen**  106:*13*
**George**  4:*13*  111:*11, 12*
    120:*5, 6*  121:*8, 8, 11, 15*
    122:*7*  236:*11, 12*
**Gerald**  26:*18*
**gestures**  187:*16*
**getting**  58:*24*  59:*2, 10*
    109:*4*  122:*19*  170:*21*
    171:*5*  172:*7*  185:*24*
    186:*1*  219:*10*
**girls**  110:*16*
**give**  20:*16, 20*  27:*13, 18*
    28:*1, 2*  47:*22*  50:*1*  55:*18*
    57:*6*  63:*11, 14, 15*  91:*25*
    102:*10*  103:*7*  121:*3*
    126:*1, 4*  128:*7*  137:*24*
    140:*8, 9*  155:*19*  158:*3*
    192:*9*  242:*4, 14*  243:*24*
    245:*15*  247:*22*  249:*13*
**given**  28:*21, 23, 25*  56:*21*
    58:*11, 17*  60:*7*  63:*2*  64:*3*
    67:*4*  87:*2*  92:*1, 7*  94:*11*
    95:*9*  96:*1, 11*  102:*9*
    121:*14*  127:*13*  128:*1*
    136:*11*  142:*11, 18, 20*
    147:*4*  151:*6*  208:*10*
    218:*23*  219:*1*  240:*22*
    243:*17*  252:*15, 19*
**giving**  17:*10*  61:*2*  141:*18*
    176:*18*
**glasses**  13:*13, 17, 20, 22*
**globs**  226:*6*
**Glock**  43:*17*
**gmail**  32:*10*
**go**  11:*18*  30:*4*  36:*10*
    38:*13, 24*  39:*4*  60:*20*
    63:*17*  64:*1*  67:*9*  68:*5*
    80:*3, 7*  94:*1*  97:*16*
    101:*16*  117:*9*  121:*15, 16,*
    *17*  122:*10*  123:*8, 14*
    125:*9*  129:*4, 17, 22*  131:*1*
    137:*8*  154:*4*  159:*12*
    166:*7, 17*  169:*2, 7*  171:*10*
    178:*19*  191:*12*  192:*3*
    194:*3, 18*  196:*13*  202:*19*
    206:*7*  210:*7*  223:*8*
    237:*24*  241:*19*  243:*20*
    244:*7, 8, 9*  246:*5*  249:*21*
    250:*21*
**goes**  40:*22, 23*  158:*8*
    189:*6*  242:*20*

Deposition of Sergeant Dean Grazziolli    Melissa Yatsko and Darian Allen vs. Sergeant Dean Grazziolli, et al.,

**going** 11:*18* 12:*13* 20:*7*
  24:*13* 34:*9*, *17* 36:*16*
  37:*1* 60:*20* 63:*19* 91:*14*,
  *15* 97:*15* 112:*13* 119:*22*
  124:*17* 125:*10* 128:*19*
  152:*1* 154:*8* 156:*14*
  158:*19* 164:*10* 168:*22*
  172:*8*, *9* 173:*7* 184:*2*, *5*, *7*,
  *8*, *8* 186:*6* 190:*21* 191:*12*
  192:*11* 193:*6* 194:*8*
  198:*23* 203:*20* 208:*3*, *4*
  210:*1*, *13* 212:*6* 214:*25*
  216:*3*, *4* 218:*13*, *15*, *17*
  221:*2*, *3* 223:*8* 224:*1*
  227:*6* 239:*11*, *12* 242:*8*,
  *15* 243:*21* 248:*19*
**Good** 7:*12*, *13* 34:*16*
  76:*5* 203:*14* 233:*18*
**gotten** 133:*8* 230:*17*
**govern** 48:*5*
**grab** 197:*18*
**grabbing** 210:*16*
**GRAZIOLLI** 1:*10*, *16*
  2:*18* 7:*5*, *10*, *16* 123:*3*
  203:*17*, *20* 252:*11*
**great** 133:*3*
**GREETING** 203:*3*
**grievance** 101:*2* 248:*11*
**ground** 11:*13*, *18* 168:*13*
  184:*17* 222:*14* 223:*4*, *5*
  224:*4*
**GROUP** 3:*6* 125:*3*
  176:*12*, *23* 224:*9*, *10*, *11*
  226:*1*
**guard** 133:*6*, *9*, *13* 249:*2*
**guess** 31:*2* 35:*13*, *14*
  38:*8* 45:*13* 54:*8* 59:*7*
  65:*22* 162:*7* 175:*16*, *16*
  182:*20* 192:*5* 199:*16*
  214:*11* 231:*12* 233:*12*
  235:*21* 238:*4* 249:*16*
**Guidelines** 146:*14*
**guilty** 82:*23* 83:*22*, *25*
  86:*10*, *25* 87:*8*
**gun** 39:*16*, *19* 43:*18* 52:*3*,
  *5* 53:*8*, *18*, *19*, *22*, *24* 63:*8*
  68:*14* 79:*7*, *13*, *20* 151:*4*
  186:*13*, *15* 212:*2*, *4*, *7*
  213:*20* 214:*3*, *4*, *7* 218:*1*
  222:*2*, *4*, *9*, *10* 225:*4*, *5*, *5*,
  *6* 229:*8*, *20*, *23* 230:*8*, *14*,
  *17*, *24*
**guy** 130:*23*, *25* 236:*12*
  242:*12*, *22*
**guys** 77:*10* 110:*16*
  138:*12* 169:*7*, *14* 175:*5*
  180:*17* 228:*1* 230:*4*
  250:*18*
**gym** 67:*9*, *20* 68:*1*, *6*

**< H >**
**habit** 53:*25* 54:*1*
**half** 122:*16* 221:*22*
**hand** 109:*19*, *21* 116:*13*
  163:*14* 184:*23*, *23* 185:*1*,
  *4*, *7*, *13*, *14*, *16* 195:*25*
  196:*3*, *5* 210:*19* 214:*4*, *7*
  215:*22* 217:*4* 222:*3*, *9*
  230:*14* 253:*6*
**handbooks** 146:*12*
**handcuffs** 44:*4*, *5*, *6* 52:*9*
  228:*4*
**handed** 230:*16*
**handheld** 164:*1*
**handles** 231:*16*
**hands** 173:*25* 176:*16*
  185:*13*
**Hands-on** 65:*23*, *24*, *25*
**hand-to-hand** 65:*23* 73:*20*
**hang** 203:*12*
**happen** 108:*22*
**happened** 19:*8* 22:*11*
  25:*17* 26:*13* 77:*6*, *9*
  96:*21* 99:*12* 107:*9*
  108:*23* 109:*2* 110:*4*, *22*
  114:*19* 125:*18* 126:*9*
  170:*14* 174:*3*, *15* 181:*1*
  200:*4*, *8*, *15* 202:*1* 225:*7*,
  *10* 226:*13* 227:*3* 229:*2*, *8*
  245:*19* 246:*12*
**happening** 58:*1* 182:*16*,
  *24* 183:*10*, *13*
**happens** 185:*22* 190:*25*
  192:*18*
**hard** 47:*24*, *24* 57:*23*, *24*
  176:*18* 213:*17* 234:*2*, *4*
**harm** 69:*12*
**harsh** 59:*11*
**head** 65:*21* 184:*17*
  211:*20* 226:*4* 239:*12*
  240:*23* 246:*21*
**headache** 247:*2*, *3*, *4*
**headquarters** 135:*4* 165:*1*
**heads** 177:*4*
**health** 28:*22*, *25* 29:*11*
  81:*1*, *5* 241:*17*, *20*
**healthcare** 124:*9*, *17*
**hear** 172:*17* 177:*15*, *19*,
  *22* 214:*2* 225:*5* 243:*11*
  248:*19*
**heard** 183:*21*
**hearing** 13:*25* 14:*3* 71:*5*
  100:*17* 208:*7*
**Heather** 240:*16*
**heavy** 50:*4*
**height** 215:*16*
**Heights** 2:*22* 68:*4*
**held** 230:*19*
**hello** 144:*9*

**help** 92:*5* 131:*6*, *12*
  188:*21* 189:*13* 192:*12*, *20*
  194:*22* 208:*25* 218:*22*, *23*,
  *25*
**helped** 132:*10* 188:*25*
  191:*1*
**helps** 158:*1*
**hemorrhage** 114:*2*
**hereinafter** 7:*7*
**hereunto** 253:*11*
**Herman** 123:*3*
**herniated** 113:*9*, *11*
**hesitate** 66:*23*
**high** 112:*22*, *24*, *25* 239:*18*
**hire** 80:*1* 144:*2* 162:*16*
**hired** 80:*3*, *9*, *11*
**hit** 104:*20* 110:*2* 114:*20*
  203:*13* 216:*24*, *25*
**hitting** 67:*19*
**Hmm-mm** 105:*25* 171:*11*
**hold** 236:*4*, *5*, *6*, *8*
**holds** 244:*4*
**holdup** 241:*5*
**hole** 127:*24*
**holster** 186:*16*
**home** 7:*19* 8:*1* 44:*24*
  79:*15*, *16* 82:*14* 83:*6*, *10*,
  *13*, *17* 84:*11* 85:*9* 119:*25*
  120:*9*, *16* 121:*15* 122:*8*,
  *10* 123:*8* 125:*10* 126:*7*
  166:*9*, *10* 167:*3* 208:*7*, *20*,
  *23* 209:*1*, *25* 244:*25* 245:*1*
**homicide** 157:*3*, *4*, *17*
  229:*22* 230:*20* 231:*16*, *21*
  232:*5*, *12*, *20*
**honestly** 108:*4* 134:*24*
**Honorable** 203:*5*
**hospital** 29:*23* 30:*6*, *14*,
  *18* 109:*7* 115:*15*, *18*
  118:*6* 244:*15* 246:*10*, *15*
  247:*14*, *17*
**hospitalized** 105:*6*
**Hospitals** 30:*2* 228:*15*
  244:*14*
**hour** 24:*15*, *21* 67:*21*
  122:*16*, *23* 243:*23*
**hours** 24:*18* 67:*22* 72:*18*
  90:*24* 92:*1* 128:*1*, *6*, *9*
  129:*1*, *4* 132:*19* 137:*20*
  138:*21* 152:*17*, *24* 153:*20*
  156:*1*, *3*, *5* 164:*21* 165:*14*
  203:*21* 205:*1*, *5* 244:*18*
**house** 84:*8* 106:*22*
  107:*11* 123:*10*, *11*, *12*, *14*,
  *17*, *23* 124:*20* 125:*23*, *24*
  166:*22* 245:*5*, *11*, *25* 246:*7*
**How'd** 136:*22*
**huge** 226:*8*
**Hulick** 2:*8*

**hundred** 32:*13*
**hundreds** 126:*17* 133:*18*
**Huron** 104:*24*

**< I >**
**ice** 168:*14* 170:*19*, *20*
  188:*16*
**ice-covered** 109:*18*
**icy** 109:*17*
**idea** 19:*8* 20:*12* 47:*23*
  75:*24* 76:*14* 110:*11*
  116:*7* 135:*17* 140:*11*
  148:*7*, *10* 161:*1* 162:*4*
  163:*9*, *10*, *15*, *19*, *22*, *24*
  166:*14* 174:*6*, *13*, *19*
  176:*22* 189:*17* 215:*10*
  216:*20* 218:*6*, *7*, *8*, *14*, *17*
  230:*9*, *12* 243:*18*
**identified** 25:*25* 27:*1*
**identify** 22:*7* 42:*16*
  64:*17* 186:*7* 189:*8* 221:*3*
**IDs** 148:*22*, *25*
**image** 221:*25*
**imminent** 69:*12*
**impair** 238:*22*
**important** 11:*25* 12:*23*,
  *25* 13:*1* 57:*22*
**impose** 145:*23*
**impression** 30:*21* 31:*5*
**improper** 95:*10*
**improvement** 241:*3*
**inbox** 31:*22*
**incident** 16:*5* 18:*13*, *21*
  21:*5* 22:*8*, *11* 23:*10*, *12*
  24:*24* 25:*6*, *21* 26:*1* 27:*4*,
  *10* 28:*22* 29:*10*, *17*, *20*
  31:*17*, *23* 32:*2*, *8*, *18* 33:*2*
  34:*2*, *6*, *12* 43:*14* 49:*4*
  53:*7* 56:*1* 58:*7* 61:*9*
  69:*4*, *22* 78:*12* 86:*16*
  88:*4* 89:*10* 93:*17* 94:*13*,
  *22* 98:*1*, *5* 100:*6* 101:*2*, *6*
  102:*20* 103:*2*, *22*, *25*
  107:*18*, *19* 108:*10*, *13*
  112:*15* 113:*2* 117:*14*
  118:*2*, *10*, *11*, *12*, *15* 119:*3*,
  *12*, *23* 149:*9* 154:*9* 156:*9*,
  *12* 157:*14* 158:*4*, *5*, *25*
  162:*1* 165:*18* 170:*14*
  171:*7*, *13*, *17* 182:*10*
  190:*5* 201:*7*, *20*, *22* 213:*5*
  214:*18* 215:*9* 229:*4*, *18*
  231:*4*, *14* 234:*18*, *22*
  235:*2* 236:*1* 241:*2* 243:*2*
  244:*14* 245:*19*
**incident,** 22:*8*
**incidents** 108:*16* 109:*24*
  110:*6*, *17* 148:*15* 158:*2*
  243:*6*, *8*

