Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT
 2        FOR THE NORTHERN DISTRICT OF OHIO
 3                 EASTERN DIVISION
 4
 5 MELISSA YATSKO and      )
   DARIAN ALLEN,           )
 6 Co-Administrator of the )
   Estate of Thomas Yatsko,)
 7                         )
 8      Plaintiffs,        )
                           )
 9   VS.                   )     1:18-CV-00814
                           )     JUDGE POLSTER
10 SERGEANT DEAN GRAZIOLLI,)
   ET AL.,                 )
11                         )
                           )
12      Defendants.        )
                           )
13
14
                  - - -
15
     VIDEOTAPED DEPOSITION OF JONATHAN SEEHOLZER
16
          TUESDAY, APRIL 30, 2019
17
                  - - -
18
19 The videotaped deposition of JONATHAN SEEHOLZER, called
20 by the Plaintiffs for examination under the Ohio Rules
21 of Civil Procedure, taken before me, Stacey Mocz, Notary
22 Public in and for the State of Ohio, at Spangenberg,
23 Shibley & Liber, LLP, 1001 Lakeside Avenue East, Suite
24 1700, Cleveland, Ohio, commencing at 10:25 a.m., on the
25 date above set forth.
```

Page 2

```
 1 APPEARANCES:
 2 On Behalf of the Plaintiffs:
 3     NICHOLAS A. DICELLO, ESQ.
       Spangenberg, Shibley & Liber, LLP
 4     1001 Lakeside Avenue East
       Suite 1700
 5     Cleveland, Ohio 44114
       216.696.3232
 6     NDiCello@spanglaw.com
 7
       JEREMY A. TOR, ESQ.
 8     Spangenberg, Shibley & Liber, LLP
       1001 Lakeside Avenue East
 9     Suite 1700
       Cleveland, Ohio 44114
10     216.696.3232
       JTor@spanglaw.com
11
   On Behalf of the Defendant MRN/Corner Alley:
12
       PATRICK M. ROCHE, ESQ.
13     Collins, Roche, Utley & Garner, LLC
       875 Westpoint Parkway
14     Suite 500
       Cleveland, Ohio 44145
15     216.916.7730
       Pmroche@cruglaw.com
16
   On Behalf of the Defendant Sergeant Dean Graziolli:
17
       DAVID M. LENEGHAN, ESQ.
18     200 Treeworth Boulevard
       Suite 200
19     Broadview Heights, Ohio 44147
       440.653.1246
20     Leneghanlaw@yahoo.com
21 On Behalf of the Defendant City of Cleveland:
22     MICHAEL J. PIKE, ESQ.
       City of Cleveland Law Department
23     601 Lakeside Avenue
       Room 106 - City Hall
24     Cleveland, Ohio 44114
       216.664.2800
25     Mpike@city.cleveland.oh.us
```

Page 3

```
 1 On Behalf of the Defendant Safeco Insurance Company (via
   telephone):
 2
       FRANK S. CARSON, ESQ.
 3     Frost Brown Todd, LLC
       10 West Broad Street, Suite 2300
 4     Columbus, Ohio 43215
       614.464.1211
 5     Fcarson@fbtlaw.com
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1                    I N D E X
   WITNESS                        Page
 2 JONATHAN SEEHOLZER
 3 EXAMINATION BY MR. DICELLO           9
 4 EXAMINATION BY MR. LENEGHAN      147
 5 EXAMINATION BY MR. PIKE          149
 6 FURTHER EXAMINATION BY MR. DICELLO   165
 7 FURTHER EXAMINATION BY MR. LENEGHAN  172
 8 FURTHER EXAMINATION BY MR. PIKE      172
 9
10
11 OBJECTIONS:
12 MR. ROCHE:  Objection           10
13 MR. ROCHE:  Objection           13
14 MR. ROCHE:  Objection           20
15 MR. ROCHE:  Objection           22
16 MR. ROCHE:  Objection           55
17 MR. PIKE:   Objection           58
18 MR. ROCHE:  Objection           75
19 MR. ROCHE:  Objection           75
20 MR. ROCHE:  Objection           80
21 MR. ROCHE:  Objection           83
22 MR. PIKE:   Objection           84
23 MR. ROCHE:  Objection           91
24 MR. ROCHE:  Objection           91
25 MR. ROCHE:  Objection           92
```


EXHIBIT
C

Jonathan Seeholzer  4/30/2019

Page 9

1      JONATHAN SEEHOLZER
2  of lawful age, called for examination, as provided by
3  the Ohio Rules of Civil Procedure, being by me first
4  duly sworn, as hereinafter certified, deposed and said
5  as follows:
6          - - - - -
7          EXAMINATION OF
8          JONATHAN SEEHOLZER
9  BY MR. DICELLO:
10  Q.   Good morning.
11  A.   Good morning.
12  Q.   Could you please state your name and spell your
13       last name for the court reporter and the record?
14  A.   Jonathan Edward Seeholzer, S-e-e-h-o-l, Z as in
15       zebra, e-r.
16  Q.   Mr. Seeholzer, my name is Nick DiCello.  We had a
17       chance to meet briefly off the record this
18       morning.  That's the first time we've met,
19       correct?
20  A.   Correct.
21  Q.   And you understand you're here to have your
22       deposition taken today?
23  A.   Yes.
24  Q.   And there's a lawsuit pending in the Northern
25       District of Ohio surrounding the shooting death

Page 10

1       of Thomas Yatsko.
2          You understand that today's deposition is
3       taken in connection with that case?
4  A.   Yes.
5  Q.   And MRN hired Dean Graziolli to provide security
6       at the Corner Alley that night, correct?
7          MR. ROCHE:  Objection.  Go ahead.  You can
8          answer.
9  A.   Corner Alley.
10  Q.   I'm sorry?
11  A.   Corner Alley Uptown hired him.
12  Q.   Okay.  You understand, though, we're here about
13       an incident that occurred January 13th of last
14       year?
15  A.   Yes.
16  Q.   Okay.  Good.  Have you ever been deposed before?
17  A.   No.
18  Q.   All right.  I'm sure you've been prepared on what
19       to expect to some extent.  Let me go over some
20       quick ground rules so we can make this as
21       efficient as possible.
22  A.   Mm-hm.
23  Q.   This will go question and answer.  I'll ask the
24       questions, and you provide the answers.
25       Understood?

Page 11

1  A.   Yep.
2  Q.   We have a video camera recording you, but it's
3       also important to make sure that your answers are
4       verbal with a yes, no, or an explanation.
5          If you give an occasional uh-huh or nuh-uh,
6       one of us at the table will politely correct you.
7       It's not to be rude.  It's just to get accurate
8       testimony down on the record, okay?
9  A.   Okay.
10  Q.   Also, please try to wait until I'm done asking my
11       question before you answer, and I'll wait for you
12       to finish.  Even though you know what I'm going
13       to ask -- you may jump in to answer the
14       question -- it's much easier on our court
15       reporter if we don't speak over one another,
16       okay?
17  A.   Okay.
18  Q.   If I ask you a question that you don't understand
19       for any reason at all, I want you to let me know
20       that, okay?
21  A.   Okay.
22  Q.   Given that understanding we have, if you answer a
23       question that I've asked you, I'm going to assume
24       that you understood it, and I'm going to move on
25       to the next one.  Is that fair?

Page 12

1  A.   Fair.
2  Q.   If at any point in time today your memory gets
3       jogged about something or you realize you left
4       something out of an answer or you want to go back
5       and change or supplement an answer you've given,
6       I want you to take the opportunity today on the
7       record to make any changes you want, okay?
8  A.   Okay.
9  Q.   You understand you're under oath today?
10  A.   I do.
11  Q.   And do you understand the oath you took to tell
12       the truth today, it's the same kind of oath that
13       one takes when he or she takes the stand and
14       testifies in front of a jury in a courtroom?
15  A.   I do.
16  Q.   I don't know how long we'll be today.  I hope not
17       to keep you too long.  This is the one chance I
18       have to speak with you before the trial in this
19       case.  So if at any point in time you want to
20       take a break for any reason or no reason at all,
21       we can do that.
22          I would ask that if a question's pending to
23       you, please answer the question first and then
24       say, Nick, let's just take a break.  And we'll do
25       that, all right?

Jonathan Seeholzer  4/30/2019

Page 29

1 Q.   Okay.  So later, let me ask, you found out that
2      Pickwick & Frolic was employing Cleveland Police
3      Officers?
4 A.   Correct.
5 Q.   And did those police officers -- you said you
6      relied on those officers --
7 A.   Correct.
8 Q.   --to provide security at Greenhouse?
9 A.   If we had issues, they were always very willing
10     to help if we needed it.
11          There was also officers, I believe, were
12     supplied by the City of Cleveland through the
13     Downtown Cleveland Alliance.  They were also
14     Cleveland Police Officers, from what I
15     understand.  Sometimes I believe they were RTA
16     Officers, as well.
17 Q.   At your time at Greenhouse Tavern, did you ever
18     hire any Cleveland Police Officers to work there?
19 A.   I believe so, once or twice, but I can't be sure.
20     I remember talking to the officers about it, and
21     I think I did.
22 Q.   Okay.  And how did you pay those officers?
23 A.   I don't recall.
24 Q.   How many times do you think it was that you
25     personally hired a police officer?

Page 30

1 A.   If we did, it was maybe twice that I can
2      remember.
3 Q.   Okay.
4 A.   And I can't be sure.  I remember looking into it.
5      I think I did -- you know what?  I think we did
6      do it once or twice, yes.
7 Q.   So you were an owner/partner, and its sounds like
8      you wore many hats --
9 A.   Yes.
10 Q.   -- at The Greenhouse Tavern up until 2013?
11 A.   I believe -- I believe it was June of '13.
12 Q.   And then where did you go after Greenhouse
13     Tavern?
14 A.   I went and worked for my current employer.
15 Q.   And your current employer is MRN, Ltd.?
16 A.   No.  My -- well, I guess technically my paychecks
17     are 629 Euclid, Ltd. or LLC.  I'm not sure.  I
18     can't remember.
19 Q.   629 Euclid either Ltd. or LLC?
20 A.   I believe.
21 Q.   How long -- so has your employer been 629 Euclid
22     since you were hired in 2013?
23 A.   Yes.
24 Q.   And that's currently your employer?
25 A.   Correct.

Page 31

1 Q.   What is 629 Euclid, Ltd. or LLC?
2 A.   I couldn't say.  I know it says that on my
3      paycheck.
4 Q.   Do you know who owns that business?
5 A.   I could make assumptions.  I believe that it is
6      some members of the Maron family, but I couldn't
7      say for certain.
8 Q.   What does that business do?
9 A.   We -- that specific business, I -- I don't know.
10     I know what I do in that business.  I don't know
11     if there's other branches within that.  I'm not
12     privy to how -- they have multiple businesses.
13 Q.   Okay.  Do you know how many employees 629 Euclid
14     has?
15 A.   I do not know, no.
16 Q.   Are you aware of anyone else other than yourself
17     who's employed by 629 Euclid?
