IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| **MELISSA YATSKO**, *et al.*, | ) | **CASE NO. 1:18-CV-814** |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **JUDGE DAN AARON POLSTER** |
| **v.** | ) | |
| | ) | |
| **SERGEANT DEAN GRAZIOLLI**, *et al.*, | ) | <u>**ORDER & OPINION**</u> |
| | ) | |
| **Defendants.** | ) | |

Before the Court are four Motions for Summary Judgement. **Docs ##:81, 66, 73, 89.** As an initial matter, Plaintiffs, in their brief in opposition to summary judgement, move to dismiss Defendants MRN Group, LLC; MRN Investment Group, LLC; MRN Enterprises, LLC; MRN Development Corporation; Corner Alley, LLC; and Corner Alley Fourth Limited Partnership. Doc #: 85 at 69. Accordingly, those Defendants are **DISMISSED**.

As a result of the above dismissal, the pending Motions for Summary Judgement are filed by Defendant Sergeant Dean Graziolli ("Graziolli"), Doc #: 81, Defendant City of Cleveland, Doc #: 66, Defendant Corner Alley Uptown, LLC ("Corner Alley"), Doc #: 73, and Defendants 629 Euclid Lld. and MRN Limited Partnership (collectively the "Corporate Defendants"), Doc #: 79.

For the following reasons Graziolli's Motion for Summary Judgement, **Doc #: 81**, is **GRANTED IN PART** and **DENIED IN PART**; The City of Cleveland's Motion for Summary Judgement, **Doc #: 66**, is **GRANTED**; Corner Alley's Motion for Summary Judgement, **Doc #:**

73 is **GRANTED IN PART** and **DENIED IN PART**; and the Corporate Defendants' Motion for Summary Judgement, **Doc #: 79**, is **GRANTED IN PART** and **DENIED IN PART**.

## I. Background

Graziolli shot and killed Thomas Yatsko while working as a security guard at the Corner Alley Uptown in University Circle ("Corner Alley Uptown"). This is one of the few material facts not in dispute. The remaining material facts revolve around two events: (A) Graziolli becoming employed at Corner Alley Uptown and (B) the fights that lead to Yatsko's death. In the following recitation, the facts are presented in a light most favorable to Plaintiffs, the nonmoving party.

### A. Graziolli Becomes a Security Guard

Jonathan Seeholzer is, and at all relevant times was, the director of restaurant operations over MRN branded restaurants. Doc #: 85-1 at 14. Corner Alley Uptown is one such MRN branded restaurant. Doc #: 85-1 at 9, 13, 165-67. Seeholzer initially had security guards at Corner Alley Uptown one or two days per week to deter underage patrons from using fake identification cards. Doc #: 85-1 at 18. But after an incident where a fight occurred at Corner Alley Uptown, Seeholzer decided to have security guards present more often. Doc #: 85-1 at 18. To increase the hours security guards were present, Seeholzer had to get approval from Jori Maron. Doc #: 85-1 at 6, 18.

The record does not clearly show which of the Defendants employ Seeholzer and Maron. Seeholzer initially said he is employed by "MRN" and confirmed that he is the director of restaurant operations for MRN Ltd.[1]  Doc #: 85-1 at 6, 42. And Seeholzer has a "MRNltd.com" email address. Doc #: 85-1 at 7. But Seeholzer also said that MRN Ltd. is not his employer, that

---

[1] Plaintiffs and deponents referred to Defendant MRN Limited Partnership as MRN Ltd.

he believes his paychecks are from 629 Euclid Ltd. Doc #: 85-1 at 9. Seeholzer further explained that he does not know what 629 Euclid Ltd. is. Doc #: 85-1 at 9. Nor can an employment contract resolve this ambiguity because Seeholzer believes no contract exists. Doc #: 85-1 at 10.

As for Jori Maron, Seeholzer views him as a supervisor. Doc #: 85-1 at 6.  Seeholzer's deposition also makes clear that the Maron family has ownership interest over Euclid 629 Ltd. and/or MRN Limited Partnership. Doc #: 85-1 at 10. Plaintiffs cite to CrainsCelveland.com to show that Maron is an MRN Ltd. partner. Doc #: 85 at 41 citing https://www.crainscleveland.com/article/20170526/who1002017/305269988/57-jori-maron.

To obtain security guards, Seeholzer would contact Cleveland Police Department Lieutenant Gerald Zarlenga. Doc #: 85-1 at 22. Seeholzer told Zarlenga that the security guards were to "assist the management when need be, just keeping an eye on possible situations prior to anything happening." Doc #: 85-1 at 25. Zarlenga would schedule off-duty officers, including Graziolli, to work as security guards at Corner Alley Uptown. Doc #: 85-3 at 35-36. The Cleveland Police Department referred to these off-duty opportunities as "secondary employment." Doc #: 85-3 at 11. Before taking secondary employment, officers were required to obtain approval from the Cleveland Police Department. Doc #: 85-3 at 11. The approval process consisted of filling out a form and submitting a worker's compensation coverage letter. Doc #: 85-3 at 11. Because of this requirement, Seeholzer provided a worker's compensation certificate and understood that it would cover Zarlenga and the officers Zarlenga scheduled to work at Corner Alley Uptown. Doc #: 85-1 at 23.

Seeholzer would give Zarlenga cash for the hours the off-duty officers worked. Doc #: 85-1 at 27. Seeholzer obtained the cash from an accountant but does not know where the accountant got the cash. Doc #: 85-1 at 27-28. No invoices reflecting these payments were made.

3

Doc #: 85-1 at 27. Seeholzer is not aware that 1099s were ever delivered to Zarlenga or the officers working at Corner Alley Uptown. Doc #: 85-1 at 28. Zarlenga would use the cash to pay the officers. Doc #: 85-3 at 36. The record is silent on what, if anything, Zarlenga was paid.

Graziolli, before starting secondary employment at Corner Alley Uptown, was trained on the rules and regulations he was required to comply with while working secondary employment. Doc #: 85-3 at 13. He was authorized to wear his police uniform and understood that he was required to carry his city-issued firearm,[2] a taser, pepper spray, an ASP baton, and handcuffs. Doc #: 85-3 at 13. Graziolli also understood that he was required to address criminal activity he observed while working secondary employment. Doc #: 85-3 at 13.

**B.  Events of January 13, 2018**

On January 13, 2018, Graziolli arrived at the Corner Alley Uptown at around 9:20 PM. Doc #: 85-3 at 43. He wore his Cleveland Police uniform, on which was affixed his metal police sergeant badge and police shoulder patch. Doc #: 85-3 at 12, 14. He carried his city-issued pistol, but not a taser, pepper spray, ASP Baton, or handcuffs. Doc #: 85-3 at 12. He declined to carry these items because he had not previously encountered any problems while working at Corner Alley Uptown. Doc #: 85-3 at 12.

On this night Graziolli encountered three problems – all involving Yatsko.

**1.  Yatsko Fights McDuffie inside Corner Alley Uptown**

Graziolli first encountered Yatsko when he was summoned by a Corner Alley Uptown Employee. Doc #: 85-3 at 44. Graziolli was informed that two men were fighting inside Corner Alley Uptown. Doc #: 85-3 at 44. By the time Graziolli reached the area, Yatsko and his friend

---

[2] The City of Cleveland's secondary employment form requires that officers carry pepper spray, ASP Baton, and a taser. Doc #: 66-8 at 29. It does not require that officers carry their city-issued firearm during secondary employment. Doc #: 66-8 at 29.