Case: 1:18-cv-00814-DAP  Doc #: 71  Filed: 01/17/20  73 of 83.  PageID #: 1142

Deposition of Sergeant Dean Grazialli                    Melissa Yatsko and Darian Allen vs. Sergeant Dean Grazialli, et al.,

**included** 37:10
**includes** 26:2 37:7
**including** 38:5 203:8
**income** 106:8, 16 127:12
130:14 132:13
**incompetency** 95:21
**indemnify** 248:4
**independent** 130:22
**INDEX** 5:1
**INDIANA** 4:2
**indicate** 83:4 84:10
**indicating** 238:17
**individual** 52:17, 21, 24
59:18, 25 60:6 61:24
65:8 71:11, 20 72:23
103:10 109:15 131:22
172:13, 18, 21 173:1
178:7 207:17 242:11
**individuals** 23:10, 21
25:24 29:14 54:23 55:1
62:1 64:21 174:20
178:16
**inefficiency** 95:21
**influence** 198:10
**informal** 138:18
**information** 94:3 124:25
147:11 148:1
**informed** 171:21 204:22
**initial** 233:23 244:24
**Initially** 27:5 229:13
**initiated** 212:16
**injured** 10:9 108:2, 17
109:21, 24 110:18 224:13,
16
**injuries** 105:2 108:9
189:25 226:24 228:12
237:10
**injuring** 109:19
**injury** 10:6 105:3, 5
109:12 111:18 115:23
**innocent** 97:14, 21, 24
174:12
**in-service** 72:12, 14, 20
**inside** 37:7 38:4, 13, 24
39:4 43:22 135:4 143:6
150:8, 25 161:8 170:14
171:7, 17 173:10, 12
175:11 178:23, 24 181:13
182:16 183:18 190:7
193:24 194:4, 9, 18
196:13 207:1 210:7
219:4 228:13 237:21
238:3
**insignia** 42:14
**instance** 214:22
**instigate** 97:5
**instinct** 214:10 218:5
**instructed** 231:7
**instructor** 56:19

**INSURANCE** 4:1 241:17,
20 249:1, 6
**intend** 248:14
**intent** 64:22
**intention** 217:17, 20
**interact** 36:20 37:3
39:19 144:7 194:24
196:12
**interacted** 36:6, 18, 24
38:9 39:12 195:15
197:21
**interacting** 38:22 59:17
60:5 64:19 197:16
208:16
**interaction** 15:17 195:3
197:5
**interactive** 48:8
**interest** 21:14
**interested** 137:5 253:3
**intermediate** 53:9, 12
73:10 145:20 219:18, 21
**Internal** 22:18, 20 23:6
234:11
**interpret** 149:22 232:25
233:3
**interpreted** 232:23 233:4
**interrogatories** 21:21
22:1, 6
**interrogatory** 25:25 31:13
126:15 133:15
**intervene** 184:8, 11, 12, 25
**intervened** 187:8, 11
**interview** 17:5 19:1
20:11 24:1, 9, 11 25:3, 10,
17, 19 26:5, 13, 19, 22
151:12
**interviewed** 16:3, 8, 10, 24
29:19, 22 232:13 234:10
**inventory** 242:6
**investigate** 94:12
**investigated** 125:4
**investigating** 10:16 95:10
**investigation** 17:1, 2 19:2,
6, 10, 13 82:11, 13, 16, 19
84:14 85:12 95:14 120:8
155:12 158:19 198:25
199:12, 13 204:23 234:17
235:14
**investigative** 82:11 90:22
119:23 126:10 233:24
**investigators** 22:19, 21, 24
23:21 25:9
**INVESTMENT** 3:6
**invoke** 200:10
**invoked** 203:25 204:18
**invoking** 199:3 200:25
**involved** 54:11 76:18
96:12 101:12 106:12
109:14 114:22 119:10
135:22 158:2, 6 227:11, 21

**Involving** 22:14 72:22
89:10 94:13 108:12
**inward** 183:2
**issue** 62:6 85:1 91:8
130:8 163:25 168:25
202:9 203:24 237:14
**issued** 43:10, 19 49:5, 8,
20, 23 51:23 64:9 72:1
101:1 130:4 153:4
230:24 242:6
**issues** 53:14 113:1
121:23 169:22
**Issuing** 66:13
**it,** 138:16
**items** 44:7, 23 51:21
**its** 82:19 142:15

**< J >**
**jacket** 50:4, 4, 5 173:7
183:24
**James** 155:22
**January** 1:22 8:2 16:5
18:14, 21 22:12 33:17
34:4 35:9 40:2 41:22
43:5 44:9 76:20 80:2, 14
102:21 112:15 113:9, 24
118:20 128:23 149:10
153:25 162:1 166:3
193:23
**Jason** 23:2
**Jeremy** 2:7 169:21
203:15 248:18
**Jerry** 25:13
**job** 35:12, 16, 21, 25 36:8
38:3 39:2 53:20 54:10
93:8 108:10, 17 109:25
110:18 134:10 135:7, 12,
13, 19, 21 136:4, 8, 10, 22
144:18 145:12 151:15
152:5 162:17 166:4
167:1 170:9 238:23
**jobs** 127:23 130:15
132:12 141:2
**joking** 242:19
**jtor@spanglaw.com** 2:13
**Judge** 1:9 199:24 200:4
202:24
**judge's** 200:14
**judgment** 35:5
**July** 88:2
**jump** 244:13
**June** 89:9 90:7
**jury** 35:2
**Justice** 23:14

**< K >**
**Kavlich** 117:19, 22 118:2
**keep** 34:16 38:12 79:13
132:17, 23, 25 141:15

214:14 222:6 229:9
**keeping** 226:25
**kept** 115:21 153:2
**Kevin** 2:8
**khulick@spanglaw.com**
2:14
**kicked** 149:8 214:18, 21
**kicking** 184:18
**kid** 172:7, 8 185:9 188:4
194:1 217:22 219:10
220:2
**kids** 161:20
**kill** 216:3, 5, 7 217:6, 9,
15, 18 218:10, 10, 11, 13
232:5
**kind** 29:11 48:8 51:25
63:14 72:4 82:4, 15
92:10 98:7 115:5 116:5
136:6 151:12 183:4
225:6 235:6, 18 238:2
239:10 245:17 247:21, 24
**kinds** 127:23
**kit** 163:18
**knew** 193:25 226:13
**knocked** 97:3 247:10
**know** 20:9 21:10 23:20
24:19 28:2, 18 31:7
32:10, 13, 15, 19 33:25
40:16 42:20, 23 47:2
50:21, 23 51:2, 19 55:7
56:9, 11, 12, 14, 23 58:2
60:11 65:22, 22 67:6, 21
68:7 70:22, 22 72:20
73:7 75:20 76:3, 4, 6, 7, 8,
12, 16, 17 83:19, 20 84:17
85:8 88:22 90:23 95:24
97:8, 16, 17 98:21, 25
99:2, 8 100:12, 13, 14, 16
101:15 102:3, 4 103:5, 12
105:6, 8 107:4, 11 108:3,
4, 5, 7, 19 109:1, 3 110:3,
7 111:5 113:11 114:2
115:18 116:13, 16, 17
117:21 118:1 119:16, 19
122:3 124:13, 16, 22
125:20 126:1 127:16
130:23 131:4 132:16, 21
133:2 134:2 135:17, 18
137:1, 20 138:20 140:20,
23, 25 141:20 144:9, 15,
20, 24 146:24 147:1
148:20 151:22, 24 152:14,
17 153:15 154:7 155:3, 5
156:14, 18 157:23 158:10,
11 159:10 160:20, 24
161:2, 5, 8, 13 163:13
164:12 165:10 166:11
167:19 168:8, 17 169:10
170:3, 6, 9 174:3, 8, 11, 19,
25 175:1, 21, 22, 23, 24, 25

Case: 1:18-cv-00814-DAP Doc #: 71 Filed: 01/17/20 74 of 83. PageID #: 1143

Deposition of Sergeant Dean Graziolli     Melissa Yatsko and Darian Allen vs. Sergeant Dean Graziolli, et al.,

176:9  181:*1, 3, 6, 22, 22*
183:*4*  185:6  187:*1*  210:*1,*
*20, 21, 22*  211:*16*  214:*10,*
*11, 16*  216:*18*  219:*8*
221:*17*  223:*16*  225:*7, 16*
226:*4, 7, 8, 24*  227:*3, 3, 4,*
*10, 20*  228:*2, 23*  229:*6, 18*
230:*19, 22, 23*  231:*15*
232:*22*  233:*3, 5, 6, 15, 16*
236:*5, 7, 8*  237:*4, 9, 22*
238:*1, 15, 20*  240:*4*
242:*14, 21*  243:*8, 12, 21,*
*24*  245:*15, 16*  246:*18, 21*
248:*16, 21*
**knowledge**  121:*7, 10*
124:*11*  148:*13, 20*  154:*6*
179:*20, 21*  195:*24*  196:*1*
230:*12*  237:*2*
**knowledgeable**  64:*7*
**Kristine**  8:*23*  101:*21*

**< L >**
**lady**  183:*14*
**Lakeside**  1:*24*  2:*9*  3:*21*
**Lambo**  131:*24, 25*  132:*22*
**L-A-M-B-O**  131:*25*
**landed**  216:*22*
**Lanett**  9:*4*  102:*16*
**language**  58:*20*  210:*25*
**large**  108:*24*  176:*12*
224:*9*
**larger**  227:*21*
**Law**  3:*19*
**lawful**  7:*6*  65:*2, 4, 5*
**lawsuit**  9:*14*  104:*3, 16, 18*
105:*9, 17, 22, 22*  106:*19*
113:*18*  203:*25*  248:*5*
**lawsuits**  101:*13*
**lawyer**  11:*12, 14, 16*
14:*17, 20, 25*  84:*24*
100:*21*  104:*16*  111:*7, 10*
126:*16*  201:*4, 9*
**lawyers**  12:*15*  111:*10*
201:*12*  204:*6*  221:*1*
250:*9*
**lax**  44:*14, 15*  53:*13*
**laying**  240:*5*
**layout**  147:*4, 5*  159:*5*
**lead**  82:*15*
**leading**  202:*2*
**learn**  92:*21*  171:*20*
**learned**  93:*7*  152:*4*
**leave**  121:*24, 24*  122:*21*
203:*7*  206:*19*  210:*3*
246:*7*
**leaving**  178:*10*  205:*18*
250:*10*
**led**  198:*12*
**left**  116:*3*  185:*5*  230:*5*

239:*5*  240:*9*
**leg**  66:*3*
**legal**  168:*25*  199:*8, 14*
**legally**  35:*4*
**Leneghan**  2:*20*  5:*15, 22*
11:*17*  17:*16*  70:*20*
202:*10*  204:*13, 14*  250:*16*
**leneghanlaw@yahoo.com**
2:*24*
**lethal**  231:*12, 13, 18*
**letter**  40:*14*
**level**  59:*17*  60:*17*
**liability**  18:*13*
**Liber**  1:*23*  2:*5*
**license**  117:*8, 20, 23*
**licensed**  180:*6*
**Lieutenant**  22:*25*  25:*13*
26:*18*  120:*3, 4, 6*  121:*8,*
*11, 15*  122:*7*  135:*9, 15*
136:*5, 12, 23*  137:*15, 16*
139:*25*  140:*7, 10*  141:*2,*
*25*  152:*5, 13, 14*  154:*22*
155:*18, 21*  156:*25*  157:*5,*
*6, 14*  179:*19*
**life**  220:*11*
**LifeWorks**  68:*2*
**lift**  67:*13, 18*
**light**  215:*2*
**likelihood**  58:*8*
**likewise**  75:*17*
**limitations**  142:*18*
**LIMITED**  3:*2*
**LINE**  5:*2*  6:*1*
**lines**  72:*12*  244:*1*
**lip**  237:*21*
**list**  242:*17*
**listed**  237:*12*
**litigation**  202:*6*
**little**  10:*14*  17:*9*  18:*9*
24:*13*  53:*13*  79:*23*
116:*14*  122:*16*  125:*12*
128:*12*  136:*1*  170:*16*
223:*8*
**live**  48:*8*  123:*4, 6, 9, 19*
238:*21*
**lived**  7:*22*
**lives**  7:*24*  123:*5*
**living**  8:*6*  123:*11*
**LLC**  3:*3, 4, 5, 6, 8*  4:*4*
9:*22*
**LLP**  1:*24*  2:*5*
**Loan**  106:*19*
**located**  68:*3*  131:*20*
160:*11, 16, 22*  161:*3*
**location**  39:*9*  138:*2, 10*
139:*7*  142:*24*  164:*6*
172:*2*  223:*1*
**long**  7:*22*  24:*11*  49:*12,*
*15, 17*  50:*20*  56:*10*  72:*14*
73:*24*  80:*16*  99:*13*  100:*3*