18 A.   Yes.
19 Q.   Okay.  Who else?
20 A.   Currently I know Christine Connell, Frances Bess,
21     Courtney, who is new, I don't know her last name.
22     Amy White.  I think they're all 629.  Geoff Goss,
23     Jeff Tichy.  This is -- I have a little less
24     knowledge of this, so I couldn't be a hundred
25     percent sure, but I'm pretty sure.

Page 32

1      Our accounting team, Geoff Goss, Adam, I
2      don't know his last name, Prawnie, I don't know
3      her last name, and Apple.  I'm not quite sure of
4      her last name.
5 Q.   Are all the folks that you just listed, did they
6      work at the offices where you work?
7 A.   We all work on the second floor.
8 Q.   Christine Connell, she's the director of sales,
9      marketing, and events?
10 A.   Correct.
11 Q.   For 629 Euclid?
12 A.   No.
13 Q.   Okay.  So Christine Connell is the director of
14     sales, marketing, and events for who?
15 A.   Hospitality restaurants.  Any -- not any.  The
16     Corner Alley Uptown, well, used to be, Downtown,
17     Zocalo, Tudor Arms, Erie Island Coffee.
18 Q.   What about Flannery's?
19 A.   No, not anymore.  She was at one point.
20 Q.   But when Flannery's was -- I mean, are these MRN
21     restaurants or no?
22 A.   As far as -- I couldn't say who owns them.  I
23     have never seen the lease.
24 Q.   Okay.  And I think Fanny Bess, we've heard her
25     name before.  Is she a human resources specialist

Jonathan Seeholzer  4/30/2019

Page 45

1  A.  Getting to that point?  Yeah.  I mean, they were
2      primary.  I was secondary, but I had knowledge in
3      -- a little bit more knowledge in kitchen layout,
4      and stuff like that, and kind of the logistics of
5      things.
6  Q.  Okay.  With respect to anything you did -- when
7      you were still in you regional operations manager
8      position, with respect to anything you did in
9      connection with Corner Alley Uptown before the
10     doors were open --
11  A.  Yeah.
12  Q.  -- who did you report to?  Was it Christine or
13     Todd?
14  A.  While I was operations manager I always reported
15     to Christine and/or Todd, and mainly Christine, I
16     think.
17  Q.  And did you do that more often than not at the
18     629 Euclid offices?
19  A.  No.  At that time, we did -- we've only had
20     offices recently.  Well, it's been a couple years
21     now.  But no, at that time, we did not have
22     offices.
23  Q.  Okay.  So when you were regional operations
24     manager, when you were first hired into that
25     role, did you have an office?

Page 46

1  A.  I did not.
2  Q.  And did you have a place where you worked from
3      regularly?
4  A.  Different restaurants and bars.
5  Q.  Which ones?
6  A.  Corner Alley and Zocalo.
7  Q.  Downtown?
8  A.  Downtown Corner Alley and Zocalo.
9  Q.  So did you have an office in each of those
10     locations that you could use and have a computer
11     terminal?
12  A.  I could use the GM office.  We would share.
13  Q.  Did you otherwise carry around a laptop?
14  A.  I did.
15  Q.  And who issued you the laptop?
16  A.  I believe Christine gave it to me.
17  Q.  Your Gmail.com account, is that one you had
18     before you --
19  A.  Yes.
20  Q.  -- took the position that Mr. Jori Maron offered
21     you?
22  A.  Yep.
23  Q.  And then the e-mail that you obtained when you
24     accepted the position that Mr. Maron offered you
25     is your MRN e-mail?

Page 47

1  A.  I do not believe that I had that e-mail.  We
2      didn't start that until later.  We had -- I don't
3      remember at what point, but I do remember that I
4      just used my Gmail when we first started all the
5      time.
6  Q.  Do you remember when it is that you were issued
7      an MRN address?
8  A.  I do not.
9  Q.  And what is the e-mail address?
10  A.  JSeeholzer@MRNLtd.com.
11  Q.  Have you ever been issued any other e-mails in
12     connection with your work with the Marons?
13  A.  I don't believe so.  There's a possibility that I
14     had a Corner Alley e-mail at one point, but I
15     can't recall.
16  Q.  What's your understanding of what MRN, Ltd. is?
17  A.  I guess a name.  We're not very formal with
18     anything, so I kind of see it as a -- as, you
19     know, a name.
20         I have the understanding that, you know,
21     Zocalo is one business and Corner Alley Uptown
22     and Corner Alley Downtown were two separate --
23     three separate.  So a brand, maybe.
24  Q.  Okay.  Does MRN, Ltd. own and manage the Corner
25     Alley?

Page 48

1  A.  I do not know.
2  Q.  Who would you ask that question of?
3  A.  Jori Maron, if I had to ask.
4  Q.  Do you know if Mr. Maron has represented publicly
5      that MRN, Ltd. owned and operated the Corner
6      Alley Uptown location?
7  A.  I do not know.  We -- I do not know.
8  Q.  Okay.  You've had occasion to be interviewed by
9      the press throughout your career, correct?
10  A.  Here and there, yeah.
11  Q.  And were you ever instructed as to how to
12     describe MRN or MRN, Ltd. when being interviewed
13     about any given venue?
14  A.  No, not that I can recall.
15  Q.  Okay.  In any public statements, have you ever
16     indicated that 629 Euclid, LLC or Ltd. managed
17     any of the venues?
18  A.  Not that I can recall.
19  Q.  Can you ever recall referencing MRN in connection
20     with the management of the venues?
21  A.  Yes.  That's what we -- I use as far as something
22     to call it, yes.
23  Q.  Okay.  And is your use of MRN as the entity that
24     manages these venues consistent with your
25     coworkers?  In other words, is that how they

Page 13  (Pages 49-52)

Jonathan Seeholzer  4/30/2019

---

**Page 49**

1  relate to -- or is that how they describe it, as
2  well?
3  A.  I think so.
4  Q.  All right. I want to move forward. This is very
5  helpful. I appreciate your patience here.
6       At some point in time, your title changed
7  from regional operations manager to what?
8  A.  I believe it's director of restaurant operations.
9  Q.  And when did that change occur, approximately, as
10  best as you can remember?
11  A.  I know it was December. I want to say it was
12  '15, but I cannot be sure.
13  Q.  Was that a promotion?
14  A.  Yes.
15  Q.  Did your employer change?
16  A.  Not -- no, I don't believe so.
17  Q.  Who offered you that new position?
18  A.  Jori Maron.
19  Q.  Did it come with an increase in pay?
20  A.  It did.
21  Q.  Did it come with an increase in responsibilities?
22  A.  I guess. I did not have any new reports. I was
23  brought up to the same level of the -- to the
24  people I was working -- that I was reporting to
25  prior to that.

**Page 50**

1  Q.  Okay. Do you recall generally the conversation
2  with Mr. Maron when he offered you this new
3  title?
4  A.  I remember -- I remember it happening, yes.
5  Q.  Can you tell me what it is you remember about
6  Mr. Maron offering you this new title?
7  A.  My pay increase.
8  Q.  I'm sure you remember that part. There's usually
9  a flip side to that, John.
10       Do you remember him telling you how your job
11  responsibilities would change in any meaningful
12  way or did they not?
13  A.  I did not, no. The only thing I remember -- you
14  know, the change would be, you know, working with
15  my former bosses as opposed to working for my
16  former bosses.
17  Q.  And would that include Christine Connell and
18  Mr. DiCillo?
19  A.  Correct.
20  Q.  Did this new title coincide with any other folks
21  leaving the company?
22  A.  I don't think so.
23  Q.  Mr. DiCillo left at some point?
24  A.  Much later, yes.
25  Q.  Okay, much later. All right. So your job

**Page 51**

1  description that you described for me as regional
2  operations manager, would that job description
3  also apply to your position as director of
4  restaurant operations?
5  A.  Probably, but maybe -- yeah, I would think so.
6  Maybe altered.
7  Q.  How was it altered?
8  A.  I honestly don't think that we ever actually
9  finalized my job description. I'm not positive,
10  but I believe I did have a job description for
11  regional operations manager, and I saw a draft of
12  one for director of restaurant operations. I
13  can't remember if it was finalized or not.
14  Q.  So let me back up. I thought I had asked you
15  this but maybe I missed it or -- you have seen
16  something in writing that describes the position
17  of regional operations manager?
18  A.  I believe so.
19  Q.  All right. If you wanted to try to put your
20  hands on that document, how would you go about
21  it?
22  A.  Type in a -- type in a job description to my
23  computer and see what I can find.
24  Q.  Okay. And then you believe you may have seen a
25  draft of a job description for director of

**Page 52**

1  restaurant operations?
2  A.  I think me and Christine were working on that at
3  one point right when I got -- took the position,
4  but I don't think we ever completed it.
5  Q.  And if you wanted to find that draft, you would
6  look in your computer?
7  A.  Same thing, Google my computer.
8  Q.  Okay. As director of restaurant operations, is
9  that a management position?
10  A.  I would consider it one.
11  Q.  Okay. And who do you report to as director of
12  restaurant operations?
13  A.  Jori Maron.
14  Q.  Are you the director of restaurant operations for
15  MRN?
16  A.  I guess. Like I said, I use that as a name, as a
17  brand that I see.
18  Q.  Are you the director of restaurant operations for
19  MRN Hospitality Group?
20  A.  Yes. We attempted to kind of brand that at one
21  point.
22  Q.  What is MRN Hospitality Group?
23  A.  It's a brand. I guess we felt that it would be
24  good for us if we were somehow able to create an
25  image of a group that managed multiple -- a

Page 14  (Pages 53-56)

Jonathan Seeholzer  4/30/2019

Page 53

1  definition for ourselves as opposed to just
2  managing different places.
3  Q.   And did you seek permission from Jori Maron to
4  create the MRN Hospitality Group?
5  A.   We did, yes.
6  Q.   And he authorized that?
7  A.   The name. We never -- I never created a
8  business.
9  Q.   Okay. So as the director of restaurant
10  operations, are you directing the operations of
11  Corner Alley Downtown?
12  A.   I'm assisting in it, yes. I have reports that
13  work for me. Our structure's changed over the
14  years.
15  Q.   Corner Alley Uptown, when it was in existence?
16  A.   I can't remember exactly when. When we opened up
17  Corner Alley Uptown, I only focused on Downtown
18  locations after the opening. I did not focus on
19  Uptown.
20       At some point, I did assist in the oversight
21  of Corner Alley Uptown. I don't remember the
22  actual time, though.
23  Q.   Okay. We'll get into that more specifically, but
24  let me focus on this title. As the director of
25  restaurant operations, you were the director of

Page 54

1  operations for what restaurants? Zocalo?
2  A.   Yeah.
3  Q.   Corner Alley Downtown?
4  A.   Correct.
5  Q.   Flannery's when it was around?
6  A.   At one point, yes. When we -- when I first took
7  the position, I don't believe that we operated
8  Flannery's.
9  Q.   Who did?
10  A.   A management company called Trifecta.
11  Q.   Do you have any names associated with Trifecta,
12  individuals that you would know?
13  A.   I would have to -- no. I do not know any of
14  them. I met one. His name was Adam. They were
15  before my time out of -- they were before my
16  time, to a certain extent.