4

Delon McDuffie were finished fighting. Doc #: 85-3 at 44. Graziolli then escorted Yatsko to get his coat, walked Yatsko out the door, and told Yatsko, "you cannot come back inside." Doc #: 85-3 at 44-47.

### 2.  Yatsko Fights McDuffie in the Street

Graziolli's second encounter with Yatsko occurred shortly thereafter. Doc #: 85-3 at 47. Graziolli was informed that Yatsko and McDuffie were fighting in the street. Doc #: 85-3 at 47. When Graziolli went into the street, he saw Yatsko punching and kicking McDuffie, who was on the ground. Doc #: 85-3 at 47.[3] McDuffie recalls that Graziolli broke up the fight, was rude to him, and threatened to arrest him. Doc #: 85-18 at 24. McDuffie further recalls that Yatsko did not make any gestures to Graziolli. Doc #: 85-18 at 19. Graziolli recalls the events differently. Graziolli says that after he broke up the fight, Yatsko turned to him with closed fists and was getting ready to punch him. Doc #: 85-3 at 48. Graziolli says that he then identified himself as a police officer by saying "look at who you're going to punch." Doc #: 85-3 at 48.

### 3.  Yatsko Fights Graziolli around Corner Alley Uptown's Patio

Graziolli's third encounter with Yatsko occurred as he was walking back to the Corner Alley Uptown after breaking up the street fight. He encountered Yatsko in front of the Corner Alley Uptown's patio. What happened next is disputed. Relevant here are the video evidence and the recollections of Graziolli and Breanne Steele.

Corner Alley Uptown's surveillance camera shows Yatsko around Corner Alley Uptown's patio for two minutes before Graziolli appears. Doc #: 85-21 at 22:41:30-22:43:30. During those two minutes, Yatsko appears to be peacefully interacting with Steele. Doc #: 85-21 at 22:41:30-22:43:30. As Graziolli approached, Yatsko stepped back. Doc #: 85-21 at 22:44:16-

---

[3] Plaintiffs claim that "this is not how McDuffie describes the incident." Doc #: 85 at 18. But McDuffie does not describe the incident at all. *See* Doc #: 85-18 at 19.

22:44:30. Graziolli responded by advancing towards Yatsko. Doc #: 85-21 at 22:44:16-22:44:50. After both men shuffled around, Graziolli began to retreat backwards into the patio. Doc #: 85-21 at 22:45:39. The video does not show who threw the first punch, how many punches were thrown, or when Graziolli unholstered his pistol. But the video does show that Yatsko lunged at Graziolli while Graziolli was pointing his pistol at Yatsko. Doc #: 85-21 at 22:45:58-22:46:00. Yatsko then immediately fell to the ground. Doc #: 85-21 at 22:60:00.

Graziolli recalls that after he broke up the fight in the street, he went back to Corner Alley Uptown to get medical aid for McDuffie. Doc #: 85-3 at 49. While doing so, he encountered Yatsko meandering outside Corner Alley Uptown's patio. Doc #: 85-3 at 49. He is unsure whether he said anything to Yatsko. Doc #: 85-3 at 50, 53-54. But he recalls that Yatsko punched him multiple times in the face and head. Doc #: 85-3 at 54. Graziolli did not punch back. Doc #: 85-3 at 54. Yatsko said that Graziolli would have to kill him and that he was going to kill Graziolli. Doc #: 85-3 at 55-56. Graziolli then unholstered his pistol "to back him off . . . ." Doc #: 85-3 at 54. But Yatsko continued to attack Graziolli. Doc #: 85-3 at 56. Graziolli did not have the opportunity to call out for help or retreat into Corner Alley Uptown. Doc #: 85-3 at 56.  Graziolli then shot Yatsko because he felt it was his only option to survive. Doc #: 85-3 at 56.

Breann Steele's recollection of the events is materially different. She recalls that before Graziolli approached, Yatsko was interacting with her peacefully and trying to find a way to get home. Doc #: 85-19 at 13-14. Graziolli approached Yatsko aggressively and said, "it was time for him to go" and "to get the fuck on." Doc #: 85-19 at 13. Yatsko asked Graziolli to call a police car to give him a ride home. Doc #: 85-19 at 53. Graziolli refused. Doc #: 85-19 at 53. Graziolli then said that he did not like Yatsko's body language. Doc #: 85-19 at 15. Steele does

6

not recall who threw the first punch.[4] Doc #: 85-19 at 14. But she does recall Graziolli punching at Yatsko. Doc #: 85-19 at 16. After Graziolli unholstered his pistol, Yatsko said "I guess you're going to have to kill me . . . ." Doc #: 85-19 at 21. Graziolli subsequently shot Yatsko when Yatsko punched Graziolli in the nose. Doc #: 85-19 at 16.

Yatsko died of his injuries. Graziolli suffered lacerations to his lip and was suspected to have a concussion. Doc #: 82-27 at 16. Yatsko weighed about 149 pounds. Doc #: 85-23 at 2. Graziolli thinks he weighed around 245 pounds at the time. Doc #: 85-3 at 55. This was the first time Graziolli discharged his pistol in his 27-year career. Doc #: 85-3 at 18-19.

## II.      Standard of Review

Summary judgment will be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a).  On the other hand, if a reasonable jury could return a verdict for the nonmoving party, summary judgment for the moving party is inappropriate. *Baynes v. Cleland*, 799 F.3d 600, 606 (6th Cir. 2015) (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986)).  The movant bears the initial burden of showing that there is no material issue in dispute.  *Id.* at 607 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  A fact is deemed material only if it might affect the outcome of the case under the governing substantive law.  *Id.* (citing *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994).  In reviewing a motion for summary judgment, the court must view the facts and any inferences reasonably drawn from them in the light most favorable to the nonmoving party.  *Id.* (citing *Kalamazoo Acquisitions, LLC v. Westfield Ins. Co.*, 395 F.3d 338, 342 (6th Cir. 2005)).

---

[4] While Steele does not recall who threw the first punch, a bartender stated during her deposition that Graziolli threw the first punch. Doc #: 85-22 at 9.

### III.     Analysis

Defendants request summary judgement on the claims against them. These claims consist of (A) 42 U.S.C. § 1983 claims and (B) State tort claims.

### A. 42 U.S.C. § 1983 Claims (Claim One, Two, & Three)

Graziolli and the City of Cleveland move for summary judgment on the 42 U.S.C. § 1983 claims against them. Docs ##: 81 at 13-20; 66. These consist of an excessive force claim against Graziolli (Claim One) a deliberate indifference to a serous medical need claim against Graziolli (Claim Two) and a *Monell* claim against the City of Cleveland (Claim Three). Doc #: 48 at 9-14.

For an officer to be liable under § 1983, a plaintiff must establish that the officer deprived a person of their Fourth or Fourteenth Amendment rights while acting under the color of law. *Flint v. Ky. Dep't of Corr.*, 270 F.3d 340, 351 (6th Cir. 2001). A *Monell* claim renders a city liable under § 1983 if the officer's unconstitutional actions taken under the color of law are the result of the city's practice, policy, or custom. *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

As an initial matter, Plaintiffs concede that summary judgement should be granted on Claim Two. Doc #: 85 at 27.