116:*15, 17, 17*  122:*14*
125:*9, 10*  169:*8*  194:*24*
216:*16*  229:*6*  236:*5, 8*
249:*10*
**longer**  24:*14, 17, 20*  99:*9*
101:*9*  122:*22*  125:*12*
154:*14*
**long-term**  105:*8*
**look**  31:*21*  34:*10*  64:*6*
101:*19*  161:*21*  186:*5*
188:*13*  221:*6*  224:*15*
**looked**  87:*18, 19*  127:*16*
161:*20*  165:*22*
**looking**  183:*4, 6, 6*  208:*22*
221:*10*  222:*19*  223:*1*
**looks**  95:*3*  101:*25*  106:*18*
223:*11, 11*
**loose**  247:*11*
**Lost**  114:*20*
**lot**  108:*2*  126:*22*  141:*9*
168:*14*  201:*14*  225:*14, 15,*
*16, 16*  240:*4*  243:*8*  246:*22*
**lower**  237:*21*
**lucky**  220:*3*
**lying**  13:*4*

**< M >**
**magazines**  43:*18, 22*
**main**  207:*13*
**maintain**  156:*1*
**majority**  91:*2*
**making**  202:*24*  242:*9*
**maliciously**  215:*5*
**man**  37:*3*
**management**  55:*5*  199:*23*
**manager**  170:*6*
**manager's**  161:*2*
**manner**  55:*2*  62:*2*
144:*21*  145:*7*  202:*11*
**manual**  146:*22*
**March**  253:*7*
**markings**  50:*2*
**marriage**  8:*22*  9:*3*
**married**  8:*14, 16*  9:*5*
**marry**  8:*24*
**martial**  73:*18*
**material**  56:*21*  64:*3*
**materials**  133:*11*  235:*1*
**matter**  10:*23*  18:*6*  53:*19,*
*24*  77:*7*  82:*22*  84:*21*
86:*21*  100:*18*  125:*4*
199:*13*  203:*16*  236:*10*
237:*18*
**matters**  103:*16*
**McDuffie**  15:*3*
**me,**  217:*10*  218:*10*
242:*16, 18*
**mean**  17:*25, 25*  36:*15*
49:*15*  55:*23*  56:*25*  59:*4*
72:*19*  87:*10*  92:*24*  97:*16*

107:*10*  116:*12*  124:*14*
127:*21*  141:*4*  147:*18*
153:*18*  155:*16*  158:*17*
160:*4*  175:*17*  176:*24*
180:*21*  198:*12*  208:*11*
214:*23, 24*  232:*7*  233:*11,*
*12*  234:*1*  243:*1*  245:*19, 20*
**meaning**  133:*23*  243:*13*
**means**  23:*23*  76:*6*
**meant**  180:*24*  248:*1*
**med**  226:*10*
**medical**  98:*4, 7*  109:*4*
112:*16*  113:*1, 25*  148:*15*
192:*4*  193:*10*  194:*2, 5*
226:*10, 17*  235:*7, 10, 18,*
*22*  238:*18*  247:*23*
**medication**  14:*6, 9*  112:*21,*
*23*  117:*17*  118:*15, 16*
239:*19, 20*  240:*23, 24*
**meet**  14:*17, 19*  104:*25, 25*
**meeting**  14:*25*  162:*13*
**MELISSA**  1:*5*
**member**  77:*16, 20, 23*
78:*8*  96:*13*  100:*23*  249:*8,*
*10*
**members**  95:*11*
**memory**  14:*7*  132:*25*
213:*6, 8, 19, 22, 25*  242:*2*
243:*15*
**memory's**  243:*7*
**Memos**  146:*16*
**Memphis**  99:*6*  114:*15*
**mental**  28:*21, 25*  29:*11*
80:*21*  81:*1, 5*
**mention**  96:*18*
**mentioned**  50:*14*  52:*4*
**message**  203:*8, 11*  204:*12*
**messages**  33:*17, 22*  34:*1,*
*5, 10, 12*
**met**  14:*18*  27:*12*  192:*19*
**Metro**  98:*14, 14*  115:*19*
117:*9*  240:*17*  244:*12*
**Michael**  3:*20*
**middle**  183:*15, 16*  203:*18*
239:*10*
**Middleburg**  68:*4*
**migraine**  240:*24*
**migraines**  240:*25*
**Mike**  242:*24*
**mind**  44:*15*  47:*7*  132:*23*
143:*15*  175:*18*  235:*19*
**mine**  51:*12*
**Mineff**  111:*11, 13*  236:*11,*
*12*
**minimize**  60:*17*
**minute**  220:*13*
**minutes**  56:*13*  61:*18*
101:*10*  112:*2*  177:*7, 11,*
*13*  216:*19*  249:*13*

Case: 1:18-cv-00814-DAP  Doc #: 71  Filed:  01/17/20  75 of 83.  PageID #: 1144

Deposition of Sergeant Dean Graziolli                    Melissa Yatsko and Darian Allen vs. Sergeant Dean Graziolli, et al.,

misdemeanor  82:23
missing  116:9
Mm-hmm  12:3  54:15
199:25
mobility  239:5
model  43:17
moment  37:2  169:4
197:10, 15  250:8
moments  124:22  229:6
Monday  82:12  86:6
93:17  119:22  121:1
126:10  129:11  156:4
165:9  245:14, 14, 18
money  104:4  105:10, 11
127:11  140:8, 21  141:15,
17, 18
monitor  159:20
monitoring  159:18, 24
monitors  160:21
month  17:11
monthly  106:14  137:18
months  80:18  86:23
103:6
mortgage  106:23  107:3
motions  202:15
motivated  38:11, 15
Mountain  170:21  171:5
mouth  134:11  135:6
191:18  237:15  238:4
move  164:11  194:21
moved  164:7
Moving  61:20  164:9

mpike@city.cleveland.oh.us
3:24
MRN  3:4, 5, 6
multiple  47:22  63:11, 15
211:18  216:23, 25  223:6
murder  233:12
muscle  239:21, 22, 24
240:18
muscular  215:19
Myers  28:5

< N >
nail  92:3
name  7:14  23:3, 5  98:15
99:8, 22  117:12  120:4
123:2  140:12  203:8
242:18, 21, 24, 25  243:21
named  9:17, 22  34:23
35:1  103:17
names  22:23  30:12, 13
40:13  144:13, 15
nasty  187:23  188:1, 4
National  242:7
nature  84:4  193:16  215:1
nauseous  246:16
ndicello@spanglaw.com

Near  182:18  197:14
206:6
necessarily  39:25  59:8
91:22  124:18  141:9
235:17
necessary  38:6  46:1  69:8
93:11  151:4  186:20, 21
neck  237:13  238:25
239:4, 10, 11, 13  240:8, 14,
19, 21, 22, 23  241:4
need  12:11  18:1  32:15,
19  34:9  37:2  53:17
57:13  58:16  169:8
194:21, 22  206:7  209:6
241:13
needed  92:8  192:3
225:24  226:13  240:1
needs  90:22  206:18
226:9, 11
neglect  95:19
neighbor  77:16  78:10
neighborhood  78:1
neither  130:10, 11
never  21:13  44:12  122:4
127:16, 16  135:2  147:11,
25  151:12  152:20  161:20
162:18  178:8  187:15, 19
191:21  196:2, 4, 6  197:12
208:2  231:7  232:13
new  55:14, 16
newer  138:12
Nicholas  2:6
Nick  248:22
night  21:5  39:9  49:7
53:6  99:10  114:25
128:21  150:9  162:1, 6, 9
163:21  164:8, 18  167:1,
19  168:4  179:13  196:2
202:1  229:10  244:25
nightclub  77:3
Nobody's  167:4
Nodding  34:15  126:20
177:4  221:5
no-firearm  79:11  150:19
noncompliant  54:12, 17
65:8  72:22
non-deadly  70:18  95:11
Nope  175:6
norm  129:8
normal  62:2  156:1, 15
normally  157:16
NORTHERN  1:2
Notary  1:19  252:7  253:12
notes  15:5, 8  249:14
notice  102:25  197:1
notifications  194:1
notify  36:15  152:12, 15
155:6
number  24:23  27:13
88:23  97:3  101:13

107:23, 24  108:4, 24
110:14  133:3  148:8
152:17  201:24  203:9, 17
205:4  212:10
numerous  27:14

< O >
o0o  1:14, 25  253:16
oath  12:18, 20, 23  13:4
20:12  23:25  204:19
object  150:16  201:9
204:14
objecting  177:15
OBJECTION  5:1  36:9
37:12  38:7  41:3, 9  45:11
46:7, 17  50:11  58:9
59:19  70:13, 20  144:22
145:2, 13  154:4  156:16
160:1  168:21, 23  205:20,
22  207:20  213:15  214:19
222:22  248:6
objective  65:2
objectives  38:21  57:11
objects  181:8
obligated  29:3
obligation  45:16
observe  45:17, 21  47:4
149:12  184:13, 15  195:15
observed  184:16  190:11,
13
observing  183:9  186:10
obtain  75:17  248:25
Obviously  42:17  52:3
108:20
occasions  93:21  141:11
occur  82:7  85:5  88:1
102:19  104:22  243:2
occurred  16:5  69:4  85:7
99:14  107:19  108:14
116:11  122:4  171:17
175:11, 13, 15, 19  181:2
occurring  189:19
o'clock  169:7
October  114:13
Ocwen  106:19
off-duty  96:12
offer  175:4
Office  16:4, 11, 21, 25
17:12  18:25  19:14, 16, 22
21:22  28:7  85:16  91:3,
16  161:2  230:21  253:6
officer  9:8  10:16  13:3
18:1  30:8  45:10  46:13,
25  50:16  51:3  53:4  54:7,
11  57:1  58:14, 19, 23
59:16  60:3, 16  62:5
64:11  65:1, 14  68:12, 18
70:1  71:2, 12, 20  72:5
73:3  74:2, 9  76:1  77:17
78:13  79:25  80:10  81:10

86:13  90:2  91:19, 22
94:7, 13  98:15  116:20
119:10  128:14, 15  133:24
139:6, 11  141:6  144:3
157:18  158:6, 12  164:17
169:10  180:7  186:8
189:9  192:1  203:22
204:24  205:17  207:15
227:10  228:8, 19  233:17
officers  31:7  41:8, 25
43:8, 24  58:6  64:17, 18
88:20  90:16  91:8  92:15,
19, 22  93:2, 10, 14  108:24
109:16  138:4, 6, 7, 9
140:3, 6  141:7, 13, 19
142:3  158:1  179:16
227:24, 25  231:9  244:20
offices  1:23  23:15
official  45:9, 23  46:6, 15,
23
Oh  44:5  103:5  104:20,
22  107:2  110:14  140:18
157:2, 23  158:20  169:3
242:25, 25
OHIO  1:2, 20, 24  2:10, 22
3:11, 22  4:8  7:20  106:1
118:5  180:4  233:19
252:3, 8  253:7, 13
Okay  10:14  11:1, 18, 20,
23, 24  12:4, 5, 8, 11, 12, 15,
16, 23  13:1, 19, 22, 25
14:13, 19  18:5, 9, 19  19:4
21:21  22:4, 11  24:8, 20
25:24  28:3  32:4, 10, 15,
18, 19, 20, 24, 25  33:16
34:8, 12, 13, 14, 19, 20, 25
35:6, 7, 12  36:25  37:6, 20
38:1, 9  40:1  42:13  43:4
47:18  48:1, 15  51:8
52:10, 23  54:10, 25  55:23
57:9, 15  58:4, 13, 19
59:14  60:8, 13, 20, 23, 24
61:4  62:17, 18, 19  63:7
64:16  65:17  68:10, 11, 17,
22  70:7  72:4  73:12
75:16, 25  76:8, 13  77:4
78:24  79:13, 17, 23  80:6,
12, 16  84:23  85:24  87:8,
14  89:21  91:11, 25  92:10,
21  93:4, 25  94:4, 22  95:3,
8  96:5, 16, 21  97:23
100:20  101:16, 25  102:9
103:7, 24  104:8, 22  108:8
109:23  110:17, 25  111:6
113:25  114:11  120:2, 11,
14, 22  122:6, 22  126:12,
13, 14  129:17  130:6, 8
132:9, 12  136:1, 17  137:3
138:3, 9  139:18  143:15
148:5, 17  150:6, 12, 21

Case: 1:18-cv-00814-DAP  Doc #: 71  Filed: 01/17/20  76 of 83.  PageID #: 1145

Deposition of Sergeant Dean Grazioli                    Melissa Yatsko and Darian Allen vs. Sergeant Dean Grazioli, et al.,