17       They are the company that opened up Zocalo,
18  Corner Alley, and Flannery's. Well, didn't open
19  Flannery's, but --
20  Q.   During your tenure, are you aware of Trifecta
21  offering or providing management services to any
22  other venues other than Flannery's?
23  A.   Yes. During my tenure?
24  Q.   Yeah.
25  A.   They -- I don't know the exact time frame. At

Page 55

1  one point, they did manage Corner Alley and
2  Zocalo and Flannery's.
3       When I was brought on, they may have still
4  been managing Corner Alley, but I cannot say for
5  certain. I'm not sure of the timeline.
6  Q.   Did Trifecta ever manage, to your knowledge,
7  Corner Alley Uptown?
8  A.   They did not.
9  Q.   And just to make sure I'm speaking the same
10  language as you are, when we talk about
11  management, we're talking about operations,
12  correct?
13  A.   Yes.
14  Q.   And it is the management folks who are
15  responsible for providing security services at
16  any given location, correct?
17       MR. ROCHE: Objection. Go ahead, if
18       you know.
19  A.   For an example-wise, we -- the general manager of
20  a location had organized -- you know, would
21  organize or find security for the locations.
22       I know that Trifecta, for instance, did not
23  -- I don't know. I'm 90 percent sure that
24  Trifecta did not organize that for, let's say,
25  Flannery's.

Page 56

1  Q.   Do you know who did?
2  A.   I would assume that it was the general manager.
3  Q.   Do you remember who the general manager was for
4  Flannery's?
5  A.   Sean O'Donnell.
6  Q.   So your understanding within the MRN Hospitality
7  Group or the restaurants underneath which you are
8  the director, that is the general manager's
9  responsibility to arrange for any necessary
10  security services?
11  A.   It had been. I had assisted when we did a
12  remodel of the Downtown Corner Alley.
13  Q.   Tell me about that.
14  A.   So whatever year it was -- maybe that was '15, so
15  the other one opened earlier -- we had closed
16  down Corner Alley Downtown for renovation for a
17  summer.
18       When we closed down, we -- prior to closing
19  down, we did have security that was arranged that
20  predates me. When we reopened, we attempted to
21  not have security because of the cost, and
22  eventually, because of incidents, we did. And I
23  headed up that -- finding the security for
24  Downtown Corner Alley.
25  Q.   Okay. Let me try to unpack that a little bit.

Page 15  (Pages 57-60)

Jonathan Seeholzer  4/30/2019

Page 57

1  A.   Yeah.
2  Q.   I'm not saying it's not a responsive answer,
3       John, but there was a lot in there for me.
4           So prior to the remodel at Corner Alley
5       Downtown --
6  A.   Mm-hm.
7  Q.   -- the general manager was responsible for
8       providing any security services at that location?
9  A.   My assumption. Like I said, it was already in
10      place when I started. The general manager --
11      the security had been around longer than the
12      current general manager, so it could have been
13      Trifecta.
14 Q.   Okay. And who was providing security at Corner
15      Alley Downtown prior to the remodel?
16 A.   I know one of the officers was named Andy, but
17      besides that, I don't remember the last name or
18      other ones.
19 Q.   So they were Cleveland Police Officers?
20 A.   They were.
21 Q.   Were there ever any private non-Cleveland --
22      non-officer, non-police officer security
23      personnel employed at Corner Alley Downtown
24      before the remodel?
25 A.   Employed by Corner Alley Downtown?

Page 58

1  Q.   Yeah.
2  A.   Not of -- not to my knowledge.
3  Q.   Okay. Prior to the remodel -- I think -- I think
4       if we can make it a point in time, it's after the
5       remodel that you start having any involvement in
6       assisting with getting security services,
7       correct?
8  A.   That is correct.
9  Q.   So let's focus on what you knew -- and I'm not
10      suggesting you should know everything --
11 A.   Mm-hm.
12 Q.   -- but before the remodel, was it your
13      understanding that security services were in
14      place at Zocalo and Flannery's and Corner Alley
15      Downtown?
16 A.   It was my understanding that security was in
17      place at Corner Alley Downtown and Flannery's.
18 Q.   And was that being provided by Cleveland Police
19      Officers?
20           MR. PIKE: Objection to form. You
21          can answer.
22 A.   From what I understand.
23 Q.   Prior to the remodel, are you ever aware of any
24      private security personnel other than Cleveland
25      Police Officers being hired at any MRN venue?

Page 59

1  A.   I can't say for certain. Timeline, I believe --
2       I don't know if this is prior, so maybe you just
3       don't want to me to answer --
4  Q.   Go ahead.
5  A.   -- but I can't say for certain.
6           At one point -- and I don't remember if this
7       is before or after -- I believe we did use
8       Tenable at one point.
9  Q.   So a security company?
10 A.   Yes.
11 Q.   Were you involved at all in the decision to use
12      Tenable?
13 A.   I think so. I can't remember.
14 Q.   Do you recall when that was?
15 A.   No, I don't. I want to say it was on a St.
16      Patrick's Day that we attempted it. It was
17      probably -- I would guess. I couldn't say for
18      certain, but it was the first St. Patrick's Day
19      after we reopened for the remodel.
20 Q.   So it was limited to the holiday?
21 A.   Correct.
22 Q.   Something else I think I heard in your previous
23      answer when you were talking about closing down
24      Corner Alley Downtown, the remodel --
25 A.   Can I say one more thing?

Page 60

1  Q.   Yeah. Yeah. Go ahead.
2  A.   I would like to say that the reason that we did
3       not use -- the reason that we ended up, when we
4       got security was to use Cleveland Police Officers
5       would be the lack of satisfaction I was with the
6       services from Tenable.
7  Q.   Okay. All right. How so?
8  A.   They didn't do anything.
9  Q.   Okay. That's a good reason.
10 A.   They sat there with jackets on and got paid to do
11      nothing.
12 Q.   That's a good reason to be dissatisfied.
13           So in your answer telling me about the
14      remodel, I think I heard you say there was a
15      period of time after the remodel where Corner
16      Alley Downtown tried to get by without Cleveland
17      Police Officer security?
18 A.   Correct.
19 Q.   Who made that decision?
20 A.   At the time it was a general manager. I believe
21      he was a general manager then. Michael Grasso.
22           He felt we could manage the situation with
23      our current managers and deescalating situations,
24      which, for the most part, worked.
25 Q.   Okay. And I think you also said there was a cost

Jonathan Seeholzer 4/30/2019

| Page 61 | Page 63 |
|---|---|
| 1    basis for that decision, as well? | 1    you know if it had security personnel? |
| 2   A.    Yeah. There was a cost basis. | 2   A.    I believe initially we did not. |
| 3   Q.    Okay. So proceeding without security at | 3   Q.    And how long was it that Corner Alley Uptown |
| 4    Cleveland -- or Corner Alley Downtown -- | 4    initially did not have any security personnel? |
| 5    understanding that Mike thought that the | 5   A.    I couldn't say for certain. I would guess six |
| 6    management could handle, and for the most part | 6    months, maybe. Maybe less, maybe more. |
| 7    could -- was, in part, a cost-saving measure? | 7   Q.    Did the decision to hire security personnel on |
| 8   A.    Not necessarily saving. We increased our head | 8    certain nights at Corner Alley Uptown coincide |
| 9    count in management. | 9    with your decision to provide security at Corner |
| 10   Q.    Okay. | 10    Alley Downtown? |
| 11   A.    When we reopened, went from, I think, three to | 11   A.    No. It was for -- |
| 12    five, so that also increased our floor presence | 12   Q.    Okay. So let me try to break that down. |
| 13    on management, so we thought we would try it out. | 13    Who made the decision to go from no security |
| 14    It was kind of a wash, probably, but, I mean, | 14    personnel at Corner Alley Uptown to security |
| 15    yeah. | 15    personnel on certain nights? |
| 16   Q.    So how long before the decision was then made to | 16   A.    I did, I believe. I think between me and the |
| 17    go back to hiring Cleveland Police Officers for | 17    general manager. |
| 18    security at Corner Alley Downtown? | 18   Q.    And the GM at the time would have been Mike |
| 19   A.    I couldn't say. I would guess less than a year. | 19    Grasso? |
| 20   Q.    Okay. And that was the result of incidents? | 20   A.    It might have been -- I don't think it was him. |
| 21   A.    Yeah. We didn't have too many, but a specific | 21    It would be Mike Graham, I believe. |
| 22    incident. | 22   Q.    Mike Graham. Do you know who Mike Graham worked |
| 23   Q.    Which one are you calling to mind? | 23    for when he was GM for Corner Alley Uptown? |
| 24   A.    I don't remember exactly. It was a man and his | 24   A.    Corner Alley Uptown. |
| 25    girlfriend were fighting, and he, I believe, hit | 25   Q.    And was it your understanding that Corner Alley |

| Page 62 | Page 64 |
|---|---|
| 1    her, and our managers tried to stop him, and it | 1    Uptown, LLC would be on Mike Graham's paycheck? |
| 2    turned into the man beating up and hitting our | 2   A.    Yes. |
| 3    employees. | 3   Q.    And how about Mike Grasso? Was there a time |
| 4   Q.    Okay. All right. So who then made the decision | 4    where Mike Grasso was the general manager of |
| 5    at Corner Alley Downtown to go back to hiring | 5    Corner Alley Uptown? |
| 6    security? | 6   A.    He -- yes, I believe so. Yes. |
| 7   A.    I did. I felt it was -- | 7   Q.    And I've seen some things online about |
| 8   Q.    You made that decision? | 8    Mr. Grasso. I know he's no longer with your |
| 9   A.    -- the best for our employees. | 9    folks, but he was the brand manager for Corner |
| 10   Q.    Okay. And how did you go about doing that? | 10    Alley? |
| 11   A.    I had asked Nick at Pickwick & Frolic -- because | 11   A.    For a period of time, yes. |
| 12    I had seen the same officers do a great job from | 12   Q.    So did he have responsibility for both Corner |
| 13    the time that I was on the street starting in | 13    Alley Uptown and Downtown? |
| 14    2009, I believe -- who used and how he went | 14   A.    He did. |
| 15    about it. | 15   Q.    And during that time frame, who did he work for? |
| 16   Q.    Can you give me a time frame? I think we're | 16   A.    He got paid through Corner Alley Downtown, but we |
| 17    talking about a year after the remodel, the | 17    -- he -- Corner Alley Uptown was billed for |
| 18    reopening. | 18    50 percent of his salary. |
| 19   A.    I'm guessing 2016. | 19   Q.    Okay. All right. Let's go back -- |
| 20   Q.    Okay. | 20   A.    I believe it was 50 percent. It was on the P&L. |
| 21   A.    Spring-ish. | 21    That's the reason I know this. |
| 22   Q.    We could probably look that up because we know | 22   Q.    Let's go back to this decision that you made to |
| 23    when it reopened. | 23    introduce, if that's the right term, security |
| 24   A.    Yeah. I don't remember. | 24    services after approximately six months in |
| 25   Q.    All right. When Corner Alley Uptown opened, do | 25    business -- I'm not going to hold you to that |

Jonathan Seeholzer  4/30/2019

Page 65

1    time frame -- at Corner Alley Uptown.
2         Why did you make that decision?
3  A.  The initial -- there was two different timelines,
4    so I'll say the initial decision was for underage
5    consumption.