### 1. Color of Law

An act is under the color of law when the actor exercised power "possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *Memphis, Tenn. Area Local, Am. Postal Workers Union v. City of Memphis*, 361 F.3d 898, 903 (6th Cir. 2004) (quoting *West v. Atkins*, 487 U.S. 42, 48 (1988)). The key question is whether the officer "intend[ed] to act in an official capacity or to exercise official responsibilities pursuant to state law." *Kalvitz v. City of Cleveland*, 763 Fed. Appx. 490, 496 (6th Cir. 2019)

8

(quoting *Waters v. City of Morristown*, 242 F.3d 353, 359 (6th Cir. 2001)). Relevant factors in determining the officer's intent include "whether the officer flashed a badge, identified himself as an officer, or arrested (or threatened to arrest) someone." *Id.* citing *Swiecicki v. Delgado*, 463 F.3d 489, 496 (6th Cir. 2006). Whether the officer was on or off duty or in or out of uniform is not determinative. *Swiecicki*, 463 F.3d at 496.

The question this Court must answer is whether a reasonable jury could only reach one conclusion on whether Graziolli intended to act in his official capacity or to exercise official responsibilities during his third encounter with Yatsko. Graziolli contends that he was acting under color of law. Doc #: 85 at 14. Unsurprisingly, the City of Cleveland argues that Graziolli was not acting under the color of law. Doc #: 66 at 16-17. Plaintiffs claim that this disagreement demonstrates that a genuine dispute exists. Doc #:85 at 25.

Graziolli's actions throughout the night of January 13, 2018 are relevant to determining whether Graziolli was acting under the color of law during his third encounter with Yatsko. The evidence is mixed as to whether Graziolli was acting under color of law during his first encounter with Yatsko. Graziolli escorted Yatsko out of Corner Alley Uptown and told him not to come back in. Removing a patron from a bar seems most like the job function of a security guard, not a police officer. But Graziolli contends that he was exercising his authority as a police officer in removing Yatsko. Doc #: 85-3 at 46.

The evidence is much clearer that Graziolli was acting under color of law during his second encounter with Yatsko. Graziolli had to leave his place of private employment to go into the street to stop the street fight. A private security guard is likely not expected to intervene in a fight occurring outside of his or her employer's establishment. According to McDuffie, Graziolli threatened to arrest him. According to Graziolli, he identified himself as a police officer by saying

9

"look at who you are going to hit." That Graziolli intervened in a street fight outside of Corner Alley Uptown and either threatened to arrest McDuffie or identified himself as a police officer demonstrates that he intended to act in his official capacity as a police officer. Thus, Graziolli was acting under color of law during his second encounter with Yatsko.

The evidence is again mixed as to whether Graziolli was acting under the color of law during his third encounter with Yatsko. Graziolli was returning to Corner Alley Uptown after breaking up the street fight. He claims that he was going to call for medical assistance for McDuffie, but Plaintiffs dispute this. And during the fight with Yatsko, Graziolli did not identify himself as a police officer or attempt to arrest Yatsko. Graziolli claims that he was not "using his position as a Cleveland police officer to compel or coerce Thomas Yatsko into leaving the area." Doc #: 66 at 16-17.

When these three encounters are considered together, it remains unclear whether Graziolli was acting under color of law during his fateful third encounter with Yatsko. A reasonable jury could conclude that Graziolli was intending to act in an official capacity throughout the night; that Graziolli was preserving the peace by escorting Yatsko out of Corner Alley Uptown, breaking up the street fight, and, upon reencountering Yatsko at Corner Alley Uptown's patio, telling him to leave.

 But a reasonable jury could also conclude that Graziolli only intended to act in an official capacity to stop the street fight. They could conclude that Graziolli was merely performing the duties of a private security guard in escorting Yatsko out of Corner Alley Uptown. And that while Graziolli was acting within his official capacity when he broke up the street fight, he returned to acting as a private security guard when he encountered Yatsko at

10

Corner Alley Uptown's patio and told him to leave, thereby preventing Yatsko from reentering Corner Alley Uptown.

Thus, whether Graziolli was acting under the color of law during his third encounter with Yatsko is a jury question.

### 2.  Qualified Immunity

Graziolli and the City of Cleveland assert that even if Graziolli was acting under color of law, summary judgment should be granted because Graziolli is entitled to qualified immunity. Docs ##: 98 at 11; 66 at 18. In evaluating whether an officer is entitled to qualified immunity, courts consider whether a constitutional violation occurred and "whether the right at issue was clearly established at the time of defendant's alleged misconduct.[5]" *Barker v. Goodrich*, 649 F.3d 428, 433 (6th Cir. 2011) (quotations omitted).

### a.  Waiver

Plaintiffs assert that Graziolli waived arguing qualified immunity on summary judgement because he failed to argue it in his Motion. Doc #: 85 at 26-27. Graziolli claims that he did, in fact, raise qualified immunity in his Motion through the following two statements: "[t]o the extent it could be found that Graziolli violated Yatsko's Constitutional rights, Graziolli is entitled to qualified immunity" and "to the extent Graziolli's actions could be [challenged under the Fourth Amendment], there is no doubt they would be found objectively reasonable." Doc #: 98 at 9.

Arguments not raised or adverted to in only a perfunctory manner in an initial motion are waived. *Kuhn v. Washtenaw County*, 709 F.3d 612, 624 (6th Cir. 2013).

---

[5] No party asserts that the right at issue was not clearly established. Because the Court concludes that whether a constitutional violation occurred is a jury question, the Court does not reach whether the constitutional violation was clearly established.

While Graziolli's statements are far from textbook examples of motion practice, the Court concludes that Graziolli did not waive his qualified immunity argument on summary judgement. At a minimum, Graziolli made clear in his motion that he was entitled to qualified immunity because his actions were objectively reasonable. This is adequate.

The Court's conclusion is further supported by the fact that Graziolli's lackluster attempt to argue qualified immunity in his motion was of little consequence. Plaintiffs had ample opportunity to, and in fact did, argue against qualified immunity in responding to the City of Cleveland's Motion. Doc #: 85 at 61-66. Furthermore, the Court ultimately denies summary judgment on qualified immunity because issues of material fact remain.

### b. Constitutional Violation

An excessive force claim should be analyzed under the Fourth Amendment's protection against unreasonable seizures when a seizure occurred. *Darrah v. City of Oak Park*, 255 F.3d 301, 305-06 (6th Cir 2001) (citing *County of Sacramento v. Lewis*, 523 U.S. 833, 843-44 (1988). Where there has been no search or seizure, the excessive force claim should be analyzed under the Fourteenth Amendment's due process clause. *Id.*

A seizure is an "intentional interference with a person's liberty by physical force or a show of authority that would cause a reasonable person consciously to submit" *Floyd v. City of Detroit*, 518 F.3d 398, 406 (6th Cir. 2008) (citing *Peete v. Metro. Gov't of Nashville & Davidson County*, 486 F.3d 217, 220 (6th Cir. 2007)). An apprehension by deadly force is a seizure. *Tenn. v. Garner*, 471 U.S. 1, 7 (1985).