152:*10* 154:*2* 155:*5, 9*
157:*19* 158:*16* 159:*8*
161:*5, 14, 22* 168:*13*
173:*1, 5* 177:*23* 180:*5*
181:*14* 185:*22* 189:*1, 4,
15* 192:*14* 198:*7, 21*
199:*3, 7, 19, 20, 22* 200:*21,
25* 201:*12* 206:*2* 210:*12*
221:*4, 6, 10, 18, 24* 222:*6,
8* 223:*18* 224:*1* 225:*9, 10*
226:*21* 232:*19, 24* 234:*4*
238:*13* 240:*13* 241:*17*
242:*1* 244:*13* 246:*4*
248:*17* 249:*5*
**old** 99:*2* 113:*13* 124:*7*
**once** 10:*4* 28:*16, 16, 19*
47:*21* 62:*25* 69:*3* 72:*13*
74:*9* 122:*13* 166:*15*
178:*18* 182:*16* 214:*6*
**ones** 46:*21* 47:*6* 52:*4*
84:*17*
**ongoing** 17:*1, 2* 50:*22*
74:*5, 7* 155:*12* 158:*19*
198:*24* 199:*12* 204:*23*
235:*13* 237:*19*
**open** 161:*11* 250:*10*
**opened** 160:*3, 5*
**OPOTA** 80:*4*
**opportunities** 134:*10*
**opportunity** 58:*12, 17*
60:*7* 66:*6, 9* 67:*4* 71:*21*
136:*12* 190:*17, 19* 191:*21*
208:*2*
**oppose** 204:*15*
**option** 220:*5, 7*
**options** 69:*17, 24* 203:*13*
**order** 40:*9* 57:*22* 63:*13,
17, 20* 65:*1* 93:*5* 111:*22,
24* 121:*25* 144:*10* 192:*10*
193:*20* 236:*21*
**ordered** 144:*10* 170:*23, 25*
**ordering** 192:*1, 6, 7*
**orders** 62:*6* 64:*1*
**outbox** 31:*22*
**outcome** 67:*6* 82:*21*
84:*13* 96:*6* 104:*3* 107:*12*
189:*25*
**outdoor** 63:*2*
**outer** 49:*14, 22*
**outlook** 243:*18*
**outside** 26:*4* 27:*16, 17, 21*
28:*3* 36:*25* 37:*15, 19*
38:*5, 22* 73:*16* 81:*13*
168:*6* 178:*18, 19* 180:*9*
183:*10, 23* 184:*3* 193:*24*
209:*23* 221:*11* 237:*15*
**overnight** 115:*21*
**over-the-counter** 118:*17*
**overtime** 129:*5* 165:*21*

**owed** 106:*3*
**owing** 106:*11*

**< P >**
**p.m** 1:*22* 153:*12* 164:*23*
166:*6* 167:*19* 179:*14*
251:*4*
**pace** 61:*9*
**PAGE** 5:*2* 6:*1* 22:*17*
**paid** 83:*12, 16* 106:*5*
129:*24* 137:*15* 140:*6*
141:*10* 142:*6* 144:*21*
145:*8* 156:*6, 8* 179:*11*
**pain** 239:*6, 7, 16* 240:*22*
247:*21*
**Pamphlets** 146:*18*
**pants** 49:*7, 9, 20* 221:*16*
**paper** 87:*2*
**paperwork** 10:*8* 247:*19*
**Pardon** 168:*22* 169:*20*
**parents** 9:*15*
**Park** 123:*5* 168:*2* 192:*20*
**Parma** 131:*21*
**part** 38:*15* 39:*1* 54:*4, 6,
10* 84:*2* 96:*20* 139:*9*
162:*5* 182:*20* 206:*14*
**particular** 37:*15* 94:*22*
117:*11* 159:*1* 183:*7*
**particularly** 204:*21*
**parties** 250:*20*
**partly** 38:*11, 14*
**partner** 91:*23* 110:*11*
**partners** 110:*12*
**PARTNERSHIP** 3:*3*
**parts** 213:*11, 14*
**part-time** 133:*21, 22, 25*
134:*1, 2* 135:*23* 137:*4*
138:*15* 141:*7*
**party** 103:*17* 253:*3*
**pass** 82:*1* 249:*16*
**passing** 31:*8* 193:*16*
**patch** 42:*19*
**patches** 42:*18, 23*
**patio** 15:*16* 37:*10, 17, 21,
24* 38:*5, 11* 178:*23*
195:*11, 14* 196:*10, 16, 24,
25* 197:*2* 198:*15* 205:*19*
206:*6* 207:*4* 221:*11*
223:*10, 13*
**Patrick** 3:*9*
**patrol** 64:*11* 80:*9* 86:*13*
90:*15* 91:*8, 9, 14, 18, 19,
21* 92:*2, 7* 93:*2* 94:*7*
140:*2, 6* 141:*18* 143:*19,
19* 165:*1* 179:*16* 233:*22*
**Patrolman** 80:*20*
**patron** 180:*1*
**patrons** 99:*19* 148:*8*
149:*19* 162:*23*

**pay** 86:*19* 106:*11, 14, 14*
130:*12* 137:*17* 140:*10, 24*
141:*7, 13, 21, 22* 161:*17*
**paying** 141:*12*
**payment** 132:*18*
**pays** 129:*18*
**peace** 45:*17*
**Pearl** 131:*21*
**penalties** 13:*4, 6*
**people** 22:*7* 99:*22*
121:*12* 148:*22* 201:*14*
225:*14, 16* 226:*17* 234:*11*
244:*22*
**pepper** 44:*2* 50:*19* 51:*1,
2, 5, 21* 52:*8* 53:*1, 2, 3*
65:*18* 219:*16*
**percent** 32:*13*
**percentage** 127:*12*
**perform** 32:*11* 116:*19*
**performance** 92:*14* 95:*22*
**performed** 151:*22* 247:*14*
**performing** 74:*20*
**period** 84:*11* 85:*1*
125:*25* 126:*6* 173:*6*
**periods** 75:*9*
**Perjury** 13:*9*
**permission** 41:*13, 16, 20*
50:*7* 83:*9* 119:*24* 120:*2,
9, 15* 121:*9, 14, 17* 122:*6*
144:*18* 145:*17, 19*
**permit** 69:*24*
**permitted** 69:*16* 70:*2*
**person** 27:*1* 46:*1* 51:*14*
59:*11* 69:*13* 102:*13*
131:*22* 136:*14*
**personal** 10:*6* 33:*5* 59:*1*
111:*17* 172:*10*
**personally** 40:*18* 59:*5*
**personnel** 55:*20* 56:*4*
95:*16* 151:*20*
**persuasion** 60:*25*
**Phillips** 17:*19, 20* 18:*5, 11*
24:*7* 25:*8* 26:*2*
**phone** 16:*16* 32:*12* 33:*2,
5, 7, 12, 14* 37:*17* 188:*9,
14, 17, 18, 19, 19* 193:*18,
21* 202:*7, 24* 203:*6, 9*
**phone,** 189:*12*
**phrase** 46:*12* 133:*16, 22*
206:*13*
**physical** 61:*23* 69:*12*
76:*19* 80:*24* 81:*1, 8, 14*
96:*12* 143:*21* 241:*7, 9, 14,
20*
**physically** 79:*14* 176:*14*
**physician** 117:*6, 7, 23*
247:*20*
**pick** 188:*24*
**piece** 176:*20, 25*

**Pike** 3:*20* 5:*6, 7, 8, 9, 10,
11, 12, 13, 14, 16, 17, 19, 23,
25* 6:*2, 3, 5* 41:*3, 9* 45:*11*
46:*7, 17* 50:*11* 58:*9*
59:*19* 70:*13* 144:*22*
145:*1, 13* 156:*16* 205:*20*
207:*20* 213:*15* 214:*19*
248:*6, 18* 249:*19* 250:*15,
24*
**Pillow** 157:*5, 6, 7, 9, 10*
**P-I-L-L-O-W** 157:*10*
**Pkwy** 3:*10*
**place** 40:*17* 61:*20* 96:*14*
99:*5* 113:*23* 114:*12, 14*
163:*21* 166:*8* 173:*20*
192:*4* 194:*4* 222:*20*
223:*2* 252:*22*
**placed** 220:*9* 228:*4, 5*
**places** 40:*13* 242:*3*
**Placing** 61:*15* 193:*4*
**plaintiff** 106:*20*
**Plaintiffs** 1:*8, 17* 2:*3*
**Plaintiff's** 204:*3*
**plan** 162:*8, 14* 163:*21, 23*
164:*5, 13* 184:*7* 186:*25*
191:*15* 193:*9, 10* 194:*3*
196:*11, 12* 208:*3*
**planning** 186:*22*
**play** 221:*2* 222:*5*
**plead** 83:*22* 87:*8, 11*
**pleaded** 86:*10, 25*
**pleading** 83:*25*
**please** 7:*2, 15* 14:*13*
75:*14* 169:*2* 182:*2* 203:*7*
**pled** 77:*8* 82:*23*
**Plent** 155:*22, 23, 24*
**plenty** 208:*10*
**plus** 88:*22* 247:*6, 7*
**pmroche@cruglaw.com**
3:*13*
**pocket** 51:*13*
**point** 16:*3* 18:*22* 21:*3*
26:*10* 34:*20* 41:*22* 56:*1*
66:*11* 75:*13* 80:*22* 89:*21*
136:*14* 139:*22* 163:*3*
166:*12* 167:*7* 171:*10*
173:*6* 174:*1* 175:*21*
180:*10* 186:*24, 25* 188:*3*
189:*16* 190:*10* 192:*20*
196:*21* 197:*12* 198:*18*
200:*10* 207:*10* 210:*3*
212:*22* 224:*22* 225:*1*
232:*4* 239:*7* 248:*14*
**points** 221:*4*
**Police** 8:*12* 9:*7, 11* 13:*3*
18:*1* 22:*20* 29:*16* 40:*4,
21* 41:*1, 8, 25* 42:*2, 4, 17,
18* 43:*8, 9, 19, 24* 45:*9*
46:*13, 25* 47:*9, 13* 48:*12,
24* 49:*8, 19, 23* 50:*1, 2, 7,*

Case: 1:18-cv-00814-DAP  Doc #: 71  Filed: 01/17/20  77 of 83.  PageID #: 1146

Deposition of Sergeant Dean Graziolli                    Melissa Yatsko and Darian Allen vs. Sergeant Dean Graziolli, et al.,

16 51:3, 23 53:4 54:7, 10
57:1, 17, 20 58:5, 5, 14
59:15, 24 60:9, 15, 23
62:21 63:12, 17, 20 64:1,
9, 16, 18 65:1 70:1, 9
71:12, 16, 19 72:1, 5
73:15, 21, 24 74:2, 9 76:1,
9 78:13 79:6, 24 80:7, 15,
17, 24 81:3, 6, 9, 15 82:14,
18 84:14 86:5, 17 88:17
89:4 90:4, 5, 13 95:5
96:13 98:18 100:9, 18
115:4 116:20 119:11
120:8 125:3 128:13, 15
129:9 133:4, 23 134:3, 15
135:4 144:2, 20 145:10,
16, 23 148:18 164:17
166:25 167:25 180:6
186:7 189:8 191:13, 15,
20 192:1, 4 193:7 205:17
206:12 207:14 214:17, 25
227:10, 19, 23, 24 228:8
229:15 233:17 234:17, 22
235:3 244:20
**policeman** 30:19, 20
35:17, 18, 19 97:19
173:19 192:5
**policemen** 245:4
**policies** 48:12, 16, 19, 24
64:8, 12 72:1 146:20
**Polster** 1:11 199:24
200:4 202:24 203:5
**portion** 46:10
**poses** 61:21
**position** 61:21 88:17
97:20 201:17 204:3, 15
205:16
**possible** 61:9 190:2
**possibly** 189:24 197:18
**posted** 134:12, 13, 17, 20
**posting** 135:12
**postings** 135:3
**postmortem** 198:4
**pounds** 215:8
**practice** 28:6 118:4
**practicing** 63:7
**precise** 17:10
**premises** 37:6 39:16
143:19 147:6 161:9
**preparation** 15:25
**prepare** 14:14 25:2
**prepared** 25:5 132:2
**prescribed** 118:25 239:19
240:19, 24
**prescribing** 117:16
**prescription** 13:13, 14, 19
112:20
**presence** 73:3 143:17, 21
149:18 162:10 194:17
252:16

**present** 14:24 24:3 25:10
26:19 201:5, 13 204:6
234:1
**preserve** 45:17 230:7
**president** 25:11, 13 26:3,
17 140:17 245:1
**press** 17:9 24:13 77:4
97:9
**pressure** 66:11 112:22, 24
117:17 118:15
**presumably** 24:23 55:4
149:17
**presume** 21:1 65:13
233:18
**pretty** 44:3 108:1 168:5
**prevent** 65:10
**prevented** 194:8
**previous** 45:4 236:13
**primary** 117:6, 22 247:20
**prior** 56:1 76:19 107:18
164:17 182:10
**private** 129:20 133:5, 9,
12 249:3
**proactive** 58:14
**Proactively** 61:12
**probably** 18:7 56:5 67:5
96:20 109:7 127:5 150:4
166:16 215:10 230:20
239:17 243:3 245:11
**problem** 70:3 237:19, 20
**problems** 13:11 14:1, 4
44:22
**procedure** 63:18
**procedures** 95:10
**proceeding** 84:24 101:20
102:1, 2 103:1
**proceedings** 101:17
**process** 151:13
**produce** 34:14
**professional** 55:1
**professionals** 226:18
**profusely** 226:3
**Progressive** 127:22
**promoted** 89:18 249:11
**promotes** 66:9
**promotion** 81:17, 20, 24
88:10
**proof** 236:24
**proper** 194:1 206:16
**properly** 204:17
**property** 107:14 230:21
**proposal** 202:6
**propounded** 202:5
**prosecutor's** 19:14, 16, 22
**protective** 111:24
**protesting** 177:16, 20
**protocol** 158:10 229:21
231:15, 17 235:20
**proved** 184:6