6         We had a college ID night, which I had
7    purchased ID scanners, which I then later found
8    out that the students are smarter than the
9    scanners, so at that point, I decided that I
10   wanted security there hoping that an officer
11   would deter underage attempts of fake IDs.
12 Q.  Okay.  Any other reason?
13 A.  At -- for that time, no.  That's why we brought
14   them in.  At that point I don't think we had any
15   major incidents up there.
16 Q.  Okay.  And how many nights a week was college ID
17   night?
18 A.  College ID night was Thursdays.  I can't remember
19   if we started on just Thursdays or we started on
20   Thursdays and Saturdays.  I don't recall.
21 Q.  So originally were there ever security personnel
22   at Corner Alley Uptown other than college ID
23   night?
24 A.  I can't remember for certain.  I can't remember
25   if we just started with Thursday or if we started

Page 66

1    Thursday/Saturday.  Eventually or from the
2    beginning, we went to Saturday.
3  Q.  Okay.  Did there come a point in time where
4    security personnel was retained at Corner Alley
5    Uptown other than for college ID night?
6  A.  Yes.  We -- I remember there was a incident on a
7    Sunday afternoon with a large group of people
8    that -- starting a -- fighting amongst them.
9         At that point I decided to increase the
10   amount of hours.  I don't remember specifically,
11   I think, if I increased the hours or days, but I
12   did increase the time that we used security
13   because of that incident.
14 Q.  Okay.  You made that decision?
15 A.  I did.
16 Q.  And did you make it in conjunction with anyone
17   else?
18 A.  Yeah.  I discussed it with -- I believe it was
19   Mike Grasso and Jori, as well.
20 Q.  Okay.  For that kind of decision to increase the
21   hours of security, is that something you would
22   need to get permission from Jori Maron about
23   before you could implement it?
24 A.  For -- for spending more money, yes.  It's
25   something that I would do.

Page 67

1  Q.  Okay.  So whether you specifically remember it or
2    not, you had to get permission from Jori Maron to
3    hire security personnel at Corner Alley Uptown,
4    correct?
5  A.  Yes.  I would discuss decisions with him.
6  Q.  And you had to get permission from him to
7    increase the hours of those security personnel at
8    Corner Alley Uptown, correct?
9  A.  Correct.
10 Q.  Okay.  Let me back up a little bit.
11        This decision -- to finish this off, this
12   decision to increase the hours of security, do
13   you remember when that was?
14 A.  I don't.  Not -- no, I couldn't.
15 Q.  Okay.  That's all right.
16 A.  I know the incident happened on a Sunday.  That's
17   the only thing -- during the day.
18 Q.  And what was that incident?  Do you remember?
19 A.  That was a large group of people -- I believe
20   they were family -- got into some kind of fight
21   amongst themselves, and it turned into a big
22   ordeal.
23 Q.  Okay.
24 A.  And I was worried about the safety of our
25   employees or just the general feeling that the

Page 68

1    employees felt backed up, and that's why I
2    increased the security.
3  Q.  Were the police called during that incident?
4  A.  I don't recall.  They may have been.  At the
5    time, I believed we would contact UCI was our
6    first go-to just because they were right there.
7  Q.  All right.  Prior to being hired on with -- prior
8    to being hired by Jori Maron, had you ever had
9    any experience managing a bowling alley?
10 A.  A bowling alley, no.
11 Q.  Any experience managing an arcade?
12 A.  No.
13 Q.  Your experience at that point -- and this isn't
14   to be pejorative.  I hope you don't take it that
15   way.
16        But your experience at the point you were
17   hired by Jori Maron was limited to management of
18   Greenhouse Tavern, and from a management
19   perspective, Greenhouse Tavern and Noodle Cat,
20   correct?
21 A.  Correct.  And my previous jobs, but correct.
22 Q.  Now, when you made decisions about security
23   personnel at Corner Alley Downtown and Corner
24   Alley Uptown, about which you've told me about,
25   did you consult with any security professionals?

Jonathan Seeholzer   4/30/2019

Page 69

1  A.   I believe -- so I know that I talked to House of
2       Blues, inquired on how they did things.
3  Q.   Who at House of Blues did you talk to?
4  A.   Scott Kapp.
5  Q.   And what was Mr. Kapp's position there?  Do you
6       know?
7  A.   I believe he's general manager.  It might be
8       higher.  I mean, he's the main boss within that
9       building.
10 Q.   Okay.  Let's just take this step by step.
11      When you talked to Mr. Kapp, did -- do you
12      know what kind of security was provided at House
13      of Blues?
14 A.   That's why I talked to him, to ask him those
15      questions.
16 Q.   Okay.  And what did Mr. Kapp tell you?
17 A.   They use a combination of Tenable and their own
18      in-house security.
19 Q.   Do you know whether or not --
20 A.   They also had officers, I believe, on certain --
21      maybe concert nights.  I cannot -- I can't
22      recall.
23 Q.   Was this an in-person meeting with Mr. Kapp or
24      over the phone?
25 A.   I don't recall.  I would see him here and there

Page 70

1       on the street.
2  Q.   Do you know if it was more than one conversation?
3  A.   I would guess that it is, but I couldn't say for
4       certain.
5  Q.   Okay.  Do you have any memory of how long these
6       conversations lasted?
7  A.   No, I do not.
8  Q.   Any paperwork exchanged in connection with these
9       discussions?
10 A.   I don't think so.
11      The only -- me and him -- and I don't
12      remember at what point this was.  I did get the
13      name of the company that did their in-house
14      training for their security.
15 Q.   And what was the name of that company?
16 A.   I don't remember, no.
17 Q.   Did you ever reach out to them?
18 A.   I did.  I went back and forth with them a few
19      times, and I was thinking about -- one of the
20      options was to have security within.  We
21      ultimately decided not to because we thought it
22      was be less effective and more of a liability.
23 Q.   Okay.  So let me -- I want to come back to that,
24      but before we do, when you say we, we decided it
25      would be less effective --

Page 71

1  A.   Jori Maron.  Sorry.
2  Q.   That's fine.  All right.  You said that -- when I
3       asked you originally, did you consult with any
4       security professionals, you said, well, I talked
5       to Mr. -- or Scott Kapp over at House of Blues.
6       My question is:  Scott Kapp is a colleague
7       of yours, fair to say?
8  A.   Correct.
9  Q.   Do you know if Scott Kapp is a professional in
10      security services?
11 A.   I do not know.
12 Q.   Okay.  So other than Mr. Kapp -- and you told me
13      Mr. Kapp gave you the name of some security
14      training company, and you talked with them.
15 A.   Mm-hm.
16 Q.   Did you talk with anybody else other than Mr.
17      Kapp?
18 A.   Where are we at?  Before we got security?
19 Q.   Yeah.  The question was:  Did you consult with
20      any security professionals in connection with
21      your decisions about security at Corner Alley
22      Downtown and Corner Alley Uptown?  And you went
23      on to say, well, I talked with Mr. Kapp.  I just
24      wanted to make sure --
25 A.   Nobody else.

Page 72

1  Q.   Okay.  All right.  Now let's focus back on this
2       decision you told me you had that you and Jori
3       Maron made -- I presume this is after or during
4       your phone calls with this security training
5       company?
6  A.   I would assume so, as well.  I can't say for
7       certain.
8  Q.   And the options -- among the options were hire
9       your own people to provide security or farm that
10      out to some service, fair?
11 A.   Fair.
12 Q.   And the decision between you and Jori was made
13      that you weren't going to hire and train your own
14      employees to provide security at Corner Alley
15      Uptown, correct?
16 A.   Correct.
17 Q.   And the basis for that decision was what?
18 A.   Well, first we decided that at Corner Alley
19      Downtown was when that decision happened.  It was
20      not Corner Alley Uptown.
21 Q.   Okay.
22 A.   We were not -- with my experience at Tenable, we
23      were not going to be able to provide the level of
24      security that we wanted.  I didn't want
25      employees, you know -- I was unsure about putting

Page 19  (Pages 73-76)

Jonathan Seeholzer   4/30/2019

Page 73

1    employees in that position even if they were
2    trained. I felt that Cleveland Police Officers
3    were going to be much better trained because they
4    were trained by the police academy, I would
5    assume.
6  Q.   Okay. When you said level of security you wanted
7    to provide, what level of security did you and
8    Jori Maron want to provide?
9  A.   I felt that having a -- having an employee in a
10    t-shirt at the front door was not quite the level
11    that I felt would be most effective.
12       I felt that a uniformed officer would be
13    more effective just off the rip. I feel that it
14    would have deterred issues just because of the
15    visual.
16 Q.   Okay. Again, not trying to be pejorative. This
17    is just what your -- based on your experience,
18    that was what your thought process was?
19 A.   Correct.
20 Q.   Did you consult with any consulting companies
21    about whether your gut feeling was correct or
22    incorrect in that regard?
23 A.   No.
24 Q.   All right. Do you consider yourself a security
25    professional?

Page 74

1  A.   No.
2  Q.   And do you consider Mr. Jori Maron a security
3    professional in any way?
4  A.   No.
5  Q.   So I think part of the decision not to go with
6    in-house security folks at Corner Alley Downtown
7    was you didn't think it would provide the level
8    of security you wanted. You thought a uniformed
9    police officer other than a guy in a t-shirt, as
10    you say, would be more effective, and then I
11    thought your original answer said there might
12    have been a liability component to the decision?
13 A.   With my understanding, Workers' Compensation is
14    based on certain different -- you pay more for
15    somebody that's working with machines than you
16    would with somebody that's typing on a computer,
17    and that having somebody as a security guard
18    would probably increase our costs.
19 Q.   Did you do anything to confirm that or was this
20    just based on your understanding of how things
21    work?
22 A.   That was just based on my understanding.
23 Q.   All right. So part of the decision to not
24    employee and train your own security service at
25    Corner Alley Downtown was cost, correct?

Page 75

1       MR. ROCHE: Objection. Go ahead.
2  A.   I'm sorry. Can you repeat the question?
3  Q.   Yeah. You've done a nice job explaining the
4    basis for your decision. My question for you is:
5    Part of the decision to not train and hire your
6    own in-house security staff at Corner Alley
7    Downtown was cost-related, correct?
8       MR. ROCHE: Objection. Go ahead.
9  A.   I guess.
10 Q.   Okay. Any other reasons that informed the basis
11    of you and Mr. Jori Maron's decision not to hire
12    and train in-house security at Corner Alley
13    Downtown that we haven't talked about?
14 A.   I felt that since the option of hiring the
15    Cleveland Police Officers were already on the
16    street in multiple locations and I felt the
17    cohesiveness of that would be helpful in general
18    opposed to having a number of different, you
19    know, groups that were responsible for it.
20 Q.   Okay. This might short circuit things; it might
21    not. But this decision process that you've just
22    described about security at Corner Alley
23    Downtown, was the same analysis then employed by
24    you in retaining security at Corner Alley Uptown,
25    or was it a different analysis?

Page 76

1  A.   I would say it was -- it was the same, and with
2    my experience with the security that had been
3    handled Downtown, I felt that I could trust it
4    would be handled correctly Uptown, as well.