The parties' disagreement on seizure centers around the intent requirement. Graziolli concludes that a seizure occurs only when the officer acts with the intention to restrain or detain the individual. Doc #: 81 at 16. Because, he asserts, he was not trying to arrest, restrain or search

12

Yatsko, but only shot Yatsko "to survive the situation," Yatsko was not seized. Doc #: 16-17. Conversely, Plaintiffs conclude that a seizure occurs whenever the officer intends to use deadly force and that deadly force prevents an individual from walking away. Doc #: 85 at 26 Thus, they assert, a seizure occurred when Graziolli intentionally shot Yatsko. Doc #: 85 at 26.

The Court agrees with Graziolli that for a seizure to occur, the officer must act with the intention to arrest, restrain, or detain. The Supreme Court explained as much in saying that "the detention or taking itself must be willful." *Brower v. County of Inyo*, 489 U.S. 593 (1989). But Courts have typically presumed that an officer using deadly force intends to restrain the individual. *See Floyd v. City of Detroit*, 518 F.3d 398, 406 (6th Cir. 2008); *Hanson v. City of Fairview Park*, 349 F. App'x 70 (6th Cir. 2009).

Here, too, Graziolli's use of deadly force demonstrates that he intended to restrain Yatsko. Graziolli says he was acting "just to survive the situation." To survive the situation, he needed to restrain Yatsko by neutralizing Yatsko's attack. Graziolli accomplished this neutralization through deadly force. No conclusion can be reached but that Graziolli intended to restrain Yatsko. Accordingly, Graziolli seized Yatsko.

Because Graziolli seized Yatsko, Plaintiffs' § 1983 claims must be analyzed under the Fourth Amendment.  *Darrah*, 255 F.3d at 305-06. Under the Fourth Amendment, an unconstitutional seizure occurs when the officer's actions were not objectively reasonable. *Graham v. Connor*, 490 U.S. 386, 397 (1989). The scope of this analysis is limited to the moments before the shooting. *Hermiz v. City of Southfield*, 484 Fed. Appx. 13, 16 (6th Cir. 2012). The court does not consider whether it was reasonable for the police to create the circumstances. *Id.*; *Livermore v. Lubelan*, 476 F.3d 397, 406 (6th Cir. 2007).

When a seizure occurs through deadly force, an officer will be found to have violated the individual's Fourth Amendment rights if the officer did not have probable cause to believe that the suspect posed a threat of serious physical harm to the officer or to others. *Floyd*, 518 F.3d at 407. "This is an objective test, to be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Sova v. City of Mt. Pleasant*, 142 F.3d 898, 903 (6th Cir 1998) (quotations omitted). Relevant factors in determining the reasonableness of an officer's use of force are: "(1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the police officers or others, and (3) whether the suspect actively resisted arrest or attempted to evade arrest by flight." *Floyd*, 518 F.3d at 407.

Here, the only relevant factor is whether Yatsko posed an immediate threat to the safety of Graziolli. Graziolli was not arresting Yatsko and did not encounter Yatsko for the third time in front of Corner Alley Uptown due to any crime being committed. Further, there is no allegation that Yatsko posed an immediate threat to anyone other than Graziolli.

The facts do not clearly show whether Yatsko posed an immediate threat to Graziolli's safety. Under Graziolli's and the City of Cleveland's version of the facts, Graziolli was being viciously attacked by a man who had already demonstrated his aggressiveness in two prior fights. Yatsko had already threatened to kill Graziolli and said that Graziolli would have to kill him. Graziolli feared that if Yatsko were to get his pistol, Yatsko would kill him. All that Graziolli could do was take the beating until he managed to unholster his pistol and fire two life-saving shots.

But under Plaintiffs' version of the facts, Graziolli picked a fight with Yatsko. During the roughly twenty-second fistfight. Both Graziolli and Yatsko threw punches and Graziolli was able to shove Yatsko away using his 100-pound weight advantage. Yatsko was unarmed and never

14

attempted to take Graziolli's weapon. In a state of disbelief that Graziolli would unholster his pistol during a fistfight, Yatsko said that Graziolli would have to kill him. After Yatsko's punches made contact multiple times, Graziolli shot Yatsko twice.

As already explained, the Court is to view the facts in a light most favorable to the nonmoving party on a motion for summary judgement. *Baynes*, 799 F.3d at 606. Graziolli asserts that the Court should not consider Plaintiffs' version of events because it is contradicted by video evidence. Doc #: 98 at 2-5.

The Court disagrees with Graziolli. The video evidence does not clearly show the events leading up to the fight, who threw the first punch, or whether Graziolli was able to fend off Yatsko's attacks. Accordingly, the Court must view the facts in a light most favorable to Plaintiffs. In this light, a reasonable jury could conclude that Graziolli did not have probable cause to believe that Yatsko posed a threat of serious harm.

Thus, a reasonable jury could disagree on whether Graziolli was acting under color of law and whether Graziolli's actions were objectively reasonable. Accordingly, Graziolli's Motion for Summary Judgement, **Doc #: 81**, is **DENIED** as to Claim One and **GRANTED** as to Claim Two.

### 3. *Monell* Claim

The City of Cleveland asserts that even if Graziolli is deemed to be acting under color of law and found to have committed a constitutional violation, it is entitled to summary judgement because Plaintiffs' *Monell* claim is not supported by evidence. Doc #: 66 at 9-13.

A *Monell* claim can succeed if the underlying constitutional violation was caused by: "(1) legislative enactments or official policy; (2) actions by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance of rights

15

violations." *Beaz v. City of Cleveland*, Case No. 1:19 cv 623, 2019 U.S. Dist. LEXIS 221609, at *5 (N.D. Ohio Dec. 27, 2019). Plaintiffs assert that their *Monell* claim is based on two theories: (a) that the City had a custom of tolerance or acquiescence towards excessive force and (b) the City failed to supervise officers working secondary employment. Doc #:85 at 66.

### a. Custom of Tolerance Claim

A custom of tolerance claim requires that the plaintiff prove that the city had notice of a clear and persistent pattern of unlawful activity; the city tacitly approved of the unlawful activity by doing nothing; and the city's tacit approval caused the constitutional violation. *Howse v. Hodous*, 953 F.3d 402, 411 (6th Cir. 2020).

Plaintiffs rely solely on a December 4, 2014 report by the Department of Justice ("DOJ Report") to prove their custom of tolerance claim. Doc #: 85 at 66-67. Plaintiffs assert, relying on *Kalvitz v. City of Cleveland*, Case No.: 1:16 cv 748, 2017 WL 6805678 (N.D. Ohio Oct. 16, 2017), that the DOJ Report proves a custom of tolerance claim and is admissible. Doc #: 85 at 66-67. In *Kalvitz*, the court determined that the DOJ Report is admissible under Federal Rule of Evidence 803(8). *Kalvitz*, 2017 WL 6805678 at *10. The court further found that the DOJ Report showed that the City of Cleveland tolerated repeated misconduct which "embolden[s] officers to commit more such applications of excessive force in the future." *Id*. at *11.

The City of Cleveland asserts that the Court should strike the DOJ Report because it was not raised during discovery. Doc #: 93 at 5-6. Defendants further assert that the report is stale, and several judges have declined to consider it in *Monell* cases. Doc #: 93 at 6-7.