**provide** 20:7 31:3 36:4
38:3 47:10, 14 93:1
121:21 124:2 133:5
225:19 236:23
**provided** 17:20 19:4
20:18 21:17, 25 22:5
73:13 93:13 147:25
151:6 234:25 238:18
241:16
**provider** 27:22 28:3, 25
29:11 33:10 124:17
**providers** 124:10
**providing** 11:22 36:17
124:15 161:23 226:18
**provoked** 212:19
**psychological** 80:22
**psychotherapy** 243:22
**Public** 1:19 41:6 54:6
64:19 88:15 96:14
182:25 252:7 253:12
**pull** 185:8 212:4, 7 218:4
220:6 243:15
**pulled** 218:7
**pulling** 212:2 213:19, 22,
25
**punch** 97:1 174:6 185:24
186:1, 6 189:2, 6, 9
211:17, 19, 21
**punched** 181:7
**punches** 77:10, 11 96:23
174:8, 13 211:10, 13
212:10 216:21
**punching** 77:12 184:17
**punish** 71:11
**punishments** 86:15
**purpose** 13:23 27:7
30:17 184:2 188:13, 14
191:6
**pursuant** 1:20
**pursuit** 108:23
**purview** 161:23
**put** 79:18 132:15, 16
168:22 173:25 176:16
185:1, 4, 7 191:8 192:2,
15 214:8, 9, 12 217:4
250:12
**putting** 54:2 184:16
186:11

**< Q >**
**qualified** 50:15, 18 252:9
**qualify** 63:3 75:21
**quarter** 167:21, 21
**question** 12:10, 14 18:9
32:5 36:22 38:15, 20
39:20 46:10 47:24 52:1
55:25 57:24 60:8 64:11,
15 69:21, 21 70:4, 7, 21
76:8, 13 88:5 159:21
169:16, 21 197:14 198:9

199:1, 10 200:21 204:2
213:7 233:7, 15 234:3
**questioned** 204:19
**questions** 11:22 12:5
23:17, 18 24:24 57:8
62:6 64:14 119:6 169:9
199:20 200:12, 14, 18
201:2, 6, 22, 24 202:5
203:22, 23 234:15 243:25
249:15, 18 250:7
**quick** 56:9
**quote** 75:14 186:11
208:10 210:24

**< R >**
**radio** 90:16 164:1, 3
**Rainey** 240:16, 17 243:17
**ran** 189:18 238:3
**range** 63:2, 5, 8, 22 69:2
**rank** 9:10 42:16, 20
80:13 88:4 98:21 141:4
**reach** 20:1 136:18
**reached** 17:4, 12 19:1
136:20 203:4
**read** 15:19 71:14, 15
133:11 169:18 205:24
**reading** 13:17, 19, 23
20:14 71:22
**ready** 104:11 166:16
185:24 186:1
**real** 107:13 179:1 239:4
247:3, 4
**really** 31:24 45:13, 14
83:19, 21 105:3 108:2
111:2 138:12, 13 165:21
222:4 226:12 230:5
242:20
**rear** 168:3
**rear-ended** 114:7
**reas** 85:24
**reason** 53:11 66:23 79:3
96:5, 8 102:9, 10 103:8
154:14 175:10, 12 187:24
194:17, 17 198:9 207:9
214:14 236:7
**reasonable** 55:2 58:6
**reasons** 34:25
**recall** 10:25 11:9 22:23
23:3, 4 24:12 27:11
30:12, 13 31:9 33:20
37:19 44:25 47:18 48:9
52:25 55:23 56:6, 15, 19
57:18 58:22 59:21 60:1,
11, 14 61:1, 11, 19, 25
62:3, 8 68:24 70:10, 11,
15, 24 71:5, 17, 22 73:14,
25 74:16 77:15 84:19
85:19 86:2 94:20 95:12
99:15, 22 100:3, 4 104:6,
13, 15 105:20 109:4

Case: 1:18-cv-00814-DAP  Doc #: 71  Filed: 01/17/20  78 of 83.  PageID #: 1147

Deposition of Sergeant Dean Grazielli                    Melissa Yatsko and Darian Allen vs. Sergeant Dean Grazielli, et al.,

110:19  111:20, 23  115:9
116:9  118:18  119:21
127:1  133:7  144:12
161:14  164:9  165:2
171:16  172:20  176:22
177:18  181:17  187:3, 4, 7,
13  193:2, 3  194:23  195:4,
5, 6, 9, 11  196:7, 16  197:3,
6, 7, 8, 10  198:1, 3  200:3,
7  206:20  207:5  208:7, 13
210:11, 12, 18, 25  212:1, 2
213:1, 5  215:14, 24  224:3
227:12, 13  234:14  246:9
247:8, 12, 13, 17
**recalls** 188:8
**receive** 33:16  47:21
55:12  63:9  74:5  81:17,
19  82:4  93:25  97:25
98:4  141:23
**received** 31:16  33:22, 25
47:19  55:21  56:2, 5
62:20  65:25  92:17, 20
93:4  95:3  101:6  102:25
132:19  140:20  141:21
156:19  221:1
**receiving** 141:17, 23
**recess** 62:12  112:8  179:6
220:18
**recollection** 107:6  200:8
217:2  243:12
**recontacted** 207:3
**re-contacted** 198:14
**record** 7:2, 14  62:10, 15
112:6, 11  169:13, 18
179:4, 9  201:4  202:20
203:1, 11  205:14  220:16,
21  249:22, 25  250:2, 5, 13
251:1
**recorded** 23:22
**records** 85:23  87:9  93:18
113:25
**recover** 105:10
**recovered** 105:12
**recruit** 80:11, 15, 15, 17
**reduce** 57:12  58:7, 16, 17
**reduced** 252:16
**reducing** 58:14
**refer** 57:25
**reference** 114:1
**referenced** 252:20
**refinance** 107:1
**reflect** 165:14, 15
**reflected** 83:10  84:7
**refresher** 63:14
**refusal** 199:8, 9
**refuse** 200:11
**refused** 200:22  204:1
**refusing** 200:24  201:1
248:4

**regarding** 47:10  63:9
95:13  168:25  201:19
203:16
**regardless** 46:4, 12
**regular** 47:22  81:9  91:8
116:19  128:10, 14, 16
235:15
**regulation** 231:8
**regulations** 47:15  48:4
84:16
**reholster** 218:1
**related** 15:24  16:4  19:5
22:1  25:20  27:4  28:22
31:17, 23  32:1, 7, 18  34:1,
12  48:12  63:12  98:5
100:5  103:21, 25  113:18
156:20  201:25  235:25
237:20
**relationship** 18:20  169:1
**relative** 102:19  253:2
**relatively** 55:14  152:7
237:8
**relaxer** 239:21, 22, 25
**relaxers** 240:18
**released** 98:10  105:7
115:20  244:17
**relevant** 43:2
**relied** 16:20
**rely** 12:13
**remember** 20:14  68:15
71:13  79:25  95:7  96:3, 9
97:2  98:2, 12  100:19, 24
102:8, 24  105:4  107:10
108:6  109:17, 19  110:4,
21  116:1  127:4  138:13
161:16  165:19, 22  166:11,
21  170:13, 18, 25  180:17
182:16  183:12  194:12
198:21  200:17, 20, 24
206:23  208:8, 15  210:16
213:12, 14  215:6  216:1, 1,
2, 4, 21  218:8  223:15, 25
224:8, 8  225:13, 14, 17, 18,
21, 23  227:16, 23  228:1, 2
242:21  244:23  246:11, 13,
19, 23, 25  247:1, 24
**remembering** 243:11
**remove** 176:14  179:25
215:21
**removed** 182:9  228:10
**rendering** 74:3, 19
**renewed** 87:24
**repair** 113:9
**repercussions** 13:8
**report** 10:19  83:11  84:3,
8  100:8, 10  106:15
130:14  132:13, 21  145:7
153:8  155:1  165:5
167:10, 12  168:15  175:8

190:4, 5, 7  231:3
**reported** 100:11, 14
**reporter** 12:1  23:23
82:12  126:10  202:21
204:7
**reporter's** 85:11
**reporting** 106:7  119:23
138:21  231:18
**reports** 84:10  85:2  90:17,
19, 20  94:9  165:13  231:9
**represented** 11:14  84:23
100:20, 25  104:15, 16
111:13  236:13
**representing** 18:3  111:7
236:9
**reprimand** 95:9  96:2
**Republican** 242:7
**request** 121:24
**require** 45:10  76:12
**required** 43:8, 25  45:8
48:23  71:25  76:14
121:21  124:1  210:2
**requirement** 75:25  236:21
**requires** 76:9
**requiring** 231:8
**resolution** 104:9
**resort** 57:13  58:16
**respect** 18:6, 12, 21  19:1,
9, 17  85:2  107:18  146:3
241:4  243:19
**respond** 158:11  233:22, 23
**responded** 16:19
**responding** 90:16
**response** 16:13  20:5, 6
31:12  58:1  70:18  126:16
189:12
**responses** 25:25
**responsibilities** 39:2  45:9
46:6, 15, 24  47:5  142:9
143:12, 16, 18, 24  170:10
173:17
**responsibility** 45:23  58:13
87:12, 15, 17  92:14
148:21  207:16
**responsible** 10:11  35:5
48:18  141:3, 12  159:18
163:16
**restraining** 111:21
**restrict** 146:2
**restricted** 116:23  154:9,
12, 16  155:10, 11, 14, 25
156:20, 23  158:21, 24
235:6
**restrictions** 145:24  151:7
169:11  235:7, 11, 22
**result** 86:8, 16
**resulted** 94:18  148:18
**results** 198:5
**retain** 87:23, 23
**retaliatory** 71:7

**return** 68:9  132:2
156:15  235:15  245:12
**returned** 178:24
**returns** 130:20  131:7, 9
132:10
**reveal** 82:13  198:5
**revealed** 198:7
**review** 90:20  249:14
**reviewed** 15:14, 24  24:8
**revoked** 41:14, 22  117:9,
20
**ride** 208:6, 23  209:1
228:19
**right** 9:12  11:12  12:17,
18  14:13  17:24  20:25
21:17, 25  22:9, 12, 13, 14,
23  31:12  32:11  33:1, 3
34:16  35:8  37:14, 21
38:3, 16  40:1, 7  49:2, 15
52:3  53:9  54:5  55:2
57:11  59:13  66:19  68:9
72:2, 25  76:18  78:19
79:4, 20  85:16  93:16
94:9, 14, 19  95:20, 23
102:15, 17  108:6, 11, 14
109:22  110:17, 22  112:3,
13  114:16  124:3  126:5,
12, 19  129:17  135:20
140:1, 4, 5, 18  142:4
143:22, 25  145:16  147:13
155:8, 9  157:12  158:23
159:3  164:11  166:19
170:12  171:16  174:14
176:2, 4, 11, 17  177:19
179:22  181:9  183:8
185:5  186:3, 10  190:24
192:24  193:15  194:10, 13
196:23, 24  199:7, 14, 19
201:1, 15, 16, 19  204:5, 20
207:24  208:20  214:12
215:22  217:25  220:12, 23
221:7, 8, 15, 18, 20  222:1,
3, 9, 11, 21  223:3, 6, 10, 20
225:11  227:17  228:16
231:20  232:9  236:15, 15
237:25  238:22  239:5, 16,
17, 22  244:13  246:10
247:22  249:12
**rights** 204:18
**ring** 94:23  105:24
**riot** 242:6
**River** 28:7
**road** 91:5, 7  131:21  238:5
**Rob** 22:25  23:1, 2
**Roche** 3:8, 9  5:3, 4, 5, 18,
20, 21, 24  6:4  36:9  37:12
38:7  154:4  160:1  168:21
169:20, 25  205:10, 22
222:22  250:14, 23

Case: 1:18-cv-00814-DAP  Doc #: 71  Filed: 01/17/20  79 of 83.  PageID #: 1148

Deposition of Sergeant Dean Graziolli       Melissa Yatsko and Darian Allen vs. Sergeant Dean Graziolli, et al.,

**Rocky** 28:7
**rode** 230:1
**role** 158:13
**roll** 134:23, 23
**Room** 3:21 134:23
160:20 204:5 230:22
244:16, 23 250:9
**rotate** 129:10
**rotated** 128:17
**roughly** 223:1
**RTA** 104:19, 20 105:9
108:12
**rude** 197:4, 7
**rule** 70:9 95:17 245:17
**rules** 11:13, 19 35:2
47:14 48:4 84:16
**run** 218:19, 20
**running** 225:17
**Runs** 223:16

**< S >**
**safe** 193:25
**SAFECO** 4:1
**safer** 61:20, 21
**Safety** 41:6 88:16
**salad** 171:2
**sales** 147:17, 18, 19
**Samsung** 33:12
**sat** 182:17
**Saturday** 165:9 166:7
245:20
**Saturdays** 138:24 139:2,
5, 9, 9 147:17 148:3, 6, 9
153:17 160:8
**save** 220:11
**saw** 27:5 37:20, 23, 24
113:25 117:13 118:2, 9
172:7, 8 189:21 196:6
197:13 214:6 224:10, 10
228:11
**saying** 59:12 126:2
164:10 176:21, 23 177:2,
22 180:18 183:14 187:3,
4, 13 188:8 193:2 195:12
207:5 208:13, 14, 15
210:11, 12, 25 215:24
227:12, 13
**says** 7:8 54:9 76:4
189:11 233:14, 16
**scale** 239:15 247:4
**scan** 247:15
**scans** 247:14
**scared** 209:16
**scenario** 73:1, 8
**scenario-based** 72:7, 9, 21
**scene** 29:20, 23 30:1
115:16 158:8, 11 227:17,
17, 18, 22, 25 228:7, 10
229:5