5  Q.   Okay. All right. Once Corner Alley Uptown is up
6    and running and you are making some of the
7    security decisions that you've told me that you
8    made -- I know they're made in conjunction with
9    other folks. You told us about that.
10       I want to get an understanding, as of
11    January of last year in your position as director
12    of restaurant operations, who was reporting to
13    you? Can we go through that? Was the -- was the
14    general manager of Zocalo reporting to you?
15 A.   Yes.
16 Q.   Was the general manager of Corner Alley Downtown
17    reporting to you?
18 A.   Yes. But I would like -- it was -- yes, but they
19    also reported to -- depending on what subject.
20 Q.   How about operations?
21 A.   Yes.
22 Q.   Okay. Was the general manager of Corner Alley
23    Uptown reporting to you from an operational
24    standpoint?
25 A.   In January, yes.

Page 21  (Pages 81-84)

Jonathan Seeholzer  4/30/2019

Page 81

1  Q.  Were they based on food sales?
2  A.  I'd like to go back on the liquor.
3  Q.  And I should say beer, wine, liquor, right?
4  A.  How about we just say sales?
5  Q.  Okay.  All right.  So -- okay.
6  A.  And that could be a factor.
7  Q.  Was it a factor?
8  A.  I don't think so.  I was going to say prior to --
9      prior to increasing the hours of security, maybe.
10     Post, no.
11 Q.  Okay.  Were the decisions surrounding the
12     security at either location dependent at all on
13     square footage?
14 A.  No.
15 Q.  Hours of operation?
16 A.  Yes.
17 Q.  How so?
18 A.  How late they would be there, how late the
19     security officers would be there --
20 Q.  Okay.
21 A.  -- at the location.
22 Q.  How about location itself?  Meaning the
23     neighborhoods where either of these restaurants,
24     bars, arcade, bowling alleys were located?  Did
25     that bear at all on you and Jori Maron's

Page 82

1      decisions relative to security requirements?
2  A.  If you wanted to relate it to volume and sales,
3      then yes.
4  Q.  How so?
5  A.  More people, higher foot traffic, more
6      possibility for incidents, I would want to
7      increase security.  Less people, which Uptown was
8      much, we didn't need it as much.
9  Q.  And it was you and Mr. Maron that made those
10     decisions?
11 A.  Once we had security, I would make the decisions
12     as far as if we needed to add somebody on for St.
13     Patrick's Day, either location, or if we had to
14     extend the hours, I would make that decision and
15     then inform.
16 Q.  The decision to provide security personnel at
17     Corner Alley Downtown, was there ever more than
18     one police officer employed?
19 A.  We didn't employ them.
20 Q.  Was there ever more than one police officer
21     hired?
22 A.  I believe so, yes.
23 Q.  And I want to exclude St. Patrick's Day or, you
24     know, maybe Cavs games.
25 A.  Yeah.  And I'll be honest.  I'm not there at

Page 83

1      night all the time.  I believe there are -- it's
2      in conjunction with other people on the street,
3      so sometimes there could be two officers there.
4      Whether they're assigned there or not, I couldn't
5      tell you for certain.  They could be assigned to
6      Pickwick & Frolic and walking and they're just
7      kind of walking and checking on things.
8  Q.  How about Corner Alley Uptown?  How many officers
9      were hired to provide security personnel on any
10     given night?
11        MR. ROCHE:  Objection.
12 A.  I couldn't say for certain.  I didn't handle the
13     scheduling.
14 Q.  Who did?
15 A.  Jerry.
16 Q.  Jerry who?
17 A.  Zig -- I can't pronounce his last name.
18     Zigliara?  Jerry Z., I call him.
19 Q.  And where does Jerry Z. work?
20 A.  Cleveland Police Department.
21 Q.  Zarlenga?
22 A.  Zarlenga.  Yeah.
23 Q.  Okay.  All right.  Is he a Cleveland Police
24     Officer, do you know?
25 A.  Yes.

Page 84

1  Q.  So the Cleveland Police Department, through
2      Officer Zarlenga, established the security
3      schedule at Corner Alley Uptown?
4  A.  Officer --
5         MR. PIKE:  Objection to form.
6         Foundation.
7  Q.  Go ahead.
8  A.  Officer Zarlenga took care of security as far as
9      scheduling, from what I understood.
10 Q.  And who gave him authority to do that?
11 A.  I did.
12        MR. DICELLO:  Okay.  Do you need a
13     break, or are you good?
14        THE WITNESS:  No.  I'm good.
15 Q.  Okay.  So I want to go back now -- sorry to keep
16     going back, but I think this is the most
17     efficient way to do it.
18     But there came a point in time around after
19     Downtown was reopened and there was this incident
20     involving this girlfriend, and you, in
21     conjunction with others, made a decision to
22     provide security at Corner Alley Downtown.
23     You told me you talked with your colleague
24     at House of Blues, and I think you said you also
25     talked with somebody at Pickwick & Frolic?

Page 22  (Pages 85-88)

Jonathan Seeholzer  4/30/2019

Page 85

1  A.   Correct.
2  Q.   And that's Nick?
3  A.   Correct.
4  Q.   And what's Nick's last name?
5  A.   Kostis.
6  Q.   So was this an in-person meeting or over the
7       phone?  Do you know?
8  A.   I don't recall.  Same thing.  I would run into
9       him here and there.
10 Q.   And my memory is that you asked Nick Kostis about
11      the Cleveland Police Officers that were hired for
12      security at Pickwick?
13 A.   Correct.
14 Q.   Because you had some interaction with those folks
15      being right across the street when you were at
16      Greenhouse Tavern?
17 A.   Correct.
18 Q.   Did you discuss with Mr. Kostis in a similar way
19      as you did with Mr. Kapp about what kind of
20      security Pickwick & Frolic offers?
21 A.   Yes.
22 Q.   And tell me what you remember Mr. Kostis telling
23      you.
24 A.   From what I remember, from the day he opened, or
25      close to it, had employed -- or not employed but

Page 86

1       used the officers.  Jerry was his contact, and
2       they had other officers that worked there.
3  Q.   Do you know if Mr. Kostis had his own security
4       personnel that were employed directly by
5       Pickwick?
6  A.   I am 90 percent sure no, but I cannot say that
7       for certain.
8  Q.   Okay.  Pickwick & Frolic, just by virtue of the
9       type of business and venue it is, is a different
10      venue than Corner Alley.
11 A.   Correct.
12 Q.   Did you ever retain any security professionals to
13      advise you as to the security requirements that
14      any Corner Alley location had?
15 A.   No.
16 Q.   Do you know what security requirements in the
17      industry a facility like Corner Alley Uptown
18      requires?
19 A.   Do I know?  No.
20 Q.   So walk me through how it is you got introduced
21      to Jerry Z.
22 A.   I asked Nick what he did for security and how it
23      worked.  He explained it to me and said -- gave
24      me Jerry's contact information.  I discussed the
25      options with Jori, and then I contacted Jerry,

Page 87

1       talked to him, discussed with Jori again, I
2       believe.  This is a long time ago.  And then we
3       ultimately decided to go with them.
4  Q.   And that is all for Downtown?
5  A.   I believe at the time, yes.  I think we started
6       Downtown before Uptown was open, I think.
7  Q.   Okay.  So let me break that down a little bit.
8       You called Jerry Z.  Did you call him at the
9       Cleveland Police Department, or did you call him
10      on his cell phone?  Do you know?
11 A.   His cell phone.
12 Q.   And then did you have a meeting with him?
13 A.   I believe, but I can't recall.
14 Q.   What do you recall during your first
15      conversations with Jerry Z. about security
16      services either on the phone or in person?  How
17      did he describe it to you?
18 A.   He told me what he did for Pickwick & Frolic,
19      that he had guys on street that he would schedule
20      for me, that they -- you know, kind of what they
21      did.
22           They usually stayed, you know, at night to
23      make sure that everything was locked up and the
24      managers felt safe and, you know, there's nobody
25      else in the building.  Just kind of in general

Page 88

1       what their role would be.
2  Q.   Did Jerry Zarlenga ever represent to you that he
3       was a security expert?
4  A.   Not that I believe.
5  Q.   And did Jerry -- did you ever interview Jerry
6       about any experience he had providing private
7       security at a bar, restaurant, or arcade or
8       bowling alley?
9  A.   We spoke about Pickwick & Frolic, their bar and
10      other restaurants that he scheduled.
11 Q.   Do you know how long Jerry Z. had been providing
12      private security services?
13 A.   From my understanding -- from Nick Kostis, I
14      believe he started doing it as soon as Pickwick &
15      Frolic opened, so as far as that year, it was
16      prior to 2005, but I don't know.  I couldn't say
17      for sure.
18 Q.   Okay.  What was your understanding of how many
19      guys Jerry was having work at Pickwick & Frolic?
20 A.   I don't remember.  I want to say maybe -- from --
21      I couldn't say for certain because I didn't know
22      if they were all just at Pickwick & Frolic.
23           There were other locations on the street
24      that used these officers, so they could have been
25      in other places, as well.

Page 24  (Pages 93-96)

Jonathan Seeholzer  4/30/2019

Page 93

1  Q.  Sometimes he is, sometimes he isn't?
2  A.  Correct.
3  Q.  Okay.  Was the rate of pay for Jerry and his guys
4      discussed initially?
5  A.  Yes.  Off the top of my head, though, I cannot
6      recall what it is.
7  Q.  Were they paid hourly?
8  A.  Yes.
9  Q.  And was it your understanding that Jerry could
10     provide these services himself?
11 A.  It's my understanding that Jerry would schedule,
12     that he would provide the services, but he could
13     not do everything all the time, so he would
14     schedule other officers for these services.
15 Q.  So for the Downtown location, who made the
16     decision about how many officers were necessary
17     and on what nights?
18 A.  I initially made the suggestions for the
19     standard -- for what we think, you know, is
20     standard, our normal run of the mill.  Jori Maron
21     and myself talked about it.
22     As far as extenuating circumstances, RNC,
23     you know, parade day, all that kind of stuff, I
24     made those decisions to increase.
25 Q.  So let's -- excluding RNC, St. Patty's Day, kind

Page 94

1      of just every day open for business, what
2      decision did you make about how many officers
3      were required and on what nights at Downtown?
4  A.  I can't say for certain because I do have it all
5      -- or their schedule listed out.  I believe it's
6      -- or not their schedule, but how many people we
7      initially talked about.  I know that it's
8      36 hours a week in total.
9  Q.  Does that ever include more than one officer
10     working on the same night?
11 A.  Yes, it does.
12 Q.  And are those on the weekends?
13 A.  Yes.  Fridays and Saturdays, I believe.
14 Q.  And those are decisions that you and Jori made?
15 A.  Yeah.  I think so.
16 Q.  Okay.  Did Jerry Z. provide any consultation in
17     that regard as to what the requirements were in
18     his opinion?
19 A.  Yes.  At certain times, we increased based on his
20     opinion.