The Court declines to decide whether the DOJ Report should be stricken because it finds that the DOJ Report fails to show that the City of Cleveland had notice of a clear and persistent pattern of unlawful activity of (a) the type of conduct alleged here and (b) for the time period in

16

question. The DOJ Report contains generalized hearsay statements which other courts in this district have flatly refused to consider. *See Warren v. Tankersley*, CASE NO. 1:14-CV-106, 2015 U.S. Dist. LEXIS 126089, at *11-13 (N.D. Ohio Sept. 21 2015); *Howse v. Hodous*, CASE NO. 1:17 CV 1714, 2019 U.S. Dist. LEXIS 59356, at *33 n. 3 (N.D. Ohio April 5, 2019). These statements, even if admissible under Federal Rule of Evidence 803(8), are based on incidents occurring more than four years before Graziolli shot Yatsko. And only two of the incidents specifically involved off-duty officers. Doc #: 85-2 at 20, 38. Generalized hearsay statements about the actions of on-duty officers before 2014 is not probative to whether the city had notice of a clear and persistent pattern of unlawful activity among its off-duty officers in 2018.

Even if the DOJ Report did indicate that the City of Cleveland had notice of a clear and persistent pattern of unlawful activities, Plaintiffs' custom of tolerance claim fails because Plaintiffs fail to assert any facts suggesting that the City of Cleveland approved of the unlawful activity or that their approval caused a constitutional injury. The Sixth Circuit has held that the DOJ Report alone does not satisfy these two elements. *Howse v. Hodous*, 953 F.3d 402, 411 (6th Cir. 2020).

### b.  Failure to Supervise Claim

Plaintiffs' failure to supervise claim fares no better. For a failure to supervise claim, a plaintiff "must show that the city acted with 'deliberate indifference' to the risk of [the constitutional violation] and that its deliberate indifference was the 'moving force' behind the assault." *Amerson v. Waterford Twp.*, 562 Fed. Appx. 484, 492 (6th Cir. 2014) (quotation omitted).

It is far from clear that police departments have a duty to supervise officers working secondary employment. Indeed, Plaintiffs cite to no case or statute for this proposition. Plaintiffs'

merely rely on their expert's opinion that supervision is required, especially because the officers working secondary employment are required to follow the Cleveland Police Department's rules and regulations. Doc #: 85 at 68-69. But the fact remains that there is presently no controlling law which mandates that police departments supervise their officers working secondary employment. This Court declines to create law which would impose such supervision requirements.

Even if the City of Cleveland did have a duty to supervise its officers working secondary employment, Plaintiffs' failure to supervise claim fails because Plaintiffs do not assert any facts indicating that the City of Cleveland was deliberately indifferent to the risk of a constitutional violation. Plaintiffs assert that deliberate indifference can be shown because the City of Cleveland failed to supervise its officers working secondary employment despite knowing of the systemic problems uncovered in the DOJ Report. Doc #: 85 at 69. But again, the DOJ Report is not probative because it reports incidents that occurred over four years prior, only two of which involved off-duty officers. And more specifically, there was no indication that Graziolli was likely to use deadly force. Graziolli had not previously fired his city-issued pistol in his 27-year career. Further, Graziolli's disciplinary history consists of a physical altercation in 2004, failure to complete use of force investigations, and tampering with records. Docs ##: 85-4, 84-7, 85-8, 85-10. Based on this history, the City of Cleveland could not have known, much less have been deliberately indifferent to the risk, that Graziolli would cause a constitutional violation using deadly force.

Accordingly, The City of Cleveland's Motion for Summary Judgment, **Doc #: 66**, is **GRANTED** as to Claim Three.

18

### B. State Law Claims

Graziolli, the City of Cleveland, Corner Alley and the Corporate Defendants request summary judgment on Plaintiffs' state law claims.

#### 1. Graziolli (Claims Four, Five, Six, & Nine)

Graziolli requests summary judgment on Plaintiffs' claim for assault and battery (Claim Four), negligence (Claim Five), intentional infliction of emotional distress (Claim Six), and wrongful death (Claim Nine) because he is entitled to statutory immunity and, even were he not entitled to statutory immunity, the claims lack legal basis. Doc #: 81 at 16.

##### a. Statutory Immunity

An employee of a political subdivision is immune from liability for his or her acts unless one of the exceptions in Ohio Rev. Code Ann. § 2744.03(A)(6) applies. Here, two of the exceptions are relevant.

Under the first relevant exception, an employee of a political subdivision is liable for his or her acts if "the acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities." Ohio Rev. Code. Ann. § 2744.03(A)(6)(a). "Scope of employment" in the statutory immunity context is based generally on agency law principles. *Chesher v. Neyer*, 477 F.3d 784, 800 (6th Cir. 2007) (citing *Martin v. Central Ohio Transit Authority*, 70 Ohio App. 3d 83, 92 (Ohio App. 10th Dist. 1990). The determinative factor is whether the conduct was "initially motivated by a desire to promote the master's business." *Id.* (quotation omitted). Even improper actions taken to further the master's business are within the scope of employment unless the actions are motivated by actual malice or other situations giving rise to punitive damages. *Id.* (quotation omitted).

Graziolli primarily argues that he must have been acting within the scope of his employment as a police officer because he was fulfilling his duty to preserve the peace when he broke up the street fight.[6] Doc #: 98 at 16.

This argument misses the point. The question here is whether Graziolli was acting within the scope of his employment as a police officer when he encountered Yatsko the third time in front of Corner Alley Uptown and subsequently shot Yatsko. As explained above, a reasonable jury could conclude that Graziolli was acting as a private security guard, not a police officer, when he encountered Yatsko in front of Corner Alley Uptown's patio. Thus, a reasonable jury could conclude that the first relevant exception to statutory immunity applies here.

Under the second relevant exception, an employee of a municipal subdivision is liable for his or her acts if "the employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner." Ohio Rev. Code Ann. §§ 2744.03(A)(6)(b). A public employee acts with malice purpose if he or she "willfully and intentionally acts with a purpose to cause harm." *Hidden Vill., LLC v. City of Lakewood*, 734 F.3d 519, 529 (6th Cir. 2013). Acting with "bad faith" means acting with a dishonest purpose or consciousness of the wrongdoing. *Cook v. City of Cincinnati*, 103 Ohio App. 3d 80, 90-91 (Ohio App. 1st Dist. 1995). Acting in a wanton manner means failing to exercise any care whatsoever. *Id.* at 91.

Here, Graziolli seeks immunity from Plaintiffs' state tort claims arising from Yatsko's shooting death. The relevant question is whether Graziolli's act of shooting Yatsko was with malicious purpose, in bad faith, or in a wanton or reckless manner. Plaintiffs do not claim that Graziolli encountered Yatsko with the intention to shoot him. Thus, Graziolli could not have

---

[6] Graziolli also asserts that the Court should not consider Plaintiffs' version of events because it is contradicted by the video camera footage. Doc #: 98 at 16. The Court concludes that Plaintiffs' version of events is not contrary to the video footage. The points of disagreement between Plaintiffs' and Defendant's version of events are not clearly resolved by the video footage.

acted with malice purpose or in bad faith. Further, Graziolli's act of shooting Yatsko was not reckless or wanton in manner. Graziolli made the decision during the fistfight that he had to shoot Yatsko. As explained above, the reasonableness of this decision is a question for the jury. But no jury could conclude that the decision to shoot a person in the middle of a fistfight where the person says that the shooter will have to kill him equates to the failure to exercise any care whatsoever.