**schedule** 91:13 128:13, 14
137:25 138:1, 3 139:24
**scheduling** 137:13
**screen** 220:23 221:6
222:7
**scuffle** 109:15
**se** 238:5
**seal** 253:6
**search** 32:11
**second** 9:3 102:16 103:7
144:18 159:8, 10, 12
160:25 172:8
**secondary** 40:5, 9 41:1, 7,
13, 17, 21 42:1, 11 43:6,
11 44:1, 8, 18, 19 45:7, 18,
22 46:14 47:1, 11, 16
48:5, 13, 19, 22 71:24
78:15 95:4 115:5, 8
126:13 127:2, 6, 9, 13, 20
128:2 129:18, 19 130:15,
21 133:17, 20 134:5, 7, 10
135:16 141:1 145:8
152:23 153:24 156:11
165:24 166:4 207:15
236:22
**Seconds** 216:19 221:7
222:6
**securely** 79:18
**security** 35:13, 14, 18, 20,
22 36:4, 12, 17 38:4 39:2,
7 124:5 133:6, 9, 12
142:9 161:23 162:5, 8, 14,
16, 18, 21 249:2
**see** 10:18 27:5 28:4, 9
29:3 31:22 33:21 34:11
37:15, 25 57:23 63:16
84:9 101:17 103:16
104:18 105:16 109:20
117:10, 22 124:17 134:25
137:9, 19, 24 138:25
147:2 149:2, 8 150:21, 24
158:24 162:25 166:24
168:18, 19 172:3, 5 184:4,
22 191:17 193:12 194:3,
20 195:20 196:20 197:14
202:8, 19 210:7 214:4
220:7 221:22, 22 222:4, 6,
10 224:9, 15, 17, 17, 18, 19,
20 226:2 237:22, 25
238:1 243:1 249:14
250:21
**seeing** 21:14 27:3, 7, 15,
16 28:11 124:9 161:14
187:7 224:3 227:23
228:1, 2
**seen** 29:10 135:2 178:7,
8 196:2, 4 235:20
**self-defense** 73:13
**send** 33:16

**sense** 36:3 92:1 232:14
238:6
**sent** 21:22 31:16 33:22,
25 126:16
**sentence** 86:22
**September** 35:3 243:4
**sequence** 189:4
**SERGEANT** 1:10, 15
2:18 7:5, 10 9:11 18:8
23:2, 4 42:17 66:21
81:24 86:11, 13 87:24
88:4, 17 90:14 92:13
203:19 229:14 230:7
252:11
**sergeants** 93:11
**sergeant's** 23:5 42:19, 20
**serious** 69:12
**service** 42:22
**Servicing** 106:20
**set** 253:5
**setting** 20:20 25:20 26:5
48:7, 9 63:25
**Seven** 85:22 126:2, 2
215:13
**severe** 239:15
**severity** 58:15
**shaken** 225:12
**shakes** 225:4, 6
**Shane** 1:19 252:7 253:12
**shape** 66:24 67:8
**Shark** 103:18
**sheriffs** 234:20
**Sheriff's** 16:4, 21, 25
17:11 18:15, 25
**Shibley** 1:23 2:5
**shift** 88:25 122:13
128:13, 20, 21, 24, 25
129:1, 14 152:6 153:11,
18, 21 167:18 179:14
**shifts** 128:17
**shirt** 42:15 43:1 49:11,
12, 14, 17, 21 50:3
**shoot** 71:4 220:6
**shooting** 63:5, 8 69:2
163:21 213:1, 3
**Short** 62:12 66:4 112:8
179:6 220:18
**shorter** 215:15
**Shortly** 89:10 217:10
**shot** 224:4, 21, 25
**shoulder** 185:1, 4, 5, 7
239:13
**shout** 217:6 219:2
**shouted** 217:9
**shouting** 216:2, 4 218:9
225:15 227:7
**shove** 211:15, 23
**shoved** 181:7

**show** 78:21 116:10
137:10 221:18, 24 224:1
237:22
**showed** 242:11
**shower** 166:16
**showing** 147:5
**shows** 21:8, 11
**sick** 40:18 152:10
**side** 103:18 138:2 204:11
223:12 228:12
**Sidearm** 78:23
**sides** 239:9
**sidewalk** 179:1, 2 182:25
192:24 196:22, 24 207:7
223:13, 16, 19
**Signature** 251:3
**sings** 243:13
**sir** 7:12 8:14 9:12 13:11
14:13 34:16 39:6 112:13
199:21 201:3 220:23
221:10, 25 224:2 248:15
250:6
**sit** 25:19 31:10 33:24
56:6 70:11, 24 75:21
**site** 162:17
**sitting** 182:23 240:5
247:8
**situation** 57:22 60:5 62:5
73:2 75:20 227:11
**Six** 80:18 86:23 108:5, 7
116:16 123:20 129:7, 15
178:22
**skills** 73:21
**sleeping** 166:11
**sleeve** 49:12, 16, 17
**slow** 57:22
**slowing** 61:8
**slung** 197:2
**slurring** 197:24
**smaller** 215:17
**smallest** 243:10
**smell** 197:22, 23
**smoke** 37:17
**smoking** 196:18, 19 207:7
**Snow** 168:13, 14
**snowy** 188:16
**Social** 124:5
**soda** 170:20, 21
**sold** 107:2 147:20 148:6
**somebody** 27:3 59:2, 6
110:8 131:3 138:15
139:19 153:8 156:25
157:11 158:8 192:20
208:1 214:2, 2 225:22, 24
226:10 227:5 233:25
**somebody's** 226:2
**song** 243:11, 13
**soon** 118:1 127:3 152:4,
7 203:10 229:4

Case: 1:18-cv-00814-DAP  Doc #: 71  Filed:  01/17/20  80 of 83.  PageID #: 1149

Deposition of Sergeant Dean Grazioli      Melissa Yatsko and Darian Allen vs. Sergeant Dean Grazioli, et al.,

**sorry** 17:13 27:19 44:5 134:6 200:2 247:25, 25
**sort** 66:1 243:22
**sound** 85:16 94:9, 19 95:22 102:17 126:18
**sounds** 94:4 124:14 138:18
**Spangenberg** 1:23 2:5
**speak** 23:9 26:4 30:25 31:4 175:9 177:21 204:11
**speaking** 176:20, 24 235:24 242:10
**special** 126:18 133:16, 18, 22
**specific** 23:17 24:24 28:1, 23 29:1 36:11 40:17 44:21 45:14 47:3, 6 48:11 55:8, 19, 24 57:4, 6, 8 58:1 60:8, 12 68:15 69:19 70:5, 15 72:6 73:7, 25 79:3 83:1 88:23 92:23 93:23 99:23 107:23 115:25 121:4 128:20 141:24 224:14 225:22 242:4
**specifically** 46:9 47:20 59:21 61:19, 25 67:16 84:3, 5, 18 91:20 100:10 136:2 142:11 161:20 165:21 224:10 249:1, 7
**specifics** 56:16 57:18 68:24 83:20 96:3 98:2 246:23
**specified** 252:23
**speech** 197:25
**spell** 131:16 157:8, 8
**spend** 63:19 67:20 91:2 124:19 164:24
**spitting** 226:6, 9
**spoke** 22:24 23:7, 13 26:1 46:21 244:8
**spoken** 22:7, 18 29:15
**spots** 223:6
**sprain** 237:13 238:25 240:14, 20 241:4
**spray** 44:2 50:19 51:1, 2, 6, 21 52:8 53:1, 2, 3 65:19 219:16
**spring** 237:9
**springtime** 17:8 18:17 27:24
**Sprint** 33:10
**square** 161:5
**SS** 252:4
**staff** 163:7
**stages** 190:18
**stairs** 172:15
**stamp** 221:7
**stand** 78:21 120:6

**standing** 127:24 196:21 207:6 223:19, 24
**start** 45:1 89:6, 16 111:5 129:2 209:24 213:7
**started** 27:16 80:12, 14 127:1 138:25 139:3, 4, 4 167:18 192:16
**starting** 167:1
**starts** 213:17
**State** 1:20 7:14 180:4 252:3, 8 253:13
**stated** 231:20
**statement** 20:8, 10, 15, 16, 19, 24 25:2, 6
**STATES** 1:1
**stature** 215:18
**status** 87:24 168:25 236:3
**statute** 1:18
**stay** 30:14 67:7 122:22 164:5, 10 191:22, 22 192:2, 2, 6, 8, 10, 15 202:20
**stayed** 159:15
**staying** 30:17 171:9 246:3
**Steele** 15:15 37:24 195:10 196:7 205:25 208:5, 9 210:9, 23 211:5
**Steele's** 209:9 212:9
**stems** 83:15
**stenographic** 23:23
**stenotype** 252:16
**steps** 32:6, 9 40:8 57:3 58:6 60:4 61:23 184:9
**sticker** 150:21
**stiff** 239:4
**stitches** 98:11, 11 237:14, 14, 17, 20
**stool** 183:3
**stop** 27:15 184:9, 11 198:24
**Street** 4:6 8:10 182:25 183:16 188:15, 22 189:13 191:2
**stress** 27:2 29:3
**stretcher** 228:17
**stripes** 42:19
**struggle** 109:14
**stuff** 65:23 67:15 233:23
**stumbling** 198:2
**subarachnoid** 114:1
**subject** 61:16 69:11
**submit** 40:14 136:6 151:17, 20
**sudden** 240:8
**sued** 103:21, 23, 24, 24 107:7
**suffer** 238:13, 25 241:24
**suffering** 237:16 238:12
**suit** 54:2

**Suite** 2:9, 21 3:10 4:7
**summertime** 27:25
**summoned** 173:18
**Superior** 104:23, 23, 24
**supervise** 93:2 167:16
**supervising** 91:19 167:14
**supervisor** 88:18, 21
**supervisors** 97:24
**supervisory** 92:9
**supplies** 163:14
**support** 31:3
**supposed** 83:17 85:9 141:21 243:20 244:1, 2
**sure** 11:12 16:18 22:16 32:23 38:13, 23 39:3, 24 40:22, 24 41:11 45:16 46:9, 11 49:4 57:8 69:23 82:20 83:19, 21 90:15, 18 92:25 95:7 111:2 122:19 130:23 141:16 149:23 169:15, 25 226:12 230:3, 6, 10 231:17 233:8 242:9
**surgeries** 113:4, 6
**surgery** 113:23 116:25
**surroundings** 18:13, 16, 19
**surveillance** 21:4 160:11, 21 220:24
**survival** 214:21, 24 218:4
**survive** 215:3, 4, 4 220:8
**suspect** 30:22 58:25 60:18 61:3, 13, 16 108:25
**suspended** 86:18 94:8 117:20
**sustain** 86:15
**sustained** 108:9
**swear** 7:2 59:24
**sweeps** 66:3
**switch** 128:18 215:2
**switched** 27:21
**sworn** 7:7 252:12
**symptoms** 239:3
**synonymous** 42:20
**system** 115:11, 13 198:8

**< T >**
**T-A** 131:17
**table** 12:15
**Ta-Check** 131:15, 15
**Tackla** 4:13
**tackling** 66:7
**tactical** 72:5
**tactics** 69:17, 25 73:1
**take** 12:21 15:5, 8 20:11 32:6, 9 34:19 40:8 50:18 54:19, 22 58:6 60:4 86:4 87:12 88:6 92:17 99:5 109:11 112:4, 22 113:23 114:12, 14 118:16 121:25 122:7, 10 126:1, 4 128:8 131:9 139:11 141:13

184:8 186:15 212:11 220:13 229:23 230:15 239:18, 24 242:14 245:15
**take-down** 66:7
**taken** 1:18 9:13, 25 11:2, 4 19:17 104:12, 14 115:15 117:24 220:18 229:5, 9, 11, 13 252:22
**talk** 15:11 26:12, 15, 21 62:1, 17 79:23 102:20 108:8 126:12 128:12 133:16 136:1 144:1 169:12 225:9
**talked** 29:14 46:16 49:2 56:24 78:17 111:18 145:20 162:18
**talking** 22:9 69:23 93:10 125:22 179:22 180:15 246:13
**tall** 215:12
**taller** 215:14
**tampering** 85:22
**tan** 222:17 223:18
**tape** 61:18 62:15 101:9 112:2, 10 177:8
**tapes** 62:12 112:8 179:6
**Taser** 44:2 50:14, 15 51:9, 22 52:5, 6, 16, 20 65:18 219:11
**taught** 56:16
**tax** 106:16 130:20, 23, 25 131:3, 4, 6, 9 132:2, 10
**Taxation** 106:2
**taxes** 106:3, 4, 6
**taxing** 130:15
**team** 162:5
**technically** 46:5 104:25
**technique** 66:4, 7 67:5 206:14, 16 218:2
**techniques** 55:10 57:12, 21 60:21 61:10 66:15, 19, 22 69:17, 25 72:25
**teeth** 247:10
**telephone** 202:14, 18
**tell** 10:14 12:11, 13 13:1 14:14 34:20 35:21 36:25 52:2 60:22 77:1 85:15 86:5 93:23 94:3 96:21 107:24 108:16 109:23 114:18 116:6 119:5 120:15 132:14 140:12 144:17 147:8, 10 151:25 155:9 163:10 170:12 171:23 181:19, 23 182:2, 6 186:5 190:21, 23 192:11, 15 193:6 194:20 198:21 199:10 206:18, 25 207:2 212:6, 23 221:23 224:6 227:9 229:1 234:12 242:1 244:2