21 Q.  So in addition to providing the actual manpower,
22     Jerry Zarlenga of the Cleveland Police Department
23     provided consultation to you and Jori Maron about
24     what the security requirements were at Corner
25     Alley Downtown, true?

Page 95

1          MR. PIKE:  Objection to form.
2  A.  You can say that, yes.
3  Q.  Did you ever interview anyone other than Jerry
4      Z.?
5  A.  No.
6  Q.  Did you ever interview any of his guys that would
7      be working security at Corner Alley Downtown?
8  A.  I spoke with, over the years, a couple -- Bo, who
9      I knew a long time, and then I forget the other
10     guy's name that I had seen a lot.
11 Q.  Were there any requirements given to the Jerry Z.
12     about the qualifications of his guys to be able
13     to work at Corner Alley Downtown?
14 A.  No.  I trusted him to take care of it.
15 Q.  So in addition to providing the manpower and
16     sometimes giving his opinion as to what the
17     security requirements were, you relied on Jerry
18     Zarlenga to select the officers that would be
19     performing the job?
20 A.  Correct.
21 Q.  And it was you and Jori Maron that gave Jerry
22     Zarlenga the authority to do that?
23 A.  Correct.
24 Q.  Was there any job description given to Jerry Z.
25     for the position?

Page 96

1  A.  Discussions of -- no formal job description, no.
2  Q.  Did you ever discuss with Jerry Z. what the
3      requirements or expectations were of his guys
4      when working security at Corner Alley?
5  A.  Yes.
6  Q.  And what were those discussions in terms of
7      requirements and job description?
8  A.  That they assist the management when need be,
9      just keeping an eye on possible situations prior
10     to anything happening.
11 Q.  Anything else?
12 A.  Keeping an eye out for underage people.
13 Q.  Anything else?
14 A.  Not that I can recall.
15 Q.  Okay.  Did Jerry's guys report to anybody at the
16     location?
17 A.  Report -- define report to.
18 Q.  Well, as I understand it, there's people at
19     Corner Alley who have direct reports, correct?
20 A.  Right.
21 Q.  And then there's management at Corner Alley who
22     have direct reports, as you've described for us.
23 A.  Right.
24 Q.  And then you have a direct report all the way up
25     to Jori Maron.

Page 23  (Pages 89-92)

Jonathan Seeholzer  4/30/2019

Page 89

1  Q.  Did Jori Maron ever interview Jerry Z.?
2  A.  Not that I'm aware of.
3  Q.  Did you -- did you interview Jerry?
4  A.  Define interview.
5  Q.  Do you have occasion to hire vendors or
6      independent contractors in connection with your
7      director of operations position?
8  A.  Yes.
9  Q.  And do you interview those folks before you hire
10     them?
11  A.  I guess you could say that.  I would not
12     interview them like I would an employee that I'm
13     hiring like a general manager, operations
14     manager.  More of a sense of who they are and
15     what they do.
16  Q.  Okay.  So did you conduct that kind of interview
17     of Jerry Zarlenga?
18  A.  I feel that I did.
19  Q.  And were you assuming that because Jerry Z. was a
20     police officer that Jerry Z. knew how to provide
21     security services at a bar, restaurant, bowling
22     alley?
23  A.  Yes.
24  Q.  And what was the basis of that assumption?
25  A.  Because they were trained by the -- or I would

Page 90

1      assume they were trained by the City of
2      Cleveland.  They were the people that we called
3      when we had incidents that had to handle them.
4  Q.  Okay.  So did Jerry Z. explain to you any
5      Cleveland Police Department requirements that you
6      had to follow?
7  A.  They needed to get -- I believe they needed to
8      get approval from -- I don't know who, if it's
9      their boss, or whatnot, in the Cleveland Police
10     Department, and we had provided a copy of our
11     Workers' Compensation Policy or Certificate.
12  Q.  Okay.  So is it your understanding that when
13     Jerry Z. would work security, or any of his
14     guys -- first of all, did you understand that
15     Jerry's guys were also Cleveland Police Officers?
16  A.  Yes.  That was my understanding.
17  Q.  Okay.  Was that a requirement for you, that
18     Jerry's guys that he would schedule would be
19     police officers?
20  A.  I was told that.  I assumed that they always
21     would be.
22  Q.  Okay.  And that's what you wanted?
23  A.  Yes.
24  Q.  All right.  So Jerry explained to you that you
25     had to provide a Workers' Compensation

Page 91

1      Certificate to him?
2  A.  Yes.
3  Q.  And was it your understanding that that Workers'
4      Compensation coverage would then cover Jerry and
5      his guys?
6           MR. ROCHE:  Objection.  Go ahead, if
7      you know.
8  A.  My understanding at the time was it was something
9      that the Cleveland Police Department required.
10  Q.  Okay.  Do you know, just for example, when Jerry
11     said, I need a Certificate of Workers' Comp.,
12     what did you think the reason was he needed it?
13  A.  We had discussed, you know, if they fall, you
14     know, whatever, that, you know, they would trust
15     that we would, you know, help them, you know --
16     not help them, but, you know, that we would have
17     them as a claim.
18  Q.  Okay.  So it was your understanding that for
19     Jerry and his Cleveland Police Officer guys, when
20     they were going to provide security services at
21     Corner Alley Downtown, it was Corner Alley
22     Downtown's Workers' Compensation coverage that
23     would cover these guys for any injuries they
24     sustained while working there?
25           MR. ROCHE:  Objection.  Go ahead.

Page 92

1  A.  That was my understanding, I believe.
2  Q.  Is that how you explained it to Mr. Maron?
3  A.  Yeah, I think so.
4  Q.  Was there ever any -- and is the same true of
5      Corner Alley Uptown when you retained Jerry Z.
6      and his guys for security there in terms of the
7      Workers' Compensation?
8           MR. ROCHE:  Objection.  Go ahead.
9  A.  I believe -- from what I understand, I believe
10     the Downtown one that I provided, Jerry listed
11     himself on the Uptown one that I provided.  I
12     believe that Jerry had told me that he had listed
13     Dean on.
14  Q.  Okay.  All right.  So when you were discussing
15     this arrangement with Jerry, do you ever recall
16     doing so in person?
17  A.  I don't know.  I couldn't tell you if it was on
18     the phone or in person.
19  Q.  Did you -- are there times in connection with
20     this arrangement that you've had to meet
21     face-to-face with Jerry Z.?
22  A.  Yes.
23  Q.  And the times that you've met with Jerry Z., is
24     he wearing a Cleveland Police Officer uniform?
25  A.  Sometimes.

Jonathan Seeholzer  4/30/2019

| Page 97 | Page 99 |
|---|---|

Page 97

1  A.   If that, then no.
2  Q.   Okay.  So Jerry's guys, the Cleveland Police
3        Officers that worked at Corner Alley Downtown,
4        did not report to anybody?
5  A.   Jerry, from what I understood.
6  Q.   They reported to Jerry?
7  A.   Not in the Corner Alley.
8  Q.   Okay.  Were the Cleveland Police Officers ever
9        involved in any management meetings?
10  A.   No.
11  Q.   Was there ever any background checks done of any
12        of these police officers?
13  A.   Not to my knowledge by me.
14  Q.   Okay.  When does -- let me just ask you.  In
15        connection with the hiring that you do, are
16        background checks done on folks who are going to
17        be working at MRN venues?
18  A.   Yes.
19  Q.   Does MRN check felony records?
20  A.   I do not know.  I do not do background checks.
21  Q.   Why were no background checks done on any of the
22        folks providing security at the Corner Alley?
23  A.   Because they were Cleveland Police Officers.
24  Q.   So what about being a Cleveland Police Officer
25        exempted them from a background check, just in

Page 98

1        your own mind?
2  A.   In my own mind, we weren't going to get anything
3        better.  If the City of Cleveland is employing
4        them actively, I don't see why I could find any
5        better.
6  Q.   And that was just your own personal feeling?
7  A.   Correct.
8  Q.   Okay.  There are security companies in the
9        hospitality industry, true?
10  A.   I haven't seen too many, no.  I mean, Tenable is
11        the only one that I know of.
12        We did find one -- and I forget the name of
13        them now -- at some point when we had the RNC.
14        We had another one in there, a different company.
15  Q.   Okay.  We've talked a lot about how you met with
16        Jerry Zarlenga to provide security services for
17        Corner Alley Downtown.  We've talked about your
18        discussions with him, the scheduling.
19        I do want to -- we tried to talk a little
20        bit about rate of pay, and you don't remember
21        exactly, but let's talk now about payment.
22  A.   Okay.
23  Q.   Did you pay Jerry Z. directly?
24  A.   I did.
25  Q.   You paid him in cash?

Page 99

1  A.   Correct.
2  Q.   And where did you meet Jerry Z. to pay him?
3  A.   Usually down on East 4th Street.
4  Q.   In your offices?
5  A.   No.  My office is on Euclid.
6  Q.   So you would meet him at East 4th Street?
7  A.   Usually.  It's been in my office.  Mostly on 4th
8        Street, could be in a restaurant.
9  Q.   Okay.  So how often did you meet Jerry Z. to pay
10        him?
11  A.   Once a week.
12  Q.   And when you would meet him, would you meet maybe
13        in a coffee shop or a restaurant, or somewhere?
14  A.   Right, depending on where I was.
15  Q.   All right.  And how much cash were you giving
16        Jerry on average?
17  A.   I don't -- I'm trying to visualize it in my head.
18        I don't know for certain, but I want to say it's
19        like $1,320.  It's 36 hours, is our standard, and
20        I forget the rate.  It's like 25 or 35.
21  Q.   And we're talking just Corner Alley Downtown now?
22  A.   Yes.
23  Q.   Okay.  Did there come a time where you were
24        meeting with Jerry Z. and paying him for security
25        services at Corner Alley Downtown and as well as

Page 100

1        other locations?
2  A.   I -- yes.  Uptown Corner Alley.
3  Q.   Did Jerry Z. provide security services to --
4        through you anywhere other than Corner Alley
5        Uptown and Downtown?
6  A.   Through me?
7  Q.   Yeah.
8  A.   No.
9  Q.   Do you know if Jerry Z. supplied security
10        services to any other MRN venues?
11  A.   I do not know.  I would assume not.
12  Q.   Do you know if the Cleveland Police Department
13        and its officers ever supplied private security
14        services to any MRN venues other than Uptown and
15        Downtown?
16        MR. PIKE:  Objection to form.
17  A.   I believe Tudor Arms Hotel they -- for weddings,
18        they do, and possibly traffic officers for
19        weddings, as well.
20  Q.   Okay.  Is that done through Jerry Z. to your
21        knowledge, or somebody else, or you don't know?
22  A.   I know who used to be there, but it's not through
23        Jerry, no.
24  Q.   Do you know who it is?
25  A.   It was Bo.  I don't know his last name.  He

Jonathan Seeholzer  4/30/2019

**Page 101**

1  passed away.
2  Q.  Okay.  So you told me $1,320 would go to
3  Jerry Z. --
4  A.  I think.
5  Q.  -- approximately, for Corner Alley Downtown.
6  Were there times you met with Jerry Z. where
7  you would pay him approximately $1,320 for the
8  Downtown services and then you'd pay him some
9  amount of cash for the Uptown services?
10  A.  Yes.  When there was -- yes.
11  Q.  And what was the amount you were paying him for
12  Uptown services on average?
13  A.  I don't remember, to be honest with you.  Jerry
14  would tell me how many hours combined, and I
15  would pay him for that.