Because a reasonable jury could conclude that Graziolli was acting outside the scope of his employment as a Cleveland Police Officer when he approached and shot Yatsko, Graziolli's Motion for Summary Judgement, **Doc #: 81**, is **DENIED** as it pertains to statutory immunity.

### b.  Assault and Battery (Claim Four)

Graziolli asserts that summary judgment should be granted on Plaintiffs' assault and battery claim. Doc #: 81 at 18. Assault and battery requires a plaintiff to prove that a defendant "unlawfully touched him with the intent of inflicting injury or creating the fear of injury." *Johari v. City of Columbus Police Dep't*, 186 F. Supp. 2d 821, 833 (S.D. Ohio 2002). If a plaintiff proves this, a defendant can avoid liability by establishing self-defense. *Niskanen v. Giant Eagle, Inc.*, 122 Ohio St. 3d 486, 491 (2009). To establish self-defense, a defendant must show:

> (1) that the defendant was not at fault in creating the situation giving rise to the affray; (2) that the defendant had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force; and (3) that the defendant did not violate any duty to retreat or avoid the danger."

*Id.* at 491-92.

Issues of material fact preclude the Court from granting summary judgement. As explained above, issues of material fact remain on the events that led up to Yatsko being shot. While these issues of material fact remain, the Court cannot decide whether Graziolli assaulted

and/or battered Yatsko or if Graziolli avoids liability under self-defense. Accordingly, Graziolli's Motion for Summary Judgement, **Doc #: 81**, is **DENIED** as it relates to Claim Four.

### c.  Negligence (Claim Five)

"To establish actionable negligence, one must show in addition to the existence of a duty, a breach of that duty and injury resulting proximately therefrom." *Mussivand v. David*, 45 Ohio St.3d 314, 318 (1989) (citation omitted). Liability for negligent actions is negated if the plaintiff assumed the risk. *Collier v. Northland Swim Club*, 35 Ohio App. 3d 35, 37 (Ohio App. 10th Dist. 1987). Under implied assumption of the risk, a defendant is not liable for their negligence if the plaintiff consents to or acquiesces in an appreciated, known or obvious risk to the plaintiff's safety. *Id.*

Graziolli requests summary judgement on Plaintiffs' negligence claim, asserting that there is no evidence that Graziolli owed a duty to Yatsko and that, even if a duty were found, Yatsko assumed the risk. Doc #: 81 at 23.

Plaintiffs argue that Graziolli owed Yatsko a duty because, as found in *Pusey v. Bator*, 94 Ohio St.3d 275 (2002), an armed security guard has a duty of care to trespassers. Doc #: 85 at 37. Plaintiffs also assert that Yatsko did not assume the risk of getting shot because he was shocked when Graziolli pulled his gun and had no reason to think that Graziolli would shoot. Doc #: 85 at 37.

Ohio law is unclear on when armed security guards owe a duty to individuals, but courts generally have implied that a duty does exist. *See Pusey*, 94 Ohio St.3d at 281 (finding that the owner of land can be vicariously liable for the acts of its armed security guards in shooting a trespasser); *Jones v. Wittenberg University*, 534 F.2d 1203, 1210 (6th Cir. 1976) (finding that issues of material fact remained on whether a fleeing individual assumed the risk of getting shot

by an armed security guard); *But see Dragich v. Taubman Co.*, 1996 Ohio App. LEXIS 5857, at 7 (Ohio App. 10th Dist. 1996) (granting summary judgment on a negligence claim where a security guard caused the plaintiff to fall because the plaintiff failed to present evidence of a duty).

Regardless of whether Graziolli owed a duty to Yatsko, Plaintiffs' negligence claim fails because Yatsko assumed the risk of getting shot. No Ohio Court has discussed whether a person assumes the risk of getting shot when he or she attacks a security guard who is pointing a gun at the person. However, courts have not foreclosed such a conclusion. In *Jones*, a security guard allegedly yelled for a fleeing individual to stop, fired a warning shot in the air and fired a second warning shot at the individual's feet. *Jones*, 534 F.2d at 1207. The second shot hit and killed the individual. *Id.* The court found that whether the individual assumed the risk of getting shot was for the jury to decide because the individual was not under arrest, the security guard's credibility and accuracy in reporting the events were issues for the jury to decide, and it was uncertain whether the individual could have anticipated actually getting hit by the warning shots. *Id.* at 1210.

Here, Yatsko assumed the risk of getting shot. Unlike *Jones*, the essential facts on assumption of risk are clearly shown in indisputable video evidence. Yatsko continued to attack Graziolli when Graziolli had his pistol pointed at Yatsko. Doc #: 85-21 at 22:45:47- 22:45:59. By continuing to attack Graziolli while a pistol was pointed at him, Yatsko acquiesced to the obvious risk of getting shot. No reasonable jury could conclude that Yatsko was not aware of the risk of getting shot when Graziolli had his pistol pointed at him. Accordingly, Yatsko assumed the risk and Graziolli cannot be liable for negligence. Thus, Graziolli's Motion for Summary Judgement, **Doc #: 81**, is **GRANTED** as to Claim Five.

### d.  Intentional Infliction of Emotional Distress (Claim Six)

The elements of intentional infliction of emotional distress ("IIED") are: (1) "that the actor intended to cause emotional distress or should have known actions taken would result in serious emotional distress to the plaintiff"; (2) "that the conduct was so extreme and outrageous as to go beyond all possible bounds of decency such that it can be considered as utterly intolerable in a civilized community"; (3) "that the actor's actions were the proximate cause of the plaintiff's psychic injury"; and (4) "that the mental anguish suffered by the plaintiff is serious and of a nature that no reasonable man could be expected to endure it." *Chisholm v. St. Mary City School District Board of Education*, 947 F.3d 342 (6th Cir. 2020).

Graziolli requests summary judgment on Plaintiffs' IIED claim, asserting that his actions were not extreme or outrageous. Doc #: 81 at 20. Graziolli asserts that his actions were not extreme or outrageous because Yatsko was punching Graziolli's head and face and Graziolli feared that if Yatsko would overpower him, Yatsko would take control of Graziolli's pistol and kill him. Doc #: 81 at 20.

The Court agrees.  There is no dispute that Graziolli was punched multiple times by Yatsko and sustained injuries including a possible concussion. There is also no dispute that, at a minimum, Yatsko said that Graziolli would have to kill him. As discussed above, a reasonable jury could disagree on whether shooting Yatsko was reasonable. But no reasonable jury could conclude that shooting an individual in these circumstances is so extreme or outrageous as to go beyond all possible bounds of decency such that it can be considered as utterly intolerable in a civilized community.  *See Davis v. City of* Detroit, Civil Action No. 05-CV-72669, 2006 U.S. Dist. LEXIS 78912, at *28 (E.D. Mich. Oct. 19, 2006) (finding that an officer's act of shooting

what appeared to be a fleeing felon at night is not outrageous). Thus, Graziolli's Motion for Summary Judgement, **Doc #: 81**, is **GRANTED** as it relates to Claim Six.