Case: 1:18-cv-00814-DAP  Doc #: 71  Filed: 01/17/20  81 of 83.  PageID #: 1150

Deposition of Sergeant Dean Graziolli

Melissa Yatsko and Darian Allen vs. Sergeant Dean Graziolli, et al.,

**telling** 38:*19* 44:*16* 114:*6*
125:*7* 191:*25* 192:*3, 7*
193:*3* 194:*23* 200:*7*
206:*23* 217:*3* 222:*24*
234:*5*
**tendons** 108:*18*
**term** 56:*25* 107:2, *4*
**terminate** 65:*10*
**terminology** 133:*19* 134:*3*
**terms** 17:*10* 36:*17* 69:*25,
25* 70:*1* 77:*9* 86:*21*
108:*8* 137:*13* 215:*18*
231:*18*
**terrible** 87:*20* 168:*6, 6, 9*
209:*22*
**test** 63:*11, 12* 88:*7* 198:*5*
**testified** 11:*6* 187:*1, 10,
15, 19* 188:*5* 204:*25*
206:*5* 208:*5, 9* 210:*23*
211:*9* 212:*13, 16, 19*
**testify** 14:*10* 252:*12*
**testimony** 15:*12, 21* 20:*12*
187:*17, 21* 188:*2* 194:*7*
206:*2, 10* 209:*9, 10* 212:*9,
11* 216:*6* 248:*19* 252:*14,
19*
**testing** 63:*18* 80:22, *25*
81:*1, 2, 5, 8, 14* 243:*25*
**tests** 247:*13*
**text** 33:*16, 22, 25* 34:*5, 10,
11*
**Thank** 203:*10* 205:6, *10*
**Theft** 85:*16, 18*
**their,** 72:*19*
**therapy** 241:*7, 9, 14, 21*
**thing** 34:*8* 50:22* 57:*23*
59:*1* 70:*5* 106:*23* 115:*25*
159:*10* 181:*12* 182:*15*
183:*12* 188:*19* 190:*24*
192:*14* 206:*22, 23* 220:*10*
225:*4* 227:*16* 243:*10, 20,
23* 247:*21*
**things** 44:*15* 65:*6* 67:*2*
84:*4* 216:*1*
**think** 10:*4, 8* 11:*3* 12:*24*
14:*7, 10* 17:*11* 20:*21*
24:*14, 17* 27:*24* 30:*11*
45:*3* 53:*21* 54:*8* 57:*3*
65:*20* 66:*18* 69:*20* 75:*7*
87:*19* 98:*11* 102:*22*
103:*8* 106:*22* 108:*6, 21*
109:*13* 110:*1* 111:*1*
114:*15* 115:*24* 116:*4, 12*
117:*12* 119:*24* 120:*17, 19*
121:*3, 3* 122:*3, 4* 124:*16*
131:*2* 132:*8, 9, 11* 138:*11*
144:*17* 153:*19, 22* 157:*2*
172:*9, 13, 14* 175:*10, 12,
14* 197:*17, 20* 198:*10*
207:*9* 215:*20* 218:*15*

**219**:22  225:*24*  228:*21*
229:*24, 25*  230:*1, 3*
234:*19*  237:*12, 13*  241:*13*
248:*22*
**thinking** 175:*18*  234:*6*
**third** 23:*4, 4*  89:*23, 25*
109:*9*
**Thomas** 1:*7*  9:*14*  15:*17*
22:*14*  36:6, *19, 24*  37:*20*
38:*10, 12, 22*  39:*3, 12*
98:*17*  99:*18, 24*  100:*14*
119:*10*  170:*15*  172:*21*
173:*6, 10, 25*  174:*4, 11, 17*
175:*18*  176:*5*  177:*15*
178:*7, 18*  179:*24*  180:*10*
184:*16*  185:*3, 23*  186:*1,
11, 23*  187:*11, 15, 19*
189:*1, 6, 15, 21*  190:*3, 10,
21*  191:*9*  192:*19, 23*
193:*13, 14*  194:*7, 16, 25*
195:*12, 15*  196:*3, 8, 11, 12,
15*  197:*4, 13, 15, 21*  198:*7,
10, 14, 19*  205:*18*  206:*6,
18*  207:*6, 9*  208:*1, 5, 10,
19, 22*  209:*12, 24*  210:*3,
16, 24*  211:*1, 6, 9, 13, 15,
17*  212:*6, 10, 14, 19, 23*
213:*1, 3, 9*  215:*7, 14, 24*
216:*6*  217:*4, 6, 9, 18*
218:*9, 11*  219:*7*  220:*6*
222:*14, 21*  223:*22*  224:*3,
13, 15*  225:*20*  226:*17*
229:*4*  231:*22*  232:*4, 9, 11*
233:*8*  234:*12*
**Thomas's** 184:*23*
**thought** 21:*13*  103:*23*
180:*18, 25*  234:*15*  242:*18*
247:*25*
**thousand** 86:*23*
**threat** 69:*12*  198:*15*
216:*10*
**threatened** 78:*5, 8*  178:*9,
12*  187:*2, 20*  209:*18*
216:*7*  218:*10, 11*
**threatening** 195:*16*
**three** 24:*17*  25:*9*  42:*19*
61:*17*  67:*11, 11*  74:*13, 24*
107:*25*  108:*5, 7*  110:*20*
112:*1, 10*  177:*7, 10, 12*
205:*1*
**threw** 174:*6, 12*  181:*6, 8*
211:*10*  212:*10*  217:*25*
**throw** 96:*23*  211:*13*
**throwing** 246:*19*
**thrown** 174:*9*
**thumb** 245:*17*
**Thursday** 153:*11*  165:*17*
**Thursdays** 138:*23*  139:*1,
5, 8, 12, 13, 14, 15*  148:*3, 6,*

**9** 160:*6*
**tie** 54:*2*
**time** 8:*7*  11:*1*  13:*7*
15:*16*  18:*24*  23:*25*  27:*18*
28:*1, 17, 18*  33:*1*  36:*13,
18*  40:*18*  41:*14*  49:*3, 6*
57:*23*  63:*19*  67:*20*  68:*5*
70:*6*  73:*24*  74:*16*  76:*25*
82:*2*  83:*1, 2, 4, 11, 12, 16*
84:*11*  85:*1, 3, 4*  89:*11, 14,
22*  90:*11*  91:*3*  92:*15, 15*
93:*19, 23*  97:*2*  102:*2*
109:*8, 9, 11*  113:*1*  114:*9,
24*  116:*20*  117:*4, 13, 18*
119:*2, 12, 15*  123:*20*
124:*19*  125:*6, 25*  126:*6*
128:*5*  130:*18*  139:*7*
150:*7, 13*  158:*6*  164:*16*
165:*25*  166:*13*  167:*19*
169:*5, 11, 22*  171:*17*
172:*2*  173:*6*  176:*18*
178:*6, 24*  181:*15*  183:*25*
188:*20*  199:*2*  202:*23*
204:*24*  206:*7*  215:*7, 8*
217:*3*  221:*7*  223:*8*  229:*7*
231:*10*  234:*2, 5*  238:*11*
241:*16*  244:*21*  245:*23*
246:*15*  247:*16*  252:*22*
**timeliness** 95:*14*
**times** 8:*18, 19, 20*  11:*3*
14:*22*  27:*11, 14*  47:*22*
53:*5*  63:*23*  67:*12*  68:*25*
74:*11, 13, 22, 24*  76:*24*
77:*13*  93:*24*  96:*25*  97:*3*
107:*22*  122:*24*  137:*7*
139:*19*  141:*9*  165:*15*
211:*17, 18*  216:*23, 25*
238:*16*  240:*4, 6*  242:*3*
**time-specific** 50:*23*  75:*10*
**title** 35:*12, 16, 22*  36:*1*
55:*8*  158:*16*
**today** 11:*14*  14:*21*  33:*24*
56:*6*  75:*21*  169:*6*
**Todd** 4:*4*  229:*14*  230:*7*
**toe-to-toe** 211:*6*
**told** 15:*21*  21:*7*  22:*17*
25:*22*  26:*5*  31:*12, 25*
53:*6, 11*  66:*18*  68:*22*
71:*15, 23*  93:*16*  101:*21*
102:*15*  107:*16*  110:*20*
113:*13*  118:*14*  119:*23*
126:*17*  135:*19*  136:*3, 16,
17*  137:*9, 10*  140:*18*
144:*25*  147:*11, 16*  154:*18*
156:*24*  157:*3, 11*  160:*14*
167:*18*  175:*22*  180:*25*
181:*2, 25*  184:*4*  191:*11,
22*  197:*12*  206:*6*  207:*14*
208:*17*  209:*22*  210:*23*

**215**:20  225:*3*  233:*10*
235:*5*  241:*2*  246:*11*
**tomorrow** 219:*8*
**tone** 59:*17*  62:2  203:*12*
**tongue** 238:*3*
**tonight** 208:*11*
**top** 65:*20*  221:*8*  239:*13,
14*
**topic** 36:*21*  68:*9*
**topics** 119:*7*
**Tor** 2:*7*  7:*11*  46:*19*
50:*13*  62:*16*  101:*8, 11*
112:*3, 12*  169:*15, 23*
170:*2*  177:*9, 12, 14*
179:*10*  201:*16*  202:*17, 23*
203:*14, 15*  205:*3, 15*
220:*12, 22*  222:*23*  248:*21,
24*  249:*12*  250:*6*
**torso** 221:*23*
**total** 152:*17*
**touch** 211:*25*
**touching** 212:*1*
**Tower** 127:*22*
**toxicology** 198:*5*
**track** 132:*23*  141:*15*
153:*2*
**traffic** 127:*24*
**trained** 50:*19*  52:*19*  55:*5,
7, 9*  57:*16, 20*  58:*4, 19, 23*
59:*2, 8, 14, 22, 23*  60:*1, 2,
3, 9, 15, 22*  61:*5, 8*  62:*1, 4*
64:*16, 25*  65:*13*  66:*19*
68:*12, 17, 23*  69:*7, 10, 15*
70:*8, 17, 23*  71:*2, 7, 10, 18*
74:*3, 19, 23*  163:*7*  206:*13*
**training** 47:*10, 14, 19, 21*
48:*2, 4, 6*  55:*12, 21, 24*
56:*2, 7, 10, 10, 17, 22*
57:*19*  62:*20, 24*  63:*1, 8*
65:*25*  70:*12, 25*  72:*5, 7,
10, 13, 15, 20, 22*  73:*13, 21*
74:*5, 8, 12, 17, 25*  75:*9, 11,
19*  80:*4*  92:*17, 20*  93:*5,
14*  133:*5, 8*  146:*9*  206:*12*
214:*18, 25*  226:*11*
**transcribed** 252:*17*
**transcribing** 204:*8*
**transcript** 15:*15*  205:*24*
**transcription** 252:*19*
**transported** 30:*7*  228:*17*
**traumatic** 114:*1*
**treadmill** 67:*17*
**treat** 115:*22*  124:*10*
180:*20*
**treated** 97:*18*  98:*9, 10, 13*
105:*7*  112:*18*  115:*20*
116:*1*  244:*15*
**treating** 240:*14*
**treatment** 109:*5*  238:*19*

Case: 1:18-cv-00814-DAP  Doc #: 71  Filed: 01/17/20  82 of 83.  PageID #: 1151

Deposition of Sergeant Dean Graziolli

Melissa Yatsko and Darian Allen vs. Sergeant Dean Graziolli, et al.,

240:*19*
tree 114:*21*
Treeworth 2:*21*
trial 12:*21* 104:*11*
tried 189:*2* 241:*8, 19*
248:*9*
trigger 213:*23* 214:*1*
218:*4*
triggered 235:*19*
true 46:*4* 54:*12, 13, 14*
252:*18*
truly 233:*4*
truth 13:*2* 120:*15* 252:*12, 13, 13*
truthfully 14:*11*
try 12:*7, 7* 67:*11, 18*
192:*11* 202:*11, 12, 18*
218:*19, 20, 22*
trying 31:*2* 62:*4* 87:*15*
157:*2* 215:*3, 4* 226:*25*
227:*1*
Tucker 22:*25* 23:*1, 2*
Tuesday 129:*12, 13*
turn 152:*15* 159:*3* 183:*4*
229:*21* 240:*8*
turned 196:*10* 219:*3*
turns 185:*23*
TV 85:*11*
twice 225:*1*
Two 8:*19, 20* 30:*11*
62:*15* 67:*22* 74:*13, 24*
118:*23* 121:*12* 138:*23*
139:*8* 174:*20* 178:*15*
185:*13* 205:*1* 216:*1*
228:*22* 230:*3* 244:*9, 20*
245:*4, 20, 22*
Tylenol 247:*20*
type 43:*16* 75:*18* 92:*23*
106:*23* 111:*17* 227:*11, 24*
types 65:*14*
typical 153:*11* 168:*9*
typically 68:*5* 129:*18, 24*
134:*9* 141:*1* 152:*22*