16  Q.  Did Jerry ever submit any paperwork to you to
17  receive this payment?
18  A.  No.
19  Q.  There's no invoice?
20  A.  No.
21  Q.  Is that typical or atypical?
22  A.  Atypical.
23  Q.  So Jerry would just call you on the phone and
24  say, my guys worked, for example, 38 hours?
25  A.  Correct.

**Page 102**

1  Q.  And you would get cash and meet him on East 4th?
2  A.  Correct.
3  Q.  Weekly?
4  A.  Correct.
5  Q.  Why did you pay Jerry Z. in cash?
6  A.  That is what -- we attempted to do it other ways,
7  but that is what Jerry and his officers did, and
8  he didn't feel that he could provide us -- they
9  wouldn't take any other type of payment.
10  We had to make a decision that was basically
11  based on the welfare of our employees because we
12  figured the positives outweighed the negatives in
13  that situation.
14  Q.  Are there negatives in paying cash to Jerry Z.?
15  A.  That's not how we -- it's out of our standard
16  protocol.
17  Q.  Okay.  So you said there was some efforts to try
18  to arrange payment other than meeting Jerry in a
19  restaurant with cash.  What other efforts were
20  made?
21  A.  Me and him discussed, you know, as far as check,
22  invoicing, you know, another company that, you
23  know, that he may be starting as far as security,
24  but ultimately were not be able -- were not able
25  to come to any other agreement besides what we

**Page 103**

1  did.
2  Q.  And what did Jerry Z. tell you specifically,
3  Mr. Seeholzer, as to why those arrangements were
4  not acceptable for him?
5  A.  That's just how he did things, and he might have
6  a problem getting guys if it was not cash.
7  Q.  Okay.  And then you relied on Jerry Z. to pay
8  cash out to the other -- to the guys who actually
9  worked security at your facilities?
10  A.  Correct.
11  Q.  Did -- was there any reporting done by anyone on
12  the payor side?
13  A.  I believe so, but I can't be certain.
14  Q.  And what do you believe happened in terms of
15  reporting of these payments?
16  A.  I know -- I'm assuming that it's tracked.
17  Q.  By whom?
18  A.  One of our accountants.
19  Q.  Who would that be?
20  A.  Jeff Tichy is the one that I received the payment
21  from.
22  Q.  Okay.  So let me walk through this.  Was there a
23  day specifically that you met with Jerry Z. or
24  could it vary?
25  A.  On Mondays.

**Page 104**

1  Q.  What time on Mondays would you meet with Jerry?
2  A.  It varied.
3  Q.  All right.  So on Mondays, you would meet with
4  Jerry with this cash.  How did you get the cash?
5  A.  From Jeff Tichy.
6  Q.  And so I presume at some point, Jerry would have
7  to call you and tell you how much cash he needed?
8  A.  He would text me how many hours each weekend, and
9  I would then send that to Jeff Tichy, Apple -- I
10  can't pronounce her last name -- and Jori Maron.
11  Q.  Okay.  And when Jerry Z. sent you these texts,
12  did he break it down as between Uptown and
13  Downtown or no?
14  A.  I believe he did.  It's been a while.
15  Q.  Do you have any of those texts?
16  A.  I would have to look.  I'm not sure.
17  Q.  Okay.  We're going to take a break at some point.
18  I would ask you just to look, see if you got any.
19  So then you would -- how did you communicate
20  this information to the accountant?
21  A.  I would e-mail them the information that Jerry
22  had texted me.
23  Q.  Do you know if that e-mail broke it down between
24  Uptown and Downtown?
25  A.  Whatever it said, whatever -- usually it was a

Page 117

1 the space.
2 Q.   All right. Do you remember anything that Jerry
3      Z. said in response to your request?
4 A.   No.
5 Q.   Did Jerry Z. -- let me ask this: The time that
6      you did walk Jerry Zarlenga through the facility
7      at Corner Alley Uptown, was he in police uniform?
8 A.   I don't recall. It's something that I would
9      assume that I would have done, but I cannot
10     remember doing it.
11 Q.  All right. Did Jerry Zarlenga, on behalf of the
12     Cleveland Police Department, agree to provide
13     security services at Corner Alley Uptown?
14         MR. PIKE: Objection to form.
15 A.  He agreed to provide security Uptown, yes.
16 Q.  Okay. And did you understand that Jerry Zarlenga
17     was doing this as a Cleveland Police Officer?
18         MR. PIKE: Objection to form.
19         Foundation.
20 A.  Yes.
21 Q.  And did you understand that the guys that Jerry
22     was going to schedule to work at Corner Alley
23     Uptown were also Cleveland Police Officers?
24 A.  Yes.
25 Q.  And was your expectation the same at Uptown as it

Page 118

1      was as Downtown in terms of the security officers
2      being in their Cleveland Police uniforms?
3 A.   Yes.
4 Q.   And carrying firearms?
5 A.   Yes.
6 Q.   Was there any description specific to Corner
7      Alley Uptown as to what the requirements were for
8      Jerry and his guys to provide services at that
9      location?
10 A.  Initially, I had asked that they card
11     individuals. He did not want to do that. He
12     wanted our guys to do that. Besides that was
13     being present.
14 Q.  Okay. Any other job description other than what
15     you just described for Jerry and his guys at
16     Uptown?
17 A.  Not that I can remember.
18 Q.  Have you ever worked as a security guard?
19 A.  No.
20 Q.  Have you ever worked for a security consultant or
21     firm?
22 A.  No.
23 Q.  With respect to the schedule, we have asked some
24     people about that unique to Corner Alley Uptown,
25     but is the same true that applied to Downtown?

Page 119

1      Was it you and Jori that made the decision of how
2      many officers were required and when?
3 A.   I believe so.
4 Q.   Did Officer Zarlenga provide his opinions and
5      recommendations in that regard at Uptown as he
6      did at Downtown?
7 A.   I don't recall.
8 Q.   Who was responsible for scheduling the Cleveland
9      Police Officers at Corner Alley Uptown?
10 A.  From what I was told by Jerry, Dean Graziolli
11     took care of making sure that somebody was there.
12     Jerry got Dean.
13 Q.  Okay. Was there a general understanding that the
14     Cleveland Police Officers that worked security at
15     Corner Alley Uptown would be comped food and
16     beverage while they worked?
17 A.  Probably. I think that goes for any officer.
18 Q.  If you had hired private security in-house, would
19     those folks have ate and drank for free or no?
20 A.  They probably would have eaten for free, yes.
21 Q.  Okay. Do the employees at Corner Alley Uptown
22     eat for free?
23 A.  They're not supposed to, but they probably do.
24 Q.  Why is it that the police officers get to eat for
25     free but the employees don't?

Page 120

1         MR. PIKE: Objection to form.
2 A.   The employees get a discount. Usually just for
3      -- out of courtesy and appreciation, they'll feed
4      them, I think.
5 Q.   The officers?
6 A.   Correct.
7 Q.   Do you know what the rate of pay was for the
8      officers at Corner Alley Uptown?
9 A.   It was the same, I believe, for Downtown, which I
10     can't recall the exact amount.
11 Q.  I apologize if this is repetitive, but it would
12     have been yourself and Jori who decided on the
13     rate of pay?
14 A.  No. It was Jerry.
15 Q.  So Jerry dictated how much his officers would be
16     paid?
17 A.  Correct.
18 Q.  Was there any negotiation?
19 A.  No.
20 Q.  Is that typical or atypical?
21 A.  It was less than what we were paying previously,
22     a couple years earlier, so I didn't feel that
23     there was a reason to negotiate.
24 Q.  If we wanted to find out how much was being paid
25     to Jerry Z. and his guys, how do we find that

Jonathan Seeholzer  4/30/2019

Page 121

1    out, per hour?
2  A.   I would -- I could try to look back. I could ask
3        an accountant.
4  Q.   I mean, we agree that --
5  A.   I would have to do math backwards. I can't
6        remember the exact amount.
7  Q.   Okay. I mean, we agree that somebody at MRN
8        should know how much these officers are being
9        paid?
10 A.   Yeah.
11 Q.   Okay. And so you think you would ask an
12       accountant for that?
13 A.   I could tell you if I remember the exact amount.
14       Like, I believe it's 1,320, and I believe it's
15       36 hours.
16 Q.   13.20 an hour?
17 A.   No. $1,320 total --
18 Q.   Oh, okay.
19 A.   -- 36 hours a week.
20 Q.   Okay. So we could probably look at your texts
21       and do some math, too?
22 A.   Correct.
23 Q.   Okay. All right. Have you ever met Dean
24       Graziolli?
25 A.   Not to my knowledge. Not that I remember. I

Page 122

1        don't think I ever have.
2  Q.   But it was your understanding through Officer
3        Zarlenga that Dean would be responsible for
4        scheduling the police officers at Corner Alley
5        Uptown?
6  A.   Correct.
7  Q.   Was it your understanding that Dean would choose
8        the officers who were going to work at Corner
9        Alley Uptown?
10 A.   Yes.
11 Q.   And were there any background checks done on any
12       of those officers at Corner Alley Uptown?
13 A.   I don't know.
14 Q.   Did you ever do anything to look into Dean
15       Graziolli's background?
16 A.   No.
17 Q.   Do you know whether or not Dean Graziolli is
18       qualified to provide security services at a bar,
19       bowling alley, restaurant?
20 A.   I would assume, because he's a Cleveland Police
21       Officer, yes.
22 Q.   Where does that assumption come from?
23 A.   Because if they're good enough to take care of
24       the City, there's no reason they shouldn't be
25       good enough to take care of a bowling alley.

Page 123

1        They respond -- they're the ones that respond
2        to complaints or issues within any of those
3        areas.
4  Q.   Did anybody at Corner Alley Uptown supervise Dean
5        Graziolli?
6  A.   Not that I'm aware of.
7  Q.   Did Dean Graziolli supervise anyone at Corner
8        Alley Uptown?
9  A.   Not that I'm aware of.
10 Q.   Was there a security team at Corner Alley Uptown?
11 A.   There was more than one.
12 Q.   How about on any given night? Was there a
13       security team?
14 A.   I can't recall.
15 Q.   Okay.
16 A.   I didn't have a lot to do with the scheduling, to
17       be honest.
18 Q.   Okay.
19 A.   I trusted them to take care of it.
20 Q.   But to the extent any security personnel were
21       working on any given night at Corner Alley
22       Uptown, it was limited to Cleveland Police
23       Officers, true?
24 A.   As far as I know.
25 Q.   So you had knowledge that Dean Graziolli would be

Page 124

1        working security at Corner Alley Uptown, correct?
2  A.   Yes.
3  Q.   And did you communicate that to Jori?
4  A.   I don't know that I would have said the specific
5        person's name.
6  Q.   Did you -- have you ever looked up Dean Graziolli
7        on the internet even to today?
8  A.   After the incident when I saw articles come out,
9        after the incident in January.
10 Q.   Why did you look up Dean Graziolli after the
11       incident on the internet?
12 A.   Because I read articles about him and previous
13       discipline from Cleveland Police.