### e.  Wrongful Death (Claim Nine)

Graziolli seeks summary judgement on Plaintiffs' wrongful death claim, asserting that because summary judgement should be granted on claims Four, Five, and Six, there is no predicate acts or omissions for the wrongful death claim. Because the Court finds that Claim Four may proceed, there remain predicate acts and omissions for Plaintiffs' wrongful death claim. *See Woodcock v. City of Bowling Green*, 679 F. App'x 419, 426 (6th Cir. 2017). Accordingly, Graziolli's Motion for Summary Judgement, **Doc #: 81**, is **DENIED** as to Claim Nine.

### 2.  The City of Cleveland (Claim Nine)

Plaintiffs concede that summary judgment should be granted for the City of Cleveland on Claim Nine. Doc #: 85 at 69. Accordingly, the City of Cleveland's Motion for Summary Judgement, **Doc #: 66**, is **GRANTED** as to Claim Nine.

### 3.  Corner Alley and The Corporate Defendants

Plaintiffs claim that Corner Alley and the Corporate Defendants are vicariously liable for Claims Four, Five, Six, and Nine. Doc #: 48 at 14-23. Plaintiffs further claim that Corner Alley and the Corporate Defendants are directly liable under premises liability (Claim Seven) and negligent/reckless hiring, retention and/or supervision (Claim Eight). Doc #: 48 at 18-22. Corner Alley and the Corporate Defendants move for summary judgment on these claims.

### a.  Vicarious Liability Claims (Claims Four, Five, Six, & Nine)

Corner Alley and the Corporate Defendants assert four reasons why summary judgement should be granted on the vicarious liability claims against them. These are: (i) Graziolli was not

an employee; (ii) Graziolli was not the Corporate Defendants' independent contractor (iii) No exception to the independent contractor rule on vicarious liability applies; and (iv) Graziolli acted as a police officer when he encountered Yatsko.

### i. Employment Status

Employment status for purposes of vicarious liability turns on whether the employer reserves the right to control the manner or means of doing the work. *Bostic v. Connor*, 37 Ohio St. 3d 144, 146 (1988). In making this determination, courts consider factors including:

> [W]ho controls the details and quality of the work; who controls the hours worked; who selects the materials, tools and personnel used; who selects the routes traveled; the length of employment; the type of business; the method of payment; and any pertinent agreements or contracts.

*Id.*

Here, there is no indicia of an employer-employee relationship. There is no evidence that Corner Alley or the Corporate Defendants ever so much as communicated with Graziolli. Neither Defendant provided Graziolli any instruction on what to do or what tools to use. Further still, neither defendant directly hired or payed Graziolli. Zarlenga was given the power to select which off-duty officers to schedule and paid those officers with the cash given to him by Seeholzer.

Neither of Plaintiffs' two developed arguments persuade the Court otherwise. Plaintiffs first argue that because Corner Alley Uptown provided workers' compensation to Graziolli, Graziolli must be an employee. In support of this argument, Plaintiffs cite *John Walters v. Americab* for the proposition that an employer-employee relationship is required for workers' compensation eligibility. Doc #: 85 at 51 citing 118 Ohio App.3d 180, 182 (Ohio App. 8th Dist. 1977). But Ohio's workers' compensation law does not use the common law test to determine employment status. *Hartings v. Nat'l Mut. Ins. Co.*, Case No. 10-13-11, 2014 Ohio App. LEXIS 1757, at 28 (Ohio App. 3d Dist. 2014). Instead, who is an "employee" for purposes of workers'

compensation is determined by Ohio Rev. Code Ann. 4123.01(A)(1). Thus, whether Graziolli

was eligible to receive workers' compensation benefits by Corner Alley Uptown has no bearing

on whether Graziolli was an employee for purposes of vicarious liability.

Second, Plaintiffs assert that a question of fact remains because there is no evidence that

Corner Alley and the Corporate Defendants did not reserve the right to control Graziolli's

manner and means of doing the work. Doc #: 85 at 52. But it is undisputed that Graziolli began

working at the Corner Alley Uptown without any communication from Corner Alley or the

Corporate Defendants. In doing so, Graziolli could have only begun working with the

understanding that he controlled the manner and means of doing the work.

Accordingly, the undisputed facts show that Corner Alley and the Corporate Defendants

did not reserve the right to control the manner or means of doing the work. Thus, Graziolli was

an independent contractor.

### ii. Graziolli's Employment by the Corporate Defendants

The Corporate Defendants also claim that Graziolli was not their independent contractor.

Doc #: 99 at 8. In support of this argument, the Corporate Defendants merely assert that Graziolli

did not provide his services to any location owned, operated, or controlled by the Corporate

Defendants. Doc #: 99 at 8. As an initial matter, the record is not clear on whether the Corporate

Defendants operated or controlled Corner Alley Uptown. Further, which defendant employs

Seeholzer and Maron, who indirectly hired Graziolli through Zarlenga, is unclear. Thus, issues of

material fact remain on whether Graziolli was the Corporate Defendants' independent contractor.

### iii. Liability for Independent Contractor's Acts

Generally, an employer is not vicariously liable for the acts of its independent contractor.

However, under the inherently hazardous work exception, an employer is vicariously liable for

the acts of its independent contractor when the work involves a high risk of physical harm to others, which is recognizable in advance and is inherent in the work itself. *Pusey v. Bator*, 94 Ohio St. 3d 275, 279-80 (2002). "The work must create a risk that is not a normal, routine matter of customary human activity, such as driving an automobile, but is rather a special danger to those in the vicinity arising out of the particular situation created, and calling for special precautions." *Id.* at 280.

Plaintiffs assert that *Pusey* shows as a matter of law that being an armed guard is an inherently hazardous activity. Doc #: 85 at 56-58. Corner Alley argues that *Pusey* does not apply because the court's holding was limited to hiring guards for the protection of property. Doc #: 97 at 3. Additionally, Corner Alley argues that the inherently hazardous work exception does not apply because there is no evidence that Corner Alley should have been aware of a likely risk that a police officer would use excessive force. Doc #: 97 at 4.

The Court agrees with Plaintiffs. In *Pusey*, a company hired security guards to guard its property and deter thieves and vandals. *Pusey*, 94 Ohio St. 3d at 276. One evening, a guard shot and killed an intruder. *Id.* at 277-78. The Court determined that the work of being an armed guard was inherently dangerous because the guards were instructed to deter thieves and vandals as opposed to merely conduct surveillance. *Id.* at 281. Thus, *Pusey* stands for the proposition that the work of an armed security guard who is expected to encounter potentially violent situations is inherently dangerous.

Here, Graziolli was hired to be a security guard at Corner Alley Uptown. He performed this function while being armed. The hours that security guards were at Corner Alley Uptown were extended after a fight occurred at the location. Viewing the evidence in a light most favorable to the nonmoving party, a reasonable jury could conclude that Graziolli was an armed

28

security guard who was expected to encounter potentially violent situations. That he was an off-duty police officer is irrelevant. Thus, for purposes of summary judgement, his work was inherently dangerous and the inherently dangerous work exception applies.

### iv. Acting as a Police Officer

A company employing an off-duty officer is not vicariously liable for the actions of its employees when the employee is acting solely as a police officer. *Evans v. Smith*, 646 N.E.2d 217, 221 (1st Dist. 1994). However, a company is vicariously liable for the actions of an employee acting in a dual capacity of employee and police officer when the acts are outside the public duties of a police officer and within the scope of his employment and solely for the benefit of his employer or the act was authorized or ratified by the employer. *Id.* at 222-23.