< U >
Uber 210:*10*
ultimately 86:*10*
uncertainty 35:*15*
unconscious 97:*4*
uncovered 121:*1*
undergo 62:*23* 72:*9*
75:*11* 80:*6, 21* 81:*8*
116:*25*
undergone 72:*4, 21* 73:*20*
74:*8, 11* 81:*13, 14* 241:*9*
Underneath 49:*14*
understand 9:*12, 17, 20*
12:*10, 14, 17* 16:*23* 22:*9*
31:*24* 34:*22* 38:*14, 17, 19*
45:*13, 15* 49:*12* 58:*2*

69:*20* 87:*16* 88:*5* 92:*6*
101:*12* 136:*24* 138:*14*
158:*20* 159:*3* 173:*17*
199:*21* 227:*2* 232:*8*
233:*21*
understanding 19:*12*
20:*17* 29:*25* 30:*16* 40:*3,
25* 41:*5, 12* 50:*6* 83:*3*
85:*13, 15* 90:*9* 94:*6*
95:*15* 96:*10* 151:*11*
218:*12* 233:*19* 235:*14*
248:*2, 8* 250:*8*
Understood 12:*2*
undertake 32:*22*
underwent 74:*17* 151:*12*
unfolding 227:*2*
unholsters 68:*14*
uniform 42:*2, 4, 7, 10*
49:*9, 17* 54:*4, 9* 78:*18*
79:*2, 7* 119:*11* 145:*16*
uniforms 228:*2*
union 18:*16* 101:*3*
unit 90:*22* 157:*3, 4, 17, 19,
24* 158:*1, 7, 9, 14, 21*
159:*1* 193:*7* 208:*19*
UNITED 1:*1*
University 30:*1* 228:*15*
244:*14*
unlawful 70:*19*
unlocked 160:*5*
unnecessarily 58:*24*
unruly 54:*14*
upstairs 171:*10* 172:*9, 11,
23* 173:*7*
UPTOWN 3:*3* 9:*22*
142:*22* 147:*9*
upwards 128:*4*
urgency 210:*2*
use 13:*22* 46:*11* 48:*24*
50:*15, 19* 51:*2, 19* 53:*21*
58:*8* 60:*18, 23* 62:*17, 21,
23* 63:*10* 64:*8, 12* 65:*14,
18* 66:*4* 67:*4* 68:*1, 10*
70:*17* 72:*1* 73:*1, 10*
94:*12* 95:*11* 133:*20*
134:*1, 4, 6, 8* 151:*4, 7*
158:*5, 7* 185:*10, 13*
193:*21* 197:*19* 206:*13*
219:*12, 23* 221:*14* 231:*3,
9, 14, 18*
uses 134:*3*
Usually 28:*16* 72:*13*
122:*13*
Utley 3:*8*

< V >
Valentine's 102:*23*
Varied 122:*15* 137:*19*

varies 28:*14* 63:*21, 21*
67:*21* 72:*16* 91:*4* 155:*18*
240:*9*
various 66:*19* 221:*4*
vary 124:*21* 129:*2*
134:*11* 139:*17*
vehemently 204:*15*
vehicle 108:*23* 114:*20*
Ventura 9:*4*
verbal 44:*13, 17* 60:*25*
66:*13* 73:*5* 81:*25* 82:*1*
88:*7* 96:*11* 101:*1*
verbally 11:*25* 20:*20*
177:*15*
verify 32:*6*
versed 32:*14*
versus 91:*15* 203:*17*
233:*4*
vice 25:*13* 26:*17* 140:*17*
vicinity 38:*5*
viciously 220:*1*
victim 97:*14, 21, 25*
174:*12*
Victor 7:*16*
video 21:*4, 7, 11, 15* 23:*22,
24* 24:*8* 202:*20* 203:*1*
220:*24, 25* 221:*2* 224:*2*
VIDEOGRAPHER 4:*13*
7:*1* 61:*17* 62:*9, 14*
101:*10* 112:*1, 5, 10* 177:*7,
10* 179:*3, 8* 205:*13*
220:*15, 20* 249:*24* 250:*4,
25*
videos 160:*21*
Videotaped 1:*15*
view 210:*4* 246:*24*
viewed 35:*17, 18, 20*
violations 84:*16* 95:*17*
violent 77:*19, 22, 25* 78:*3*
102:*5, 12* 103:*8, 14* 195:*21*
visible 150:*3*
vision 13:*11* 246:*20*
voice 59:*17* 62:*2* 225:*5*
VOICEMAIL 203:*3*
voluntarily 176:*11, 13*
201:*21* 202:*4*
voluntary 20:*14, 16, 23*
vomited 246:*18*
vs 1:*9*

< W >
W-2 130:*6, 8* 153:*4*
Wagner 8:*23*
Wait 12:*4* 248:*23*
waitresses 170:*24*
waived 201:*18* 204:*4*
251:*3*
waiver 204:*17*
wake 240:*6*

walk 67:*17* 87:*11* 123:*18,
22* 138:*14* 187:*7* 193:*20*
209:*3* 210:*13*
walked 170:*22* 172:*7, 15,
16* 173:*2* 179:*23* 191:*3*
219:*4* 223:*23* 228:*12, 13*
walking 175:*17* 176:*8, 9,
9* 177:*5* 191:*6* 192:*16*
209:*24*
wall 197:*2*
want 22:*4, 16* 34:*19* 49:*4*
60:*21* 64:*5* 89:*8* 98:*9*
110:*1, 14* 114:*13* 121:*2*
138:*16* 139:*3* 142:*15*
154:*19* 157:*3* 167:*21*
169:*14* 171:*1* 175:*5*
196:*18* 202:*11, 12* 205:*8*
222:*25* 229:*13* 245:*13*
249:*14, 21* 250:*12*
wanted 20:*13, 15* 21:*1*
144:*2* 175:*7* 191:*8, 11*
193:*24* 227:*5*
wants 204:*11* 249:*17, 23*
warmer 194:*4*
warn 213:*3*
warning 94:*12* 95:*4*
96:*11* 101:*1*
warnings 61:*3*
watched 21:*3*
watching 182:*24*
way 31:*17* 48:*3* 50:*25*
55:*25* 57:*5* 59:*3, 7, 9*
71:*4* 78:*17* 87:*17* 97:*18*
102:*5* 111:*3* 127:*15, 17*
129:*22* 149:*23* 155:*5*
161:*17* 163:*11* 164:*13*
168:*16* 170:*10* 174:*13*
180:*19* 183:*3, 4* 194:*21*
198:*13* 238:*23* 240:*5, 8*
weapon 43:*16* 63:*3*
150:*12* 184:*22* 186:*12*
195:*23, 25* 196:*3, 5, 6*
197:*13, 14, 19* 216:*13, 15,
17, 22* 217:*1, 7, 11, 12, 18,
21, 24* 219:*18, 21*
weapons 52:*2, 14* 53:*9, 12*
73:*10* 78:*18, 22* 145:*20*
162:*20, 23* 163:*1*
wear 13:*13, 17* 42:*2, 7, 10*
50:*8* 79:*7* 116:*15, 18*
145:*16* 150:*6*
wearing 42:*4* 43:*4* 49:*12,
18* 54:*2* 79:*1* 116:*21*
222:*17*
weather 144:*10* 150:*11*
168:*4*
Wednesday 1:*21* 129:*13*
week 20:*3* 28:*16, 19*
67:*12* 72:*17* 90:*25* 92:*1*
125:*12, 13, 14, 17, 22, 25*

Deposition of Sergeant Dean Graziolli | Melissa Yatsko and Darian Allen vs. Sergeant Dean Graziolli, et al.,

126:4  128:1, 6  129:6, 7,
11, 12, 15  156:3, 5  165:6,
7, 14  245:11, 22, 25  246:8
**weekly**  137:18
**weeks**  28:17  116:16
**weigh**  215:8
**weighed**  215:7
**weight**  215:18
**weights**  67:14, 18
**Well**  10:14  32:15  37:20
42:16  46:11  56:24  59:14
67:7  74:24  83:8  91:5
92:25  96:21  114:11
120:14, 19  124:21  126:1
129:5  131:4  140:3
141:20  148:5  176:5
180:11  181:2  188:8
198:7  202:17  225:9
226:1  232:9, 24  233:17
234:4  240:13, 22, 25
241:8  242:2  244:12
247:1, 19
**went**  29:23  30:1  104:10
109:6, 7  166:8, 9  172:11,
14  176:10  182:12  183:23
189:18  211:5
**We're**  7:1  22:16  62:9, 14
63:22, 23  69:23  102:20
112:5, 13  169:3, 6  179:3,
8  205:13  220:15  221:10
222:19, 25  241:1  249:24
250:4, 17, 25
**were,**  180:19
**West**  4:6  114:15
**Westlake**  3:11
**Westpoint**  3:10
**we've**  55:7  56:24  111:18
203:20  204:21
**what'd**  166:10, 15  171:23
180:12  185:18
**whatsoever**  44:22
**Where'd**  168:2
**WHEREOF**  253:5
**whiplash**  110:3
**white**  60:12
**Wichita**  7:20
**wife**  101:21  102:16  103:7
**window**  182:18
**windows**  182:19
**winter**  168:11
**wintertime**  237:8
**within-named**  252:10
**witness**  7:3  10:20  171:25
183:18  189:19, 23  204:8
207:22  249:16  252:10, 15,
17, 20  253:5
**witnessed**  207:18
**witnesses**  207:17
**woman**  15:16  37:23
195:10, 11

**word**  76:3  108:19  133:25
134:11  135:6  226:7, 7
**words**  51:2  59:25  99:24
100:1
**wore**  49:7
**work**  8:9  41:13, 17, 20
48:5  67:24  89:1, 22, 24
98:23  109:11  115:1, 4
116:8, 9  127:9  128:10, 13
130:21  135:15  136:12
137:25  138:3, 16  139:12,
14, 16, 22  140:3  141:2
142:23  144:18  146:2
152:5, 11  155:2  164:25
165:7, 9, 17  166:8, 17, 25
179:19  217:23  235:8
245:12  249:2
**worked**  44:12  110:10
126:17  127:6, 19, 21, 22,
23, 25  131:23  132:19
136:13  137:21  138:9, 11
139:13  142:22, 25  143:2
150:13  152:18, 23, 25
154:15  156:11  163:5
165:11, 16  242:12, 22
**Workers**  40:15, 16  105:13
107:16, 20  108:13  110:24
111:4, 6, 14  113:15
235:25  236:13, 16, 24
237:3, 5  241:6, 10
**working**  35:9  36:12  39:7
40:2  42:11  43:5, 10, 25
44:8, 17, 19, 21  45:1, 7, 18,
22  46:14  47:1, 16  48:22
50:9  71:24  78:15  89:6,
13, 16  95:4  104:21  114:9,
10  127:2  128:2  137:5
138:6, 7  139:6  141:7
142:9  145:12  149:15, 25
150:7  151:8  153:24
154:8, 23  157:16  159:6,
13, 25  160:4, 5, 15  162:2,
21  164:6, 16  165:20, 23,
24  173:19  207:15
**workout**  67:23
**works**  98:25
**worry**  188:18, 20
**wrist**  116:2, 2, 3, 11, 13
**write**  20:19
**writing**  20:18
**writings**  84:4
**written**  20:10  21:17  25:2,
5  56:21  64:3  81:25  82:1
88:6  93:1  94:11  95:4, 9
96:1  136:7  144:18  146:6
202:14  235:1

**< Y >**
**YATSKO**  1:5, 7  15:17
22:14  36:7, 19, 24  37:21

38:10, 12, 22  39:12
172:22  178:7  203:17
205:18  222:14
**Yatsko's**  9:15
**Yeah**  13:21  22:15  28:20
31:25  36:12, 22  39:24
44:5  54:8, 8  61:22  66:14,
14  68:21  76:22  83:2
85:5, 24  92:12  94:25
95:13  101:19  106:3, 5
110:15, 23  116:4  125:8
126:21  128:7  131:8
135:11  136:16  140:5
157:7  165:8  168:20
169:23  172:24  180:11
188:4  198:20  202:19
208:15  215:23  217:16
221:9, 13  222:5, 16, 18, 19
223:3, 3  228:21  233:2
243:8  244:19  245:23
246:6  248:8  249:15
**year**  8:24  9:1, 5, 6  17:7
20:4  27:20  41:17  45:4
55:18  62:25  72:13  76:5
95:24  102:23  106:12, 16
109:2  110:4  127:4, 13
128:24  132:4, 7  234:11
237:7  241:1
**yearly**  63:4, 9
**years**  7:23  42:21, 24
54:20, 22  63:22  68:25
101:13  110:13  126:24
128:15  131:2  233:18
242:14
**yelling**  214:2  225:21
**young**  37:3  195:10
**younger**  66:24

**< Z >**
**Zarlenga**  25:13  26:18
135:9, 10, 15  140:13, 15,
16  154:22