14 Q.   And what do you recall reading?
15 A.   Something about a time clock issue.
16 Q.   And what do you recall learning about him when
17       you looked him up on the internet?
18 A.   The time clock issue thing.
19 Q.   Okay. Did you form any opinions about Dean
20       Graziolli in connection with your research online
21       about him?
22       MR. LENEGHAN: Objection.
23 A.   No.
24 Q.   Do you have any opinions about his reputation for
25       truthfulness?

Page 32  (Pages 125-128)

Jonathan Seeholzer  4/30/2019

Page 125

1  A.   No.
2  Q.   Was it your understanding that these Cleveland
3       Police Officers who would be providing security
4       services at Corner Alley Uptown were
5       moonlighting?
6            MR. PIKE: Objection to form.
7  A.   Yes.
8  Q.   And was it your understanding that they would be
9       working their regular day jobs as police officers
10      at the same time they're providing security at
11      Corner Alley Uptown?
12           MR. PIKE: Objection to form.
13 A.   Be more specific, I guess.
14 Q.   Yeah. I'm trying to get an understanding, do you
15      know, was there any requirement from you as to
16      how many hours any given officer could work
17      before showing up to work at Corner Alley Uptown?
18 A.   No.
19 Q.   Was it your understanding that on any given day,
20      a Cleveland Police Officer providing security at
21      Corner Alley Uptown was working before coming
22      into work at Corner Alley Uptown?
23 A.   I never honestly thought about it.
24 Q.   Was Dean Graziolli vetted in any way by anyone at
25      MRN?

Page 126

1  A.   No.
2  Q.   Do you know whether Dean had any experience
3       providing security at bars before doing so at
4       Corner Alley Uptown?
5  A.   I don't know for certain. I know that Jerry said
6       that he had done similar things, I believe.
7  Q.   Do you know whether Dean Graziolli had any
8       criminal history prior to working at the Corner
9       Alley Uptown location?
10 A.   No.
11 Q.   Would criminal history be -- depending on what it
12      was, could there be criminal history that would,
13      in your mind, render any given Cleveland Police
14      Officer unfit to work at the Corner Alley Uptown?
15           MR. ROCHE: Objection. Go ahead.
16 A.   Yeah, I think so.
17 Q.   And what kind of criminal history would that be?
18           MR. LENEGHAN: Objection. Calls for
19      speculation.
20 A.   Violence, I guess.
21 Q.   What about a history of use of excessive force
22      against members of the community? Would that be
23      disqualifying to work at an MRN establishment?
24           MR. ROCHE: Objection. Go ahead.
25 A.   Maybe.

Page 127

1  Q.   So at the time -- you've done -- you've said a
2       couple different times today that Cleveland
3       Police Officers, if they're good enough for the
4       City, then they're qualified. I'm just
5       paraphrasing.
6  A.   Right.
7  Q.   Do you have any -- at the time that you and Jori
8       made this decision to employ Cleveland Police
9       Officers, did you have any understanding as to
10      what kind of training they received?
11 A.   Besides the knowledge of -- no. No.
12 Q.   Did you believe at the time that these decisions
13      were made that the Cleveland Police Department
14      had a good reputation for protecting civil
15      rights?
16           MR. PIKE: Objection.
17           MR. LENEGHAN: Objection.
18 A.   Yes.
19 Q.   Do you believe at the time that you and Jori made
20      these decisions about security that the Cleveland
21      Police Department had a good reputation for not
22      using excessive force against members of the
23      community?
24           MR. PIKE: Objection to form.
25           MR. ROCHE: Objection.

Page 128

1  A.   Yes.
2  Q.   And what's the basis for that understanding?
3  A.   I've never seen any issues.
4  Q.   Have you ever heard about any?
5  A.   Yeah.
6  Q.   So at the time that you and Jori made these
7       decisions, you had heard of reports of excessive
8       force by the Cleveland Police Department?
9  A.   Yes.
10 Q.   Did you just make an assumption that that
11      wouldn't occur in connection with the officers
12      that you were hiring?
13 A.   Yes.
14 Q.   Why?
15 A.   Why not?
16           MR. ROCHE: Just answer, if you can,
17      rather than asking a question in
18      response.
19           THE WITNESS: Okay.
20 A.   No.
21 Q.   Did you ever see any written requirements that
22      are issued by the City of Cleveland that govern
23      -- the City of Cleveland calls it secondary
24      employment. Did you ever hear of that term?
25 A.   Yes.

P&G Reporting, LLC
216.870.2218

Page 39  (Pages 153-156)

Jonathan Seeholzer  4/30/2019

Page 153

1  A.    Yes, comma, no.
2  Q.    Did you have the final say as to what any of
3         these officers' job responsibilities would be
4         while providing security at your locations?
5  A.    No.
6  Q.    Who did?
7  A.    I would assume Jerry.
8  Q.    And that's something you -- that authority is
9         something you delegated to him, correct?
10 A.    It was assumed, I believe.
11 Q.    Well, did you pay him for that?
12 A.    I paid him to take care of my security needs.
13 Q.    Did you pay him a separate fee to take care of
14        your security needs outside of what you believe
15        was paid to the individual persons working?
16 A.    I can't speak to that.  I don't know.  I know
17        that I paid him for the hours that he submitted
18        to me weekly.
19 Q.    I mean, you didn't pay him some type of
20        consultation fee?
21 A.    Not that I'm aware of.
22 Q.    Despite any signage on the -- well, strike this.
23        You were asked about the -- whether or not
24        firearms were permitted in any of the -- well,
25        let's start with the Corner Alley Uptown.  Do you

Page 154

1         remember that testimony?
2  A.    Yes.
3  Q.    And there's a sign that's -- that was represented
4         to you on the outside of the door saying no
5         firearms permitted, correct?
6  A.    Okay.  Yes.
7  Q.    Are you aware of that sign or no?
8  A.    I don't know if it's still there.  It was a long
9         time ago.
10 Q.    Are you aware of other signs at other MRN
11        properties that are similar to that?
12 A.    Yes.  Whether they're still up or not, but yes.
13 Q.    That's something that MRN can make a decision
14        about, correct, whether or not to permit
15        firearms?
16 A.    I've made the decision before, but yeah, I mean
17        -- yeah.
18 Q.    And I'm assuming since it's your policy and
19        decision, you can make exceptions to that rule,
20        correct?
21 A.    Yeah.
22 Q.    And do you believe that any of your security
23        officers -- well, strike that.
24        Even though there might not have been
25        something in writing, you permitted them to have

Page 155

1         their weapons on them when they were in the
2         facility, correct?
3  A.    Correct.
4  Q.    Had you chosen to, you could have told them not
5         to carry a firearm, correct?
6  A.    I don't know.  I never thought about it because,
7         I mean, they were Cleveland Police Officers.
8  Q.    Well, money talks, doesn't it?  Do you know what
9         I mean by that?
10            MR. ROCHE: Objection.
11 A.    No.
12 Q.    If you want to work or get paid by MRN, you can
13        dictate the terms of that employment or that
14        service, correct?
15            MR. ROCHE: Objection.
16 A.    I would not necessarily agree in this situation.
17 Q.    It's your position that had you said they cannot
18        wear firearms in your establishments that you
19        would still have to pay them and allow them to
20        wear firearms in your establishment?
21            MR. ROCHE: Objection.
22 A.    I could choose not to hire them.
23 Q.    Correct.  That's what I mean.  You have the final
24        authority via the power of your purse and money
25        to determine what these people did or didn't do

Page 156

1         at your facilities, correct?
2             MR. ROCHE: Objection.
3  A.    I could choose not to hire them.
4  Q.    Right.  So you had the power to hire and fire
5         those people, correct?
6             MR. ROCHE: Objection.
7  A.    Jerry.  Not the other individuals, but yes.
8  Q.    You mean you were bound by a decision that Jerry
9         made at your facility as to whether or not you
10        would allow them on your premises and pay them?
11 A.    I trust that he would -- I wouldn't directly say
12        to an officer that was scheduled by Jerry, you
13        cannot do this.  I would say that to Jerry.
14 Q.    Right.  And then you would rely upon Jerry to
15        express your conditions of employment to the
16        individual persons, correct?
17 A.    Correct.
18 Q.    And it's my understanding that you dictated when
19        security officers would be present at the
20        particular facility, correct?
21 A.    For the most part.
22 Q.    Are you -- strike that.
23        How would these security officers arrive at
24        the facilities they were working?  Would they
25        take their own cars?

P&G Reporting, LLC
216.870.2218

Page 44  (Pages 173-176)

Jonathan Seeholzer  4/30/2019

Page 173

1  Q.  Did -- do you know with respect to the week of
2      service surrounding the night of the incident,
3      did you pay Jerry Zarlenga for the officer's work
4      that night?
5  A.  **So the following --**
6  Q.  Whatever your practice was.
7  A.  **My practice was every Monday.**
8  Q.  Do you have any recollection of not following
9      that practice?
10 A.  **No.  I would have followed that practice.**
11 Q.  Okay.  So to the extent you had anybody working
12     security, that person in this case, Dean
13     Graziolli, was paid by Corner Alley to perform
14     that service?
15 A.  **He was paid by Jerry, as far as I know.**
16          MR. PIKE:  Okay.  Thank you.
17          MR. ROCHE:  He'll read it.  Thanks.
18              - - - - -
19     (Deposition concluded at 1:47 p.m.)
20              - - - - -
21
22
23
24
25

Page 174

                    CERTIFICATE
2
3  State of Ohio,        )
4  County of Lake.       )
5
       I, Stacey Mocz, RPR and Notary Public within and
6  for the State of Ohio, do hereby certify that JONATHAN
   SEEHOLZER was by me first duly sworn to testify to the
7  truth, the whole truth, and nothing but the truth, and
   that the above deposition was recorded stenographically
8  by me and reduced to typewriting by me.
9      I FURTHER CERTIFY that the foregoing transcript
   of the said deposition is a true and correct transcript
10 of the testimony given by the said witness at the time
   and place specified hereinbefore.
11
       I FURTHER CERTIFY that I am not a relative or
12 employee or attorney or counsel of any of the parties,
   nor a relative or employee of such attorney or counsel,
13 or financially interested directly or indirectly in this
   action.
14
       IN WITNESS WHEREOF, I have hereunto set my hand
15 seal of office at Cleveland, Ohio on this 8th day of
   May, 2019.
16
17
18
   _____
19     Stacey Mocz, RPR
20     Notary Public in and for the State of Ohio,
21     My Commission Expires May 25, 2020
22
23
24
25

Page 175

1                WITNESS SIGNATURE
2
3  I have read the foregoing transcript.  Any corrections
4  that I feel necessary will be made on a separate sheet
5  and attached to the transcript.
6
7       _____
8                JONATHAN SEEHOLZER
9  Subscribed and sworn to me this ___ day of _____,
10 2019.
11
12      _____
13                My commission expires:
14
15
16
17
18
19
20
21
22
23
24
25

Page 176

1                ERRATA SHEET
2  Caption:  Yatsko vs. Graziolli, et al.
3  Deposition of:  Jonathan Seeholzer
4  Date Taken:  April 30, 2019
5
6  PAGE NO.    LINE NO.         CORRECTION
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____