Corner Alley asserts that Graziolli was acting solely as a police officer during all of his encounters with Yatsko. Doc #: 73 at 13. As an initial matter, the only relevant time here is when Graziolli encountered Yatsko in front of Corner Alley Uptown and subsequently shot Yatsko. As already explained above, a reasonable jury could conclude that Graziolli encountered Yatsko to preserve the peace (a public function), to prevent Yatsko from reentering Corner Alley Uptown (a private function), or both. Thus, a reasonable jury could conclude that Graziolli was acting outside of his public duties, within the scope of his employment as a security guard, and solely for the benefit of Corner Alley Uptown.

In conclusion, the Court finds that Corner Alley and the Corporate Defendants are not entitled to summary judgement on the issue of vicarious liability because (1) Graziolli was an independent contractor, (2) the hazardous work exception to the independent contractor vicarious liability rule applies, (3) issues of fact remain on whether Graziolli was the Corporate Defendant's independent contractor, and (4) a reasonable jury could conclude that Graziolli was

acting outside his public duties and solely for the benefit of Corner Alley Uptown. Thus, Corner Alley's and the Corporate Defendants' Motions for Summary Judgement, **Docs ##: 73, 79**, are **DENIED** as they pertain to Claims Four and Nine.[7]

### b.  Direct Liability Claims (Claims Seven & Eight)

Plaintiffs raise two direct liability claims against Corner Alley and the Corporate Defendants: (i) premises liability (Claim Seven) and (ii) negligent/reckless hiring, retention and/or supervision (Claim Eight). Doc #: 48 at 19-22. Corner Alley and the Corporate Defendants move for summary judgment on both claims.

### i.  Premises Liability (Claim Seven)

To establish negligence in premises liability, the plaintiff must show the existence of a duty, a breach of that duty, and an injury proximately resulting from the breach of duty. *Armstrong v. Best Buy Co.*, 99 Ohio St. 3d 79, 81 (2003). A party that does not control the subject premises owes no duty under premises liability. *See Fryberger v. Lake Cable Rec. Ass'n*, 533 N.E.2d 738, 741 (1988).

Despite broadly asserting that it is entitled to summary judgement, Corner Alley's initial motion makes no argument that this Court can construe as applying to Plaintiffs' premises liability claim. Thus, Corner Alley waived arguing for summary judgment on the premises liability claim. *See Kuhn*, 709 F.3d at 624.

The Corporate Defendants assert that they are entitled to summary judgement because there is no evidence that they ever controlled the subject premises. Doc #: 79 at 11. In support, the Corporate Defendants point to an affidavit of Geoffrey S. Goss. Doc #: 79 at 11. Goss explains that MRN Limited Partnership never had an ownership interest in Corner Alley and

---

[7] Because this court determined that Graziolli is not liable for negligence and IIED (Claims Five and Six), Corner Alley and the Corporate Defendants cannot be vicariously liable for negligence.

"never provided any support or direction regarding the operation of Corner Alley Uptown." Doc #: 79-4 at 1.

But Plaintiffs have established an issue of material fact over what control the Corporate Defendants exerted over Corner Alley Uptown. While Goss asserts MRN Limited Partnership did not support or direct Corner Alley Uptown, Goss does not speak to whether 629 Euclid Ltd. controlled Corner Alley Uptown. Furthermore, which corporation authorized the hiring of and actually hired Graziolli is in dispute. These issues of material fact preclude the grant of summary judgement. Accordingly, Corner Alley's and the Corporate Defendants' Motions for Summary Judgment, **Docs ##: 73, 79**, are **DENIED** as they relate to Plaintiffs' premises liability claim.

### ii. Negligent Hiring, Retention, and/or Supervision (Claim Eight)

The elements of negligent hiring, retention, and supervision are: (1) the existence of an employment relationship; (2) the employee's incompetence; (3) the employer's actual or constructive knowledge of such incompetence; (4) the employee's act or omission causing the plaintiff's injuries; and (5) the employer's negligence in hiring or retaining, training or supervising the employee as the proximate cause of Plaintiffs injuries. *LaMusga v. Summit Square Rehab, LLC*, 94 N.E.3d 1137, 1144 (Ohio App. 2d Dist. 2017).

The Corporate Defendants move for summary judgement claiming that a negligent hiring, retention, and supervision claim is inapplicable because Graziolli was an independent contractor. Doc #: 79 at 13-14. But the Corporate Defendants are wrong. Most Ohio cases correctly find that "one is liable for its own negligence in engaging or retaining an incompetent or careless independent contractor." *Leach v. Newport Yellow Cab, Inc.*, 628 F. Supp. 293, 299 (N.D. Ohio 1985) *citing Mooney v. Stainless, Inc.*, 338 F.2d 127, 131 (6th Cir. 1964); *Evans v. Akron Gen. Med. Ctr.*, 2018 Ohio App. LEXIS 3272, at *28 (Ohio App. 9th Dist. 2018).

Both Corner Alley and the Corporate Defendants move for summary judgement because they did not have actual or constructive knowledge of Graziolli's alleged incompetency. Doc #: 97 at 13; 79 at 15. "Constructive knowledge means knowledge that one using reasonable care or diligence should have, and therefore is attributable to a given person." *State v.* Barry, 145 Ohio St.3d 354, 360 (2015) (quotation omitted).

Plaintiffs assert that Corner Alley and the Corporate Defendants had constructive knowledge of Graziolli's incompetency because they paid no attention to the DOJ investigation, did not seek out information concerning excessive force by Cleveland police officers, and did no background checks on Graziolli before hiring him. Doc #: 85 at 48.

The Court agrees with Corner Alley and the Corporate Defendants. Corner Alley and the Corporate Defendants could not have known that Graziolli was incompetent in such a way that would lead to Yatsko's shooting death. As explained above, the DOJ Report is not probative on whether Corner Alley or the Corporate Defendants would be on notice that Graziolli was likely to use excessive force as a private security guard in 2018.

Rather, only a personal history of using excessive force would have shown that Graziolli was incompetent in such a way. Graziolli had not previously discharged his pistol within his 27-year career. And Graziolli's disciplinary history consists of a physical altercation in 2004, failure to complete use of force investigations, and tampering with records. Docs ##: 85-4, 84-7, 85-8, 85-10. These facts would not cause a person exercising reasonable care to believe that Graziolli was incompetent in such a way that would cause him to shoot Yatsko

Thus, Corner Alley's and the Corporate Defendants' Motions for Summary Judgement, **Docs ##: 73, 79**, are **GRANTED** as they relate to Plaintiffs' negligent hiring, retention, and/or supervision claim.

32

### IV.    Conclusion

For the above reasons, Graziolli's Motion for Summary Judgement, **Doc #: 81**, is **GRANTED IN PART** and **DENIED IN PART**; The City of Cleveland's Motion for Summary Judgement, **Doc #: 66**, is **GRANTED**; Corner Alley's Motion for Summary Judgement, **Doc #: 73** is **GRANTED IN PART** and **DENIED IN PART**; and the Corporate Defendants' Motion for Summary Judgement, **Doc #: 79**, is **GRANTED IN PART** and **DENIED IN PART**.

**IT IS SO ORDERED.**

_/s/Dan Aaron Polster May 1, 2020_
**DAN AARON POLSTER**
**UNITED STATES DISTRICT COURT**